In re TOY KING DISTRIBUTORS,
INC., Debtor.

Official Committee of Unsecured Credi-
tors of Toy King Distributors, Inc.
Plaintiff,

v.

Liberty Savings Bank, FSB,
et al., Defendants.

Bankruptcy No. 90–00528–BKC–6C1.
Adversary No. 91–022.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Nov. 9, 2000.

David D. MacKnight, Lacy, Katzen, Ryan & Mittleman, LLP, Rochester, NY, Kenneth D. Herron, Jr., Wolff, Hill, McFarlin & Herron, P.A., Orlando, FL, for Plaintiff.

Thomas C. James, III, James, Bates, Pope & Spivey, LLP, Macon, GA, for Liberty Savings Bank, FSB.

Kenneth L. Mann, Kenneth L. Mann, P.A., Orlando, FL, for Liberty Savings Bank, FSB.

J.D. Humphries, III, Stites & Harbison, Atlanta, GA, for Don S. Morrow, Michael Angle, Robert King, Jerome Hunsaker, II, Jerome Hunsaker, III, Melanie Ranney, T.K. Acquisitions, Inc., and M & D Financial, Inc.

Kirk W. Watkins, Womble, Carlyle, Sandridge & Rice, PLLC, Atlanta, GA, for Constance Woodward.

### MEMORANDUM OF DECISION

C. TIMOTHY CORCORAN, III,
Bankruptcy Judge.

This adversary proceeding represents convoluted and complicated disputes between a failed toy retailer, Toy King Distributors, Inc. ("Debtor" or "Toy King"), on the one hand, and the retailer's insiders, co-guarantors, and a bank, on the other hand. It involves events occurring over the retailer's two bankruptcy cases. This retailer failed promptly after confirming a Chapter 11 plan of reorganization in the first case. The confirmed Chapter 11 plan in the second case involved liquidating the retailer. In the liquidation, the unsecured creditors received nothing whatsoever.

The court authorized the official committee of unsecured creditors in the second Chapter 11 case to pursue this adversary proceeding. In the proceeding, the committee seeks to recover against the debtor's insiders, co-guarantors, and principal lender, thereby ensuring some recovery for the creditors. Although the committee has not proven all of its claims, the court concludes that the committee has established entitlement to recover $2,903,844.00.

I. *TABLE OF CONTENTS.*

| | | |
|---|---|---|
| I. | TABLE OF CONTENTS | 29 |
| II. | INTRODUCTION | 34 |
| III. | JURISDICTION | 35 |
| IV. | GENERAL FACTS OF THE CASE | 35 |
| | A. BACKGROUND | 35 |
| | B. MORROW LOOKS AT TOY KING | 36 |
| | C. T.K. ACQUISITIONS ACQUIRES TOY KING | 37 |
| | D. THE TOY KING I CASE | 37 |
| | 1. Toy King files bankruptcy | 37 |
| | 2. The First Union claims | 39 |
| | 3. The Touche Ross pro forma | 41 |
| | 4. The Liberty loan | 42 |
| | 5. The C & S line of credit | 48 |

 6. Confirmation of Toy King I ........................................... 49
E. POST–CONFIRMATION EVENTS ..................................... 50
 1. Another draw on the C & S line of credit .............................. 50
 2. The Touche Ross pro forma is finalized ............................... 50
 3. Liberty waives the requirement to obtain a Touche Ross opinion letter.... 51
 4. The debtor does not have $2 million in equity following the Toy King I confirmation ...................................................... 52
 5. The Liberty loan closes ............................................. 54
F. TOY KING'S FINANCIAL CONDITION ............................... 57
 1. Immediate borrowings .............................................. 57
 2. Balance sheets .................................................... 57
 3. Asset valuation .................................................... 58
 4. Toy King is insolvent .............................................. 60
 5. Inventory reports .................................................. 62
G. OTHER POST–CONFIRMATION DEVELOPMENTS ..................... 62
 1. The Liberty credit line is exhausted ................................. 62
 2. The C & S line is drawn again ...................................... 63
 3. Toy King makes plan payments to creditors .......................... 64
 4. Trade credit is king ............................................... 66
 5. The Nintendo loan ................................................ 68
H. THE FINAL CHAPTER .............................................. 71
 1. Christmas is no help .............................................. 71
 2. Preparing for the inevitable ........................................ 77
 3. VMI makes an offer ............................................... 78
I. THE TOY KING II CASE ........................................... 79
 1. The trade creditors file an involuntary Chapter 7 petition ............... 79
 2. Closing the Toy King I case ......................................... 81
 3. Toy King II becomes a Chapter 11 case .............................. 81
V. CONSIDERATION OF INDIVIDUAL CLAIMS AND MORE SPECIFIC FACTS ............................................................... 83
A. INTRODUCTION .................................................... 83
B. THRESHOLD LEGAL ISSUES ....................................... 84
 1. What is the effect of the commitment letter as included in the order of confirmation in Toy King I? ......................................... 84
 2. Is the debtor the obligor or a guarantor on the Liberty loan? ............ 86
C. PREFERENCE CLAIMS ............................................. 89
 1. Introduction ...................................................... 89
 2. Payments by the debtor to TKA made during the 90 days immediately before the filing of Toy King II ..................................... 89
 a. Introduction .................................................. 89
 b. Do the payments to TKA constitute transfers? ..................... 90
 c. Was each transfer to or for the benefit of a creditor? ................ 90
 d. Were the transfers for or on account of an antecedent debt? .......... 90
 e. Was the debtor insolvent at the time of the transfers? ............... 91
 i. Presumption of insolvency .................................... 91
 ii. Liquidation valuation test ..................................... 92
 iii. Going concern valuation test .................................. 93
 f. Did the transfers occur on or within 90 days of the filing of the petition? ..................................................... 94
 g. Did TKA receive more than it would have received in a Chapter 7 liquidation? ................................................. 95
 i. Secured claims or unsecured claims? ........................... 95
 ii. Liquidation scenario ......................................... 96
 h. Summary for transfers to TKA during the 90–day preference period. ..................................................... 96
 3. Payments by the debtor to TKA made between 90 days before the commencement of Toy King II and the date of confirmation of Toy King I ............................................................ 97
 a. Introduction .................................................. 97
 b. Was TKA an insider of the debtor? ............................. 97
 c. Was the debtor insolvent at the time of the transfers? ............... 98

 i. Introduction .............................................. 98
 ii. Going concern valuation test ................................ 98
 iii. Retrojection analysis ...................................... 99
 d. Summary for transfers to TKA during the insider preference period ................................................ 100
4. Payment by the debtor to M & D made during the 90 days immediately before the filing of Toy King II ................................... 100
 a. Introduction .............................................. 100
 b. Does the payment constitute a transfer of the debtor's property? ... 102
 i. Whose money was it? ...................................... 102
 ii. Conversion vs. a new filing ................................. 103
 iii. National bankruptcy policy ................................. 104
 c. Was the transfer to or for the benefit of a creditor? ................. 106
 d. Was the transfer for or on account of an antecedent debt? ........... 106
 e. Was the debtor insolvent at the time of the transfer? ............... 106
 f. Did the transfer occur on or within 90 days of the filing of the petition? ................................................ 106
 g. Did M & D receive more than it would have received in a Chapter 7 liquidation? ............................................ 106
 h. Summary for transfer to M & D during the 90–day preference period ................................................ 107
5. Recording of UCC–1 financing statements by Liberty during the 90 days immediately before the filing of Toy King II ................... 107
 a. Introduction .............................................. 107
 b. Does the re-filing of UCC–1 financing statements that specify proceeds for the first time constitute transfers? .................. 107
 c. Does the filing of UCC–1 financing statements more than 30 days after inventory has been moved constitute transfers? ............. 109
 d. Summary for recording of UCC–1 financing statements by Liberty during the 90–day preference period ........................... 110
6. Execution of amended security agreement by the debtor to Liberty between 90 days before the commencement of Toy King II and the date of confirmation of Toy King I ................................. 111
 a. Introduction .............................................. 111
 b. Was Liberty an insider of the debtor? ........................... 111
 c. Summary for the execution of the amended security agreement during the insider preference period ........................... 112
7. Ordinary course of business affirmative defenses to preference claims ... 112
 a. Introduction .............................................. 112
 b. Were the debts incurred in the ordinary course of both the debtor's and the creditor's businesses? ................................ 114
 i. Debts to TKA ........................................... 114
 (1) Introduction ........................................ 114
 (2) The Liberty loan .................................... 114
 (3) The C & S line of credit .............................. 116
 (4) The Nintendo loan ................................... 117
 (5) The guaranty fees for the C & S line of credit .............. 118
 (6) Summary for whether debts to TKA were incurred in the ordinary course of business ........................... 118
 ii. Debt to M & D .......................................... 118
 c. Were the payments made in the ordinary course of the businesses of both the debtor and the creditors? ........................... 120
 i. Introduction ............................................ 120
 ii. Payments to TKA ....................................... 120
 (1) Introduction ........................................ 120
 (2) Payments of interest ................................. 121
 (3) Payments of guaranty fees ............................. 121
 (4) Payments of principal ................................ 121
 iii. Payment to M & D ...................................... 123
 d. Were the payments made in accordance with ordinary business terms? ................................................ 125

 i. Introduction .............................................. 125
 ii. Payments to TKA ........................................ 126
 iii. Payment to M & D ...................................... 126
 e. Summary for the ordinary course of business affirmative defenses... 126
D. FRAUDULENT TRANSFER CLAIMS ................................ 126
 1. Transfers by the debtor to TKA and M & D made between the
 confirmation of Toy King I and the commencement of Toy King II ... 126
 2. Actual fraud ............................................... 127
 a. Badges of fraud ........................................ 127
 i. Introduction ....................................... 127
 ii. Transfers to insiders ............................... 128
 iii. Concealment of transfers........................... 129
 (1) Collective action ................................ 129
 (2) During Toy King I .............................. 130
 (3) Touche Ross pro forma......................... 130
 (4) Financial statements ........................... 131
 (5) First Union claims ............................. 132
 (6) December transfers............................. 132
 (7) Conclusion..................................... 133
 iv. Transfers for less than reasonably equivalent value ............. 133
 (1) Alternative approaches ................................. 133
 (2) Payments to TKA and M & D of principal ................. 134
 (3) Payment to TKA of loan fees and expenses ............... 135
 (4) Payments to TKA and M & D of interest .................. 135
 (5) Payments to TKA of guaranty fees on the C & S line of
 credit .............................................. 138
 (6) Summary....................................... 139
 v. Insolvency at the time of the transfers ....................... 139
 vi. Summary ......................................... 139
 b. Subjective evaluation of the debtor's motive....................... 139
 c. Conclusion ............................................ 141
 3. Constructive fraud ......................................... 141
 a. Introduction ........................................... 141
 b. Unreasonably small capital ............................... 142
 c. Summary .............................................. 143
 4. Summary ................................................. 143
E. LIABILITY OF TRANSFEREES OF AVOIDED TRANSFERS ........... 143
 1. Introduction .............................................. 143
 2. Who are the initial transferees?................................ 144
 a. The conduit theory ...................................... 144
 b. Who is a conduit? ....................................... 145
 c. Equitable considerations .................................. 147
 d. Conclusion ............................................ 148
 3. Who are the beneficiaries or immediate transferees of the transfers?... 148
 4. Liberty's "good faith" defense to transferee liability .................... 148
 a. Introduction ........................................... 148
 b. Was Liberty a transferee who took for value, in good faith, and
 without knowledge of the voidability of the transfers? ............. 149
 i. Introduction ....................................... 149
 ii. For value ......................................... 149
 iii. Good faith ........................................ 149
 iv. Without knowledge of voidability ............................ 152
 c. Conclusion ............................................ 153
 5. Summary ................................................. 153
 6. Liability under Florida law..................................... 154
F. OTHER STATE LAW CLAIMS .................................... 156
 1. Introduction: Section 544 .................................... 156
 2. Breach of the Toy King I confirmed plan........................... 156
 a. Introduction ........................................... 156
 b. Did Liberty breach the confirmed plan? ......................... 157
 i. Introduction ....................................... 157

 ii. Making the Liberty loan .......................................... 157
 iii. Making the Nintendo loan ..................................... 160
 iv. Conclusion ....................................................... 160
 c. Did TKA breach the confirmed plan? ............................ 160
 i. Introduction ..................................................... 160
 ii. Failing to make a $1 million capital contribution ............... 160
 iii. Charging fees and costs on the Liberty loan .................... 162
 iv. Charging interest upcharges and guaranty fees ................. 162
 v. Conclusion ....................................................... 163
 d. Did M & D breach the confirmed plan? ........................... 164
 e. Summary ........................................................... 164
 3. Payment of dividends by an insolvent corporation ...................... 164
 4. Breach of fiduciary duties ........................................... 165
 a. Introduction ...................................................... 165
 b. Woodward, Hunsaker II, Hunsaker III, and Ranney ............... 165
 c. Morrow, Angle, and King ......................................... 165
 i. Introduction ..................................................... 165
 ii. The duties of care and loyalty ................................. 166
 iii. The business judgment rule ..................................... 168
 iv. Did they breach their duties of care? .......................... 168
 (1) Introduction .............................................. 168
 (2) Causing Toy King to make impermissible dividend distributions or fraudulent financial transactions .............. 169
 (3) Failing to make the $500,000 capital contribution ........... 169
 v. Did they breach their duties of loyalty? ........................ 170
 (1) Introduction .............................................. 170
 (2) Acquiring the First Union claims .......................... 171
 (3) Inapplicability of the business judgment rule ................ 173
 (4) The Toy King I confirmation order does not insulate the First Union transaction ................................. 174
 (5) Other transfers to Morrow, Angle, and King ................ 175
 d. Summary .......................................................... 177
 5. Aiding and abetting the breaches of fiduciary duties ................... 178
 6. Discharge of Toy King's guaranty of TKA's Liberty loan ............... 179
 7. Toy King's right of contribution from its co-guarantors ............... 181
 8. Toy King's right of subrogation against Liberty ...................... 183
 9. Claims for Toy King's payment of rent and prepetition salary .......... 184
 10. Summary ............................................................ 184
G. POST–PETITION CLAIM FOR EXCESS SALARY ...................... 185
 1. Introduction ........................................................ 185
 2. Toy King's payment of salary to Morrow during Toy King II in excess of approved amounts ........................................ 185
H. THE SECURED STATUS OF LIBERTY'S CLAIM AND THE AMOUNTS TO WHICH LIBERTY IS ENTITLED TO BE PAID ON ITS SECURED CLAIM ................................................. 186
 1. Introduction ........................................................ 186
 2. Determining the secured status of Liberty's claim .................... 187
 3. Does Liberty have a perfected security interest in all of Toy King's inventory? ....................................................... 187
 a. Inventory in Pennsylvania and Maryland ........................ 187
 b. Inventory in Mississippi .......................................... 187
 i. Effect of the bankruptcy filing when a financing statement was not filed in Mississippi ................................. 187
 ii. Who has priority if the perfection lapses? The debtor or the secured party, Liberty? ..................................... 189
 iii. Conclusion ..................................................... 189
 4. What is the value of Liberty's collateral? ............................ 190
 5. Is Liberty entitled to interest as an oversecured creditor? ............ 192
 6. Is Liberty entitled to attorney's fees as an oversecured creditor? ..... 192
 7. May the debtor surcharge Liberty? ................................. 193
 8. Summary ............................................................ 194

I. EQUITABLE SUBORDINATION ....................................... 194
 1. Introduction ............................................. 194
 2. Equitable subordination theory: a higher standard to subordinate non-insiders and non-fiduciaries ....................................... 195
 3. The claim against Liberty ................................ 197
 4. The claims against TKA and M & D ......................... 198
 a. Introduction ........................................ 198
 b. Inequitable conduct ................................. 198
 c. Resulting harm or unfair advantage .................. 201
 d. Consistency with the provisions of the Bankruptcy Code ............. 202
 e. Conclusion ......................................... 203
 5. The claims against the individual defendants ............. 203
 a. King ............................................... 203
 i. Inequitable conduct ........................... 203
 ii. Resulting harm or unfair advantage ............ 203
 iii. Consistency with the provisions of the Bankruptcy Code ........ 204
 iv. Conclusion .................................... 204
 b. Morrow, Angle, Woodward, Hunsaker II, Hunsaker III, and Ranney ............................................... 204
 6. Summary ................................................. 205
 7. The appropriate remedy .................................. 205
J. THE PLAINTIFF'S RECOVERIES .................................. 207
 1. Introduction ............................................ 207
 2. Summary of plaintiff's recoveries ....................... 207
 3. Summary of judgment provisions .......................... 208
 4. Allowance of costs to the plaintiff as prevailing party .................. 210
VI. CONCLUSION ................................................... 211

## II. *INTRODUCTION.*

The debtor first filed for relief under Chapter 11 of the Bankruptcy Code on July 6, 1988, Case No. 88–1663 ("Toy King I"). Toy King I ultimately resulted in the confirmation of a plan on May 23, 1989. The plan provided for a pro rata distribution to unsecured creditors, most of whom were toy manufacturers. The only shareholder of the reorganized debtor was the corporate parent of the debtor, T.K. Acquisitions, Inc. ("TKA"). The debtor funded the plan with monies borrowed by TKA from Liberty Savings Bank, F.S.B. ("Liberty"). Liberty also loaned monies on a line of credit to TKA which, in turn, made the funds available to the debtor for its operations. Liberty secured its loans by a lien on Toy King's inventory and other collateral.

The reorganized debtor continued in business, closing some stores and opening others, but operated at a loss through 1989. Toy King was therefore unable to continue as a viable entity. Creditors of the company filed an involuntary Chapter 7 bankruptcy petition on February 12, 1990, Case No. 90–528 ("Toy King II"), the case in which this adversary proceeding is brought. The court converted the case to a case under Chapter 11 and ultimately confirmed a liquidating plan. In the liquidation, Liberty received full payment for its secured claim. The unsecured creditors, however, most of which were also unsecured creditors in Toy King I, received no dividend in the liquidation.

As part of the confirmed liquidating plan, the court authorized the Official Committee of Unsecured Creditors ("creditors committee") to prosecute the debtor's claims against entities and persons involved with the debtor. Accordingly, the creditors committee filed this adversary proceeding against Liberty Savings Bank, F.S.B. ("Liberty"), T.K. Acquisitions, Inc. ("TKA"), Don S. Morrow ("Morrow"), Michael Angle ("Angle"), M & D Financial, Inc. ("M & D"), Robert King ("King"), Constance L. Woodward ("Woodward"), Jerome Hunsaker II ("Hunsaker II"), Jerome Hunsaker III ("Hunsaker III"), and

Melanie Ranney ("Ranney"). Drawn in 16 counts, the complaint seeks to recover monies for the benefit of the estate from the defendants on various theories, including preferences, fraudulent transfers, equitable subordination, and various state law claims, including breach of the confirmed plan in Toy King I and breach of fiduciary duties.

After the filing of this adversary proceeding, the creditors committee also filed an objection to the claim of Liberty Savings Bank (Main Case Document No. 338). On June 7, 1991, the court entered a stipulated order (Main Case Document No. 343) consolidating the objection to claim with this adversary proceeding.

The defendants, other than Liberty, filed an answer that included affirmative defenses and counterclaims. Liberty also filed an answer and counterclaim. The individual defendants abandoned some counterclaims in the pretrial stipulation (Document No. 43). In its final pretrial order (Document No. 59), the court dismissed all remaining counterclaims raised by both the individual defendants and Liberty for reasons stated orally and recorded in open court. In the final pretrial order, the court also narrowed the issues for trial to those as described in the pretrial stipulation (Document No. 43).[1]

The trial on these issues occurred over 17 days during a period of more than seven months. The evidence included the testimony of 14 witnesses and the utilization of more than 20 volumes of documents. After considering all of the testimony, particularly the demeanor and credibility of the witnesses, the exhibits admitted at trial, pleadings and stipulations filed by the parties, and oral and written arguments of counsel, including the authorities cited by the parties, the court determines, by a preponderance of the evidence, the facts and issues as more specifically delineated below as required by F.R.B.P. 7052.

This is a lengthy decision. Much of the financial and other factual detail is set forth in the notes. Because the notes themselves are lengthy, the court has prepared the notes as endnotes rather than as footnotes. These notes, of course, are an integral part of the decision.

## III. *JURISDICTION.*

The court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the standing order of reference entered by the district court. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b), and the parties have consented to the entry of final orders and judgment by this court subject, of course, to appellate review under 28 U.S.C. § 158.

## IV. *GENERAL FACTS OF THE CASE.*

### A. *BACKGROUND.*

Sam Levy incorporated Toy King Distributors, Inc., in Florida in 1959. He was the principal shareholder. Toy King's primary business was the sale of toys at retail through leased space in shopping centers. The company's headquarters and distribution warehouse were in Orlando, Florida. Its retail stores were in several states.

Between 1984 and 1986, the company grew rapidly from 34 stores to 62 stores located primarily in the Southeast. In addition to the retail sale of toys, Toy King expanded its business to include the sale of children's apparel. The company also acquired a fleet of trucks and undertook the transport of its goods throughout the

---

1. In some cases, the parties did not identify with precision in the pretrial stipulation each of the claims and defenses. In some cases, the parties made vague or passing reference to a claim or defense in their respective statements of the case and then proceeded to join issue and try those claims and defenses. Because the statements of the parties' cases are contained in the pretrial stipulation, the court will also determine here the claims and defenses of this sort that the parties actually tried. *See* F.R.B.P. 7015 and F.R.Civ.P. 15(b).

Southeast from its warehouse facility in Orlando. The company initially received inventory at this warehouse and, from there, distributed it to the various stores. Inventory for new stores was specially segregated in the warehouse.

By the end of 1986, largely due to its rapid expansion, Toy King was experiencing chronic business problems. The company posted a loss of $965,919 at the end of its 1986 fiscal year.[2] At the same time, Mr. Levy's health was failing. Mr. Levy died in early 1987. His estate owned approximately 75 percent of the debtor's stock, and family litigation ensued with respect to the ownership of the company.

In an effort to resurrect the troubled business, the estate's executor hired Robert O. King as president of Toy King that same year. King was well known in the trade, having been chief toy buyer and marketing man for A.M. Best for more than ten years.[3] King had developed, and continued to have, a good working relationship with many of the toy manufacturers' credit managers. King had no prior relationship with Toy King.

King took a number of steps to improve the profitability of the debtor. He replaced the corporate comptroller and implemented a computer supported inventory control system. He also discontinued the children's clothing operations and liquidated the inventory connected with those operations. Finally, he discontinued the trucking operation and began to utilize commercial freight lines to transport inventory.

### B. *MORROW LOOKS AT TOY KING.*

Despite these improvements, by the end of 1987 the company was still operating at a loss. Following the 1987 Christmas season, Toy King's trade and other credit was substantially curtailed, and it had drawn down most of its lines of credit. In the spring of 1988, King placed an advertisement in the *Wall Street Journal* seeking investors.

Don S. Morrow was one of the respondents. Morrow was a certified public accountant in Florida and Georgia.[4] He had over five years of experience both as an auditor and accountant with Haskins & Sells, a nationally recognized accounting firm. He also had at least ten years of experience in evaluating acquisition prospects and turnaround candidates. He had no experience, however, in the retail toy industry.

King and Morrow met for the first time in April 1988. At that time, Morrow examined the books, records, and business of Toy King. Morrow determined that the financial difficulties of the company required a voluntary arrangement with the major toy manufacturers and supplier creditors.

Accordingly, King and Morrow attended the Toy Manufacturers of America Credit Managers annual convention in New York City on June 23, 1988. The Toy Manufacturers of America is a trade association, and most toy manufacturers are members. Once a year, there is a convention to showcase new products and take orders. Credit managers employed by the toy manufacturers also meet with toy retailers at the convention to negotiate credit lines and terms for the upcoming year.

These credit lines are of vital importance in the industry because toy retailers characteristically operate at a loss for most of the year. The toy retail business is seasonal, and historically toy retailers recoup losses and turn a profit from sales that occur in November and December. It is not uncommon for 40 to 50 percent of

---

**2.** The fiscal year for the company ended on January 31 of the year following.

**3.** At one point, A.M. Best was the sixth or seventh largest toy retailer in the country.

**4.** Morrow allowed his certified public accountant's licenses to lapse long before the events giving rise to these proceedings.

the industry's sales to occur in the month of December.

Because of the seasonality of the industry, toy retailers generally do not pay for inventory purchases under a 30, 60, or 90–day term arrangement as is common with other kinds of retailers. Instead, toy manufacturers routinely make available favorable dating terms to accommodate the historical sales pattern. When dating terms are used, the seller ships goods to the buyer and bills for those goods at a later date agreed upon by the seller and buyer. For example, goods shipped in August through November would be billed in January, and goods shipped in December through February would be billed in late spring or early summer. Thus, a toy retailer is able to receive inventory during the loss months and pay for it following the profit months.

Although most toy retailers utilize short term credit lines to fund their operations during the months they are operating at a loss, it is virtually impossible to operate a toy retail concern without trade credit. The amount of cash needed to fund operations and purchase inventory during loss months is prohibitive.

Consequently, Morrow hoped to determine whether the toy manufacturers attending the convention would extend credit to Toy King if it were under new management. King and Morrow participated in several meetings at the convention with credit managers of major toy manufacturers. The consensus reached as a result of these meetings was that Toy King needed to be reorganized under Chapter 11. The credit managers agreed to work with King and Morrow to attempt to create a viable plan of reorganization.

### C. T.K. ACQUISITIONS ACQUIRES TOY KING.

In July 1988, Morrow exercised his option to purchase 75 percent of the stock of Toy King Distributors, Inc., from the estate of Sam Levy. He paid $50,000.[5] He later transferred his stock in Toy King to T.K. Acquisitions, Inc., a corporation incorporated for this purpose.[6] At this time, Morrow and Michael Angle were the principal shareholders of TKA, and each owned more than 20 percent of the stock of that company. Angle, like Morrow, was a certified public accountant. Morrow and Angle were also directors and officers of Toy King. Both were responsible for the financial management of the debtor, including the preparation of the debtor's internal balance sheets.

King was also a director and officer of Toy King and, at some point, acquired stock in the debtor, although his stock comprised less than ten percent of the shares. He was responsible for the day-to-day operations of the debtor.

Around this time, Morrow and Angle also incorporated Acquisition Management, Inc. ("AMI").[7] This company provided management services to both TKA and the debtor for a fee.

### D. THE TOY KING I CASE.

#### 1. Toy King files bankruptcy.

On July 8, 1988, Toy King filed a Chapter 11 petition in this court, Case No. 88–1663. The United States trustee appointed an unsecured creditors committee. Toy manufacturers comprised the entirety of the unsecured creditors committee. The committee retained counsel and an accountant.

---

5. The evidence shows that Woodward, Hunsaker II, Hunsaker III, and Ranney provided $33,000 of this money to Morrow. Morrow and Angle each contributed $8,500.

6. After TKA's incorporation, each person who provided money to Morrow to purchase the stock of Toy King Distributors, Inc., received

shares in the newly incorporated company. In addition, a portion of the monies paid by Woodward, Hunsaker II, Hunsaker III, and Ranney was booked as a loan to TKA rather than as a purchase of stock.

7. Morrow and Angle each contributed $500 to capitalize this company.

The debtor's only secured creditor was First Union National Bank ("First Union"). First Union held a mortgage on the debtor's warehouse and also had a security interest in some personalty. In addition, First Union was the largest unsecured creditor. Other than First Union, the majority of the unsecured creditors were manufacturers and suppliers in the toy industry.

Following the filing of the bankruptcy case, the unsecured creditors committee and principals of the debtor began to negotiate a consensual plan. The debtor promulgated a proposed plan of reorganization and submitted it to its creditors by the end of September 1988. Thereafter, there were a number of meetings, extensive and often heated, to negotiate the proposed dividend to unsecured creditors. As part of the process, the debtor provided several different plans that included projections and possible capitalization for a reorganized debtor.[8] At several of these meetings, Morrow indicated there was a likelihood of further investment in TKA by himself and others following a successful confirmation of the Toy King bankruptcy case.

During these meetings, the unsecured creditors negotiated for a plan that would enable the debtor to continue as a going concern and preserve it as a potential customer. The unsecured creditors, therefore, balanced the net dividend to be paid through the plan, together with the potential profit that would accrue to the unsecured creditors from an ongoing relationship with the debtor, with what they would receive if the debtor were liquidated. Had the unsecured creditors believed that the reorganized debtor would not be viable as an ongoing customer, they would have negotiated for a dividend commensurate with

liquidation value or sought to have the case converted to a case under Chapter 7 for the purpose of liquidation. Because future credit relations with the debtor were important to the unsecured creditors, however, they were prepared to accept a dividend that was something less than liquidation value.

Ultimately, in December 1988, after much deliberation and negotiation, a 17.5 percent "pot" plan was agreed between the debtor and the unsecured creditors committee. Under this agreement, an amount equal to 17.5 percent of the debtor's unsecured debt would be placed in a "pot" and distributed to unsecured creditors on a pro rata basis. The debtor estimated that these prepetition dividends would total $1.6 million. Following this agreement, the accountant and counsel for the unsecured creditors committee became much less active in the case. After this point, the work performed for the unsecured creditors committee by these professionals was in furtherance of confirming the agreed plan rather than in evaluating feasibility and operations of the debtor.

During the bankruptcy case, the debtor maintained its operations and obtained inventory on new credit advances secured by a court-approved super-priority lien in favor of the toy manufacturers.[9] This super-priority lien secured post-petition credit advances by toy manufacturers with a lien on assets of the debtor acquired post-petition and proceeds from those assets that was superior to the claims of administrative expense claimants and superior to the liens of any others holding a lien on those assets. The debtor also sought court approval of a special arrangement with Nintendo whereby the super-priority lien of that creditor would secure prepetition debt of approximately $200,000 as well as post-

---

8. Robert J. McCarthy, the plaintiff's accounting expert, testified at trial that even the debtor's "worst case" projections were based on profit margins and turnover that exceeded both the debtor's historical performance and the industry's averages. The court credits this testimony.

9. Toy manufacturers were required to file a copy of an itemized purchase order to qualify for this priority status.

petition advances used for new purchases. As part of this accommodation, the debtor also agreed to dismiss a pending preference action against Nintendo in which the debtor sought repayment of $90,000. The court disapproved this arrangement.[10] As a consequence, Nintendo refused to extend credit to the debtor during the bankruptcy case notwithstanding the super-priority lien protection in place.

The debtor also obtained inventory from the parent company, TKA. TKA purchased this inventory directly from manufacturers and then transferred it to the debtor at cost. TKA did not receive a super-priority lien for these purchases on the debtor's behalf. The debtor, however, paid TKA a $50,000 "surety fee." TKA incorporated this "surety fee" into advertising costs that it charged to the debtor. The debtor paid these advertising "costs" to TKA in the usual course of its business during the pendency of the bankruptcy case. There is no evidence that this "surety fee" was disclosed to creditors or approved by the court.

Toy King filed its proposed plan of reorganization and its disclosure statement on December 27, 1988. The disclosure statement stated that 10,000 shares of $10 par value stock would be created following confirmation and 1,000 of the shares would be purchased by TKA after confirmation for the total sum of $10,000. Neither the plan nor the disclosure statement provided for any other infusion of new capital into the debtor. Under "Means for Executing the Plan" at Article V, on page four, the plan provided that "[t]he Debtor plans to use TK Acquisitions, Inc., to *make a loan* or *arrange a loan* to be made by another entity *in order to fund the Plan.*" (Emphasis added). There was no mention of preferred stock in either the plan or the disclosure statement.

The disclosure statement also reflected that operating losses of almost $700,000 were anticipated for the 1989 fiscal year. In addition, the disclosure statement contained a section that listed compensation for officers.[11] This section listed the name, title, and amount of compensation without explanation or elaboration. Morrow's compensation was stated as $60,000, Angle's was $15,000, and King's was $115,000.

### 2. *The First Union claims.*

Following the conclusion of negotiations with the committee, First Union, the undersecured holder of various mortgages on the debtor's warehouse, approached the debtor and struck a bargain with regard to its claims. According to Morrow and Angle, First Union was anxious to sever its connection with the debtor and did not wish to wait until confirmation for distribution on its claims. The debtor agreed to transfer to the bank the real property and fixtures encumbered by the lien and security interest of First Union and to arrange for the immediate payment of First Union's unsecured claims at a discount.

Morrow and Angle formed and incorporated M & D Financial, Inc. ("M & D"), for the purpose of purchasing the unsecured claims of First Union. Both were officers and directors of M & D, and each owned more than 20 percent of the common voting stock of that company until December

---

10. At this time, Nintendo enjoyed a 95 percent market share and was in a very strong marketing position because its product, due to inadequate supply for the demand, sold quickly and at higher than industry markups. Because Nintendo could pick and choose its customers, it was able to demand and obtain the debtor's agreement to pay, in effect, a percentage of Nintendo's prepetition claim as a condition of future shipments. The court disapproved this arrangement as violative of the Bankruptcy Code's distribution scheme.

11. The preface to the disclosure statement stated: "No representations concerning the Debtor (particularly as to their future business operations, value of property, or the value of any promissory notes to be issued under the Plan) are authorized by the Debtor other than as set forth in this Disclosure Statement."

23, 1989. On that date, Angle sold his interest in TKA and M & D to Morrow and resigned as an officer and director of M & D and the debtor. At some point, Woodward obtained a five percent interest in M & D.

First Union agreed to sell its unsecured claims totaling $2,373,615 to M & D for the sum of $125,000. Under this arrangement, M & D would pay $125,000 for the right to receive under the plan $415,382.62, representing 17.5 percent of the face amount of the total First Union unsecured claims, for a net "profit" to M & D of $290,382.62. This equates to a 232 percent profit on M & D's investment. Although First Union made this favorable opportunity available to the debtor, Morrow and Angle structured the transaction for their personal benefit.

Debtor's counsel sent a letter dated December 29, 1988, to counsel for the unsecured creditors committee advising him of the proposed sale.[12] The specifics of the sale, most importantly the anticipated profit that would accrue to the purchaser, were not contained in the letter. The letter stated without elaboration that "[t]he deal with First Union must be done by tomorrow." The closing was scheduled for the next day, Friday, December 30, 1988. The timing of the closing on a Friday in the midst of the holiday season, 24 hours or less from the date the letter was sent, effectively eliminated any opposition on the part of the creditors committee.[13] The record is devoid of any evidence that anyone received actual notice of the proposed sale prior to the scheduled closing date.

The debtor filed a motion for substitution of claimant, seeking to substitute M & D for First Union as the holder of the claims, on January 9, 1989 (Main Case Document No. 261 in Toy King I).[14] The motion was supported by a stipulation executed by First Union. The motion did not disclose M & D's close connection with the debtor, nor did it disclose the financial details of the substitution.[15] The court

---

12. The December 29, 1988, letter, in its entirety, stated:

Dear Scott:

I tried reaching you and in your absence, Leroy Culton on December 27, 1988. To date, no one has called back.

First Union approached us with Toy King paying off their secured personal property claim of approximately $225,000 plus buying the unsecured claim before the year end at a discount. After some negotiations, we agreed on a total figure of $350,000.

We cannot of course, use Toy King to pay off the unsecured claims so a new corporation has been formed to acquire the unsecured claims with Debtor's monies used to pay the secured personal property claim.

Don Morrow and Mike Angel [sic] do not want to do anything without the committee knowing. The deal with First Union must be done by tomorrow. For that reason, I fax this letter to you and Leroy so you can contact the committee for any objection. We plan to close by noon, tomorrow, December 30, 1998. Therefore advise of any objection by that time.

Very truly yours,
Ray J. Rotella

13. One witness testified that the unsecured creditors committee was aware as early as September 1989 that M & D was being formed to purchase First Union's claims. The totality of the evidence, however, supports the conclusion that in fact there was no communication to the unsecured creditors committee about M & D and its purchase of First Union's claims until late December.

14. The motion for assignment was filed by counsel for the debtor and simply stated the parties' agreement to the assignment of the unsecured claims of First Union to M & D. Service of the motion was made only on counsel for First Union. The motion was considered and granted ex parte with service of the order on counsel for the debtor and First Union. This transfer, of course, occurred before F.R.B.P. 3001 was amended in 1991 to change the way in which claims are transferred.

15. It also appears from the record that, contrary to the requirements of F.R.B.P. 9019, the debtor did not seek or obtain court approval of the First Union compromise that related to First Union's secured claim, including the surrender of the real property and the early payment of First Union's secured claim on the debtor's personality.

granted the motion on an ex parte basis on January 12, 1989 (Document No. 263 in Toy King I).

Notwithstanding the principals' representations of urgency and First Union's alleged impatience, M & D did not actually make the payment to First Union for the claims until April 11, 1989. At the time M & D paid First Union for the acquisition of its unsecured claims, Morrow and Angle had been in active negotiations for more than a month to obtain financing for the debtor's plan. In fact, M & D made the payment to First Union on the very day that the court approved the debtor's disclosure statement and thus at a point when there appeared to be little significant risk of non-payment of the underlying claims. The defendants offered no explanation for the almost three month delay in making the payment to First Union.

Although M & D made the $125,000 payment to First Union, it did so with funds provided by Morrow and Angle that they borrowed individually from a commercial lender. M & D gave Morrow and Angle a promissory note to document their loan to M & D.

### 3. The Touche Ross pro forma.

Morrow, on behalf of the debtor, engaged the services of the Touche Ross [16] accounting firm to prepare a financial statement reflecting the effect of the Toy King confirmation on the debtor's balance sheet. Morrow planned to use this statement to obtain monies to fund the plan and for post-confirmation trade credit.

Touche Ross made pro forma adjustments to the debtor's audited statements that it had prepared for the 1988 fiscal year to reflect the effect of the bankruptcy confirmation as if it occurred at the end of that fiscal year. Touche Ross made these adjustments based upon information and assumptions provided by Morrow.

For example, Morrow estimated that the debtor would have prepetition liabilities immediately following confirmation in the amount of $1,168,107 and a subordinated note of $294,382 for a total of $1,462,489 in projected liabilities to be paid under the plan. Morrow also indicated that the debtor's assets would be increased by $1,010,000 in cash through capital contributions, $1 million of which would be through preferred stock and $10,000 of which would be through common stock. Morrow anticipated that TKA would purchase the preferred stock using post-confirmation borrowings.

Morrow also requested that Touche Ross use the "quasi-reorganization" accounting convention to restate the debtor's reorganized debt as new shareholder's equity. After considerable research into the propriety of using this accounting convention in the debtor's circumstances, Touche Ross acceded to Morrow's request.

Under the "quasi-reorganization" accounting convention, assets are carried on the balance sheet at their historical values. The company's liabilities that are discharged through the reorganization, however, are zeroed out of the balance sheet, with a corresponding increase in shareholder's equity, first reducing net losses and next creating net equity.

The use of "quasi-reorganization" accounting was controversial at the time. It was disapproved by the Financial Accounting Standards Board and the Auditing Standards Board for use by companies subject to scrutiny by the Securities and Exchange Commission. At the time of the confirmation of Toy King, however, it was not prohibited for use by closely held companies. Because Toy King was a closely held company, the debtor's use of "quasi-reorganization" accounting was permitted by accounting standards. Long after the events in question here, the use of "quasi-

---

16. In 1989, Touche Ross merged with Deloitte, Haskins & Sells. After the merger, the surviving entity became Deloitte & Touche.

reorganization" accounting fell into complete disfavor. It is not acceptable for use in any circumstances at the present time.

Touche Ross completed its preliminary pro forma report on April 21, 1989. Although Touche Ross had prepared six footnotes that provided additional information about the debtor and the assumptions upon which the pro forma was based, it did not include these footnotes in its completed preliminary report.

The preliminary pro forma showed that, if the reorganization occurred on January 29, 1989, the debtor would have $2,935,777 in net worth; $1,925,777 from the "quasi-reorganization" accounting methodology and $1,010,000 from additional paid-in capital and new common stock.

### 4. *The Liberty loan.*

During the pendency of the bankruptcy case, the debtor had been engaged in negotiations with various banks in an effort to obtain further financing to fund the plan. Preliminary negotiations with Liberty began in March 1989. Although Liberty had no prior connection with the debtor, it had a business relationship with Morrow and Angle and respected both as members of the local business community in Macon, Georgia.

Steve Horne ("Horne") was the bank officer charged with negotiating with the debtor. Horne was a senior loan officer with lending authority of $250,000. He was also a certified public accountant. At this time, Horne's department was thinly staffed. He therefore did the loan analysis himself. Horne conducted an initial investigation, including reviewing the loan application package, interviewing the debtor's principals and management, and conducting a personal inspection of the debtor's

office, warehouse, and other facilities. Morrow provided to Horne projections of the debtor's operations post-reorganization that showed a best-case scenario of a $464,000 profit and a worst-case scenario of a $20,000 loss. Morrow also provided a copy of the preliminary Touche Ross pro forma balance sheet showing $1.9 million in equity in the debtor post-reorganization as a consequence of the "quasi-reorganization" accounting methodology.

Horne prepared a credit approval/credit memorandum on May 3, 1989, in furtherance of the loan application. In that memorandum, Horne listed the debtor as having a net worth of $1,942,912 as of December 31, 1988. Horne wrote that the loan would be collateralized by cash or cash equivalents in the amount of $660,000; store fixtures with a value of $150,000; $300,000 in real estate; and inventory in the amount of $2,795,000. He further wrote that Morrow would provide an unlimited guaranty, and Woodward and Hunsaker would provide a limited guaranty of $450,000 each.

Horne stated as strengths the debtor's new management, minimal reliance on inventory by the bank resulting from the pledge of additional collateral, the debtor's relationship with suppliers, and $2 million in equity that would be in the debtor following confirmation. Horne stated as weaknesses the bank's partial reliance on inventory, the location of the inventory, the seasonality of the business, and the recurring losses of past years. He graded the prospective loan as a 2S [17] with some risk. He recommended approval, however, of a $1.5 million line of credit to fund the debtor's plan of reorganization and to provide additional operating funds. On May 4, 1989, Horne sent a memorandum to the senior loan committee to that effect.

---

17. Horne testified that Liberty rated loans in relation to the risk they presented to the bank, with a 1 rating representing the least risky loan and a 5 rating representing the most risky loan. He further testified that the bank would not make a loan to a new borrower rated 3 or higher, although a pending loan might be given a higher rating under adverse circumstances. A 2S loan was ranked between 2 and 3. Horne testified that he rated the Liberty loan as 2S because the debtor was coming out of bankruptcy and because the business was seasonal. The court credits this testimony.

In his May 4, 1989, memorandum, Horne stated that "[o]nce the Company comes out of Chapter 11 bankruptcy, it will have net worth in excess of $2,000,000 . . . ."

The bank's senior loan committee met on May 10, 1989, to consider the loan. At the meeting, Horne updated the committee on the collateral being offered to secure the loan. Horne indicated that the cash collateral had been increased to $750,000, real estate collateral had been decreased to $250,000, and inventory was still valued at $2,795,000. There was no mention of fixtures offered as collateral to secure the loan. Horne further indicated that Morrow, Angle, and King would sign unconditional guaranties of the loan, while Woodward and Hunsaker would offer limited guaranties of $450,000 each. The senior loan committee approved the loan as described.

Prior to the granting of this loan, Liberty was principally in the business of residential mortgage lending. Its loan to TKA was one of its early forays into commercial lending. The TKA loan was the first to be made by Liberty in aid of a debtor in the midst of a Chapter 11 reorganization.

There was initial discussion between Liberty, TKA, and the debtor about the structure of the Liberty loan. Liberty intended the loan to be made directly to the debtor as obligor but was dissuaded from doing so by TKA and the debtor.[18] There was evidence presented at trial that TKA and the debtor believed that structuring the loan with TKA, rather than the debtor, as obligor was more consistent with the disclosure statement and also would inure to the benefit of the debtor by providing some tax benefits. Structuring the loan with TKA as obligor also avoided possible scrutiny by bank examiners because the obligor was not a company in bankruptcy. This tangentially benefited Liberty.

Accordingly, TKA was denominated as the borrower on the Liberty loan.[19] TKA was a shell company with no assets except its stock in the debtor and receivables owed to it by the debtor. All parties to the transaction understood that the monies from the borrowing would ultimately be used by and for the benefit of the debtor. All parties also understood that the debtor's revenues from its operations would ultimately be used to service the loan. Toy King and TKA's shareholders, Morrow, Angle, Woodward, the Hunsakers, and Ranney, were to be guarantors.

Following the final approval of the loan, Liberty issued a commitment letter. This commitment letter, dated May 19, 1989, stipulated that up to $1 million of the total $1.5 million proceeds was to be used to pay plan dividends to prepetition unsecured creditors of the debtor. The remaining monies were to be used by the borrower, TKA, solely to make *capital contributions* to the debtor for "general corporate purposes."[20] (Emphasis added). The loan

---

18. The parties stipulated that TKA was the obligor on the Liberty loan at Liberty's request. The evidence, however, clearly contradicts this stipulation, and the court therefore does not accept it.

19. The evidence shows that the parties decided the identity of the obligor over a short span of time. Liberty sent a letter to debtor's counsel on May 17, 1989, suggesting that the debtor should be denominated as obligor. Two days later, on May 19, 1989, the commitment letter was drafted with TKA as obligor.

20. The commitment letter read, in part, as follows:

 \* \* \* \* \* \*

 A. *TERMS OF LOAN*

 1. *BORROWER:* T.K. Acquisitions, Inc.

 2. *GUARANTORS:* Don S. Morrow, Michael A. Angle, Robert O. King and Toy King Distributors, Inc., a Florida corporation ("Toy King") (collectively, the "Full Guarantors") will jointly and severally guarantee payment of all sums due under the Loan. The following individuals (collectively, the "Limited Guarantors") will each guarantee the payment of a portion of the outstanding balance of the Loan in the amounts shown below:

 | | |
 |---|---|
 | Constance H. Woodward | $350,000 |
 | Jerome Hunsaker, Jr. | $175,000 |
 | Jerome Hunsaker, III | $ 87,500 |
 | Melanie Rainey | $ 87,500 |

 3. *LOAN:*

(a) *Principal Amount:* One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00); provided, that no more than $500,000 shall be advanced under the Loan so long as the Letter of Credit (defined below) remains outstanding.

(b) *Interest Rate:* Of the outstanding principal balance of the Loan, $700,000 principal shall bear interest at a fixed rate equal to 1% in excess of the interest rate payable by Lender on the certificates of deposit pledged by Ms. Woodward and Mr. Hunsaker, discussed below. The remaining outstanding balance of the Loan shall bear interest at a rate 2% in excess of the prime rate of interest charged by Lender from time to time, with such rate to fluctuate as and when changes occur in said prime rate of interest. Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed. If interest is based upon the prime rate of Lender, it is acknowledged that such prime rate merely serves as the basis upon which the effective rate of interest is calculated for the Loan and that such prime rate may not be the lowest or best rate at which Lender calculates interest or extends credit.

(c) *Maturity Date:* June 30, 1990.

(d) *Repayment Terms:* Interest which shall accrue on amounts advanced under the Note shall be due and payable on the first day of each calendar month. The outstanding balance of the Note shall be due and payable on June 30, 1990. Borrower may prepay and reborrow all or any part of the principal balance of the Loan at any time and from time to time so long as no event of default exists under the Loan documents.

(e) *Late Charges:* Any installment of principal or interest not received within ten (10) calendar days after its due date must be accompanied by the payment of a late charge in the amount of ten percent (10%) of the amount of such installment.

(f) *Letter of Credit:* Lender shall issue to Toy King an irrevocable letter of credit (the "Letter of Credit") for the sum of $1,000,000 for the account of Borrower, to be in the form attached hereto as Exhibit "A". All drafts drawn under the Letter of Credit must be accompanied by the signed certificate of the chief executive officer of Toy King that the funds drawn will be used to pay unsecured pre-petition creditors of Toy King whose claims have been filed in the Bankruptcy Case, defined below. At Lender's option, drafts under the Letter of Credit may be made jointly to Toy King and such unsecured pre-petition creditors whose claims will be paid with the proceeds of such drafts. The Letter of Credit will expire at midnight on the ninetieth (90th) day following the effective date of the reorganization plan of Toy King in the Bankruptcy Case becomes non-appealable, but no later than September 11, 1989. The Letter of Credit shall not be transferrable. Immediately following any draft upon the Letter of Credit, Lender shall advance an amount of Loan proceeds equal to the amount of such draft so as to reimburse Lender for same. The total of all drafts under the Letter of Credit may not exceed $1,000,000.

4. *LOAN PURPOSE:* Up to $1,000,000 of the proceeds of the Loan shall be used to reimburse Lender for any drafts presented under the Letter of Credit. Toy King shall agree to use such proceeds only for the purpose of the payment of undisputed or settled claims of unsecured pre-petition creditors of Toy King following the entry of an order and the expiration of any time for appeal thereof in the United Bankruptcy Court, Middle District of Florida for the reorganization of Toy King in the case In Re: Toy King Distributors, Inc., Case No. 88–01663–BKC–6P1 pursuant to a plan of reorganization in the form and content presently pending before said Court.

The remaining proceeds of the Loan together with amounts initially disbursed for the purpose of reimbursing the Lender for drafts made under the Letter of Credit and subsequently repaid and reborrowed, shall only be used by Borrower to make capital contributions to Toy King to be used for Toy King's general corporate purposes.

5. *LOAN SECURITY:* The Loan will be evidenced by a promissory note (the "Note") and will be secured or further evidenced by the following items:

(a) *Security Interest:* The grant by Borrower of a prior perfected security interest in all outstanding shares of stock of Toy King free from any restrictions upon the encumbrancing or subsequent transfer thereof.

(b) *Guaranty of Payment and Performance:* The Full Guarantors listed in subparagraph A.2 above will execute and deliver a separate unconditional guaranty agreement jointly and severally guaranteeing repayment of the entire indebtedness of Borrower to Lender and the performance by Borrower of all of Borrower's obligations to Lender under the documents evidencing, securing or in any way relating to the Loan. The Limited Guarantors listed in subparagraph A.2 above will execute and deliver a separate

limited guaranty agreement guaranteeing, in the case of each of the Limited Guarantors, repayment of the amount of $350,000 of the indebtedness of Borrower to Lender.

6. *SECURITY FOR GUARANTIES:* The obligations of the Full Guarantors and the Limited Guarantors under the guaranty agreements executed and delivered by them to lender shall be secured or further evidenced by the following items to be furnished to Lender by the party indicated:

(a) *Security Deeds:* From Mr. Morrow, a second lien deed to secure debt conveying security title to Lot 14, Howard Oaks Subdivision, Bibb County, Georgia, and from Mr. Angle, a first lien deed to secure debt conveying first security title to Lots 30 and 31, Howard Oaks Subdivision, Bibb County, Georgia (collectively, the "Security Deeds").

(b) *Stock:* From Mr. Morrow, an assignment of 500 shares of common stock of Georgia Timberlands, Inc., a Georgia corporation, representing 5% of the outstanding shares of such corporation, free from any restrictions thereon, including the encumbrancing or subsequent transfer thereof.

(c) *Life Insurance:* From Mr. King, a first assignment of a $500,000 life insurance policy upon Mr. King's life. From Messrs. Angle and Morrow each, a first assignment of a $250,000 life insurance policy on each of their lives; provided, that Messrs. Angle and Morrow may each pledge $100,000 in life insurance at the closing and shall each have until sixty (60) days following closing within which to pledge the remaining life insurance.

(d) *Certificates of Deposit:* From both Ms. Woodward and Mr. Hunsaker, a prior perfected security interest in certificates of deposit in the amount of $350,000 each to be issued by Lender, for a total of $700,000.

(e) *Inventory:* From Toy King, a prior perfected security interest in all inventory, together with proceeds thereof, wherever the same may be located (the "Personal Property"). The Personal Property shall not be further encumbered during the term of the Loan.

7. *Loan Fees:* Lender shall receive a loan fee in the amount of $5,000.00 which shall be fully earned and due and payable at the time of the closing of the Loan.

\* \* \* \* \* \*

C. *GENERAL REQUIREMENTS OF LOAN*

1. *ATTORNEYS OPINION:* At the time of the closing of the Loan, Borrower's counsel and Toy King's counsel shall deliver opinions addressed to Lender in form, scope and substance satisfactory to Lender concerning all aspects of the Loan including the legality, validity and binding effect of all required Loan documents. At the time of the closing of the Loan, borrower's bankruptcy counsel shall deliver an opinion addressed to Lender that an order approving the plan of reorganization of Borrower as disclosed to Lender has been entered and is final and nonappealable and that Toy King is authorized to execute and deliver to Lender all necessary Loan documents.

2. *COSTS AND EXPENSES:* Lender shall not incur any expense whatsoever in connection with this Commitment or the Loan. Borrower shall pay all costs and expenses incurred in connection with the preparation for and the closing of the Loan, whether the Loan is closed or not, including, without limitation, legal fees, including the fees of Lender's counsel, intangible taxes, note taxes, mortgage taxes, transfer taxes, all recording costs, all license and permit fees, and all title insurance and other insurance premiums. Borrower shall reimburse Lender for post-closing travel and out-of-pocket costs in connection with the monitoring of the Loan in an amount not to exceed $5,000.

3. *RESTRICTION ON SECONDARY FINANCING OF PERSONAL PROPERTY:* So long as this Commitment or any part of the Loan is outstanding, the Personal Property shall remain free and clear of all encumbrances, liens, mortgages, security interests and secondary financing, except those approved in advance in writing by Lender, and Borrower shall not, without the prior written consent of Lender, encumber all or any part of its interest in the Personal Property. The occurrence of any of the foregoing shall, at the option of Lender, constitute grounds for terminating this Commitment and for accelerating any and all sums unpaid under the Loan.

4. *FINANCIAL STATEMENTS:* Borrower, all of its subsidiaries, including Toy King, and each Guarantor shall furnish to Lender on an annual basis within one hundred thirty five (135) days after the end of the appropriate fiscal year current financial statements in form and content satisfactory to Lender certified by a certified public accountant acceptable to Lender. Additionally, Borrower shall furnish to Lender on a monthly basis an itemized balance sheet, statement of income and expenses and cash flow statement applicable to Borrower and all of its subsidiaries, including Toy King certified by Borrower, to be furnished within fif-

teen (15) days following the end of each calendar month. Such statements shall be in form and content satisfactory to Lender.

5. *INSURANCE:* Borrower shall furnish to Lender an all-risk hazardous insurance policy with a mortgagee loss payable clause satisfactory to Lender, and containing an agreement to notify Lender in writing at least thirty (30) days prior to the cancellation of such policy, covering hazards to any collateral given to secure the loan in such amounts, in such form and issued by such company as shall have been approved by Lender in writing.

6. *INVENTORY REPORTS:* Borrower will cause to be supplied to Lender within fifteen (15) days following the end of each calendar month, and as a condition precedent to any draw of the Loan proceeds, a report of the quantity and cost valuation of all inventory held and owned by Toy King categorized by store, such report to be certified as to accuracy by the chief executive officer of Toy King. Borrower shall cause to be furnished to Lender, at Borrower's cost, a verification of the amounts and cost value of all inventory held and owned by Toy King as of July 31, 1989, and January 31, 1990, certified as to accuracy by an independent inspector to be chosen by Lender. Such reports shall be furnished on or before forty-five (45) days following the effective dates thereof. Lender shall be entitled to obtain such reports at any other time, at Lender's expense.

7. *ACCOUNTS PAYABLE REPORT:* Borrower shall cause to be furnished to Lender within fifteen (15) days following the end of each calendar month a report of accounts payable to vendors by Toy King to be certified as to accuracy by the chief executive officer of Toy King.

8. *DEPOSIT ACCOUNTS:* So long as the Loan is outstanding, all deposit accounts of Borrower and its subsidiaries, including Toy King, except depository accounts maintained in connection with Toy King's retail stores, shall be maintained with Lender. The balance of each such depository account will be wired to Toy King's master checking account with Lender on a daily basis.

9. *LIMIT OF TOY KING EXPANSION:* Toy King shall agree that it will not open more than five (5) new retail stores so long as the Loan is outstanding.

10. *DIVIDENDS AND BONUSES:* Neither Borrower nor Toy King will pay any dividends or bonuses or permit any withdrawals except as approved in writing by Lender and except as necessary to pay-

ment of the Loan. Notwithstanding the above, bonuses may be paid by each company to employees on an annual basis totaling no more than 10% of the net profits of each company, but not to exceed a total of $50,000 for both companies.

11. *M & D FINANCIAL, INC. NOTE SUBORDINATION:* M & D Financial, Inc. will subordinate that certain promissory note to be delivered by Toy King to M & D Financial, Inc. in the original principal amount of $294,382 to the prior payment in full of all indebtedness, obligations and liabilities of Toy King under its guaranty of the Loan to be delivered to Lender. Notwithstanding the above, so long as there is no default under the Loan, Lender shall permit the payment of such promissory note, which is anticipated to have an outstanding balance of $311,219 on January 31, 1990, in monthly installments of principal and interest in the amount of $10,712.47 beginning February 1, 1990.

12. *MINIMUM INVENTORY LEVEL:* Toy King shall maintain a cost level of inventory at all times of not less than $2,500,000 based on the lower of cost or market value.

13. *OTHER DEBT:* Neither Borrower nor Toy King shall incur any indebtedness other than the Loan, other than normal trade credit, exceeding a cumulative total of $50,000 from time to time during the term of the Loan without the prior written consent of Lender.

14. *CAPITAL EXPENDITURES:* Neither Borrower nor Toy King shall incur capital expenditures in the cumulative total of more than $100,000 during the term of the Loan without the prior written consent of Lender.

15. *EQUITY:* Borrower shall cause to be delivered to Lender an opinion letter from Touche Ross & Co., Certified Public Accountants, stating that immediately following the entry of a final order approving the plan of reorganization in the Bankruptcy Case there will exist at least $2,000,000 of stockholders' equity in Toy King.

16. *OTHER BUSINESS VENTURES OF MORROW AND ANGLE:* During the term of the Loan, Messrs. Morrow and Angle may not, individually or collectively, engage in any new business ventures requiring the investment by either of them of any sum whatsoever without the prior written approval of Lender.

17. *TOY KING STOCK:* Toy King will not issue any new stock without Lender's prior written consent; provided, that Toy

was to be secured by TKA's stock in the debtor, the debtor's inventory, and other collateral owned by the individual guarantors. The debtor, Morrow, Angle, and King were unconditional guarantors of the loan, while Woodward, the Hunsakers, and Ranney were limited guarantors.[21] The commitment letter provided that TKA would pay a loan fee of $5,000 to Liberty in addition to all other costs.

The commitment letter also contained a number of conditions and prohibitions that Liberty sought to impose on both TKA and the debtor. The inclusion of these conditions and prohibitions was intended to protect Liberty's position. For example, Liberty required that TKA pay down the outstanding balance on a line of credit it had just established with Citizens and Southern Bank ("C & S") that was secured by its stock in the debtor and its accounts receivable. At the time the parties negotiated the loan commitment, TKA owed C & S approximately $180,000.[22] Liberty included this condition to ensure the priority of its secured status.

Liberty also required that both TKA and the debtor maintain their operating accounts at Liberty Bank so that it would be able to monitor both companies closely. In addition, Liberty prohibited TKA and the debtor from paying to themselves any dividends or bonuses, other than dividends to service the loan itself, except by written permission of Liberty. Liberty intended these prohibitions to prevent TKA or the debtor from making payments without the bank's knowledge and to keep cash in the debtor and its parent.[23]

In addition to the conditions and prohibitions imposed on TKA and the debtor, Liberty required M & D to subordinate to Liberty's debt $294,382 of its dividend on the claims it acquired from First Union.[24] With this prohibition, Liberty sought to keep cash in the debtor as well as ensure that its claim against TKA and the debtor would be superior to any other.

Finally, Liberty required that TKA was to obtain an opinion letter from Touche Ross stating that, immediately following the successful confirmation of Toy King I, there would be "at least $2,000,000 of

King may issue new stock to Robert O. King not to exceed 10% of the total outstanding stock of the company on the condition that Robert O. King pledge such new stock as security for the Loan.
18. *C & S LINE OF CREDIT:* Borrower shall pay, prior to or contemporaneously with the closing, all sums owed The Citizens and Southern National Bank under the $400,000 line of credit presently available to Borrower by such lender, and shall provide satisfactory evidence to Lender of the payment of same and of the satisfaction of any security documents given to secure the same.

21. Woodward's guaranty was limited to $350,000, Hunsaker II's guaranty was limited to $175,000, and Hunsaker III and Ranney's guaranties were limited to $87,500 each.

22. By the time the parties closed the Liberty loan, this indebtedness had increased to approximately $301,000. *See* Section IV.E.1. *infra.*

23. The court credits Horne's testimony on these points.

24. The commitment letter provided that, if there was no default in the Liberty loan, the debtor could begin to make payments on the M & D promissory note beginning on February 1, 1990. The commitment letter further stated that the M & D note, with a principal balance of $294,382, would have an outstanding balance of $311,219 on January 31, 1989, representing principal and accrued interest.

It appears that the outstanding balance was roughly derived from the payment of interest at nine percent effective from the date of the subordinated note, June 14, 1989, through January 31, 1990. The court calculates this as follows: Nine percent interest divided by 365 days equals a daily interest rate of .0002465. This rate multiplied by the principal balance of $294,382 equals a per diem of $72.565163. Multiplying the per diem by the number of days from the date of the note till the projected payment on January 31, 1990, in the total amount of 232 days, would equal $16,845.12 in accrued interest. Adding $16,845.12 in accrued interest to the principal balance of $294,382 totals $311,217.11. This amount is within $2 of the $311,219 balance on the M & D note projected in the commitment letter as of January 31, 1990.

stockholder's equity in Toy King." The bank required this opinion letter as objective assurance that the debtor's net worth after confirmation would be substantially as represented by Morrow and Angle at the time the Liberty loan was negotiated and as shown by the preliminary pro forma. Although Horne testified that this equity requirement was of little importance to Liberty in making the loan, the evidence itself contradicts this assertion. The court does not credit this testimony.

The commitment letter provided that the letter was "a commitment only" and was not a "substitute for the definite loan agreement." The same paragraph explained that Liberty's "obligation to loan funds to borrower shall arise only under the terms of such definitive loan agreement and other documentation."

With regard to the treatment of the Liberty loan proceeds used by TKA to make a capital contribution in the debtor, the commitment letter was inconsistent with the preliminary draft of the Touche Ross pro forma. According to the commitment letter, the funds for TKA's capital contribution were to come from a $500,000 line of credit. The remaining funds were to be used by the debtor under a letter of credit to pay plan dividends to Toy King I unsecured creditors.

The preliminary draft of the pro forma, however, provided that $1 million was to be infused as a capital contribution in the debtor. Although the pro forma contained no notation as to the source of the $1 million capital contribution, Horne, Morrow, and Michael Zychinski, the Touche Ross accountant, all testified that they understood that the funds for the $1 million capital contribution were to come from proceeds of the Liberty loan. The preliminary pro forma did not include any notation as to the use of the remaining $500,000 of the Liberty facility or indicate

how those proceeds would be treated on the debtor's internal balance sheets.

Horne, Morrow, and Zychinski understood that the Touche Ross pro forma and the Liberty commitment letter were critical documents that were intended to define the structure of the Liberty loan and how it would affect the debtor's financial condition. They knew also that the debtor's trade creditors were to receive copies of these documents and would make credit decisions on the basis of the information they contained. Horne and Morrow testified that they believed trade credit was essential to the debtor's ability to sustain its operations post-confirmation.

### 5. The C & S line of credit.

The court approved the debtor's disclosure statement on April 11, 1989.[25] As the date of the confirmation hearing approached, the debtor was in a precarious financial posture. In the midst of TKA's final negotiations with Liberty, the debtor was overdrawn on its debtor-in-possession account and was at the low ebb of the sales cycle.

TKA obtained a line of credit from C & S on May 8, 1989, for the purpose of funding the debtor. TKA executed a promissory note in favor of C & S that provided for a $400,000 line of credit with a maturity date of December 15, 1989, and interest payments due quarterly on the third day of the month, beginning in June, 1989. The C & S line of credit was secured by the accounts receivable of TKA and unconditionally guarantied by Morrow, Angle, and Constance L. Woodward, another TKA shareholder. The debtor had no liability on the C & S line of credit, either as obligor or guarantor.

TKA made an immediate draw on the C & S line of credit in the amount of $180,000 and made the proceeds available to the debtor. The debtor in turn execut-

---

**25.** M & D also paid First Union for the purchase of First Union's unsecured claims on this date.

ed an unsecured note, Note 1, in favor of TKA at an interest rate that exceeded the interest rate being paid by TKA on the underlying C & S obligation by at least one percent. The promissory note executed by the debtor was a demand note without a specific due date for the payment of principal.[26]

The debtor did not seek the court's approval of this post-petition borrowing, although Morrow testified that he was aware that such approval was required. It appears from the record that creditors did not receive notice of this post-petition borrowing. This borrowing was also not reflected as a liability on the debtor's financial statement filed in the pending bankruptcy case and signed under penalty of perjury by King.

### 6. *Confirmation of Toy King I.*

In connection with confirmation of the plan, the debtor mailed ballots to all creditors with a ballot return deadline of May 16, 1989. Counsel for the unsecured creditors committee wrote a solicitation letter to unsecured creditors urging acceptance of the plan. The plan was overwhelmingly approved. Of 101 unsecured creditors, 96 voted in favor of the plan, and only five, representing less than $6,000 in unsecured debt, voted against the plan. M & D voted its claims, which it had acquired from First Union, in favor of the plan.

The confirmation hearing in Toy King I took place on May 23, 1989. Morrow testified at the confirmation hearing on behalf of the debtor. He testified that the debtor would effectuate the plan with a $10,000 capital stock purchase and a loan commitment from the parent company. Morrow also testified that all creditors were to be paid as proposed by the plan. Morrow testified that the plan proposed to pay unsecured creditors under a letter of credit 90 days after the confirmation of the debtor's plan. When directly asked if the

debtor had made promises to any creditors, other than what was to be paid through the plan, Morrow testified: "No, it has not." The debtor's evidence with respect to feasibility was uncontroverted at the hearing.

The debtor offered the commitment letter into evidence at the confirmation hearing. There was no discussion or testimony about the specifics of Liberty's loan or the terms and provisions of Liberty's commitment letter. The commitment letter had not been distributed or made available to creditors prior to the confirmation hearing. The debtor had not made the commitment letter a part of the debtor's plan of reorganization. Nevertheless, the loan described in the commitment letter is what made the plan feasible and thereby confirmable.[27] There was no discussion at the hearing about, nor did the plan or commitment letter mention, the debtor's borrowing from TKA on TKA's C & S line of credit.

The court expressed concern at the hearing that the plan made no provision for the payment of interest to those unsecured creditors who were to be paid 90 days or more after confirmation. The court confirmed the plan subject to a modification that provided for the payment of interest at the rate of nine percent to unsecured creditors who were not paid immediately upon confirmation.

The court entered the order confirming the plan on May 23, 1989, the same day as the confirmation hearing. The effective date of the plan was June 12, 1989. The order of confirmation provided:

> (B) that the Debtor *shall be authorized* to execute and to deliver to Liberty Savings Bank, FSB, Macon, Georgia any instruments and documents necessary to evidence, secure and relate to Debtor's guaranty or obligations in connection with the proposed letter of credit to be provided to Debtor and line of credit to be provided T.K. Acquisitions, Inc. pur-

---

26. The promissory note stated that "[t]ime is of the essence in this note. This is a demand note."

27. Morrow testified at the confirmation hearing that the dividend to be paid to unsecured creditors under the plan would come from the loan commitment.

50

suant to and in accordance with the terms of that certain commitment letter of Lender to T.K. Acquisitions, Inc. dated May 19, 1989, *which is incorporated herein by reference.*

(Emphasis added).

The court added this language to the confirmation order at the specific request of Liberty.

Through some error, the commitment letter was not attached to the order confirming the plan as was contemplated by the terms of the confirmation order. Nevertheless, the parties to this proceeding have stipulated that the commitment letter in evidence is a true and accurate copy of the commitment letter that was intended to be attached to the confirmation order. Although the debtor did not mail the commitment letter to creditors with a copy of the confirmation order, the parties stipulated that most creditors of the debtor received or obtained a copy of the commitment letter at some point in time close to the date of the Toy King I confirmation.

No party took an appeal from the May 23, 1989, confirmation order or sought to modify it. The plan was then substantially consummated.

### E. *POST–CONFIRMATION EVENTS.*

#### 1. *Another draw on the C & S line of credit.*

One week after the confirmation of Toy King I, TKA again drew on the C & S line of credit in the amount of $80,000. TKA loaned the proceeds to the debtor which in turn gave a promissory note to TKA on the same terms as the first note. This note was Note 2. During this period, TKA also made other draws on the C & S line of credit and made the funds available to the debtor without any written documentation.[28]

#### 2. *The Touche Ross pro forma is finalized.*

Touche Ross finalized its pro forma by June 4, 1989. The final version of the pro forma included the six footnotes omitted from the preliminary pro forma. These footnotes provided additional information about the debtor and the assumptions upon which the pro forma was based. For example, one of the footnotes stated that Touche Ross did not include contingent liabilities of the debtor for rejection of certain leases in its balance sheet in an amount of up to $414,000.

The final version of the pro forma also included two new footnotes. The first new footnote was a going concern qualification. A going concern qualification reflects a reasonable doubt that the entity in question has the ability to survive for a one-year period without additional capital or debt financing.[29] The second new footnote noted that the debtor's case had been confirmed and that no objections to the confir-

---

28. The parties stipulated that TKA made all proceeds of the C & S line of credit available to the debtor. The debtor executed Notes 1 and 2 reflecting a $260,000 indebtedness in favor of TKA on the C & S line of credit. The parties also stipulated that, at the time the Liberty loan closed on June 14, 1989, TKA owed the aggregate sum of $301,822.93 to C & S, approximately $40,000 more than evidenced by Notes 1 and 2. The parties further stipulated that every note executed by the debtor was made a matter of record in this proceeding. The court can only conclude, therefore, that TKA and the debtor failed to reduce to writing the debtor's obligation for the remaining sums of the C & S line of credit drawn by TKA and loaned to the debtor. The

$18,707.22 paid to Liberty in loan fees and costs is included in this amount.

29. Footnote 8 specifically stated that:

The Company experienced significant losses from operations in fiscal 1989 and 1988 resulting in the Company seeking protection from creditors under Chapter 11 of the Bankruptcy Act of 1978 as discussed in Note 1. A plan of reorganization was submitted to and approved by the Company's creditors and shareholders and confirmed by the Bankruptcy Court as discussed in Note One. The approved plan of reorganization requires that the Company obtain funding in order to settle creditor claims. Man-

mation had been filed within the ten-day appeal period.

Touche Ross appended to the pro forma an independent auditor's report of historical financial statements. In that report, dated April 21, 1989, Touche Ross rendered an opinion that "the financial statements referred to above present fairly, in all material respects, the financial position of Toy King Distributors, Inc. as of January 29, 1989, and the results of its operations and cash flows for the year (52 weeks) then ended in conformity with generally accepted accounting principles."

Touche Ross also appended to the pro forma an independent auditor's review report on pro forma financial information. In that report, dated June 5, 1989, Touche Ross cautioned that "[a] review is substantially less in scope than an examination, the objective of which is the expression of an opinion on management's assumptions, the pro forma adjustments and the application of those adjustments to historical financial information. Accordingly, we do not express such an opinion."

In the finalized pro forma, therefore, Touche Ross rendered an opinion only as to the accuracy and reasonableness of the debtor's historical financial information as of January 29, 1989, that came from its audited books and records. Touche Ross did not render an opinion about the accuracy, reasonableness, or propriety of management's assumptions concerning the effect of a reorganization on the debtor's financial condition, although it did indicate that "nothing came to our attention that caused us to believe that management's assumptions do not provide a reasonable basis" for the pro forma adjustments.

Liberty received a copy of the finalized pro forma in its entirety prior to the closing of the Liberty loan.

In early June 1989, TKA paid into the debtor the $10,000 new capital,[30] the debtor cancelled the old stock, and the newly reorganized debtor acquired right and title to all of debtor's property subject to the confirmed plan of reorganization.

3. *Liberty waives the requirement to obtain a Touche Ross opinion letter.*

Prior to the closing of the Liberty loan, a representative from Touche Ross called Horne and asked him whether the bank required the opinion letter. Horne reviewed the finalized pro forma and compared it to the debtor's internal balance sheets. The debtor's May 28, 1989, balance sheet included both the $1,010,000 capital contributions and the $1.9 million equity derived from use of the "quasi-reorganization" accounting methodology that were assumptions used in the pro forma. The May 28, 1989, internal balance sheet showed a net loss of $421,000, resulting in a corresponding reduction in the net equity. Thus, the May 28, 1989, balance sheet showed net equity in the debtor in the approximate amount of $2.5 million. Horne understood that $1 million of this equity was to be funded through the Liberty loan.

After reviewing these papers, Horne concluded that the debtor's balance sheets corroborated the information and assumptions used in drafting the pro forma. He therefore determined that the opinion letter was unnecessary. Accordingly, TKA did not engage Touche Ross to prepare an opinion letter, and Touche Ross did no further work on behalf of TKA or the debtor that is relevant to this proceeding.

During these events, Liberty knew it was entering uncharted waters by making

---

agement's plan in regard to this settlement includes obtaining a one million dollar capital infusion and a $500,000 revolving working capital loan from T.K. Acquisitions, Inc. The loan is to be secured by the company's inventory. Should the company not return to profitability there is reason-

able doubt about its ability to continue as a going concern without an additional infusion of capital or debt financing.

30. There is no evidence in the record to show who paid this money and in what amounts.

a large loan for the use of a company emerging from bankruptcy reorganization. Liberty also knew that the loan was for the benefit of, and would be repaid from, the operations of the debtor. The net equity covenant contained in the commitment letter was critical to the debtor's ability to pay that loan in the event that the debtor did not perform as expected. Liberty knew that the debtor had lost money for the three years prior to the reorganization and that there was a going concern qualification with respect to the debtor's future performance stated in the pro forma.

Liberty had confidence in Morrow and Angle, however, and relied upon their representations as to the debtor's financial condition as assurance that the bank was protected in making the loan to TKA.

Willard M. Iman ("Iman") testified as the plaintiff's banking expert. He opined that Liberty was imprudent in making the Liberty loan to TKA without first obtaining an opinion letter from Touche Ross that corroborated the net worth that was projected to be in the debtor after its reorganization. Iman stated that Liberty was especially imprudent in the face of losses before confirmation that caused a 20 percent erosion of the equity as shown in the pro forma and in light of the going concern qualification. The court credits this testimony on all of these points.

### 4. The debtor does not have $2 million in equity following the Toy King I confirmation.

Although both sides stipulated that the commitment letter contained a net worth covenant as a condition of the Liberty loan, there is a dispute as to the what the debtor's equity was to include. The defendants assert that the equity requirement included the capital contribution from the loan proceeds anticipated to occur after the closing of the loan and shown on the pro forma and debtor's balance sheet under assets as a stock subscription receivable and under shareholder's equity as preferred stock. Horne testified repeatedly throughout the trial to that effect.

The plaintiff, on the other hand, asserts that a plain reading of the commitment letter in conjunction with generally accepted accounting principles mandate a conclusion that the equity requirement did not include the $1 million capital contribution shown in the pro forma and the balance sheet. Robert J. McCarthy ("McCarthy"), the plaintiff's accounting expert, testified that generally accepted accounting principles would not permit the debtor to put $1 million into assets until the event occurred that caused that money to be available to the debtor. Accordingly, the debtor could not show $1 million in assets prior to the funding of the Liberty loan to satisfy a condition of the loan itself. The court credits this testimony and does not credit Horne's testimony on this point.

In addition, the evidence suggests that in fact Horne himself did not look to the $1 million capital contribution arising from the Liberty loan to satisfy Liberty's equity requirement. For example, Horne's notes made in furtherance of the loan approval exclude the $1 million capital contribution from his estimation of the debtor's net equity.

Moreover, it is clear from the evidence that the parties to the Liberty loan could not have reasonably believed under any set of facts that $1 million of the loan could be infused into the debtor as a lump sum capital contribution as part of a single transaction or event even after the Liberty loan closed. The parties knew that $1 million of the loan was to be held in a letter of credit in favor of the debtor to be incrementally drawn down to pay the plan dividends to unsecured creditors. All parties to the loan understood that the letter of credit would be drawn down over a period of at least 90 days. Horne, Morrow, Angle, and Zychinski, the Touche Ross accountant, were all certified public accountants with a better than average understanding of basic accounting princi-

ples. Each one knew or should have known that the letter of credit could not be posted as an asset on TKA's or the debtor's balance sheets until it was actually drawn upon and then only in the amount of the specific draw. Accordingly, Liberty, TKA, the debtor and all individuals involved in negotiating and executing the Liberty loan knew or should have known that the $1 million capital contribution shown as a stock receivable creating $1 million in shareholder's equity was not accurate or realistic.

In addition, the parties to the Liberty loan knew or should have known that it was unlikely that the debtor could service the Liberty loan through dividend payments on its stock owned by its shareholder, TKA. The parties understood that the debtor was projected to post a loss for every month and would therefore be unable to declare dividends in any amount. McCarthy testified as to all of these points, and the court credits his testimony.

On the other hand, it would have been feasible from an accounting perspective for TKA to use $500,000 of the Liberty loan proceeds to make a capital contribution in the debtor after the Liberty loan closed. This could have been effected by TKA taking an immediate draw in the full amount on that line of credit and then using the proceeds to make a purchase of preferred stock in the debtor in the amount of $500,000. This treatment would also have been completely consistent with the requirements of the commitment letter.

TKA could not structure its capital contribution in the debtor in this way, however, because TKA had a direct obligation to C & S that had to be satisfied from the $500,000 line of credit proceeds at the closing of the Liberty loan. TKA was required to draw down the line of credit to pay C & S directly and thus could not use those monies to purchase preferred stock in the debtor. Horne, Morrow, and Angle all knew that TKA had an obligation to C & S in some amount. Each knew therefore that TKA could not make a capital contribution in the debtor using the full proceeds of the $500,000 line of credit.

For the foregoing reasons, the court concludes that the $2 million equity required as a condition of making the Liberty loan was to exclude any monies from the Liberty loan itself.

As stated in Section IV.E.3. above, Horne relied upon the Touche Ross pro forma as verification of the debtor's net equity following the Toy King I confirmation. The net equity shown in the pro forma derived solely from the adjustments made as a consequence of management's projections and assumptions provided to Touche Ross, including the "quasi-reorganization" accounting convention. Without those adjustments the debtor's historical financial statements, which were audited and as to which Touche Ross rendered an opinion, showed the debtor as having a substantial negative net worth. Accordingly, the equity that Liberty was relying on in its loan analysis came solely from assumptions and projections provided by Morrow. Touche Ross offered no opinion as to the management assumptions used in formulating the pro forma.

As to the Touche Ross pro forma and the assumptions upon which it is based, it is clear from the evidence that Morrow crafted the assumptions provided to Touche Ross for its use in drafting the pro forma in a way that would give maximum positive effect to the debtor's net worth while at the same time ignoring or discounting anything that would have an adverse effect.

As the court noted above, Morrow was inaccurate and unrealistic in his projections of a $1 million cash or cash equivalent capital contribution. Morrow also projected the prepetition dividend liabilities in an amount that was $200,000 less than he estimated in the debtor's disclosure statement prepared at around the same time, and substantially less than the claims that were filed and allowed as of

that date. Morrow used, instead, an arbitrary amount that he estimated would be the debtor's full liability after the debtor completed its claims litigation. These adjustments served to depress the debtor's liabilities and inflate the debtor's assets.

Morrow fixed the debtor's post-petition liabilities at a point in time when the debtor's sale cycle had come full circle, thereby ignoring the liabilities and losses that he knew the debtor would incur in the pre-Christmas months. He also refused to estimate the debtor's liabilities ensuing from lease rejection damages because they were "contingent," a specious and somewhat ironic reason considering that the pro forma was prepared at a time when the only fact that was not "contingent" was that the debtor would operate at a loss. Finally, Morrow failed to show as a liability of the debtor the $500,000 that TKA was to loan the debtor from the proceeds of the Liberty loan.

Thus, Morrow was able to create an inflated statement of the debtor's net worth by giving an exaggerated and unrealistic effect to the capital contribution through the stock subscription receivable while at the same time omitting or downplaying projected liabilities.

Had TKA engaged Touche Ross to prepare an opinion letter that attested to the reasonableness of management's assumptions and the debtor's financial statements as to the debtor's net worth, Touche Ross would have conducted an examination that would have looked at these assumptions and financial records in depth. McCarthy testified that such an examination would have included an examination of TKA's and the debtor's financial statements to determine the propriety of the related transaction shown as a $1 million capital contribution. He also testified that an examination would have required scrutiny of the debtor's books and records to deter-

mine with specificity the debtor's actual liabilities in existence at the time of the examination. The court credits all of McCarthy's testimony on those points.

It is reasonable to conclude, therefore, that, had Touche Ross conducted such an examination, it would have adjusted the pro forma balance sheet to exclude the $1 million capital contribution, while at the same time increasing the liabilities in some amount. These adjustments, together with the $421,000 net loss that the debtor posted between January 29, 1989, and May 28, 1989, would have shown net equity in the debtor in an amount much less than the required $2 million.[31] McCarthy also testified that, in his expert opinion, the debtor did not have $2 million in equity following the Toy King I confirmation. The court credits McCarthy's testimony on this point.

Accordingly, the court determines that the debtor did not have $2 million in equity immediately following the Toy King I confirmation and prior to closing the Liberty loan. The court further concludes that Touche Ross would have been unable to render an opinion that verified equity of $2 million in the debtor as required by the commitment letter.

### 5. The Liberty loan closes.

TKA and Liberty finalized the Liberty loan in mid-June following the completion and release of the Touche Ross pro forma. TKA and Liberty executed a master promissory note that provided for the payment of interest, on the first day of each calendar month, at a fixed rate on the first $700,000 and at two percent above the prime rate on the remaining balance due. The principal was due and payable on June 30, 1990, although there was no penalty for prepayment. The defendants represented that the parties had a verbal agreement that at least $900,000 of the principal

---

**31.** Indeed, assuming that Touche Ross made no adjustments to the debtor's balance sheet other than eliminating the $1 million capital contribution from the asset and shareholder's equity sections, the debtor would show a net worth of only $1.5 million as of May 28, 1989, representing only 75 percent of the equity required by the commitment letter.

would be paid prior to December 31, 1989, notwithstanding the June 30, 1990, maturity date. The master promissory note further provided that it was to be construed and enforced according to the laws of the State of Georgia.

TKA, Liberty, and Toy King also executed a revolving credit and security agreement on June 9, 1989, which incorporated by reference the master note. The documents included provisions for loan supplements or extensions to be incorporated within the terms of the documents with a borrowing limit of no more than $1.5 million in aggregate indebtedness at any time.

The debtor pledged inventory, account balances, stock, and all products and/or proceeds of any of the foregoing as security for the payment of the master note and "all obligations whatsoever of borrower or Toy King." Liberty filed Uniform Commercial Code financing statements in Alabama, Florida, South Carolina, Virginia, and Wisconsin in June 1989. These financing statements did not specifically identify proceeds and products as part of the bank's collateral.

Toy King, Morrow, and Angle signed joint and several unconditional guaranties. As collateral for the loan, Morrow pledged undeveloped real property, two life insurance policies, and shares of stock in an acquisition company. Angle pledged undeveloped real property[32] and two life insurance policies. King did not sign a guaranty.

Woodward, the Hunsakers, and Ranney all signed limited guaranties. Each limited guaranty was capped: Woodward's in the amount of $350,000; Hunsaker II's in the amount of $175,000; and Hunsaker III's and Ranney's in the amount of $87,500 each. These limited guaranties totaled $700,000. Each of the limited guarantors pledged as collateral a master repurchase agreement with a face amount of the capped limited guaranty exposure. Accordingly, Liberty held cash, cash equivalents, or real estate as collateral in the undisputed amount of at least $1 million.

Liberty did not denominate any of the pledged collateral as primary or secondary. Every guarantor was jointly and severally liable to Liberty.[33] Each guaranty was identical in its language with the exception of the dollar limitation contained in the limited guaranties. The provisions of each guaranty were applicable to "all renewals, amendments, extensions, consolidations and modifications" to the loan documents.[34] Also, each guaranty specifically provided that the guarantor waived and agreed not to assert or take advantage of

... any defense based on the failure of Lender to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other persons or non-action on the part of any other person whosoever, in connection with any obligation hereby guaranteed ... any defense based upon failure of Lender to commence an action

32. During the pendency of this adversary proceeding, the court entered an order permitting the substitution of a certificate of deposit for the real property (Document No. 110).

33. The guaranty documents all stated that:
This is a guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower or any other person, nor against securities or liens available to Lender, its successors, successors-in-title, endorsees or assigns.

34. Each guaranty stated that:
The provisions of this Guaranty shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of the Loan Documents, and any and all references herein to the Loan documents shall be deemed to include any such renewals, extensions, amendments, consolidations or modifications thereof. This Guaranty unconditionally guarantees the performance of all obligations to Lender made on behalf of Borrower by any officer, partner, or agent of Borrower.

against Borrower ... the failure of Lender to perfect any security or to extend or renew the perfection of any security; or ... any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.[35]

Finally, each guaranty stated that it was a "guaranty of payment and performance and not of collection. The liability of Guarantor under this Guaranty shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against Borrower...."

As additional protection for Liberty, the guarantor defendants pledged a life insurance policy on King's life.

Finally, M & D executed an agreement that subordinated to Liberty $294,382 of its right to payment on the claims it had acquired from First Union. This represented the balance that would remain after an initial payment of $121,000.62.[36]

Thus, the loan as finalized differed in several material ways from the loan that was approved by the senior loan committee. The most important change, of course, was the change in obligor from the debtor to TKA with the debtor becoming an unconditional guarantor of the loan. The finalized loan was also not supported by an unconditional guaranty by King. In addition, the finalized loan was supported by limited guaranties in an amount $200,000 less than approved.[37]

Iman testified that, in his opinion, Liberty was imprudent in making a loan on terms different than those approved and

35. The guaranty of payment and performance contains the following text:

> Guarantor waives any right to require that an action be brought against any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person or to require that resort be had to any security or to any balance of any deposit account or credit on the books of Lender in favor of Borrower or any other person. Guarantor hereby waives and agrees not to assert or take advantage of (a) the defense of the statute of limitations in any action hereunder or for the collection of the indebtedness or the performance of any obligation hereby guaranteed; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of Guarantor or any other person or entity, or the failure of Lender to file or enforce a claim against the estate (either in administration, bankruptcy, or any other proceeding) of Borrower or any other person or entity; (c) any defense based on the failure of Lender to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any person whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon an election of remedies by Lender which destroys or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Borrower for reimbursement, or both; (e) any defense based upon failure of Lender to commence an action against Borrower; (f) any duty on the part of Lender to disclose to Guarantor any facts it may now or hereafter know regarding Borrower; (g) acceptance or notice of acceptance of this Guaranty by Lender; (h) notice of presentment and demand for payment of any of the indebtedness or performance of any of the obligations hereby guaranteed; (i) protest and notice of dishonor or of default to Guarantor or to any other party with respect to the indebtedness or performance of obligations hereby guaranteed; (j) any and all other notices whatsoever to which Guarantor might otherwise be entitled; (k) any defense based on lack of due diligence by Lender in collection, protection or realization upon any collateral securing the indebtedness evidenced by the Note; (l) the invalidity or unenforceability of any of the Loan Documents; (n) any transfer by Borrower of all or any part of the security encumbered by the Loan Documents, (o) the failure of Lender to perfect any security or to extend or renew the perfection of any security; or (p) any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled.

36. *See* note 59 *infra* for the specifics of how this amount was determined.

37. The court calculates this amount by subtracting $700,000 in limited guaranties ($350,000 from Woodward, $175,000 from Hunsaker II, and $87,500 each from Hunsaker III and Ranney) from the $900,000 ($450,000 each from Woodward and Hunsaker II) stated in the May 10, 1989, senior loan committee minutes.

memorialized in the May 10, 1989, senior loan committee minutes. The court credits this testimony.

The loan closed on June 14, 1989. At about this time, Woodward acquired 20 percent or more of the shares of TKA, and the Hunsakers and Ranney each acquired less than 20 percent of the shares of TKA stock.[38]

### F. TOY KING'S SUBSEQUENT FINANCIAL CONDITION.

#### 1. Immediate borrowings.

The debtor operated at a loss throughout the pendency of the Toy King I bankruptcy case.[39] As discussed earlier, its financial condition worsened before confirmation, necessitating further borrowing from the parent.[40] This borrowing enabled the debtor to operate through confirmation and until the closing of the Liberty loan.

At the closing of the Liberty loan, TKA immediately drew on the $500,000 line of credit in the amount of $320,530.15. Of this sum, $18,707.22 was paid out in closing fees and costs, including attorney's fees. Liberty also made a direct payment to C & S in the amount of $301,822.93 to pay down TKA's obligation to C & S. As a result of this payment, TKA had no obligation to C & S after this date, although the line of credit remained open.

Despite the pay down of the C & S line of credit, TKA did not execute or deliver to the debtor a satisfaction of Notes 1 and 2. Instead, it continued to hold those notes, allocating them as being supported by the Liberty loan instead of the C & S line of credit. Essentially, TKA substituted the Liberty loan indebtedness for the C & S

line of credit indebtedness as the underlying obligation of the parent.

After payment of loan-related expenses and the payment to C & S, only $179,469.85 remained on the Liberty line of credit to be used for the ordinary operating expenses of the reorganized debtor. Because the bulk of the $500,000 line of credit simply replaced the borrowing on the C & S line of credit that occurred immediately before and after confirmation, the Liberty loan resulted in scant positive net effect on the debtor's financial condition.

#### 2. Balance sheets.

According to the debtor's balance sheets, however, the financial condition of the debtor appeared to be healthy. The balance sheet of May 28, 1989, stated the debtor's assets as $5,222,483, liabilities as only $2,718,146, and shareholder's equity as $2,504,336. It appeared from the balance sheet, therefore, that the debtor had substantial equity and was in a good position to weather the slow sales months to come.

The court, however, credits the testimony of McCarthy that the debtor's balance sheets are not credible or reliable evidence of the debtor's true financial condition. McCarthy based his opinion, in part, on the debtor's use of the "quasi-reorganization" accounting convention. Because that convention overstates assets while reducing liabilities, the shareholder's equity that results from the application of the "quasi-reorganization" accounting convention is phantom equity. It is essentially unrealizable. In McCarthy's opinion that the court credits, therefore, the debtor's use of the "quasi-reorganization" accounting con-

---

**38.** See note 6 supra. Ultimately, TKA's shares were distributed proportionately as follows:

| Shareholder | Ownership percentage |
| --- | --- |
| Woodward | 30.0 |
| Morrow | 20.0 |
| Angle | 20.0 |
| Hunsaker II | 15.0 |
| Hunsaker III | 7.5 |
| Ranney | 7.5 |
| | 100.0 |

**39.** The monthly operating report filed with the court in Toy King I for the month ending May 28, 1989, showed a loss of $907,057.

**40.** TKA made funds available to the debtor from its C & S line of credit.

vention resulted in a substantial exaggeration of the debtor's net worth.

McCarthy testified that "purchase" or "fresh start" accounting would more accurately state the debtor's true financial position upon confirmation. Using "fresh start" accounting, the assets of the debtor would have been valued at their allocable part of the amount used to purchase the company, in this case $10,000, representing what a willing buyer, here the new shareholders, were willing to pay for the business.[41] The court credits this testimony for the purpose of determining the solvency or insolvency of the debtor.

McCarthy also opined that the debtor's balance sheets contained material omissions or misrepresentations that resulted in an overstatement of assets and an understatement of liabilities.

He testified that the balance sheets should have excluded the "stock subscription receivable" or "parent company receivable" shown as an asset.[42] McCarthy also testified that inventory was inflated, shrinkage was not reflected accurately, and the debtor improperly listed unearned discounts and allowances.

McCarthy testified further that liabilities shown on the balance sheets understated the debtor's borrowings from the parent company, unamortized loan costs, sales taxes, expenses associated with opening of new stores, and lease rejection expenses in connection with closing of old stores.

In addition, the debtor's balance sheets booked some of the monies received from TKA from the Liberty loan as liabilities, some as equity, and some not at all. For purposes of payment, however, the debtor repaid all of the monies received from or on behalf of TKA as if they were loans or liabilities. McCarthy testified that liability cannot be equity and the monies the debtor received from the parent company were therefore not consistently or accurately reflected on the balance sheets.

Finally, McCarthy opined that, at the very least, the debtor was thinly capitalized at all times following confirmation. The court credits McCarthy's testimony on all of these points.

### 3. *Asset valuation.*

R. Steven Haas, plaintiff's expert on valuation, testified that the debtor's inventory and fixed assets, as reflected on its balance sheets, were overstated in value. Haas testified that the debtor's inventory as of January 28, 1990, was comprised of a substantial amount of stale or seasonal goods that were saleable only at greatly reduced prices, if at all. He opined that the debtor's inventory as of January 28, 1990, was worth only 50 percent of the amount stated

---

**41.** McCarthy relied upon the AICPA Task Force Statement of Position 90–7 dated November 19, 1990, "Financial Reporting by Entities in Reorganization of the Bankruptcy Code." It states that, at the time of reorganization, assets should be recorded on the basis of reorganization value and liabilities should be recorded at fair value so that reorganization value generally approximates the fair value of the entity before considering liabilities and approximates the amount a willing buyer would pay for the assets of the entity immediately after restructuring.

Thus, under "fresh start" accounting, the "purchase price" or "new value" contributed to the reorganized entity represents the true value of the debtor's assets, without regard to its liabilities. The debtor's liabilities are stated at "fair value," and the shareholder's equity is determined accordingly. The following examples illustrate this accounting principle with varying "purchase" price amounts.

| | Assets | Liabilities | Shareholder's Equity |
|---|---|---|---|
| Example 1 | $150,000 | $100,000 | $50,000 |
| Example 2 | 100,000 | 100,000 | 0 |
| Example 3 | 50,000 | 100,000 | (50,000) |

**42.** McCarthy relied upon *Montgomery's Auditing* (10th ed.), pages 778–79, an authority recognized by certified public accountants nationwide. It states that:

For financial statement purposes, however, such receivables (whether for shares already issued or to be issued) should be deducted from capital stock issued or subscribed, as appropriate, and additional paid-in capital. This accounting is required for all SEC registrants and, in the author's opinion, is appropriate for all companies.

on the debtor's balance sheet on that date. Haas formulated this opinion using extensive information from the debtor's books and records from the months of January and February 1990. Haas testified at trial that this opinion was "absolute." The court credits this opinion.

Haas also opined that the debtor's inventory on July 30, 1989—an earlier date—was worth 70 percent of the amount stated on the debtor's balance sheet on that date. Haas testified further that it was appropriate to use the same valuation for the May 28, 1989, inventory because the debtor's sales figures between May 28, 1989, and July 30, 1989, suggested that its inventory mixture did not change between those dates. Accordingly, Haas opined that the debtor's inventory on May 28, 1989, was also worth 70 percent of the amount stated on the debtor's balance sheet of the same date.

Haas acknowledged at trial that his opinion as to the worth of the debtor's inventory in May and July 1989 was only a "ballpark figure" because he did not have access to all the information needed to reach a firm valuation.[43]

The court credits Haas' testimony with respect to his observation that he did not see an appreciable difference between the value of the debtor's inventory between May and July 1989. The court does not, however, credit Haas' opinion as to a valuation of 70 percent of the stated worth of the debtor's inventory in May and July 1989. Instead, the court credits McCarthy's opinion that a retailer coming out of a successful reorganization is left with a substantial amount of residual inventory that cannot be sold at a normal margin. McCarthy testified that this occurs because the debtor expedites sales and tries to turn over its inventory more rapidly during a reorganization than during normal operations.

For reasons that will be more fully explicated in Section IV.G.4. of this opinion, the court concludes that the debtor's inventory from May 23, 1989, and at all times thereafter was inventory that in substantial part was not susceptible to sale at a normal mark up. Accordingly, the court concludes that the debtor's inventory at all times after the confirmation of Toy King I was overstated on its balance sheets by 50 percent.[44]

Haas also testified as to the value of the debtor's fixed assets. Haas opined that, at all times between the confirmation of Toy King I and the filing of Toy King II, the debtor's furniture, fixtures, and equipment had a value that did not exceed $52,000. He further opined that the debtor's permanent assets, including leasehold improvements and point of sale equipment, and this $52,000 of furniture, fixtures, and equipment, had a value that did not exceed $130,000 at any time during this period.[45]

43. McCarthy, the plaintiff's accounting expert, testified that, at the time Toy King II was filed, the debtor's books and records represented only about five percent of the records that one would expect a debtor with operations of the size and volume of the debtor to have. Most of the records that the debtor had in its possession at that time concerned the debtor's operations in the months immediately preceding the filing of Toy King II or concerned the debtor's satellite operations rather than its corporate office operations. The court credits this testimony.

44. The weight of the evidence clearly supports this conclusion. The debtor had sold off its good inventory during the reorganization in its efforts to raise money. Accordingly, the court concludes that the debtor's inventory

mix at the time of confirmation was comparable in type and quality to the debtor's inventory on January 28, 1990, and should therefore be valued similarly. In addition, the evidence suggests that the debtor did not change its purchasing habits between the confirmation of Toy King I and the filing of Toy King II. In other words, the debtor suffered from a poor inventory mix, stale products, inadequate product lines (most notably a lack of Nintendo products) and the like, from the time that Morrow first acquired Toy King up to the time that the unsecured creditors filed their involuntary petition initiating Toy King II.

45. Haas expressed no opinion as to the worth of the debtor's automobiles and trucks. The court, therefore, will accept the debtor's fig-

The court credits this opinion for the purpose of determining the debtor's financial condition.

### 4. *Toy King is insolvent.*

Based upon the credited testimony of these experts, the court is required to adjust the balance sheets presented by the debtor. Where the evidence permits, the court has made adjustments to the debtor's balance sheets in accordance with this expert testimony. As shown in the notes, the court adopts these adjusted balance sheets as illustrative of the debtor's true financial condition.[46] These balance sheets

ures before depreciation as to the value of the debtor's vehicles.

**46.** The court has adjusted the debtor's balance sheets consistent with the evidence and credited testimony of McCarthy and Haas. Specifically, the court has adjusted the assets to eliminate the parent company receivable (shown as a stock subscription), as well as to reduce the value of the debtor's inventory and fixed assets. The court has adjusted the liabilities in accordance with the debtor's actual receipt of monies from TKA as stipulated by the parties. Finally, the court has adjusted the shareholder's equity to eliminate the paid-in capital occurring from the "quasi-reorganization" accounting convention and to eliminate the preferred stock of $1,000,000.

Although McCarthy testified credibly that the debtor's balance sheets as presented to the court overstated the prepaid expenses and improperly included unearned discounts, the court cannot adjust for these overstatements because the record contains insufficient evidence on these points. McCarthy also testified credibly that the debtor's balance sheets understated its liabilities, including lease rejection costs, costs of opening new stores, unamortized loan costs, or sales taxes, but again the court cannot adjust the balance sheets because the record contains no specific evidence of these understatements.

Accordingly, the court adopts the following balance sheet, as adjusted by the court, as its finding of fact as a reasonable approximation of the true financial picture of Toy King on the stated date:

MAY 28, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---|---|
| ASSETS: | | |
| CASH | 32,639.05 | 32,639.05 |
| RECEIVABLES | | |
| MISC. STOCK | 25,663.66 | 25,663.66 |
| SUBSCRIPTION | | 1,000.000.00 |
| INVENTORY | 1,786,509.91 | 3,573,019.81 |
| PREPAIDS | 89,501.95 | 89,501.95 |
| NET FIXED ASSETS | 273,548.26 | 430,692.70 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 70,965.90 | 70,965.90 |
| TOTAL ASSETS | 2,278,828.73 | 5,222,483.07 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 538,166.91 | 538,166.91 |
| EXPENSES | 213,667.77 | 213,667.77 |
| DISTRIBUTION PAYABLE PREPETITION DEBT | 1,168,107.00 | 1,168,107.00 |
| ACCRUED PAYROLL | 0.00 | 0.00 |
| ACCRUED INTEREST | 0.00 | 0.00 |
| ACCRUED EXPENSE | 308,092.14 | 308,092.14 |
| ACCRUED RENT | 0.00 | 0.00 |
| CREDIT MEMOS | 718.27 | 718.27 |
| (PARENT CO.) BORROWINGS | 180,000.00 | 180,000.00 |
| TAX LIABILITIES | 0.00 | 0.00 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 15,731.05 | 15,731.05 |

do not reflect "purchase" or "fresh start" accounting.[47] The court notes, however,

| | | |
|---|---:|---:|
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 2,718,865.14 | 2,718,146.67 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.50 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |
| COMMON STOCK | 10,000.00 | 10,000.00 |
| RETAINED EARNINGS (LOSS) | (450,036.41) | (421,439.30) |
| TOTAL SHAREHOLDER'S EQUITY | (440,036.41) | 2,504,336.20 |
| TOTAL LIABILITIES AND EQUITY | 2,278,828.73 | 5,222,483.07 |

47. The record does not contain sufficient information for the court to calculate how the application of "fresh start" accounting would impact the debtor's balance sheets prepared between May 28, 1989, and January 29, 1990. It is clear, however, that the use of "fresh start" accounting would significantly decrease the value of the debtor's assets.

For example, McCarthy opined that the debtor's assets would have a $10,000 value at the time of confirmation using the "purchase" or "fresh start" accounting convention. The court credited this testimony.

McCarthy did not testify, however, as to the "fair value" of the debtor's liabilities using "purchase" or "fresh start" accounting. It is unclear, therefore, what adjustments, if any, would be made to the debtor's liabilities to represent their "fair value" at the time of confirmation. The court assumes, however, that any such adjustment would be minor because the debtor's prepetition liabilities were substantially reduced, fixed, and determined at the time of confirmation and all of the debtor's post-petition liabilities were without dispute.

The court adopts the following balance sheet as illustrative of the debtor's worth around the time of the confirmation of Toy King I using "purchase" or "fresh start" accounting. In so doing, the court credits McCarthy's opinion that the "purchase" or "fresh start" value of the debtor's assets was the $10,000 of new capital contributed under the plan. The court also adopts its corrected statement of liabilities as of May 28, 1989.

MAY 28, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---:|---:|
| ASSETS: | | |
| TOTAL ASSETS | 10,000.00 | 5,222,483.07 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 538,166.91 | 538,166.91 |
| EXPENSES | 213,667.77 | 213,667.77 |
| DISTRIBUTION PAYABLE PREPETITION DEBT | 1,168,107.00 | 1,168,107.00 |
| ACCRUED PAYROLL | 0.00 | 0.00 |
| ACCRUED INTEREST | 0.00 | 0.00 |
| ACCRUED EXPENSE | 308,092.14 | 308,092.14 |
| ACCRUED RENT | 0.00 | 0.00 |
| CREDIT MEMOS | 718.27 | 718.27 |
| (PARENT CO.) BORROWINGS | 180,000.00 | 180,000.00 |
| TAX LIABILITIES | 0.00 | 0.00 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 15,731.05 | 15,731.05 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 2,718,865.14 | 2,718,146.67 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.50 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |

that use of this accounting convention would reflect an even graver financial posture for the debtor dating from the confirmation of Toy King I on May 23, 1989, through the filing of Toy King II on February 12, 1990.

Adjusting the May 28, 1989, balance sheet in accordance with these findings, the court determines that the debtor showed a negative net worth of at least $450,036.41 at the time of confirmation. The debtor plainly was insolvent then. As these figures clearly illustrate, the little cash remaining on the Liberty line of credit was inadequate for the debtor's needs.

### 5. Inventory reports.

Haas also testified that the debtor prepared inventory reports that valued its inventory by pricing it at its retail price, rather than the lowest sale price or cost. This retail price was calculated by multiplying cost by an anticipated gross margin of 41.8 percent, or approximately 174 percent of the initial cost of goods. The margin used exceeded even the most favorable projections used by the debtor and was unrealistic, especially given the fact that 30 to 34 percent of the debtor's inventory was comprised of stale or obsolete merchandise. In addition, the debtor included defective, return, and "field destroy" merchandise in its inventory counts, thereby further inflating the value of the inventory.

Haas opined that the debtor's use of this methodology in valuing its inventory was "unusual."

The debtor's use of a retail valuation methodology, particularly with this 41.8 percent margin, substantially inflated the calculated value of its inventory in its reports. The debtor sent these inventory reports to Liberty each month with its balance sheets. The debtor also sent these reports to McCarthy. It is unclear from the evidence whether the trade creditors received these inventory reports.[48]

### G. OTHER POST-CONFIRMATION DEVELOPMENTS.

#### 1. The Liberty line of credit is exhausted.

Although it appeared that the debtor had navigated the shoals of bankruptcy, the future was not clear sailing, and the debtor was ill-equipped to handle the approaching storms. The debtor was in the down cycle for sales and was also attempting to open new stores in Mississippi, Pennsylvania, and Maryland. It had very little capital to sustain its operations. At the same time, it needed inventory to stock its stores for the coming Christmas season.

By mid-July, TKA had drawn most of the money remaining on the $500,000 line of credit.[49] All of the monies in turn were

| | | |
|---|---|---|
| COMMON STOCK | 10,000.00 | 10,000.00 |
| RETAINED EARNINGS (LOSS) | (2,698,864.14) | (421,439.30) |
| TOTAL SHAREHOLDER'S EQUITY | 0.00 | 2,504,336.20 |
| TOTAL LIABILITIES AND EQUITY | 10,000.00 | 5,222,483.07 |

48. There is no evidence to show why the debtor sent inventory reports to McCarthy. Nor is there any evidence to show what use, if any, McCarthy made of the inventory reports. McCarthy's employment as accountant for the unsecured creditors committee in Toy King I effectively ceased long before the debtor confirmed its plan in Toy King I. It appears from the record that McCarthy did little or no work for the unsecured creditors committee in Toy King I after December 1988.

49. The $500,000 line of credit was disbursed to TKA and loaned to the debtor as follows:

| Date | Amount | TK Note |
|---|---|---|
| 06/15/89 | $320,530.15 | 1 & 2 * |
| 06/15/89 | 75,000.00 | 3 |
| 07/12/89 | 80,000.00 | 4 |
| 09/06/89 | 6,885.00 | 8 |
| 10/03/89 | 17,584.85 | 15 ** |
| | $500,000.00 | |

* It appears from the evidence that no note was given by TK to support its obligation to pay to TKA $60,530.15 of this sum. It is clear, however, that the $18,707.22 paid by TKA to Liberty for loan fees and costs was included in the first disbursement.
** Although the parties only stipulated to 14 notes, the evidence clearly shows that the debtor made

made available to the debtor and in most cases, the debtor executed unsecured notes in favor of TKA. The interest rate on the TK notes was in all cases at least one percent more than TKA was obligated to pay to Liberty.[50] All of these notes were demand notes.

Despite its rapidly dwindling cash, the debtor continued to make interest payments to TKA, including the additional interest upcharge of one percent, on every penny it received from the parent's borrowing from Liberty and C & S. The debtor also paid TKA guaranty fees tied to the parent's C & S line of credit indebtedness.

In addition, Morrow and Angle received salaries that exceeded the salaries paid during the pendency of Toy King I. Both Morrow and Angle worked part-time for the debtor, and each received an annual salary of $75,000 following the confirmation of Toy King I.[51]

The debtor also paid fees to AMI for management services. There is no evidence in the record as to the specific services that AMI provided to the debtor or the amount of fees it received for those services. AMI, TKA, and M & D each had its office at the debtor's business premises. The evidence, however, does not show how the premises were divided or who paid the operating costs for those premises.

### 2. *The C & S line is drawn again.*

As the Liberty line of credit was exhausted, the debtor began to look for a new source of capital. The debtor approached Liberty for an additional loan as early as June 27, 1989. Liberty, however, declined. Nevertheless, Liberty did consent to waive the prohibition contained in the commitment letter and its loan documents against further borrowing and sent a letter to that effect to TKA.

Accordingly, between August 7, 1989, and September 8, 1989, TKA drew on the C & S line in the amount of $250,000 and in turn made the money available to the debtor to pay its ordinary operating expenses.[52] The debtor executed unsecured demand notes in favor of TKA at a rate of interest, to be paid monthly, that was at least one percent more than the interest paid by TKA to C & S.[53] As stated earlier,

payments to TKA on 15 notes. The debtor's payments on note 15 are consistent in timing and amount with an obligation incurred in early October in the amount of $17,584.85. This sum was disbursed to the debtor together with $30,749.78 remaining on $1 million letter of credit no later that October 3, 1989.

50. The difference between the amount that TKA paid Liberty and the debtor paid TKA will be more specifically calculated in note 57 *infra*. Calculating this amount is made difficult because, in its payments to Liberty, TKA did not distinguish between interest paid on the $500,000 line of credit and the $1 million letter of credit.

51. Morrow's annual salary during the pendency of Toy King I was $60,000. The debtor's tax return for the fiscal year beginning on February 1, 1989, and ending on January 31, 1990, reflects that Morrow received a total of $71,269 in salary for that period.

Angle's annual salary during the pendency of Toy King I was $15,000. The debtor's tax return for the fiscal year beginning on February 1, 1989, and ending on January 31, 1990, reflects that Angle received a total of $53,962 in salary for the period.

There is no evidence in the record that shows exactly how much time each week that Morrow and Angle spent performing services on behalf of the debtor and how much time they spent performing services for the other companies that they owned.

52. TKA borrowed from the C & S line of credit and in turn loaned to the debtor monies as follows:

| Date | Amount | TK Note |
|------|--------|---------|
| 08/07/89 | $125,000 | 5 |
| 08/03/89 | 65,000 | 6 |
| 09/08/89 | 50,000 | 7 |
| 09/22/89 | 10,000 | 10 |
| | $250,000 | |

53. TKA paid interest to C & S as follows:

| Date | Amount |
|------|--------|
| 09/26/89 | $2,491.67 |
| 10/25/89 | 2,583.33 |
| 11/30/89 | 2,500.00 |
| | $7,575.00 |

TK paid interest to TKA as follows:

| Date | Amount | Note |
|------|--------|------|
| 08/24/89 | $1,171.88 | 5 |
| 08/24/89 | 219.38 | 6 |
| 09/26/89 | 1,453.12 | 5 |
| 09/26/89 | 755.62 | 6 |

TKA's promissory note to C & S required interest payments to be made quarterly and the principal to be paid on December 30, 1989.

In addition, TKA charged the debtor "guaranty fees" ostensibly tied to the C & S line of credit. These fees were essentially funneled through TKA, the actual obligor on the C & S line of credit, and distributed equally to the individual guarantors on the C & S line of credit, Morrow, Angle, and Woodward.[54] There was no writing between the debtor and TKA with respect to these "guaranty fees."

Initially, the "guaranty fees" were one percent, but beginning in September all "guaranty fees" were increased to two percent. The "guaranty fees" were tied to specific notes executed by the debtor, and accordingly the debtor paid "guaranty fees" even during months in which TKA owed no money to C & S and the actual

| 09/26/89 | 431.25 | 7 |
| 09/26/89 | 33.75 | 10 |
| 10/25/89 | 1,406.25 | 5 |
| 10/25/89 | 731.25 | 6 |
| 10/25/89 | 581.25 | 7 |
| 10/25/89 | 116.25 | 10 |
| 11/20/89 | 1,406.25 | 5 |
| 11/20/89 | 731.25 | 6 |
| 11/20/89 | 562.50 | 7 |
| 11/20/89 | 112.50 | 10 |
| 12/28/89 | 46.88 | 5 |
| 12/28/89 | 24.38 | 6 |
| 12/28/89 | 18.75 | 7 |
| 12/28/89 | 3.75 | 10 |
| | $9,806.26 | |

Accordingly, TK paid $1,825 more in interest to TKA than TKA paid to C & S prior to November 15, 1989 ($6,900 minus $5,075) and $406.26 more after November 15, 1989 ($2,906.26 minus $2,500).

54. The evidence suggests that the debtor paid guaranty fees beginning in April 1989, although the specifics of the early payments are not in evidence. The evidence does show that the debtor paid guaranty fees as follows:

| Date | Amount |
| --- | --- |
| 05/30/89 | $ 2,500.00 |
| 06/20/89 | 1,760.75 |
| 08/24/89 | 1,175.81 |
| 09/28/89 | 4,680.00 |
| 10/25/89 | 5,166.66 |
| 12/08/89 | 5,000.00 |
| | $20,283.22 |

guarantors were in no danger of being called upon to perform on their guaranties.[55]

The defendants put forward no credible explanation for why the debtor, neither obligor nor guarantor of the C & S obligation, paid these fees to the parent company, TKA, the actual obligor on the note. The court credits the testimony and opinion of Iman, plaintiff's banking expert, that these "guaranty fees" were excessive and unreasonable.

### 3. *Toy King makes plan payments to creditors.*

During this time, the debtor also began making payments to creditors from the $1 million Liberty letter of credit pursuant to its confirmed plan. These payments were effected by sending a list of the payees and amounts to Liberty who in turn made the payments and debited the letter of credit.[56] The debtor did not execute any note to

TKA in turn distributed the guaranty fees on a pro rata basis to Morrow, Angle, and Woodward at or about the same time. Morrow, Angle and Woodward each received payments as follows:

| Date | Amount |
| --- | --- |
| 05/89 | $ 833.33 |
| 06/89 | 586.92 |
| 08/89 | 391.93 |
| 09/89 | 1,560.00 |
| 10/89 | 1,722.22 |
| 12/89 | 1,666.67 |
| | $6,761.07 |

Accordingly, Morrow, Angle, and Woodward each received $5,094.41 before November 1, 1989, and $1,666.67 after December 1, 1989, in guaranty fees.

55. For example, the debtor paid guaranty fees in May, June, and July in the total amount of $6,601.30 even though TKA owed no money then on the C & S line of credit. The fees paid represented one percent of the outstanding amounts due on Notes 1 and 2. At the time the debtor paid these fees, TKA had allocated these notes as supporting its obligations on the Liberty line of credit after paying off the C & S line of credit obligation. TKA did not borrow against the C & S line of credit again until August 7, 1989.

56. The $1 million letter of credit was debited as follows:

memorialize an indebtedness owed by Toy King to TKA on the $1 million letter of credit. Notwithstanding this lack of documentation, the debtor made regular interest payments to TKA that it credited in service of the $1 million letter of credit obligation. The interest rate that the debtor paid to TKA was at least one percent more than the rate that TKA paid Liberty.[57]

| Date | Amount |
|------|--------|
| 06/28/89 | $ 215,498.61 |
| 09/20/89 | 203,403.81 |
| 09/20/89 | 314,573.61 |
| 09/29/89 | 49,919.36 |
| 09/29/89 | 167,876.70 |
| 10/03/89 | 48,727.91 * |
| | $1,000,000.00 |

* The evidence does not show the exact date that this amount was debited from the letter of credit. It does show, however, that it was debited no later than October 3, 1989. The evidence also shows that $30,749.78 was not used to pay prepetition dividend payments but was rolled over to the $500,000 line of credit to be used for the debtor's general operating expenses. Accordingly, only $969,250.22 of the letter of credit was used to pay prepetition dividend payments.

**57.** TKA paid interest to Liberty as follows:

| Date | Amount |
|------|--------|
| 07/10/89 | $ 1,638.26 |
| 07/31/89 | 6,960.18 |
| 08/31/89 | 6,843.10 |
| 10/03/89 | 8,971.97 |
| 11/01/89 | 14,398.93 |
| 12/04/89 | 14,374.94 |
| 01/02/90 | 14,375.00 |
| 02/06/90 | 8,976.39 |
| 03/02/90 | 8,050.00 |
| | $84,588.77 |

TK paid interest on both the $500,000 line of credit and the $1 million letter of credit (LOC) as follows:

| Date | Amount | Note or LOC |
|------|--------|-------------|
| 05/30/89 | $ 1,740.00 | 1 |
| 05/30/89 | 64.44 | 2 |
| 06/20/89 | 1,087.50 | 1 |
| 06/20/89 | 483.33 | 2 |
| 07/10/89 | 1,087.50 | 1 |
| 07/10/89 | 483.33 | 2 |
| 07/10/89 | 483.33 | 3 |
| 07/27/89 | 2,247.50 | 1 |
| 07/27/89 | 998.89 | 2 |
| 07/27/89 | 996.61 | 3 |
| 07/27/89 | 644.44 | 4 |
| 08/24/89 | 2,134.03 | LOC |
| 08/24/89 | 2,030.00 | 1 |
| 08/24/89 | 902.23 | 2 |
| 08/24/89 | 825.00 | 3 |
| 08/24/89 | 942.23 | 4 |
| 09/26/89 | 6,265.19 | LOC |
| 09/26/89 | 2,025.00 | 1 |
| 09/26/89 | 900.00 | 2 |
| 09/26/89 | 843.75 | 3 |
| 09/26/89 | 900.00 | 4 |
| 09/26/89 | 64.55 | 8 |
| 10/25/89 | 11,625.00 | LOC |
| 10/25/89 | 2,092.50 | 1 |
| 10/25/89 | 930.00 | 2 |
| 10/25/89 | 871.88 | 3 |
| 10/25/89 | 930.00 | 4 |
| 10/25/89 | 80.04 | 8 |
| 11/20/89 | 11,250.00 | LOC |
| 11/20/89 | 2,025.00 | 1 |
| 11/20/89 | 900.00 | 2 |
| 11/20/89 | 843.75 | 3 |
| 11/20/89 | 900.00 | 4 |
| 11/20/89 | 77.45 | 8 |
| 11/20/89 | 389.06 | 15 |
| 12/28/89 | 11,625.00 | LOC |
| 12/28/89 | 540.00 | 1 |
| 12/28/89 | 240.00 | 2 |
| 12/28/89 | 225.00 | 3 |
| 12/28/89 | 483.75 | 4 |
| 12/28/89 | 46.47 | 8 |
| 12/28/89 | 184.64 | 15 |
| 01/29/90 | 10,762.50 | LOC |
| 02/28/90 | 9,450.00 | LOC |
| 03/31/90 | 10,462.50* | LOC |
| 08/02/91 | 149,008.33** | LOC |
| | $254,091.72 | |

* Liberty stipulated that the debtor made this payment directly to it.
** According to the final accounting attached as an exhibit to the debtor's application for final decree (Main Case Document No. 351), the debtor paid Liberty $149,008.33 in interest on the Liberty loan at the same time it paid the outstanding principal.

Accordingly, TK paid $5,865.83 more in interest to TKA than TKA paid to Liberty prior to November 15, 1989 ($44,678.27 minus $38,812.44) and $2,766.29 more after November 15, 1989, and before February 12, 1990 ($40,492.62 minus $37,726.33).

Virtually the first dividend paid under the plan was to M & D in the amount of $138,500 in partial payment of its right to payment under the original First Union claims. (The total amount of that right to payment was $415,382.62, representing 17.5 percent of the face amount of First Union's original claims.)[58] The payment to M & D, in turn, was distributed to Morrow, Angle, and Woodward as princi-

**58.** The debtor made the payment on July 6, 1989, less than three months after M & D paid First Union for the claims. The report of dividends generated on June 26, 1989, carries the claims as to be paid to First Union rather than to M & D. The First Union claims are the only claims that are shown as disputed. In addition, the report lists the First Union

pal, interest, and "profit" and, as a practical matter, reimbursed Morrow and Angle for their purchase of the First Union claims in addition to their equity contribution in the debtor.[59] From this time forward, Morrow and Angle's financial risk on account of the debtor was therefore limited to their personal guaranties.

### 4. Trade credit is king.

Although the debtor continued to operate, it was beset with problems. It could not open its new stores as scheduled.[60] Much of its inventory was stale and inadequately advertised. Inventory shrinkage exceeded industry norms. Most importantly, the debtor's actual sales were below

projections, and the gross margin realized by the debtor was not even close to the anticipated 40 percent.[61]

At the same time, the debtor had a continuing need for inventory. Trade credit was therefore the linchpin of the debtor's post-confirmation operations. After Toy King I was confirmed, each toy manufacturer made an independent credit decision about the debtor, based upon the debtor's current financial status. Many, if not all, of these creditors received a copy of the finalized Touche Ross pro forma. They also received periodic copies of the debtor's internal balance sheets. Each creditor placed primary reliance on the financial reports of the debtor in deter-

claims as paid in full in the amount of $138,500 with 0.00 interest.

59. The parties stipulated that M & D distributed the payment to Morrow, Angle, and Woodward as follows:

| | Angle | Morrow | Woodward |
|---|---|---|---|
| Principal | $63,000.00 | $63,000.00 | $7,000.00 |
| Interest | 4,224.72 | 4,224.72 | 245.43 |
| Profit | 2,105.28 | 2,105.28 | 221.61 |
| | $69,350.00 | $69,350.00 | $7,467.04 |

The amount of the stipulated distribution exceeds the payment by the debtor. A breakdown of the stipulated distribution demonstrates that Morrow and Angle each received 47.45 percent of the distribution, while Woodward received 5.1 percent. Accordingly, the court finds that the debtor paid to Morrow and Angle $65,718.25 of the $138,500 dividend and to Woodward $7,063.50.

The evidence is also confusing with respect to M & D's allocation of principal and interest on its July 6, 1989, dividend payment. The total dividend due on the First Union unsecured claim was $415,382.62. Subtracting the amount owing on the subordinated note, $294,382, from this amount suggests that only $121,000.62 of the $138,500 represented principal. The remainder, in the amount of $17,-499.38, denominated by the individual defendants as interest and "profit," was something else. The parties' stipulation, however, suggests that at least $125,827.23 of the distribution was shown as a principal payment (calculated by multiplying each distribution as found by the court by .9085).

The court finds that the weight of all the evidence in this proceeding more consistently supports $121,000.62 as the actual amount of principal paid by the debtor in the $138,500 distribution to M & D.

60. The parties stipulated that the debtor opened new stores as follows:

| Store | Location | Date Opened |
|---|---|---|
| Bowie | Maryland | October 21, 1989 |
| Hattiesburg | Mississippi | November 11, 1989 |
| Landover | Pennsylvania | November 11, 1989 |

The debtor segregated and staged inventory to be shipped to the new stores on the following schedule:

| Store | September * | October | November | December |
|---|---|---|---|---|
| Bowie | $ 95,916.45 | $54,575.12 | $55,722.33 | $ 44,302.32 |
| Hattiesburg | 87,767.45 | 43,411.50 | 44,597.45 | 105,381.44 |
| Landover | 103,537.43 | 55,458.24 | 48,568.68 | 35,364.57 |

* Although the evidence reflects these inventory values on September 30, 1989, the evidence does not reflect a precise date for the other months. The court assumes that these are all month end figures.

61. The court credits the testimony and opinion of Haas that the debtor's gross margin on sales averaged 25.7 percent during 1989.

mining whether and how much credit to advance the debtor. In addition, each creditor relied on informal reports of the debtor's financial situation provided periodically by Morrow, Angle, and King.

Joseph Stewart, Director of Credit and Collections for Hasbro Industries, Thomas R. Mauntel, Director of Credit Administration for Kenner Products, and James E. Brown, Credit Manager for Fisher Price, Inc., all testified at trial on the above points. Each also testified that, based upon the information provided by the debtor, he believed that the debtor had substantial equity following the confirmation of Toy King I.[62] Each witness testified that he would not have extended credit to the debtor, after the confirmation of Toy King I, absent the equity cushion as shown in the debtor's balance sheets and the Touche Ross pro forma. The court credits this testimony.

Following confirmation, toy manufacturers were initially cautious in extending credit to the debtor. Lines of credit were lower than requested, terms were less generous, and the debtor was encouraged to buy on anticipation.[63] The debtor began placing its orders for the Christmas season beginning in late July. Most of its Christmas inventory needed to be ordered during August for shipment during September and October.[64] Consequently, it was essential that the debtor increase its lines of credit with the toy manufacturers to accommodate its greater inventory needs.

Morrow, Angle, and King sent optimistic letters to the toy manufacturers to induce them to increase the debtor's credit lines. In these letters, they stated that the debtor was exceeding projections and performing well. Angle and King reinforced that message in personal phone calls placed to credit managers.

The gist of these communications was that expenses were below budget and sales were holding steady or higher than projected, thereby allowing the debtor to show a smaller loss than anticipated for the summer months.[65] There was no mention of the fact that the cost of goods used to generate budgeted sales exceeded projections. In addition, Morrow based his calculations of actual versus projected performance using the financial information contained in the debtor's balance sheets, and therefore understated the expenses. Also, none of these communications gave any indication that the debtor was suffering from an extreme shortage of cash. Accordingly, all of these communications were misleading with respect to the financial condition of the debtor at the time they were made.[66]

62. Each witness believed that the debtor had $2.9 million in equity and that, even if the debtor paid out $1 million in plan payments, the debtor would have at least $1.9 million remaining as a cushion during loss months or in the event of disappointing sales.

63. When buying on anticipation, the purchaser receives an effective discount on the price of goods in return for paying some of the indebtedness before the due date. The early payment of the obligation also enables the purchaser to order more goods under the line of credit at an earlier point in time than would otherwise be possible.

64. According to the evidence, toy retailers receive the largest shipments of inventory in August, September, and October for sale during the Christmas season.

65. Morrow calculated these projections based upon sales during 1989 of more than $10 million, a 3.7 turnover of goods during the year, and an anticipated gross margin of 40 percent average on sales. These projections exceeded both the industry's averages and the debtor's historical performance. Consequently, these projections had the effect of projecting smaller accounting losses and reduced cash requirements for the debtor. Morrow projected that the debtor would incur losses during the summer months and would show a profit beginning in December 1989, consistent with other toy retailers in the industry.

66. The trade creditors could not and did not appreciate the extent of this misleading information until after the inception of the Christmas season when the variance between the actual versus projected would be applied to 40 percent or more of the debtor's annual sales.

These communications were further buttressed by the debtor's balance sheets reflecting a positive net equity. As stated earlier, each of these balance sheets utilized "quasi-reorganization" accounting, omitted liabilities, and most importantly, showed $1 million of the Liberty loan as paid-in capital or equity.

Many of the toy manufacturers responded favorably to the debtor's requests for credit line increases, although the total credit was still inadequate to meet the debtor's needs. Nintendo was a notable exception.

### 5. *The Nintendo loan.*

Nintendo products were an integral component of the debtor's business plan. At that time, Nintendo was the leading manufacturer of electronic games and game cartridges and enjoyed a substantial percentage of the market share for such products.[67] Electronic games and game cartridges were very popular and thus sold quickly and with little advertising. Because Nintendo did not produce enough product to satisfy demand, its product could be marked up by the seller more than other kinds of inventory, thereby enhancing the gross margin.

While formulating projections in connection with the confirmation of Toy King I, the debtor projected that 26 percent of its sales would be from Nintendo products. Toy King was unable, however, to negotiate credit terms with Nintendo following confirmation due to the debtor's negative history with Nintendo. Accordingly, all orders placed with Nintendo were on a "cash in advance" basis. In view of Toy King's severely limited cash position, this represented a significant problem.[68]

At the same time, the debtor was forced to purchase a substantial percentage of its general inventory from toy wholesalers, rather than toy manufacturers, with a concomitant increase in the cost of goods. This was due to the debtor's inability to obtain adequate credit from toy manufacturers. The debtor filled in with closeout inventory.[69] Because this kind of inventory was relatively inexpensive, the markup at sale was greater resulting in a higher gross margin. Unfortunately, closeout goods, by their very nature unpopular with the public, also had the potential to depress the gross margin if they could not be sold.

Notwithstanding its limited cash reserves and its anticipated increase in operating costs, the debtor continued faithfully to make its payments of interest to TKA, including the interest upcharge of one percent. The debtor also paid the "guaranty fees" to TKA without fail.[70]

The debtor's cash flow problem became acute. The C & S line of credit had an available balance of $210,000 at this time. The line was inadequate, however, to address fully the debtor's cash flow problems. In addition, Morrow and Angle were keenly aware of their personal exposure on that line and sought to limit that exposure as much as possible.

TKA turned instead to Liberty and, on August 10, 1989, requested additional cred-

---

67. Nintendo had virtually no competitive pressure at this time and had a market penetration of a 95 percent share in its markets.

68. Each of the witnesses testifying on behalf of the toy manufacturers was unaware that Nintendo had refused to extend credit terms to the debtor during the post-confirmation period and that the debtor was on cash only terms for that creditor.

Because the debtor's projections were based upon one quarter of its sales revenues coming from the sale of Nintendo products, Nintendo was one of the debtor's key suppli-

ers. The trade creditors would have been greatly concerned about the debtor's financial viability had they known that it was on a "cash only" basis with one of its most important suppliers.

69. Closeout inventory consists of seasonal, obsolete, or unpopular goods.

70. At this time, the debtor's cost of borrowing monies from TKA on the C & S line of credit was effectively 26.5 percent, inclusive of interest and guaranty fees.

it, the stated purpose of which was to purchase Nintendo products. On August 30, 1989, Horne prepared a three page memorandum to the Liberty loan committee recommending extension of a new $600,000 short-term line of credit to benefit the debtor. The senior loan committee considered the loan request on August 31, 1989. The committee deferred its decision pending further investigation.

Even though Liberty had not yet approved the loan request, TKA executed a promissory note on September 12, 1989. That note granted Liberty a security interest in the same collateral that secured the original Liberty loan, including the debtor's inventory. The note contemplated monthly interest payments with the principal being retired by TKA on December 31, 1989. Morrow and Angle signed the note as officers of TKA.

The debtor was not a signatory on that note. The defendants testified that the note was executed on this date as an accommodation to Liberty because Morrow and Angle were frequently out of town. The court finds this testimony incredible in view of subsequent events.

On September 13, 1989, Liberty received a request from TKA to draw $100,000 from the $500,000 line of credit. The request exceeded the amount available on the line of credit.[71] Liberty made funds available to TKA, notwithstanding the unavailability of funds on the line of credit, and charged it against the $1 million portion of the Liberty loan. TKA, in turn, made those funds available to the debtor. In effect, therefore, the debtor utilized these monies for operating funds with Liberty's full knowledge and consent. Although the $1 million letter of credit had expired by its own terms two days earlier, the loan documents nevertheless limited the $1 million

portion of the loan for the sole use of making payments to creditors under the confirmed plan.

There were a number of meetings between Horne and the senior loan committee to discuss the Nintendo loan request, and the committee sought additional information. Horne ultimately prepared a credit approval/credit memorandum on September 27, 1989, in furtherance of the Nintendo loan request. In that memorandum, Horne wrote that the Nintendo loan would be secured by the same collateral that secured the Liberty loan except that all guarantors would unconditionally guaranty the Nintendo loan and there would be a $350,000 letter of credit to secure advances in excess of $350,000. Horne also recommended that the loan be effected through a letter of credit made payable to Nintendo.

The senior loan committee met on September 27, 1989, to consider the Nintendo loan. At that meeting, the senior loan committee approved the Nintendo loan on the terms submitted by Horne with two exceptions. First, the senior loan committee did not require that the loan be disbursed through a letter of credit to Nintendo.[72] Second, the senior loan committee did not require all guarantors to guaranty unconditionally the Nintendo loan. Instead, the senior loan committee required unconditional guaranties from Woodward and Hunsaker II. The Nintendo loan approval on these terms was memorialized in the senior loan committee's minutes.

Thus, there were significant differences between the Nintendo loan and the Liberty loan. First, the Nintendo loan was short-term and required payment of the entire balance within three months. Second, the loan contained no provisions for

---

71. At this time, there remained only $17,584.85 available from the $500,000 line of credit to be used for operations. On the other hand, $784,501.39 remained on the $1 million portion of the Liberty loan.

72. Of course, by the time this meeting occurred Liberty had already advanced $100,000 to TKA from the debtor's letter of credit and knew that those funds would need to be replaced from the Nintendo loan proceeds.

further extensions or repayment of principal. Third, the loan was to be secured with an additional letter of credit in the amount of $350,000. Finally, the loan was to be unconditionally guarantied by two additional guarantors, Woodward and Hunsaker II.

The loan as ultimately structured was not in accord with the terms approved by the senior loan committee, except that it did not permit further extensions or advances and was to be repaid on December 31, 1989. After the approval of the Nintendo loan, TKA informed Liberty that the individual guarantors were unwilling to provide a letter of credit to secure the loan.[73] Although Liberty prepared and sent for execution the paperwork that would have expanded the guaranties, none of the paperwork that would have effected those changes was ever signed. Instead, the debtor, Morrow, Angle, Hunsaker II, Hunsaker III, and Ranney signed amendments that simply carried over their guaranties from the Liberty loan. Woodward did not sign an amended guaranty.

Liberty charged a loan fee of .005 percent of the total indebtedness, or $3,500. It is unclear from the record whether this fee was ever paid or, if so, who paid it.

On September 30, 1989, Liberty posted and established a note with a maximum availability of $700,000 effective September 12, 1989, and maturing on December 31, 1989. Also on that date, Liberty posted the $100,000 line of credit "overdraw" advances of September 13 to the Nintendo loan effective September 13, 1989. At the same time, Liberty debited the debtor's letter of credit for the charge posted on September 13, 1989.

Iman, the plaintiff's banking expert, testified that Liberty's actions in advancing funds prior to the receipt of signed loan documents and on terms different and materially less advantageous than those that the senior loan committee approved were imprudent. The court credits this testimony.

The Nintendo loan was fully drawn down by October 17, 1989. TKA disbursed the monies to Toy King as they were drawn.[74] Toy King in turn executed unsecured notes in favor of TKA. The interest rate on the Toy King notes exceeded the interest rate charged to TKA by Liberty by at least one percent.[75] All of the notes were demand notes.

Notably, Toy King used less than a quarter of the monies obtained through the Nintendo loan to purchase Nintendo

---

73. The individual guarantors could not reach a consensus as to the letter of credit due to the serious illness of Woodward's spouse.

74. The Nintendo loan was disbursed as follows:

| Date | Amount | Note |
|---|---|---|
| 09/13/89 | $100,000.00 | 9 |
| 10/03/89 | 300,000.00 | 11 |
| 10/11/89 | 100,000.00 | 12 |
| 10/13/89 | 100,000.00 | 13 |
| 10/14/89 | 100,000.00 | 14 |
| | $700,000.00 | |

75. TKA paid interest on the Nintendo note to Liberty as follows:

| Date | Amount |
|---|---|
| 11/01/89 | $ 6,631.94 |
| 12/01/89 | 57,291.67 |
| 01/09/90 | 2,916.67 |
| | $16,840.28 |

TK paid interest to TKA as follows:

| Date | Amount | Note |
|---|---|---|
| 09/26/89 | $ 675.00 | 9 |
| 10/25/89 | 1,162.50 | 9 |
| 10/25/89 | 3,262.50 | 11 |
| 10/25/89 | 787.50 | 12 |
| 10/25/89 | 712.50 | 13 |
| 10/25/89 | 562.50 | 14 |
| 11/20/89 | 1,125.00 | 9 |
| 11/20/89 | 3,375.00 | 11 |
| 11/20/89 | 1,125.00 | 12 |
| 11/20/89 | 1,125.00 | 13 |
| 11/20/89 | 1,125.00 | 14 |
| 12/28/89 | 675.00 | 9 |
| 12/28/89 | 457.00 | 11 |
| 12/28/89 | 1,050.00 | 12 |
| 12/28/89 | 1,050.00 | 13 |
| 12/28/89 | 1,050.00 | 14 |
| | $19,319.50 | |

Accordingly, TK paid $530.56 more in interest to TKA than TKA paid to Liberty prior to November 15, 1989 ($7,162.50 minus $6,631.94) and $1,948.66 more in interest than TKA after November 15, 1989 ($12,157 minus $10,208.34).

products.[76] The rest of the monies were used to pay ordinary operating expenses.

## H. *THE FINAL CHAPTER.*

### 1. *Christmas is no help.*

As the debtor moved into the 1989 Christmas season, the debtor's financial situation worsened dramatically. November's actual sales were much lower than projected by the debtor.[77] Because this was the debtor's peak sales season, the disparity between projected gross margin and actual gross margin, attributable in part to higher acquisition costs and poor product, was more marked.[78] In short, all of the previous bad business decisions and siphoning of cash by management, in the guise of interest upcharges and guaranty fees,[79] was coming home to roost with a vengeance.

During the 1989 Christmas season, all toy retailers experienced slow sales, and most discounted their sale prices early in the season. The debtor was reluctant to do this for fear that it would further reduce its gross margin. The debtor did not discount until right before Christmas and consequently had little opportunity to boost its sales.

This delay in discounting, coupled with poor inventory mix, inadequate capital, and the continuous bleeding of the debtor's scant cash, sounded the death knell for the debtor.[80] It became clear to Morrow, Angle, and King that the debtor was going to post a substantial loss for the year and would not be able to meet its deferred obligations to its trade creditors. The debtor's days as an independent operating entity were clearly numbered. At the same time, the due dates for payment to trade creditors for the debtor's inventory were fast approaching.[81] As important to Morrow and Angle, the due dates for payment of principal by TKA on the C & S and the Liberty Nintendo obligations were imminent.

Morrow wrote a letter to Liberty dated October 17, 1989, and advised the bank that the debtor was experiencing a downturn in sales. Horne met with Morrow and Angle on November 17, 1989, and learned that a loss was projected for the year and that TKA did not believe that it would be able to make any principal prepayments on the $1.5 million loan.

As shown in the notes, the debtor's liabilities exceeded its assets throughout this period as they had from the date of confir-

**76.** The defendants stipulated that only $357,815.18 of the Nintendo loan was used to purchase Nintendo product. The defendants stipulated to the following payments:

| Date | Amount |
|------|--------|
| 7/20 | $ 1,954.07 |
| 8/07 | 9,034.68 |
| 8/21 | 72,814.68 |
| 9/11 | 6,919.69 |
| 9/25 | 89,510.55 |
| 10/11 | 62,647.90 |
| 12/01 | 114,933.51 |
| | $357,815.18 |

Of this amount, however, $90,723.12 in purchases occurred before the Nintendo loan was made and $114,933.51 in purchases occurred long after the Nintendo loan was completely drawn down. Accordingly, the court concludes that the debtor used only $152,158.45 of the Nintendo loan proceeds for the purchase of Nintendo products.

**77.** This was especially problematic because November was one of the two months in each calendar year when toy retailers historically recoup their losses for the rest of the year.

**78.** For example, in his December 18, 1989, letter to Horne, Morrow indicated that the debtor performed 40 percent below budget for the first two weeks in December.

**79.** By this time, TKA was charging the debtor a two percent guaranty fee so that the debtor was effectively paying 37 percent for the use of monies borrowed by the parent on the C & S line of credit, inclusive of interest and guaranty fees.

**80.** The debtor's sales were 7.6 percent less than projected, while cost of inventory was 4.6 percent higher. The debtor was able to turn over its inventory only 2.4 times in contrast to its projected turnover of 3.8.

**81.** This liability was in excess of $3 million by this time.

mation.[82] By October 29, 1989, the debt- or's liabilities exceeded its assets by at

**82.** The court has adjusted the debtor's balance sheets consistent with the evidence and credited testimony of McCarthy and Haas. Specifically, the court has adjusted the assets to eliminate the parent company receivable (shown as a stock subscription), as well as to reduce the value of the debtor's inventory and fixed assets. The court has adjusted the liabilities in accordance with the debtor's actual receipt of monies from TKA as stipulated by the parties. Finally, the court has adjusted the shareholder's equity to eliminate the paid-in capital occurring from the "quasi-reorganization" accounting convention and to eliminate the preferred stock of $1,000,000.

Although McCarthy testified credibly that the debtor's balance sheets as presented to the court overstated the prepaid expenses and improperly included unearned discounts, the court cannot adjust for these overstatements because the record contains insufficient evidence on these points. McCarthy also testified credibly that the debtor's balance sheets understated its liabilities, including lease rejection costs, costs of opening new stores, unamortized loan costs, or sales taxes, but again the court cannot adjust the balance sheets because the record contains no specific evidence of these understatements.

Accordingly, the court adopts the following balance sheets, as adjusted by the court, as its findings of fact as a reasonable approximation of the true financial picture of Toy King on the stated dates:

### JULY 2, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
| --- | --- | --- |
| ASSETS: | | |
| CASH | 71,124.98 | 71,124.98 |
| RECEIVABLES | | |
| MISC. | 20,781.54 | 20,781.54 |
| STOCK SUBSCRIPTION | 0.00 | 784,501.39 |
| INVENTORY | 1,782,304.46 | 3,564,608.92 |
| PREPAIDS | 89,784.07 | 89,784.07 |
| NET FIXED ASSETS | 273,548.26 | 437,522.00 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 75,802.90 | 75,802.90 |
| TOTAL ASSETS | 2,313,346.21 | 5,044,125.90 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 512,063.96 | 512,063.96 |
| EXPENSES | 70,695.82 | 70,695.82 |
| DISTRIBUTION PAYABLE PREPETITION DEBT | 1,165,831.96 | 1,165,831.96 |
| ACCRUED PAYROLL | 0.00 | 0.00 |
| ACCRUED INTEREST | 0.00 | 0.00 |
| ACCRUED EXPENSE | 224,777.55 | 224,777.55 |
| ACCRUED RENT | 0.00 | 0.00 |
| CREDIT MEMOS | 0.00 | 0.00 |
| (PARENT CO.) | | |
| BORROWINGS | 611,028.76 | 335,000.00 |
| TAX LIABILITIES | 0.00 | 0.00 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 15,377.00 | 15,377.00 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 2,894,157.05 | 2,618,128.29 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.50 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |
| COMMON STOCK | 10,000.00 | 10,000.00 |
| RETAINED EARNINGS (LOSS) | (590,810.84) | (499,777.89) |
| TOTAL SHAREHOLDER'S EQUITY | (580,810.84) | 2,425,997.61 |

| TOTAL LIABILITIES AND EQUITY | 2,313,346.21 | 5,044,125.90 |

## JULY 30, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---|---|
| ASSETS: | | |
| CASH | 29,365.22 | 29,365.22 |
| RECEIVABLES | | |
| MISC. | 25,342.52 | 25,342.52 |
| STOCK SUBSCRIPTION | 0.00 | 784,501.39 |
| INVENTORY | 1,793,224.52 | 3,586,449.04 |
| PREPAIDS | 105,616.22 | 105,616.22 |
| NET FIXED ASSETS | 273,548.26 | 436,490.10 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 74,129.90 | 74,129.90 |
| TOTAL ASSETS | 2,301,226.64 | 5,041,894.39 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 612,561.43 | 612,561.43 |
| EXPENSES | 67,458.16 | 67,458.16 |
| DISTRIBUTION PAYABLE PREPETITION DEBT | 914,511.14 | 914,511.14 |
| ACCRUED PAYROLL | 20,865.50 | 20,865.50 |
| ACCRUED INTEREST | 8,000.00 | 8,000.00 |
| ACCRUED EXPENSE | 273,208.28 | 273,208.28 |
| ACCRUED RENT | 25,998.68 | 25,998.68 |
| CREDIT MEMOS | 0.00 | 0.00 |
| (PARENT CO.) BORROWINGS | 691,028.76 | 415,000.00 |
| TAX LIABILITIES | 55,992.11 | 55,992.11 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 15,023.03 | 15,023.03 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 2,979,029.09 | 2,703,000.33 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.00 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |
| COMMON STOCK | 11,110.00 | 11,110.00 |
| RETAINED EARNINGS (LOSS) | (688,912.45) | (587,990.94) |
| TOTAL SHAREHOLDER'S EQUITY | (677,802.45) | 2,425,997.61 |
| TOTAL LIABILITIES AND EQUITY | 2,301,226.64 | 5,041,894.39 |

## AUGUST 27, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---|---|
| ASSETS: | | |
| CASH | 51,352.83 | 51,352.83 |
| RECEIVABLES | | |
| MISC. | 24,192.72 | 24,192.72 |
| STOCK SUBSCRIPTION | 0.00 | 784,501.39 |
| INVENTORY | 2,025,621.75 | 4,051,243.49 |
| PREPAIDS | 117,124.60 | 117,124.60 |
| NET FIXED ASSETS | 273,548.26 | 616,477.86 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 114,907.90 | 114,907.90 |
| TOTAL ASSETS | 2,606,748.06 | 5,759,800.79 |

| LIABILITIES: | | |
|---|---|---|
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 1,167,921.87 | 1,167,921.87 |
| EXPENSES | 254,675.26 | 254,675.26 |
| DISTRIBUTION PAYABLE | | |
| PREPETITION DEBT | 914,511.14 | 914,511.14 |
| ACCRUED PAYROLL | 21,875.50 | 21,875.50 |
| ACCRUED INTEREST | 9,400.56 | 9,400.56 |
| ACCRUED EXPENSE | 215,073.11 | 215,073.11 |
| ACCRUED RENT | 15,358.70 | 15,358.70 |
| CREDIT MEMOS | (192.82) | (192.82) |
| (PARENT CO.) BORROWINGS | 881,028.76 | 605,000.00 |
| TAX LIABILITIES | 38,105.36 | 38,105.36 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 14,669.02 | 14,669.02 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 3,826,808.46 | 3,550,779.70 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.00 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |
| COMMON STOCK | 11,110.00 | 11,110.00 |
| RETAINED EARNINGS (LOSS) | (1,231,160.40) | (717,863.91) |
| TOTAL SHAREHOLDER'S EQUITY | (1,220,060.40) | 2,209,021.09 |
| TOTAL LIABILITIES AND EQUITY | 2,606,748.06 | 5,759,800.79 |

### OCTOBER 1, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---|---|
| ASSETS: | | |
| CASH | 53,898.98 | 53,898.98 |
| RECEIVABLES | | |
| MISC. | 26,946.64 | 26,946.64 |
| STOCK SUBSCRIPTION | 0.00 | 37,634.78 |
| INVENTORY | 2,265,248.92 | 4,530,497.84 |
| PREPAIDS | 116,602.38 | 116,602.38 |
| NET FIXED ASSETS | 295,255.26 | 683,983.42 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 115,607.90 | 115,607.90 |
| TOTAL ASSETS | 2,873,560.08 | 5,565,171.94 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 1,674,869.07 | 1,674,869.07 |
| EXPENSES | 336,453.03 | 336,453.03 |
| DISTRIBUTION PAYABLE | | |
| PREPETITION DEBT | 128,412.76 | 128,412.76 |
| ACCRUED PAYROLL | 52,714.22 | 52,714.22 |
| ACCRUED INTEREST | 4,680.00 | 4,680.00 |
| ACCRUED EXPENSE | 173,406.11 | 173,406.11 |
| ACCRUED RENT | 15,358.70 | 15,358.70 |
| CREDIT MEMOS | (397.71) | (397.71) |
| (PARENT CO.) BORROWINGS | 1,783,687.24 | 778,770.00 |
| TAX LIABILITIES | 52,207.42 | 52,207.42 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 33,105.07 | 33,105.07 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 4,548,877.91 | 3,164,266.18 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.50 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |

least $1,860,956.05.[83] The November 26, 1989, balance sheet posted the $1 million

| | | |
|---|---|---|
| COMMON STOCK | 11,110.00 | 11,110.00 |
| RETAINED EARNINGS (LOSS) | (1,686,427.83) | (905,673.73) |
| TOTAL SHAREHOLDER'S EQUITY | (1,675,317.83) | 2,021,211.27 |
| TOTAL LIABILITIES AND EQUITY | 2,873,560.08 | 5,565,171.94 |

83. The court has adjusted the debtor's balance sheet consistent with the evidence and credited testimony of McCarthy and Haas. Specifically, the court has adjusted the assets to eliminate the parent company receivable (shown as a stock subscription), as well as to reduce the value of the debtor's inventory and fixed assets. The court has adjusted the liabilities in accordance with the debtor's actual receipt of monies from TKA as stipulated by the parties. Finally, the court has adjusted the shareholder's equity to eliminate the paid-in capital occurring from the "quasi-reorganization" accounting convention and to eliminate the preferred stock of $1,000,000.

Although McCarthy testified credibly that the debtor's balance sheets as presented to the court overstated the prepaid expenses and improperly included unearned discounts, the court cannot adjust for these overstatements because the record contains insufficient evidence on these points. McCarthy also testified credibly that the debtor's balance sheets understated its liabilities, including lease rejection costs, costs of opening new stores, unamortized loan costs, or sales taxes, but again the court cannot adjust the balance sheets because the record contains no specific evidence of these understatements.

Accordingly, the court adopts the following balance sheet, as adjusted by the court, as its findings of fact as a reasonable approximation of the true financial picture of Toy King on the stated date:

OCTOBER 29, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---|---|
| ASSETS: | | |
| CASH | 114,019.87 | 114,019.87 |
| RECEIVABLES | | |
| MISC. | 51,677.60 | 51,677.60 |
| STOCK SUBSCRIPTION | 0.00 | 37,634.78 |
| INVENTORY | 2,641,825.38 | 5,283,650.75 |
| PREPAIDS | 118,982.90 | 118,982.90 |
| NET FIXED ASSETS | 295,255.26 | 734,379.18 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 115,607.90 | 115,607.90 |
| TOTAL ASSETS | 3,337,368.91 | 6,455,952.98 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 2,347,458.00 | 2,347,458.00 |
| EXPENSES | 191,222.46 | 191,222.46 |
| DISTRIBUTION PAYABLE | | |
| PREPETITION DEBT | 116,928.33 | 116,928.33 |
| ACCRUED PAYROLL | 56,788.67 | 56,788.67 |
| ACCRUED INTEREST | 0.00 | 0.00 |
| ACCRUED EXPENSE | 173,406.11 | 173,406.11 |
| ACCRUED RENT | 15,358.70 | 15,358.70 |
| CREDIT MEMOS | (517.89) | (517.89) |
| (PARENT CO.) BORROWINGS | 2,450,000.00 | 1,378,770.00 |
| TAX LIABILITIES | 58,590.77 | 58,590.77 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 32,342.59 | 32,342.59 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 5,735,959.74 | 4,664,729.74 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.00 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |

letter of credit as a liability rather than as preferred stock for the first time. By this time, the debtor's trade creditors had shipped to the debtor all of its inventory for the Christmas selling season. The debtor's liabilities continued to exceed its assets throughout the Christmas season.[84]

| | | |
|---|---:|---:|
| COMMON STOCK | 11,110.00 | 11,110.00 |
| RETAINED EARNINGS (LOSS) | (2,409,700.83) | (1,135,661.76) |
| TOTAL SHAREHOLDER'S EQUITY | (2,398,590.83) | 1,791,223.24 |
| TOTAL LIABILITIES AND EQUITY | 3,337,368.91 | 6,455,952.98 |

**84.** The court has adjusted the debtor's balance sheet consistent with the evidence and credited testimony of McCarthy and Haas. Specifically, the court has adjusted the assets to eliminate the parent company receivable (shown as a stock subscription), as well as to reduce the value of the debtor's inventory and fixed assets. The court has adjusted the liabilities in accordance with the debtor's actual receipt of monies from TKA as stipulated by the parties. Finally, the court has adjusted the shareholder's equity to eliminate the paid-in capital occurring from the "quasi-reorganization" accounting convention.

Although McCarthy testified credibly that the debtor's balance sheets as presented to the court overstated the prepaid expenses and improperly included unearned discounts, the court cannot adjust for these overstatements because the record contains insufficient evidence on these points. McCarthy also testified credibly that the debtor's balance sheets understated its liabilities, including lease rejection costs, costs of opening new stores, unamortized loan costs, or sales taxes, but again the court cannot adjust the balance sheets because the record contains no specific evidence of these understatements.

Accordingly, the court adopts the following balance sheet, as adjusted by the court, as its findings of fact as a reasonable approximation of the true financial picture of Toy King on the stated date:

NOVEMBER 26, 1989, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---:|---:|
| ASSETS: | | |
| CASH | 582,800.16 | 582,800.16 |
| RECEIVABLES | | |
| MISC. | 33,003.44 | 33,003.44 |
| STOCK SUBSCRIPTION | 0.00 | 0.00 |
| INVENTORY | 2,514,775.65 | 5,029,551.30 |
| PREPAIDS | 136,557.40 | 136,557.40 |
| NET FIXED ASSETS | 295,255.26 | 827,074.77 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 115,607.90 | 115,607.90 |
| TOTAL ASSETS | 3,677,999.81 | 6,724,594.97 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 2,393,707.17 | 2,393,707.17 |
| EXPENSES | 455,842.17 | 455,842.17 |
| DISTRIBUTION PAYABLE | | |
| PETITION DEBT | 116,928.33 | 116,928.33 |
| ACCRUED PAYROLL | 70,192.27 | 70,192.27 |
| ACCRUED INTEREST | 0.00 | 0.00 |
| ACCRUED EXPENSE | 173,406.11 | 173,406.11 |
| ACCRUED RENT | 15,358.70 | 15,358.70 |
| CREDIT MEMOS | (673.51) | (673.51) |
| (PARENT CO.) BORROWINGS | 2,450,000.00 | 2,389,469.85 |
| TAX LIABILITIES | 93,164.58 | 93,164.58 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 31,580.11 | 31,580.11 |
| SUBORDINATED NOTE PAYABLE (M & D) | 294,382.00 | 294,382.00 |
| TOTAL LIABILITIES | 6,093,887.93 | 6,033,357.78 |

Morrow testified that he knew in December that the debtor would be unable to pay all of its debts as they came due. On December 14, 1989, Morrow began advertising the availability of the debtor for sale or merger in the *Wall Street Journal.* On December 18, 1989, Morrow wrote a letter to Liberty stating that the debtor was now projecting a "sizable" loss and was beginning a deep discount program. In addition, Morrow advised the bank that he had put the company up for sale or merger.

### 2. *Preparing for the inevitable.*

As the end drew inevitably nearer, the debtor began making payments of principal to TKA on its demand notes for the stated purpose of enabling TKA to pay down its secured debt on the underlying transactions.[85] The debtor made all of these payments by check drawn on the debtor's operating account and signed by both Morrow and King. There is no evidence in the record that TKA made formal demand on the debtor for these payments of principal.

The debtor also paid to M & D the remaining amount due on the First Union claims in contravention of the subordination agreement and without the written consent of Liberty.[86] The debtor made this payment by check drawn on the debtor's operating account and signed by Morrow.[87] King questioned the propriety of this payment.[88] Morrow and Woodward ultimately received substantially all of the proceeds of this payment.[89] The debtor

| STOCKHOLDER'S EQUITY: | | |
|---|---:|---:|
| PAID–IN–CAPITAL | 0.00 | 1,915,775.00 |
| CAPITAL STOCK | 0.00 | 0.00 |
| COMMON STOCK | 11,110.00 | 11,110.00 |
| RETAINED EARNINGS (LOSS) | (2,426,998.12) | (1,235,647.81) |
| TOTAL SHAREHOLDER'S EQUITY | (2,415,888.12) | 691,237.19 |
| TOTAL LIABILITIES AND EQUITY | 3,677,999.81 | 6,724,594.97 |

85. TKA made payments as follows, having received payments from TK in the same amounts at substantially the same times:

| Date | Amount | To |
|---|---|---|
| 12/01/89 | $ 250,000 | C & S |
| 12/08/89 | 350,000 | Liberty—Nintendo loan |
| 12/18/89 | 350,000 | Liberty—Nintendo loan |
| 12/28/89 | 500,000 | Liberty—1.5M loan |
| 01/08/89 | 100,000 | Liberty—1.5M loan |
| | $1,550,000 | |

86. TK paid $301,006.17 to M & D on December 29, 1989. Of that amount, $294,382 was principal and $6,624.17 was interest.

87. This was the only check executed in payment of principal that did not contain King's signature.

88. King wrote a letter to counsel for the debtor, the pertinent part of which reads as follows:

> Dear Ray,
> It is my understanding from Toy King's Chairman of the Board, Don Morrow, that he met with you on or about December 28, 1989, and discussed the steps that needed to be taken in order for Toy King to get its final decree in Chapter 11 Case # 88–1663. It is my understanding from Mr. Morrow that in order to apply for and get the final

decree, all claims must be paid including the M & D Financial claim for $294,382.63. Subsequently, Mr. Morrow signed a Toy King Distributors, Inc., check for $301,006.17 payable to M & D Financial, Inc., for payment of the above claim on December 29, 1989.
> Please confirm to me in writing that 1) the payment of this claim for the specified amount was necessary in order to apply for and receive a final decree in Chapter 11 Case $[sic] 88–1663, 2) the action in your opinion is proper and legal and 3) that it does not violate any officers fiduciary responsibility.
> I would appreciate your response immediately.
> Sincerely,
> TOY KING DISTRIBUTORS, INC.
> Robert O. King President

There is nothing in the record concerning counsel's response, if any.

Contrary to the statements attributed to counsel in this letter, there was no requirement that M & D be paid to obtain the final decree. *See* Section IV.H.2. and IV.I.2. *infra* for a discussion on this point.

89. Morrow received at least $280,000 of the monies paid to M & D on the subordinated

paid the dividend claim of at least one other Toy King I unsecured creditor during this same period.[90] By this time, the debtor had paid at lest $1,270,256.39 in Toy King I dividends.[91]

The debtor did not prepare a balance sheet for December, even though Morrow had advertised the company for sale or merger. Although the debtor prepared its balance sheets on an inconsistent and irregular schedule dating from the confirmation of Toy King I, this was the first time that the debtor failed to prepare any balance sheet.[92]

Angle divested himself of his interest in TKA and all related companies, including M & D, by selling his shares to Morrow on or about December 23, 1989.[93] At the same time, he resigned his position as an officer and director of the debtor, TKA, and M & D. Angle remained personally liable on TKA's obligations to Liberty and C & S.

In January, Liberty filed Uniform Commercial Code financing statements in all states with Toy King stores except Mississippi.[94] All of these financing statements for the first time specifically included proceeds and products in the description of collateral.

On January 22, 1990, Liberty sent formal notice to TKA that it was closing the

open-ended provision in the Liberty loan note. That provision allowed TKA to make additional draws against the line of credit equivalent to the amount of principal repayments, provided that TKA was not in default of its obligations. The letter simply recognized the financial realties facing both TKA and the debtor, even though TKA was not in default and $500,000 was technically available on the line.

### 3. *VMI makes an offer.*

There were several responses to the *Wall Street Journal* advertisement, among them a response by Wisconsin Toy, Inc. (later known as Value Merchants, Inc., or "VMI"). In mid-January, VMI made an offer to buy the debtor for $1.5 million. Under the terms of the offer, shareholders were to receive stock in VMI with an approximate value of $50,000 while general unsecured creditors were to receive payment of 24 percent of their debts. The offer was effective only until February 8, 1990, and contained numerous contingencies. One of these contingencies was the entry of a final decree in Toy King I.

The trade creditors were dissatisfied with the terms of the proposed merger agreement, principally because it contained an equity distribution in favor of the individual defendants. The creditors felt that any equity distribution to the debtor's

note. Woodward received $10,000. The remaining monies were disbursed to others at the direction of Morrow.

**90.** The parties stipulated that the debtor paid a dividend to Coleco in December 1989.

**91.** The evidence shows that the debtor used $969,250.22 of the letter of credit to make Toy King I dividend payments. This amount, added to the December 29, 1989, payment of $301,006.17 made to M & D, equals $1,270,-256.39. Although there were other Toy King I dividend payments made in December 1989 (e.g., to Coleco), the amounts of those additional payments is not in evidence.

**92.** The debtor prepared its balance sheets on the following dates:

May 28, 1989

July 2, 1989
July 30, 1989
August 27, 1989
October 1, 1989
October 29, 1989
November 26, 1989
January 28, 1990

Except for the gap between November 27, 1989, and January 28, 1990, therefore, the length of time between each balance sheet ranged between 28 and 35 days.

**93.** Angle received as compensation for his interest in TKA and M & D the sum of $29,-500. He testified that this payment represented a repayment of his original contributions in TKA, M & D, and AMI, plus $24,000.

**94.** The parties stipulated that Liberty did not file a UCC–1 financing statement in Mississippi.

principals was unwarranted and unconscionable under the circumstances.

Most of the trade creditors had been creditors of Toy King I. Although these creditors did receive from the debtor payment in satisfaction of their Toy King I claims, that payment represented only 17.5 percent of each creditor's total claim in that case. The merger agreement contemplated payment to unsecured creditors that was only marginally better than the Toy King I dividend, making many of the unsecured creditors two time losers.

At the same time, some of the facts relating to the debtor's actual financial situation were coming to light. Consequently, unsecured creditors were beginning to learn about the debtor's early payment of principal to TKA, payment of subordinated debt to M & D, and the true nature of the debtor's financial arrangements with TKA.

In addition, the trade creditors correctly believed that it was unlikely that the proposed merger could be consummated because of the many contingencies. Both VMI and the debtor lacked the ability to satisfy all of the contingencies. For example, neither VMI nor the debtor had the means to effect the court's entry of a final decree in Toy King I. Indeed, the court itself had no ability to enter a final decree because there was an appeal pending of the bankruptcy court's order awarding attorney's fees. The court could not enter a final decree until that appeal was determined.

## I. THE TOY KING II CASE.

### 1. The trade creditors file an involuntary Chapter 7 petition.

The relationship between the unsecured creditors and the principals of the debtor became very hostile at this point. When it became apparent that an accord could not be reached, several toy manufacturers filed an involuntary Chapter 7 against the debtor on February 12, 1990, commencing this case—Toy King II.

Even though the debtor operated continuously at a loss during the almost nine month period between the confirmation of Toy King I and the filing of Toy King II, TKA and M & D profited handsomely from their relationship with the debtor. The debtor paid TKA [95] $13,342.60 in interest upcharges and $20,283.22 in guaranty fees during that time. Morrow and Angle, of course, received the lion's share of these profits by virtue of their ownership interests in TKA. In addition, the debtor paid generous salaries to both. Finally, both received a handsome profit on their acquisition of the First Union claims in Toy King I through M & D. After the debtor completed all payments on those claims, M & D received $314,506.17 more than it paid for the claims. This represented a "profit" of more than 250 percent, most of which ended up in Morrow's pocket.[96]

The debtor terminated King's employment on January 31, 1990. King resigned as director on February 13, 1990. He subsequently filed a proof of claim (Claim No. 21) on April 24, 1990, for monies owed on his employment contract in the amount of $77,591.89, $2,000 of which he claimed as priority and $75,591.89 of which he claimed as unsecured.

At the time the creditors filed the involuntary petition initiating this case, the debtor's liabilities exceeded its assets.[97] Both the debtor's tax return for 1989 and its balance sheets for January 28, 1990, corroborate the debtor's financial condition. The debtor's 1989 tax return reflects

---

**95.** As shown in prior notes, TKA paid monies it received from the debtor to Liberty, C & S, and individual guarantors. The monies the debtor paid to TKA exceeded the monies TKA paid to these recipients on TKA's obligations. The record does not reflect how TKA distributed these excess amounts.

**96.** *See* notes 59, 86, and 89 *supra*.

**97.** The debtor's schedules reflect that, at the time the petition was filed, the debtor's liabilities were $3,669,570 and its assets were $3,588,406.

net income as a negative $2,673,287 before taking the net operating loss deduction and a negative $5,085,341 after posting the net operating loss deduction. As shown in the notes, the January 28, 1990, balance sheet reflects that, at a minimum, the debtor's liabilities exceeded its assets by at least $1,675,317.83.[98]

98. The court has adjusted the debtor's balance sheet consistent with the evidence and credited testimony of McCarthy and Haas. Specifically, the court has adjusted the assets to eliminate the parent company receivable (shown as a stock subscription), as well as to reduce the value of the debtor's inventory and fixed assets. The court has adjusted the liabilities in accordance with the debtor's actual receipt of monies from TKA as stipulated by the parties. Finally, the court has adjusted the shareholder's equity to eliminate the paid-in capital occurring from the quasi-reorganization accounting convention and to eliminate the preferred stock of $1,000,000.

Although McCarthy testified credibly that the debtor's balance sheets as presented to the court overstated the prepaid expenses and improperly included unearned discounts, the court cannot adjust for these overstatements because the record contains insufficient evidence on these points. McCarthy also testified credibly that the debtor's balance sheets understated its liabilities, including lease rejection costs, costs of opening new stores, unamortized loan costs, or sales taxes, but again the court cannot adjust the balance sheets because the record contains no specific evidence of these understatements.

Accordingly, the court adopts the following balance sheet, as adjusted by the court, as its findings of fact as a reasonable approximation of the true financial picture of Toy King on the stated date:

### JANUARY 28, 1990, BALANCE SHEET

| | COURT ADJUSTED AMOUNTS | DEBTOR'S ORIGINAL AMOUNTS |
|---|---|---|
| ASSETS: | | |
| CASH | 318,147.38 | 318,147.38 |
| RECEIVABLES | | |
| MISC. | 64,872.75 | 64,872.75 |
| STOCK SUBSCRIPTION | 0.00 | 0.00 |
| INVENTORY | 1,169,313.76 | 2,338,627.51 |
| PREPAIDS | 15,995.74 | 15,995.74 |
| NET FIXED ASSETS | 295,255.26 | 664,795.26 |
| DEPOSITS AND AMORTIZABLE LOAN COSTS | 185,968.22 | 185,968.22 |
| TOTAL ASSETS | 2,049,553.11 | 3,588,406.86 |
| LIABILITIES: | | |
| ACCOUNTS PAYABLE | | |
| MERCHANDISE | 1,967,705.57 | 1,967,705.57 |
| EXPENSES | 510,440.85 | 510,440.85 |
| DISTRIBUTION PAYABLE | | |
| PREPETITION DEBT | 0.00 | 0.00 |
| ACCRUED PAYROLL | 23,896.00 | 23,896.00 |
| ACCRUED INTEREST | 0.00 | 0.00 |
| ACCRUED EXPENSE | 0.00 | 0.00 |
| ACCRUED RENT | 0.00 | 0.00 |
| CREDIT MEMOS | 718.27 | 718.27 |
| (PARENT CO.) BORROWINGS | 900,000.00 | 900,000.00 |
| TAX LIABILITIES | 37,571.73 | 37,571.73 |
| NOTE PAYABLE—FORD MOTOR CREDIT | 30,817.63 | 30,817.63 |
| SUBORDINATED NOTE PAYABLE (M & D) | 0.00 | 0.00 |
| TOTAL LIABILITIES | 3,471,150.05 | 3,471,150.05 |
| STOCKHOLDER'S EQUITY: | | |
| PAID–IN–CAPITAL | 0.00 | 1,915,775.00 |
| CAPITAL STOCK | 0.00 | 1,000,000.00 |

### 2. *Closing the Toy King I case.*

The Toy King I case continued to be active long after the filing of Toy King II. The Toy King I debtor filed an application for final decree on January 25, 1990 (Main Case Document No. 428 in Toy King I). The court could not enter the decree, however, because there were matters pending in the case, including objections to claims and a pending appeal of one of the court's orders approving attorney's fees.

The debtor filed a motion for special consideration of application for final decree (Main Case Document No. 430 in Toy King I) on January 31, 1990, in a final bid to consummate the VMI sale before the offer lapsed. The court denied that motion (Main Case Document No. 449 in Toy King I) on June 28, 1990, however, because of the pending matters.

The clerk docketed a notice of the district court's transmittal of the appeal to the court of appeals on August 28, 1990 (Main Case Document No. 450 in Toy King I). The court of appeals dismissed the appeal on January 30, 1991, and the clerk docketed a notice of entry of the dismissal of the appeal on February 6, 1991 (Main Case Document No. 450A in Toy King I). Subsequently, the debtor filed a renewed motion for final decree (Main Case Document No. 451 in Toy King I), and the court entered a final decree (Main Case Document No. 452 in Toy King I) on June 1, 1992.

### 3. *Toy King II becomes a Chapter 11 case.*

After several of the debtor's unsecured creditors filed the involuntary petition under Chapter 7 on behalf of the debtor (Case No. 90–528), the debtor filed a motion to dismiss the case and a motion to convert the case to one under Chapter 11.

The petitioners and the debtor ultimately stipulated to the entry of an order for relief and to the conversion of the case to Chapter 11. The court conducted an evidentiary hearing of the joint motion for order of relief and the motion to convert on April 10, 1990. On April 13, 1990, the court entered an order for relief, effective April 10, 1990, and converted the case to a case under Chapter 11 (Main Case Document No. 52).

The debtor filed its statement of financial affairs and schedules (Main Case Document No. 43) on April 11, 1990. It listed secured debt in the amount of $932,818.97, priority unsecured debt in the amount of $177,295.67, and unsecured debt in the amount of $2,372,118.59.[99]

The same counsel who represented the debtor in the Toy King I case represented the debtor in the Toy King II case. On April 30, 1990, the debtor filed a motion to approve Morrow's salary of $90,000 per year (Main Case Document No. 78A). Several of the debtor's unsecured creditors filed an objection to the motion.

The debtor also immediately filed a motion to approve a sale to VMI of substantially all of the debtor's assets (Main Case Document No. 56A). The proposed sale contemplated that VMI would pay $1.5 million for these assets. The terms of the sale required VMI to pay $1.2 million for the debtor's inventory, $299,000 for the debtor's fixed assets, $500 to assume eight leases, and $500 for the right to purchase goods from Nintendo. The purchase price for the debtor's inventory was subject to adjustment for diminution.

The United States trustee appointed an unsecured creditors committee on May 29, 1990. Many of the creditors on that committee had previously been members of the unsecured creditors committee during the pendency of Toy King I.

| | | |
|---|---|---|
| COMMON STOCK | 11,110.00 | 11,110.00 |
| RETAINED EARNINGS (LOSS) | (1,432,706.94) | (2,809,628.19) |
| TOTAL SHAREHOLDER'S EQUITY | (1,421,596.94) | 117,256.81 |
| TOTAL LIABILITIES AND EQUITY | 2,049,553.11 | 3,588,406.86 |

**99.** The debtor listed as disputed $1,129,333.24 of its unsecured debt.

Although the debtor continued its operations while the motion to sell was pending, it immediately began to close its stores and consolidate its inventory. To further this effort, the debtor filed a number of motions to reject leases.

The court conducted a hearing on the motion to sell the debtor's assets on May 1, 1990. The court heard certain objections and resolved all issues, orally approving the sale on terms substantially the same as those proposed. The court entered its findings of facts and conclusions of law and an order approving the sale on May 11, 1990 (Main Case Documents Nos. 102 and 103). That order required the sale to be concluded no later than noon on May 15, 1990. By this date, the debtor had effectively ceased all operations.

The parties appeared in court on May 15, 1990, and announced that they were unable to consummate the sale on the terms and by the deadline set forth in the court's order. VMI offered at that hearing to purchase the debtor's inventory and fixed assets and to assume three leases for the reduced price of $1,050,000. VMI reduced its offer largely because the debtor's inventory had diminished. On May 17, 1990, the court entered an order approving the sale on the terms announced at the May 15, 1990, hearing (Main Case Document No. 119).

VMI and the debtor completed the sale, and the parties filed a closing statement (Main Case Document No. 169) on June 25, 1990. The debtor received all the proceeds of the sale. Comparing the original VMI offer with the reduced offer ultimately consummated, and considering the fact that VMI reduced its offer because of the diminution in the debtor's inventory, the court concludes that $750,000 of the sale proceeds represented the debtor's inventory, $299,000 represented the debtor's fixed assets, and the remaining $1,000 represented the lease assignments and purchase rights.

The defendants have suggested at various times throughout this proceeding that, through their actions, the petitioning creditors or the official committee of unsecured creditors interfered with the consummation of the original VMI sale and/or delayed the consummation of the second VMI offer. They have further suggested that these actions caused a diminution of the amount ultimately realized by the debtor from its sale of assets to VMI. These assertions are wholly without merit. The actions of the petitioning creditors and the official committee of unsecured creditors in advancing their interests were not wrongful in any respect. Moreover, nothing these creditors did delayed the sale to any material degree. The fact is that the sale occurred as quickly as the bankruptcy process would permit.

The court conducted a contested hearing on June 26, 1990, of the debtor's motion to pay compensation to Morrow. The court subsequently entered an order authorizing the debtor to pay Morrow compensation in the reduced amount of $5,000 per month, or $60,000 per year, only from April 10, 1990, to May 18, 1990. (Main Case Document No. 192) The court further directed Morrow to return to the debtor any compensation that the debtor paid him prior to the entry of the order in excess of the allowed amount.

Morrow was entitled to compensation under that order in the amount of $6,333.33.[100] The debtor's financial reports, filed under penalty of perjury, reflect that Morrow received $20,769.24 in compensation between the dates of April 10, 1990, and June 30, 1990.[101] The debtor's July financial report, reflecting the debtor's business from July 1, 1990, through July 31, 1990, shows a repayment by Morrow pursuant to court order in the

---

100. The court calculates this by dividing $5,000 by 30 days for a per diem salary of $166.66. Multiplying $166.66 by 38 days, representing the period from April 10, 1989, through May 18, 1989, results in $6,333.33.

101. The debtor filed no financial reports prior to the entry of the order of relief. There is no evidence in the record, therefore, of what salary, if any, the debtor paid Morrow between the dates of February 12, 1990, and

amount of $12,014.62. The court concludes, therefore, that Morrow received and continues to hold $2,421.29 in compensation more than the amount to which he was entitled.[102]

Liberty filed a motion for payment of its secured claim (Main Case Document No. 217) on August 15, 1990. The unsecured creditors committee and several unsecured creditors vehemently opposed the motion. The court denied the motion for payment after a hearing.

The court approved the debtor's disclosure statement on November 1, 1990. The court conducted a confirmation hearing on January 29, 1991, and entered a confirmation order on February 12, 1991, exactly one year after the petitioning creditors filed the involuntary petition.

Under the terms of the confirmed plan, the debtor was to pay Liberty's secured claim. The plan further provided that unsecured creditors would be paid any funds remaining up to the full amount of their claims. The debtor ultimately paid Liberty on its secured claim in the amount of $1,049,008.33 on August 2, 1991. This payment was comprised of $900,000 in principal and $149,008.33 in interest.[103] There were no remaining funds, and, therefore, the debtor made no distribution to priority or unsecured creditors. There are pending in this case allowed priority claims in the approximate amount of $273,973.39 and allowed general unsecured claims in the approximate amount of $2,889,908.52.[104]

The court authorized the unsecured creditors committee to pursue any and all of the debtor's claims for the benefit of the priority and unsecured creditors. Liberty was to retain all collateral pledged by the individual guarantors pending the court's determination of the adversary proceeding, if filed. The committee then filed this adversary proceeding by the deadline fixed by the court to do so.

## V. CONSIDERATION OF INDIVIDUAL CLAIMS AND MORE SPECIFIC FACTS.

### A. INTRODUCTION.

The complaint in this adversary proceeding contained claims stated in 16 sepa-

April 9, 1990, although it appears probable that Morrow received compensation in some amount during that period of time.

102. The court calculates this amount by subtracting the $12,014.62 repayment from the total amount paid of $20,769.24, resulting in $8,754.62 as the compensation that Morrow actually received. When the court approved compensation of $6,333.33 is subtracted from the actual compensation of $8,754.62, there is a $2,421.29 balance that has yet to be repaid to the debtor for excess compensation.

103. Post-petition the debtor made one interest payment to TKA in the amount of $9,450. Post-petition TKA made one interest payment to Liberty in the amount of $8,050.

Post-petition the debtor also made one interest payment directly to Liberty in the amount of $10,462.50. The debtor then paid Liberty $149,008.33 in interest on August 2, 1991. Accordingly, the debtor paid directly to Liberty a total of $159,470.63 in interest during the pendency of Toy King II.

Because interest accrued on most of the Liberty loan at a floating rate, the court is unable to determine with accuracy the amount of interest earned by Liberty on a monthly basis between February 12, 1990, and August 2, 1991. In the absence of evidence of the monthly rate of interest applicable to the loan, the court is constrained to determine the interest on a pro rata basis. Accordingly, the court determines that Liberty earned interest at the rate of $297.5202 per day on its claim of $900,000. The court calculates this per diem rate by dividing the total amount of interest paid, $159,470.83, by the number of days, 536, between February 12, 1990, and August 2, 1991.

104. The debtor's schedules reflect general unsecured claims that are not disputed, contingent, or unliquidated in the amount of $612,787.44. In addition, creditors have filed proofs of general unsecured claims in the amount of $2,277,121.08. In those circumstances in which a scheduled claimant filed a proof of claim, the court has subtracted the scheduled amount and added the claimed amount. In those circumstances in which the claimant filing the proof of claim was not scheduled, the court had added the amount of the proof of claim. In this manner, the record shows allowed general unsecured claims in the approximate amount of $2,889,908.52.

rate counts. In addition, the committee objected to the claim of Liberty, and the court consolidated that contested matter with this adversary proceeding. Later, the parties filed several stipulations of fact and law (Document Nos. 31, 43, 87A, 104) that restated, recharacterized, modified, and expanded the claims somewhat. The court dismissed both Liberty's and the individual defendants' counterclaims for the reasons stated orally and recorded in open court at the final pretrial conference (Document No. 59). As made clear in the final order on pretrial conference, the claims and defenses that the court tried are those described in the pretrial stipulation (Document No. 43, 87A and 104).[105]

Before discussing each of the claims, however, the court will initially address threshold or preliminary legal issues that affect the consideration of several claims. These issues involve the legal effect of the confirmation order in Toy King I as it relates to the claims made in this proceeding and the defendants' assertion that the Liberty loan should be recharacterized as a loan made to the debtor rather than to TKA.

### B. THRESHOLD LEGAL ISSUES.

1. *What is the effect of the commitment letter as included in the order of confirmation in Toy King I?*

■ Initially, the parties dispute the effect of the confirmation order in Toy King I as it relates to the obligations of Liberty and the borrowers and guarantors under the commitment letter. Liberty says that the commitment letter was nothing but a private contract under which it agreed to lend money. Once it lent the money, the terms of the loan documents themselves establish all rights and obligations of the parties, and the commitment letter itself loses any independent significance.

The plaintiff, on the other hand, says that the commitment letter became a spe-

cific order of the court that Liberty and the others were bound to follow. In that sense, Liberty was bound to perform and to require performance by the debtor and the other defendants under the terms of the commitment letter. To the extent the loan actually made differed from the terms of the commitment letter, the plaintiff contends the differing aspects were not authorized and can be avoided. To the extent the parties did not comply with the terms of the commitment letter and creditors were damaged thereby, the plaintiff contends the breaches are actionable.

The confirmation order in Toy King I confirmed the plan and authorized the debtor to execute and deliver to Liberty all necessary documents in connection with the debtor's guaranty in accordance with the terms of the commitment letter attached to the order and incorporated in it by reference. Thus, the terms of the commitment letter became an integral part of the plan as confirmed, indistinguishable in any respect from any of the plan's other terms. The loan terms described in the commitment letter were the only terms that were permitted or authorized by the court. Terms or provisions that were materially different from the loan described in the commitment letter would and will constitute a breach of the plan as confirmed by the court to the extent any such breach can be attributed to a person or entity bound by the confirmed plan.

The parties had ten days to take an appeal from the confirmation order pursuant to Part VII of the Federal Rules of Bankruptcy Procedure or to seek to alter or amend the confirmation order pursuant to F.R.B.P. 9023 and F.R.Civ.P. 59. No party took any such action. Accordingly, the confirmation order became final.

Section 1141(a) of the Bankruptcy Code provides that "the provisions of a confirmed plan bind the debtor, ... any entity acquiring property under the plan, and any creditor, [and] equity security holder...."

---

**105.** *See also,* note 1 *supra* and related text.

Obviously, therefore, all defendants were bound by the terms of the commitment letter as an order of the court and as part of the confirmed plan. TKA and King were equity security holders of the debtor. TKA, Morrow, Angle, Woodward, Hunsaker II, Hunsaker III, and Ranney all acquired property under the plan. M & D was a creditor of the debtor.

Liberty was to acquire property under the plan. It was to receive a security interest in the debtor's inventory. It was also to receive the debtor's guaranty of TKA's obligation to repay the loan. It is true that Liberty was not to receive these interests in the debtor's property until the loan closed. The loan as described in the commitment letter, however, was an integral part of the debtor's confirmed plan, specifically approved and authorized by the court and without which the plan would not have been feasible and therefore not confirmed. Thus, it is clear that Liberty was an "entity acquiring property under the plan."

Liberty was also bound to the terms of the confirmation order, as an order of the court and as an integral portion of the debtor's confirmed plan, because Liberty voluntarily appeared and agreed to be so bound. Indeed, it was Liberty that requested that the commitment letter be made part of the confirmation order.

Section 1142 of the Bankruptcy Code provides that:

> (a) Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.
>
> (b) The court may direct the debtor and any other necessary party to execute and deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

In this case, Liberty came to the bankruptcy court and proposed making the loan described in the commitment letter as the means of permitting the confirmation of the debtor's plan. Liberty is clearly an "other necessary party" within the meaning of Section 1142(b). Liberty was bound under the terms of the confirmed plan to make the loan described in the commitment letter—not a loan the terms of which varied in material respect from the loan described in the commitment letter.

In *Paul v. Monts,* 906 F.2d 1468, 1472 (10th Cir.1990), the court dealt with the effect of a confirmed plan on a third party who proposed to take specified action under the plan but who did not perform. The plan as confirmed contained alternative means to consummate the plan, one of which anticipated that the third party would provide new capital to the reorganized debtor. The third party was not a signatory on any documents and had not specifically consented to be bound. The court held that, under these circumstances, the Bankruptcy Code did not bind the nonperforming third party but that such a party could agree to be bound. *Id.* The court stated that "[a] fair reading of section 1141(a) provides that [the noncreditor] was not bound by the plan under section 1141(a) and would not be bound until it acquired property thereunder or *unless it agreed to be bound.*" *Id.* (Emphasis added). The court further suggested that, where the party to be charged enters into a preconfirmation written agreement with the debtor that is incorporated into the confirmed plan, the noncreditor party is bound (*citing Kal–O–Mine Industries, Inc. v. Camp (In re Lumpkin Sand & Gravel, Inc.),* 104 B.R. 529, 536 (Bankr. M.D.Ga.1989), *aff'd,* 111 B.R. 370 (M.D.Ga. 1990)). *Id.* Finally, the court suggested that, although the noncreditor was not bound by the confirmed plan under the

Bankruptcy Code, ordinary contract principles nevertheless applied. *Id.*

In this case, Liberty was not merely an alternative party to the plan. Instead, it represented the only means by which the plan was to be consummated. To this end, Liberty was a signatory to the commitment letter that was incorporated into the order of confirmation. Indeed, the court incorporated the commitment letter into the confirmation order at the request of Liberty. Liberty made that request specifically to bind the debtor to the conditions and terms outlined in the commitment letter. But for Liberty's action in requesting approval of the making of the loan described in the commitment letter, the court would not have been able to confirm the plan. These circumstances can be construed in only one way—that Liberty consented to be bound by the terms of the confirmed plan just as the other parties described in Section 1141(a) would be bound.

Having so consented, Liberty was also contractually bound. *See In re Page,* 118 B.R. 456, 460 (Bankr.N.D.Tex.1990) ["In essence, the plan becomes a binding contract between the debtor and the creditors and controls their rights and obligations."]; *United States v. Shepherd Oil, Inc. (In re Shepherd Oil, Inc.),* 118 B.R. 741, 751 (Bankr.D.Ariz.1990) ["Certainly a plan of reorganization is a binding contract."].

For these reasons, therefore, each and every defendant was bound by the terms of the commitment letter.

2. *Is the debtor the obligor or a guarantor on the Liberty loan?*

The way in which the court construes the Liberty transaction—whether with the debtor as guarantor or the debtor as principal obligor—is important because of its significant ramifications affecting other issues in this proceeding. These ramifications include:

• Whether TKA or Liberty is the initial transferee of recoverable preferences;

• Whether transfers made by the debtor were to insiders or non-insiders;

• Whether the transferee recovered more in payment of its loan than it would in a hypothetical Chapter 7 liquidation of the debtor;

• Whether the payments were made by the debtor in the ordinary course of the debtor's and TKA's business or the debtor's and Liberty's business;

• Whether the debtor or its principals made the payments with the intent to hinder, delay, and defraud creditors;

• Whether the debtor received equivalent value for its payments;

• Which defendants are the immediate or mediate transferees and thus eligible to use the good faith defense to preference and fraudulent transfer claims;

• The scope of the principals' fiduciary duties;

• Whether the debtor has available the defenses of a surety; and

• Whether the debtor has rights of contribution or subrogation against the other guarantors/defendants and Liberty.

The plaintiff takes the position that the written loan documents evidence the true and accurate position of the parties with respect to their rights and obligations under the Liberty loan. Under both the commitment letter and the loan documents, of course, Liberty made the loan to TKA as obligor. The debtor guarantied this obligation.

The plaintiff also asserts that TKA made or intended to make some or all of the proceeds of the Liberty loan available to the debtor as a capital contribution, consistent with the terms of the commitment letter. It points to the inclusion of preferred stock in the Touche Ross pro forma and the debtor's listing of $1 million of these proceeds as shareholder's equity on all of its balance sheets generated between May 28, 1989, through October 29, 1989.

The defendants argue, however, that the court should construe the transaction differently. The defendants say the court should determine that the debtor was, in actual fact, the principal on the Liberty loan rather than the guarantor. This construction, the defendants assert, is consistent with the actual substance of the transaction as contemplated and transacted between the parties.

The defendants point out that all parties understood from the outset that the Liberty loan was for the ultimate benefit of the debtor. In addition, the parties understood that the ultimate payment of the loan would be effected through the sale of the debtor's inventory in the ordinary course of its business.

The defendants assert that this understanding was consistent with the financial realities of the debtor and TKA. The debtor was the operating entity and generated revenues through the sale of its inventory. TKA, in contrast, was nothing but a shell company, with its only asset being its stock in the debtor and receivables owed to it by the debtor. Accordingly, TKA, on its own, was financially incapable of servicing the loan without the debtor's revenues. The defendants argue, therefore, that Toy King was intended to be the—"true"—obligor on the loan.

The defendants claim that Liberty wanted to denominate TKA as the borrower to avoid the appearance of making a loan to a company in bankruptcy. The defendants say denominating TKA as borrower was nothing more than a technical formality or a semantic exercise for appearances only.

The gist of the defendant's argument seems to be as follows: the debtor was the one who needed the money, the debtor received the money, and the debtor was the one who repaid the money. Because the debtor was the only one with the resources to repay the loan, the transaction was never and could never have been more than a simple loan to the debtor, notwithstanding any writings to the contrary.

The most notable aspect of the transaction consistent with the defendants' argument is the execution of notes and the monthly payment of interest by the debtor. The defendants argue that these loan characteristics of the Liberty loan are more reasonable than the capital contribution aspects. The defendants point to the clear benefit inuring to the debtor and the inability of the parent to service the underlying loan absent these periodic payments.

The difficulty with this argument is that the notes that the debtor executed were not notes to Liberty but were instead notes to TKA. The interest that the debtor paid was not interest paid to Liberty but was instead interest paid to TKA. These notes were entirely and legally independent of the Liberty loan promissory note. The debtor did not give any notes or pay any interest directly to Liberty.

Moreover, the record overwhelmingly supports the fact that TKA intended to use at least some of the Liberty loan to make a capital contribution rather than a loan to the debtor. The commitment letter, prepared by sophisticated and competent counsel, clearly states that the proceeds could be used solely for payment of Toy King I dividends and capital contributions to the debtor. Similarly, the accountant from Touche Ross testified that it was his understanding, gained from information provided by Morrow, that at least some of the Liberty loan proceeds would be applied as a capital contribution to the debtor. This understanding is consistent with the written evidence. The pro forma referred to preferred stock—plainly a capital contribution—and the debtor's own balance sheets for many months posted some of the monies received from the proceeds of the Liberty loan as preferred stock.[106]

---

106. All balance sheets prepared by the debtor between May 28, 1989, and October 29, 1989, showed $1 million as preferred stock in shareholders' equity. The November 26, 1989, balance sheet was the first and only balance sheet in which the $1 million was

In addition, the record contains no evidence that the debtor was unable to obtain financing on its own behalf,[107] other than the self-serving testimony of the individual defendants. To the contrary, the evidence supports the fact that Liberty was willing to denominate Toy King as borrower but did not do so at the request of the debtor's principals. Although Liberty received a tangential benefit in acceding to this request, it was the debtor who received the most benefit. As Morrow testified, designating TKA as borrower, rather than the debtor, afforded the debtor substantial tax advantages.

The most important advantage, however, was the "capital contribution" characterization of some of the borrowing. This characterization enhanced the debtor's stated net worth. Had the Liberty loan been posted on the debtor's balance sheets as a liability, the debtor's net worth would have been reduced by that amount.

Finally, as will be discussed at greater length in Section V.D.2.a.iii. and V.D.3. below, this characterization was a material factor in the toy manufacturers' decisions to extend credit to the debtor after confirmation. Thus, the debtor was a direct recipient of the benefits of structuring the transaction with the debtor as guarantor and TKA as obligor.

Recognizing the debtor as guarantor rather than obligor is more than mere "form" or an exercise in semantics. The defendants' argument invites circuity—if the parent company was "nominal" to the loan to the point that it should be excised from the transaction, why was it needed in the first place? If it was necessary to structure the transaction in that way, then TKA could not have been a nominal party.

▪ A finding that the debtor is obligor on the Liberty loan would materially affect the disposition of this proceeding and the potential liability of each party, as noted

earlier. It would be inequitable to permit the parties to reap the benefits of the transaction as they structured it, with TKA as obligor and the debtor as guarantor, and then avoid the consequences by having the court ignore their chosen structure and recharacterize the transaction well after the fact. Recharacterizing the transaction as the defendants urge would turn equity on its head, contrary to principles of reorganization. "It is the duty of the court, especially a court of equity, to adjust the rights of the parties so far as possible so that the ultimate loss shall accord with the equitable position of the parties." *Whitlock v. Max Goodman & Sons Realty, Inc. (In re Goodman Industries, Inc.)*, 21 B.R. 512, 520 (Bankr. D.Mass.1982) (*quoting* 10 *Williston on Contracts* § 1264 at 842 (3d ed.1967)). "That is especially true when the party now complaining that the court should consider the realities and not the form were instrumental in creating the very form of which they now complain." *Id.*

It is true, as the defendants argue, that there is some evidence in the record supporting the proposition that all parties to this proceeding intended that the debtor was the "real" or "true" borrower. It is also true, however, that there is equally compelling evidence that supports the position that the parties intended TKA to be the borrower while the debtor served as guarantor. In the face of this conflicting evidence, the court is persuaded that the terms of the commitment letter and loan documents themselves establish the roles each of the parties were and are to play in accordance with the intent and desires of the parties.

More importantly, this was the role mandated by the terms of the confirmed plan as evidenced by the Toy King I confirmation order. Were those roles to be

---

shown as a liability. The January 28, 1990, balance sheet again showed $1 million as preferred stock in shareholder's equity.

107. As the defendants themselves point out, the debtor was the entity that generated the revenue.

reversed by the parties, the parties would be in material breach and in violation of the confirmed plan. That breach would be no less material or severe if ordered by the court in this proceeding at the urging of the defendants.

Accordingly, the court finds that TKA is the obligor for the Liberty loan and the debtor is an unlimited guarantor.

## C. *PREFERENCE CLAIMS.*

### 1. *Introduction.*

The unsecured creditors committee seeks to set aside as preferences, pursuant to the provisions of Sections 547 and 550 of the Bankruptcy Code, payments that the debtor made to TKA. The payments that the committee attacks are payments of interest and principal on the Liberty loan, the C & S line of credit, and the Nintendo loan. Also included are guaranty fees paid by the debtor to TKA in connection with the C & S line of credit.

The debtor made these payments in two discreet time periods. First, the debtor made these kinds of payments in the 90–day period before the filing of the petition commencing the Toy King II case on February 12, 1990. Second, the debtor made these kinds of payments earlier, during the period commencing with the confirmation of the Toy King I case on May 23, 1989, and continuing through the date 91 days before the commencement of the Toy King II case.

In addition, the plaintiff attacks as preferences certain payments the debtor made to M & D. The plaintiff also seeks to set aside as preferences certain UCC–1 filings by Liberty purporting to perfect security interests and a security agreement allegedly made by the debtor in favor of Liberty after the loan purporting to be secured by the security agreement had closed.

Section 547(b) of the Bankruptcy Code permits the avoidance of:

... any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

 "The bedrock philosophy of the Bankruptcy Code is an equality of a division of assets for all creditors of the debtor." *Jones v. J.E.G. Enterprises, Inc. (In re Greenbrook Carpet Co.),* 22 B.R. 86, 89 (Bankr.N.D.Ga.1982). The plaintiff carries the burden of establishing by a preponderance of the evidence each of the elements constituting a preferential transfer. *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 595 n. 15 (11th Cir.1990); *Ruff v. Vurchio (In re Vurchio),* 107 B.R. 363, 365 (Bankr. M.D.Fla.1989).

### 2. *Payments by the debtor to TKA made during the 90 days immediately before the filing of Toy King II.*

#### a. *Introduction.*

During the 90–day reach back period, the debtor paid TKA $2,906.26 in interest

on the C & S line of credit, $40,492.62 in interest on the Liberty loan, and $12,157 in interest on the Nintendo loan. During the same period, the debtor also paid TKA $250,000 in principal on the C & S line of credit, $600,000 in principal on the Liberty loan, and $700,000 in principal on the Nintendo loan. The debtor also paid TKA a $5,000 guaranty fee in connection with the C & S line of credit during this period.

### b. *Do the payments to TKA constitute transfers?*

A "transfer" is broadly defined in Section 101(54) of the Bankruptcy Code. Under this definition, a transfer encompasses every means of disposing of or parting with property or an interest in property of the debtor. "The concept of property of the estate under Bankruptcy Code section 541(a) is expansive." *United Agri Products v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408, 417 (Bankr.D.Ariz.1994) (*citing Begier v. Internal Revenue Service,* 496 U.S. 53, 58–59, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)). In this case, the debtor wrote and delivered checks to TKA in payment of all its obligations. These checks were drawn on its regular operating account. The debtor's operating account contained funds that were obtained through the sale of its inventory sold in the ordinary course. There can be no dispute, therefore, that the debtor's payments to TKA were transfers within the meaning of Section 547(b).

### c. *Was each transfer to or for the benefit of a creditor?*

Section 101(10) of the Bankruptcy Code defines "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Section 101(5) defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

TKA made monies available to the debtor both directly and indirectly. TKA directly loaned to the debtor $500,000 of the Liberty loan, the C & S line of credit, and the Nintendo loan. The debtor executed notes that formalized its obligations to TKA for most, but not all, of these monies.

TKA also indirectly loaned to the debtor $1 million of the Liberty loan. Although Liberty funded the $1 million letter of credit by making payments to the debtor's creditors as required by the confirmed plan, TKA was the obligor on the Liberty loan. TKA and the debtor did not execute a note to memorialize the debtor's obligation to TKA for this $1 million portion of the Liberty loan. The, debtor, however, made monthly payments of interest to TKA on account of the $1 million letter of credit.

TKA and the debtor operated on the premise that all of the monies TKA made available to the debtor from the Liberty loan, the C & S line of credit, and the Nintendo loan created debts of the debtor in TKA's favor. Although the plaintiff now attacks the payments of those debts, the defendants do not dispute that TKA was a creditor of the debtor at all times between the confirmation of Toy King I and the filing of Toy King II.

It is clear, therefore, that the debtor made transfers directly to TKA; TKA was the recipient of the funds paid; the transfers reduced the debtor's unsecured obligations to TKA; and TKA received the direct benefit of these payments. Accordingly, TKA is a creditor of the debtor with respect to all transfers at issue here as required by Section 547(b)(1).

### d. *Were the transfers for or on account of an antecedent debt?*

Section 101(12) of the Bankruptcy Code defines a "debt" as a "liability on a claim." Section 101(5) defines a "claim" as a "right to payment. . . ." "Although 'antecedent debt' is not defined by the Code, essentially a debt is 'antecedent' if it is

incurred before the transfer." *Tidwell v. AmSouth Bank, N.A. (In re Cavalier Homes of Georgia, Inc.),* 102 B.R. 878, 885 (Bankr.M.D.Ga.1989) (*citing 4 Collier on Bankruptcy* ¶ 547.05 (15th ed.1989)).

■ The debtor incurred the obligation to repay the principal debts at issue in this claim of preference at the time that it received the monies from TKA. This was true even when the debtor did not execute a note to evidence its obligation to TKA, as was the case with the $1 million letter of credit and a small portion of the $500,000 line of credit monies. Similarly, the debtor incurred the obligation to pay the C & S guaranty fees at the time it received the proceeds from that line of credit. In every case, the obligation to repay principal or to pay guaranty fees was incurred before November 14, 1989—the date 90 days before the filing of the Toy King II case. Accordingly, the payments of principal and guaranty fees on these obligations were payments "for or on account of" antecedent debts.

■ The debtor also incurred the obligation to pay interest at the time it executed each note or otherwise incurred each obligation, notwithstanding the fact that the precise amount of the interest may then have been contingent until the due date of each interest payment. *CHG International, Inc. v. Barclays Bank (In re CHG International, Inc.),* 897 F.2d 1479, 1486 (9th Cir.1990). The payment of interest was on account of, tied, and related to each of the underlying obligations that were plainly antecedent debts. This conclusion is consistent with Florida state law. *See Parker v. Brinson Construction Co.,* 78 So.2d 873, 874 (Fla.1955) [interest is "generally considered to be a part of the principal debt itself" because it is compensation paid by a borrower to a lender for the use of money].[108] Accordingly, all in-

terest payments made during the 90 days before the filing of this bankruptcy case were payments made "for or on account of" antecedent debts within the meaning of Section 547(b)(2).

 e. *Was the debtor insolvent at the time of the transfers?*

 i. *Presumption of insolvency.*

■ Under Section 547(f) of the Bankruptcy Code, the court presumes the debtor to be insolvent during the 90 days prior to the date of the filing of the bankruptcy petition. This presumption is not conclusive and may be rebutted by the defendants. *Pembroke Development Corp. v. Window (In re Pembroke Development Corp.),* 122 B.R. 610, 611–12 (Bankr. S.D.Fla.1991). The plaintiff retains the burden of persuasion on the issue of insolvency, however, and must demonstrate the debtor's insolvency by a preponderance of the evidence if the creditor defendant successfully rebuts the presumption. *Id.*

■ In this case, the defendants presented evidentiary support of the debtor's solvency in the form of the debtor's financial balance sheets from the period of November 1989, through February 1990. These balance sheets reflected assets that exceeded liabilities for every month during that time. In addition, the defendants presented expert testimony in the person of Morrow, who is a certified public accountant in addition to being an officer and director of the debtor and a defendant personally. Morrow testified that, in his opinion, the debtor was solvent during the period between the confirmation of Toy King I and the filing of Toy King II irrespective of whether the debtor's inventory was valued at cost or at market value. This evidence and testimony, while ultimately not credited by the court, is sufficient to rebut the presumption of insolven-

---

**108.** The court notes that there is a contrary line of authority that holds that the obligation to pay interest does not create an antecedent debt unless it is not paid timely because the obligation to pay interest does not arise until

the due date. *See Friedman v. Gass (In re Martec Corp.),* 127 B.R. 65, 67–68 (Bankr. S.D.Fla.1991). The court declines to follow this minority view and instead adopts the better reasoned authorities.

cy and require the plaintiff to put on its proof.

### ii. *Liquidation valuation test.*

■ Section 101(32)(A) of the Bankruptcy Code defines "insolvent" when referring to a corporation such as the debtor as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...." In most circumstances, fair valuation is "an estimate of proceeds realizable within a reasonable time frame through either collection or sale at regular market value." *Pembroke Development,* 122 B.R. at 611 (*citing Hill v. Southeast Bank, N.A. (In re Continental Country Club, Inc.),* 108 B.R. 327, 331 (Bankr.M.D.Fla.1989)).

■ In circumstances where the debtor is on its "financial deathbed" and has no hope of continuing to operate as a going concern, liquidation value may represent a fair valuation of the financial condition of the debtor. *Schwinn Plan Committee v. AFS Cycle & Co. (In re Schwinn Bicycle Co.),* 192 B.R. 477, 487 (Bankr. N.D.Ill.1996); *Miller & Rhoads, Inc. Secured Creditors' Trust v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.),* 146 B.R. 950, 956–57 (Bankr.E.D.Va.1992). This standard is especially applicable in circumstances such as those presented here where the debtor is liquidated shortly after the filing of the petition because otherwise the company's true financial condition is "fictionalized." *Miller & Rhoads,* 146 B.R. at 956.

In *Miller & Rhoads,* the debtor, M & R, was acquired in the late 1980's in a leveraged buyout. The debtor incurred substantial debt in connection with the acquisition. After the buyout, the parent company made unsuccessful changes in the direction and focus of the debtor. As a consequence of these changes, the debtor was at a competitive disadvantage and performed below industry averages. Price Waterhouse issued a going concern qualification with its audit of the 1988 fiscal year end financial statements. The retail economy declined and the debtor posted operating losses for almost every month after the leveraged buyout. Ultimately, the debtor was unable to pay its debts as they matured and filed for protection under Chapter 11. A Chapter 11 liquidating plan was confirmed less than a year after the case was filed. The debtor was unable to pay all claims in full upon liquidation.

In determining insolvency, the court found that the debtor "was not financially viable ... and was not salvageable." *Id.* at 954. It further found that "M & R's chances of reorganizing were nonexistent unless it received a substantial infusion of new equity capital...." *Id.* In conclusion, the court stated that the "evidence of M & R's extremely precarious financial position when it filed bankruptcy ... is overwhelming and in large part uncontroverted." *Id.*

In the Toy King case, the facts are much the same. Despite repeated borrowings, the debtor could not continue as a going concern without additional equity infusions because it was unable to generate sufficient sales to allow it to pay its operating costs in addition to its debt. This was apparent to all defendants at least as early as the November 17, 1989, meeting between Morrow, Angle, and Horne. From that point in time or soon afterwards, the focus of the debtor was on liquidation.

VMI was the only suitor that exhibited serious interest in "merging" with the debtor after it was offered in the *Wall Street Journal.* VMI was known in the industry as an "undertaker" with no interest in operating its acquisitions. VMI was interested only in acquiring the debtor's inventory and leasehold interests at a substantially discounted price. VMI ultimately purchased the assets of Toy King after the filing of Toy King II for a price of $1,050,000, an amount that was not sufficient to pay the debtor's unsecured creditors. Indeed, the debtor was unable to make any payment to unsecured creditors.

This case is unlike *Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Co.)*, 143 B.R. 468, 474 (Bankr.E.D.Tenn.1992). In that case, the court used "going concern" valuation even though the debtor had not made a profit in the last three years because, notwithstanding its protracted losses, it was sold as a going concern. *Id.* The court stated that the usual assumption is that "going concern value is greater than forced sale, liquidation or salvage value. Going concern value means that value is added to the property because it can be operated as a business." *Id.* at 475.

In contrast, Toy King was not sold as a "going concern." VMI had no interest in operating Toy King stores but instead wanted to use the leaseholds to sell the debtor's inventory together with its own at "rock bottom" prices.

Using a liquidation valuation approach, the court finds that the debtor was insolvent during the entire 90 day preference period, dating from November 14, 1989, through the filing of the involuntary petition on February 12, 1990. The debtor was in a liquidation posture for much of that time and was put in that posture through the direct actions of its principals who were actively seeking to sell the debtor.

iii. *Going concern valuation test.*

 Even if the court were to use a "going concern" valuation as its measure for insolvency, the court would still find the debtor to be insolvent during this period. In determining going concern value, the court must "take into account all considerations that the parties might fairly bring forward and give substantial weight in their bargaining." *National Rural Utilities Cooperative Finance Corp. v. Wabash Valley Power Association, Inc. (In re Wabash Valley Power Association, Inc.)*, 111 B.R. 752, 768 (S.D.Ind.1990). The court should consider both a willing buyer and a willing seller, evaluating the "as-

sumptions and methods used by both sides." *Id.* at 769.

 The balance sheet test is the simplest methodology to determine insolvency using a going concern valuation approach. This test compares "the fair value of the Debtor's assets at the time of the transaction with the Debtor's liabilities of the same date." *Food & Fibre Protection*, 168 B.R. at 417 (*citing McWilliams v. Gordon (In re Camp Rockhill, Inc.)*, 12 B.R. 829, 833–34 (Bankr.E.D.Pa.1981)).

In this case, the court has found that the balance sheets of the debtor were not credible evidence of the debtor's true financial condition. The court determined that the assets were overstated, the liabilities were understated, and some liabilities of the debtor were mischaracterized as shareholder's equity. In addition, the balance sheets reflected the forgiveness of debt as shareholder's equity in contravention of what is now generally accepted accounting practice. The debtor's liabilities did not include all of the borrowings of the debtor. The liabilities also did not include lease rejection damages incurred as a consequence of closing stores after confirmation, nor did they include the actual costs of opening the six stores after confirmation. The persistent and unequivocal losses of the debtor were similarly understated.

Although the record does not contain sufficient evidence to correct the balance sheets with precision, the record does permit the court to make gross adjustments as are required by the expert testimony the court has credited, as the court has done in notes 46, 82, 83, 84, and 98. *See GHK Associates v. Mayer Group, Inc.*, 224 Cal.App.3d 856, 274 Cal.Rptr. 168, 178 (1990) [court has power to infer specific values for assets and/or damages, but inferences must be drawn from substantial evidence actually presented by the parties].[109] Based on the adjusted balance

**109.** Morrow, through his direct testimony, opined that the debtor's assets included good

sheets, the court concludes that the debtor was insolvent from at least October 29, 1989, and at all times thereafter.

This conclusion is also supported by all the facts and circumstances of the debtor as established by the evidence. *See Du-Voisin v. Anderson (In re Southern Industrial Banking Corp.)*, 71 B.R. 351, 369 (Bankr.E.D.Tenn.1987). By late October 1989, the debtor was in a downward spiral. By this time, most of the inventory needed for Christmas had been received. That inventory was insufficient in amount, contained many stale or unpopular products, and was obtained at a cost that almost guarantied inadequate sales margins. Despite its repeated borrowings from TKA, the debtor did not have sufficient capital to purchase quality inventory at a competitive cost.

Consequently, Toy King's sales during November and December were substantially below projections and insufficient to compensate for the persistent and systemic losses of the debtor that occurred after the confirmation of Toy King I. As the deferred deadline for payment on its inventory approached, the debtor was completely and unquestionably incapable of meeting its obligations as they came due. "The point of peril is reached when the firm's ability to continue as a going concern—a concern that can cover its costs—is in doubt because its expected costs are greater than its expected revenues." *In re Taxman Clothing Co.*, 905 F.2d 166, 169 (7th Cir.1990). "In legal and accounting terms, this means when its liabilities exceed its assets." *Id.*

The debtor's schedules also support the court's finding that the debtor was insolvent throughout the 90–day period before filing. Those schedules, executed under penalty of perjury by Morrow, reflect that liabilities of the debtor in the amount of $3,669,570 exceeded assets of $3,588,406. These schedules purport to represent the debtor's financial condition at the time of the filing of the bankruptcy petition and reflect the debtor's financial status following the months that traditionally are the most profitable in the industry.

The assets as stated in the schedules are in the exact amount of the assets as reflected in the debtor's January 28, 1990, balance sheet. The liabilities, however, are greater, corroborating McCarthy's opinion that the debtor understated its liabilities.

Moreover, the schedules overstate the actual value of the assets because the inventory value on the schedules is at "cost" at an amount that is twice the value of the inventory that the court has found as a matter of fact. These schedules, adjusted for the actual value of the inventory, paint a much more accurate picture of the debtor's true financial condition.

For all the reasons stated above, the court concludes that the debtor was insolvent during the 90–day period before the filing as required by Section 547(b)(3).

f. *Did the transfers occur on or within 90 days of the filing of the petition?*

■ In this case, the creditors filed the involuntary petition on February 12, 1990,

---

will. The court does not credit this opinion. *See Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir.1983) [court found that it was not error to exclude good will from the debtor's balance sheet for purposes of determining insolvency where the record lacked "[t]ypical indicators of goodwill, such as a record of highly profitable operation over a period of years, a valuable customer list, or a trade name developed by the company...." The court further noted that "[t]ypically, goodwill will not be reported on a balance

sheet unless there is hard evidence of its existence and value...." *Id.* at 983].

In this case, the debtor was an economic "basket case" throughout the entire time following the confirmation of Toy King I as described in detail in this decision. Perhaps the best evidence of the debtor's "good will" lacking any tangible value is the fact that VMI ultimately purchased the debtor's assets in a liquidation sale. The debtor did not sell its business as a going concern.

and the court entered its order for relief on April 10, 1990. When the petition date and the order for relief date are different, "[t]he preference period is measured from the date the involuntary petition is filed, not the date the order for relief is entered." *Cavalier Homes of Georgia*, 102 B.R. at 883 n. 6. Counting back 90 days from the filing date of February 12, 1990, one can calculate that the 90–day preference period begins on November 14, 1989. Thus, all payments made on or after November 14, 1989, by the debtor to TKA on account of the loans in question satisfy the Section 547(b)(4)(A) element.

### g. *Did TKA receive more than it would have received in a Chapter 7 liquidation?*

#### i. *Secured claims or unsecured claims?*

■■■■■ To satisfy the requirements of Section 547(b)(5), the plaintiff must establish that the recipient of the transfers at issue received more through the transfer than it would have received in a Chapter 7 liquidation. "As a general rule, the question is whether other creditors holding unsecured claims are prejudiced." *Grove Peacock Plaza, Ltd. v. Resolution Trust Corp. (In re Grove Peacock Plaza, Ltd.)*, 142 B.R. 506, 517 (Bankr.S.D.Fla.1992). "Unless the assets are sufficient to provide a 100 percent distribution to creditors in a liquidation, any creditor holding an unsecured claim who receives a payment during the preference period is in a position to receive more than it would have received in a Chapter 7 liquidation." *Hill v. Southeast Bank, N.A. (In re Continental Country Club, Inc.)*, 108 B.R. 327, 332 (Bankr. M.D.Fla.1989). A transferee who holds a secured claim, on the other hand, does not receive more through a prepetition transfer than it would in a Chapter 7 liquidation because such a creditor holds collateral for its claim. *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.)*, 874 F.2d 1186, 1200 (7th Cir. 1989); *Miller v. Rausch–Alan (In re Gam-*

*est, Inc.)*, 129 B.R. 179, 182 (Bankr. D.Minn.1991).

■■■■ The defendants argue that the payments to TKA in question were payments on *secured* claims. If so, the payments would not meet the requirements of Section 547(b)(5). It is true that TKA's obligations to Liberty were secured by collateral, some of which included the debtor's assets. The Liberty notes executed by TKA contained specific dates for repayment of principal and charged interest at a rate of prime plus two percent. In contrast, the TKA notes executed by the debtor were *unsecured* demand notes that charged interest at a rate of prime plus three percent. Although the parties stipulated that each of the debtor's obligations to TKA tracked an underlying obligation of TKA, there was no legal requirement that TKA cancel the debtor's note upon the satisfaction of the underlying note. Indeed, TKA did not do so upon the repayment of the C & S line of credit following the confirmation of Toy King I.

In this case, therefore, each of the debtor's payments to TKA that the plaintiff attacks was a payment on an *unsecured* obligation. Although TKA used the monies it received from the debtor to make payments on its secured obligations to Liberty and C & S, those obligations were factually and legally separate.

On its facts, this case is analogous to *Ray v. City Bank and Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490, 1493 (6th Cir.1990). In that case, the bank made a personal loan to the debtor's president. The president's mother, who also secured the loan by pledging a certificate of deposit, co-signed the loan. The president loaned the monies obtained from the bank to the debtor. This loan was unsecured. The debtor made payments on its loan to the president's mother or directly to the bank. The court found the payments to be preferential, notwithstanding the bank's secured position, because the transfers at issue were repayments on the unsecured

debt between the debtor and the president. *Id.*

Similarly, the *debtor's* obligations to TKA were wholly unsecured, and it is the payment of those obligations that the plaintiff attacks. Thus, the fact that TKA's obligations to Liberty were secured is irrelevant in determining what position TKA would hold in a hypothetical Chapter 7 case of the debtor. In a Chapter 7 case, TKA's claims against the debtor would be unsecured claims independent of Liberty's claims. It is from TKA's position as an unsecured creditor, therefore, that the court must determine whether TKA received more by the payments in question than it would have received in a Chapter 7 case had the payments not been made.

### ii. *Liquidation scenario.*

■ A plaintiff may rely on the debtor's schedules and filed claims to show that a 100 percent distribution would not be possible. *Continental Country Club,* 108 B.R. at 332 (*citing Flatau v. Tribble's Shoes, Inc. (In re Lawrence),* 82 B.R. 157, 160–61 (Bankr.M.D.Ga.1988)). The schedules and claims in this case substantiate the conclusion that the assets of the debtor, even if liquidated at the scheduled values, would not permit a full distribution to be paid to unsecured creditors who either filed claims or were listed by the debtor in its schedules.

■ Alternatively, a plaintiff may demonstrate that a 100 percent distribution is unlikely under the circumstances of the case. In *Braniff, Inc. v. Sundstrand Data Control, Inc. (In re Braniff, Inc.),* 154 B.R. 773, 777 (Bankr.M.D.Fla.1993), for example, the court concluded that Section 547(b)(5) was satisfied where the record showed that there was "no scenario under which unsecured creditors . . . [would] receive 100 cents on the dollar."

■ The same conclusion can be made in this case. The case was initially filed as an involuntary Chapter 7 case but was then converted to a case under Chapter 11. After the court entered an order for relief,

the debtor liquidated by selling its assets to VMI with the court's approval. The purchase price of $1,050,000 was insufficient to pay any dividend whatsoever to unsecured creditors.

In all likelihood, a Chapter 7 trustee would not have been able to liquidate the debtor as quickly or on as favorable terms as the debtor was able to obtain in the Chapter 11 case. Indeed, this is precisely why the debtor and the creditors agreed to convert the case to a case under Chapter 11 after the petitioning creditors initially filed the involuntary Chapter 7 case. Accordingly, there is no scenario under which the unsecured creditors would have received 100 cents on the dollar.

In these circumstances, therefore, it is apparent that TKA received more when it received the payments in question than it would have received in a Chapter 7 liquidation had the payments not been made. In a Chapter 7 liquidation, it would receive nothing. As it was, it received the full value of the payments at the time the debtor made them. Accordingly, the transfers satisfy the requirements of Section 547(b)(5).

### h. *Summary for transfers to TKA during the 90–day preference period.*

As the foregoing describes, the plaintiff has proven by a preponderance of the evidence that the payments by the debtor to TKA of principal and interest on the C & S line of credit, the Liberty loan, and the Nintendo loan made during the 90–day period immediately before the filing of this case satisfy each and all of the preference elements set forth in Section 547(b) of the Bankruptcy Code.

The defendants, however, have raised affirmative defenses to these preference claims as provided by Section 547(c) of the Code. The plaintiff has other preference claims as to which the defendants have raised the same affirmative defenses. From an organizational standpoint, there-

fore, it is desirable to consider first the plaintiff's other preference claims as to which the defendants have identical affirmative defenses. After the court has considered all of these preference claims, then the court can consider the affirmative defenses that relate to all.

3. *Payments by the debtor to TKA made between 90 days before the commencement of Toy King II and the date of confirmation of Toy King I.*

a. *Introduction.*

The unsecured creditors committee also seeks to set aside as preferences payments that the debtor made to TKA at an earlier period of time: between 90 days before the commencement of the Toy King II case on February 12, 1990, and the confirmation of the Toy King I case on May 23, 1989. As with the payments made by the debtor to TKA during the 90–day period immediately before the filing of this case, the payments the committee attacks are the payments of principal and interest on the C & S line of credit, the Liberty loan, and the Nintendo loan. Also at issue are the guaranty fees paid by the debtor on the C & S line of credit.

In analyzing this claim in relation to the elements of Section 547(b) of the Bankruptcy Code, the court reaches the same results on the elements described below for the same reasons as the court reached for the plaintiff's preference claim as to the payments made during the 90–day period immediately before the filing of this case:

• Section 547(b): the payments are transfers.

• Section 547(b)(1): the payments were made to or for the benefit of TKA, a creditor.

• Section 547(b)(2): the payments were made for or on account of an antecedent debt owed by the debtor before such transfer was made.

• Section 547(b)(5): the payments enabled TKA to receive more than it would receive in a Chapter 7 liquidation if the payments had not been made.

The plaintiff's preference claim for payments made during the earlier period before the 90 days immediately before the filing of this case, however, requires separate and different consideration of the Section 547(b)(3) and (4) elements.

b. *Was TKA an insider of the debtor?*

Section 547(b)(4)(B) of the Bankruptcy Code permits transfers made up to a year before the filing of the bankruptcy case to be set aside if the transfer is to an insider. If the transfer is to an insider, therefore, the transfer need not be made only within the 90–day period immediately before the filing. In this sense, transfers to insiders are subject to a much greater reach back period.

The plaintiff here seeks to reach back to the time of the confirmation of Toy King I. Because the date of that confirmation order was May 23, 1989—less than a year before the filing of Toy King II—the plaintiff seeks to reach back only to the points *within* the one-year insider reach back period provided by Section 547(b)(4)(B) and not all the way back to the beginning of that one-year period.

The transfers that the plaintiff attacks are the following:

During the period between May 23, 1989, and November 13, 1989, the debtor paid TKA $6,900 in interest on the C & S line of credit, $44,678.27 in interest on the Liberty loan, and $7,162.50 in interest on the Nintendo loan. The debtor also paid $15,283.22 in guaranty fees to TKA on the C & S line of credit.

The evidence clearly establishes that the debtor made these payments to TKA. Thus, the question on which the plaintiff's ability to use the one-year reach back period turns is whether TKA is an "insider" of the debtor. The insider rela-

tionship is to be determined on the exact date of the transfer. *Dent v. Martin (In re Trans Air, Inc.)*, 86 B.R. 290, 292 (S.D.Fla.1988).

In the case of a corporation such as the debtor here, Section 101(31) of the Bankruptcy Code defines "insider," among other things, as a "person in control of the debtor." Section 101(41) of the Code then defines "person," among other things, as a "corporation." Thus, TKA, a corporation, can be an insider of the debtor if TKA was in control of the debtor.

In *Lee's Place v. Hawbaker*, 1992 WL 164443 (C.D.Ill.), the court found that, where the defendant controlled "both policy and day-to-day operations, in addition to other aspects of the business, including seeking financing for the business, development and implementation of long-term plans, and furnishing significant input for decision-making outside the normal course of business," the defendant was an insider of the debtor because the defendant was in control of the debtor. *Id.* at *5.

 Similarly, the facts proven at trial plainly establish that TKA was in control of the debtor. TKA was initially incorporated for the purpose of acquiring the stock of the debtor. TKA undertook to obtain all financing, other than trade credit, that was ultimately provided to the debtor. TKA determined the dates those monies were made available to the debtor and in what amount. TKA also determined the cost to the debtor of those borrowings and on what terms.

An affiliate is also included within the definition of insider. 11 U.S.C. § 101(31)(E). Section 101(2)(A) defines "affiliate" as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ." TKA held more than 20 percent of the outstanding shares of the debtor. Thus, TKA is also an insider because it is an affiliate of the debtor.

For all of these reasons, it is plain that TKA was an insider of the debtor within the meaning of Section 547(b)(4)(B). The plaintiff has therefore established the Section 547(b)(4)(B) element of its preference claim as to the payments to TKA made outside the non-insider 90–day preference period and going back to the time of the confirmation of Toy King I.

c. *Was the debtor insolvent at the time of the transfers?*

i. *Introduction.*

The plaintiff is required to demonstrate that the debtor was insolvent between the time of the confirmation of the first case, May 23, 1989, and the beginning of the 90–day preference period, November 14, 1989, to satisfy this Section 547(b)(3) element. As previously stated, the plaintiff seeks to reach back only to May 23, 1989, and not all the way to the beginning of the one-year insider reach-back period.

In Section V.C.2.e. above, the court found that the debtor was insolvent during the 90–day period immediately before the filing of the second bankruptcy case using either a liquidation approach or a going concern approach. In determining whether the debtor was insolvent during the period beginning on May 23, 1989, and continuing to the start of the 90–day period on November 14, 1989, the court cannot rely on the same liquidation analysis as previously discussed by the court. The reason, of course, is that the time between the making of the payments now in issue and the ultimate liquidation of the debtor is too great.

ii. *Going concern valuation test.*

 In Section V.C.2.e.iii. above, the court analyzed the debtor's solvency during the 90 days immediately before the filing using the going concern valuation test. The court's analysis there is fully applicable to the larger insider reach back period beginning on May 23, 1989. The court therefore adopts it for this purpose. The debtor's balance sheets, as adjusted by the court for the reasons previously

described, establish that the debtor's liabilities exceeded its assets at all times from the date of confirmation of Toy King I through the 91st day before the filing of this case.

The facts of the case are consistent with the picture painted by these adjusted balance sheets. The debtor was in a tenuous condition even before it reached confirmation of its first case. Before confirmation in Toy King I, the debtor had overdrawn its debtor-in-possession operating account and was forced to borrow money from TKA.

After confirmation, the debtor continued to operate at a loss while it shored up its rapidly sagging operations with more borrowings from TKA. TKA made available the monies it obtained from Liberty and C & S but at premium rates due to interest upcharges and guaranty fees.

Within 60 days of confirmation, the debtor essentially exhausted the monies received from TKA on the Liberty $500,000 line of credit. More than half of this amount was disbursed within three weeks of confirmation. Shortly thereafter, TKA was forced to borrow again on the C & S line of credit and make those monies available to the debtor. Following that borrowing, TKA was once again knocking at the door of Liberty for another loan on behalf of the debtor. Before the loan was even finalized, TKA attempted to overdraw the $500,000 line of credit.

TKA exhausted the entirety of the Liberty $700,000 Nintendo loan by disbursing the monies to the debtor within 30 days after Liberty approved the loan. Only $152,158.45 of the Nintendo loan was used for the stated purpose of purchasing Nintendo products; $547,841.55 was used for ordinary operations because of the debtor's precarious financial position and shortage of cash.

These borrowings demonstrate clearly that the debtor was thinly capitalized.

The debtor's only capital was the $10,000 capital infusion that occurred at confirmation. The debtor's only significant asset was its inventory. Because of poor management, a bad mix of product, and insufficient advertising, coupled with a slow season, the debtor was unable to maintain a sales volume that enabled it to meet its operating costs without further borrowing.

Stated another way, the debtor's average gross margin of 26 percent was insufficient to sustain its operating costs and to pay its debts as they became due. The debtor was able to operate throughout the summer and fall only through its repeated borrowings and the industry practice of shipping inventory on terms that allowed a substantial delay in payment for the goods.[110] The shipment of inventory on dating terms enabled the debtor to feed on itself and to maintain the illusion of health and vigor for a protracted period of time. Accordingly, the court finds that the debtor was insolvent during this entire period of time within the meaning of Section 547(b)(3).

### iii. *Retrojection analysis.*

Alternatively, the court can determine solvency or insolvency using retrojection analysis when the debtor's financial condition is unascertainable as of the relevant dates. *Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 731 (Bankr.D.Mass.1996). The retrojection rule provides that when a debtor was insolvent "on the first known date and insolvent on the last relevant date, and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankruptcy between the retrojection dates,' the debtor is deemed to have been insolvent at all intermediate times." *Id. (quoting Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296, 300 (Bankr.D.Mass.1983)). This rule allows the court to conclude that a debtor is insolvent even when there is a deficiency

110. The industry practice of shipping inventory on dating terms recognized that the typical toy retailer operates at a loss for most of the year. *See* Section IV.B. *supra.*

of evidence as to financial status during some of the time period at issue. The theory is that if a debtor is insolvent on one date and insolvent on a later date and there are no intervening circumstances that would suggest otherwise, the court can conclude that the debtor was insolvent during the entirety of the intervening period, even in the absence of specific financial information. *Id.*

The court has previously found that the debtor was insolvent at the time of the confirmation of Toy King I and immediately thereafter. Among other things, this is because the "fresh start" accounting convention would have more accurately presented the debtor's true financial situation rather than the "quasi-reorganization" convention that the debtor then used. Similarly, the court has also found that the debtor was insolvent on October 29, 1989, a date that precedes the 90–day period before the filing of this case. The evidence presented at trial contains nothing that would suggest any material change for the better in the debtor's financial condition between these two dates. Indeed, the evidence plainly shows a continuing deterioration in the debtor's financial health from the first date to the second. This retrojection analysis, therefore, provides further support for the court's conclusion that the debtor was insolvent during the entire time from May 23, 1989, through November 14, 1989, and satisfies the requirement of Section 547(b)(3).

### d. *Summary for transfers to TKA during insider preference period.*

As the foregoing describes, the plaintiff has proven by a preponderance of the evidence that the payments by the debtor to TKA of principal and interest on the Liberty loan, C & S line of credit, and the Nintendo loan, as well as the C & S guaranty fees, made between 90 days before the commencement of the Toy King II

case and the confirmation of the Toy King I case satisfy each and all of the preference elements set forth in Section 547(b) of the Bankruptcy Code.

Before determining this claim, however, the court will need to consider the defendants' affirmative defenses as provided by Section 547(c) of the Code. The court will first consider the plaintiff's remaining preference claims.

### 4. *Payment by the debtor to M & D made during the 90 days immediately before the filing of Toy King II.*

#### a. *Introduction.*

The unsecured creditors committee also seeks to set aside as a preference a payment that the debtor made to M & D on December 29, 1989, in the amount of $301,006.17. This payment related to the claims in Toy King I that M & D purchased from First Union.

As is more fully described in Section IV.D.2. above, First Union originally held unsecured claims for $2,373,615 [111] against the debtor in Toy King I. Under the confirmed plan in Toy King I, the debtor was to pay unsecured creditors 17.5 percent of their claims. Thus, First Union was to receive about $415,382 on account of these claims.

Principals of the debtor, Morrow and Angle, formed M & D to purchase the First Union claims. M & D was substituted for First Union as the holder of the First Union unsecured claims on January 12, 1989. M & D paid First Union $125,000 for the claims on April 11, 1989.

On July 6, 1989, the debtor paid M & D $138,500 on account of the First Union claims. Around the same time, the debtor gave M & D a promissory note for the remainder due on the claims, in the amount of $294,382.[112] On December 29, 1989, the debtor paid M & D the amount

---

**111.** The parties stipulated to this amount.

**112.** The confirmed plan in Toy King I provided that unsecured claims receiving distribution more than 90 days after confirmation

then due on the note, $301,006.17.[113] It is this payment, the payment of a remaining unpaid dividend pursuant to a confirmed plan, that the plaintiff attacks as a preference.[114]

Although once unheard of, it is becoming more common for a business that has reorganized in Chapter 11 to come a second time to the bankruptcy court for relief after the reorganized debtor fails again. That is what happened here. The case law generated by successive Chapter 11 cases, however, is relatively sparse. The reported cases generally deal with the propriety of a subsequent case, as was the case in *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.)*, 886 F.2d 859, 868 (7th Cir. 1989), or the treatment of claims arising from the first case that remain unpaid upon the filing of the second case. *Id.*

The question presented here is one of first impression. Is a payment

were to be paid nine percent interest. The debtor made a dividend payment to M & D on July 6, 1989. Because the debtor made its first payment on the First Union claim within 90 days of confirmation, it was not required to pay interest on that dividend distribution. The debtor was required to pay only the principal amount on that claim. As the court found in note 59 and related text *supra*, the debtor paid $138,500 to M & D comprised of $121,000.62 in principal and $17,499.38 in interest and "profit." Accordingly, $17,499.38 of that payment was interest and "profit" in excess of that provided for and contemplated under the confirmed plan ($138,500 minus 121,000.62).

113. It is unclear how the debtor and M & D determined this amount. Under the plan, the debtor was to pay interest at the rate of nine percent to all claimants not receiving payment within 90 days of confirmation. The interest began to run on the effective date of the plan, June 12, 1989. Assuming that $294,382 represented the remaining principal balance owed to M & D as of December 29, 1989, the debtor would owe $14,513.03 in interest. The court calculates this amount as follows: Nine percent interest divided by 365 days in a year equals a daily interest rate of .0002465. Multiplying the remaining principal balance of $294,382 by the daily rate of .0002465 gives a per diem rate of $72.6516. Multiplying the per diem by the number of days between the effective date of the confirmed plan and the final payment on the claim, or 200 days, equals $14,513.03 in interest. The debtor would therefore owe $308,895.03, inclusive of interest, on December 29, 1989, using this methodology. (This calculation does not take into account the excess $17,499.38 that the debtor paid on July 6, 1989, in contravention of the terms of the confirmed plan.)

The note that the debtor executed on behalf of M & D, however, provided for the payment of interest at 14.5 percent beginning on September 11, 1989, a date that was the 91st day after the effective date of the debtor's confirmed plan. Assuming that $294,382 represented the remaining principal balance owed to M & D as of December 29, 1989, the debtor would owe $19,159.86 in interest under the note. The court calculates this as follows: Multiplying the principal amount of $294,382 by the nine percent per diem rate, as calculated above, for 90 days equals $6,538.64 in interest owing for the first 90 days. Then, 14.5 percent interest divided by 365 days in a year equals a daily interest rate of .000397. Multiplying the daily interest rate by the principal balance of $294,382 owed gives a per diem rate of $116.6965. Multiplying the remaining principal balance of $294,382 by the number of days between September 11, 1989, and the final payment of the claim, or 108 days, equals $12,621.22 in interest. The debtor would therefore owe $313,541.86, inclusive of interest, on December 29, 1989, using this methodology. (This calculation does not take into account the excess $17,499.38 that the debtor paid on July 6, 1989, in contravention of the terms of the confirmed plan.)

Regardless of which calculation is used, the debtor did not pay M & D all the interest to which it was entitled in the December 29, 1989, payment. M & D received $7,888.86 less than it was entitled to receive under the confirmed plan ($308,895.03 minus 301,006.17) and $12,535.69 less than it was entitled to receive under the subordinated M & D note ($313,541.86 minus $301,006.17).

The court declines to "add back" the interest and "profit" paid in derogation of the confirmed plan to M & D on July 6, 1989, for the purpose of these calculations. To do so would effectively ratify the principals' self-dealing in paying themselves more than was due under the confirmed plan and more than other creditors in like circumstances, where the payment was made in direct contravention to the confirmed plan and at a time when the debtor was in financial distress.

114. The record does not reveal why the plaintiff does not also attack the July 6, 1989, payment as a preference.

made pursuant to a confirmed Chapter 11 plan subject to attack as preferential in a subsequent case? The defendants say no, arguing that payments on a confirmed plan are not transfers of property of the debtor's estate in a subsequent case. For reasons that will be delineated below, the court concludes that a payment pursuant to a confirmed plan is no different from any other transfer and therefore is susceptible to attack as a preference.

As previously discussed, Section 547(b) of the Bankruptcy Code sets forth the elements of a preference that the plaintiff is required to establish by a preponderance of the evidence.

### b. Does the payment constitute a transfer of the debtor's property?

#### i. Whose money was it?

To recover the payment as a preference, Section 547(b) requires that the plaintiff must first establish that the payment constitutes a "transfer of an interest of the debtor in property." As the court has previously decided in Section V.C.2.b. above, payments, such as the ones the debtor made to TKA, plainly constitute transfers. The threshold issue presented by the payment to M & D, however, is whether that transfer was of the debtor's property or property in which the debtor held an interest. Because the transfer was of money, the question is whether it was the *debtor's* money that the debtor paid to M & D. If so, then the plaintiff will have satisfied this element.

The debtor made a payment of $301,006.17 to M & D on December 29, 1989. The debtor made this payment by check, executed by Morrow on behalf of the debtor, and drawn on the debtor's operating account. All funds in the account as of the date of the transfer were monies earned by the reorganized debtor by operation of its business after the confirmation of Toy King I or monies borrowed from TKA. Clearly, the facts in this case would seem to demonstrate that this money was the debtor's property so that there was a transfer of the debtor's property.

Notwithstanding the debtor's apparent ownership of the funds used to make the M & D payment, the defendants argue that these funds were somehow held in trust for the purpose of paying Toy King I claims arising from the confirmation of that case. All assets of the reorganized debtor, they suggest, are the beneficial property of the claimants of the confirmed bankruptcy case and should not therefore be considered the debtor's property for purposes of Section 547(b) of the Bankruptcy Code. The defendants cite a number of cases in support of this argument. *See, e.g., Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 930 F.2d 458, 464 (6th Cir.1991) [holding, on principles of res judicata, that the trustee could not avoid transfers made after confirmation but prior to conversion to Chapter 7 because creditors are entitled to rely on the plan as confirmed]; *In re T.S.P. Industries, Inc.,* 117 B.R. 375, 379 (Bankr.N.D.Ill.1990) [holding that conversion of a confirmed Chapter 11 case to Chapter 7 was not justified absent prepetition preferences or fraudulent transfers because there is otherwise no longer estate property to be administered for the benefit of creditors]; *In re Kaleidoscope of High Point, Inc.,* 56 B.R. 562, 566 (Bankr. M.D.N.C.1986) [holding that funds disbursed pursuant to a confirmed Chapter 11 plan could not be "reeled in," absent unusual circumstances, after conversion of the case to one under Chapter 7].

Assuming for the moment the defendant's argument is valid, even if Toy King I claimants had an equitable interest in the reorganized debtor's assets, the reorganized debtor would still retain a legal interest in that property. *See* 11 U.S.C. § 541(a)(1) [property of the estate includes all of the debtor's legal or equitable interests in property]. Thus, the debtor's money used to pay M & D, even if equitably owned by the Toy King I creditors, would still be money in which the debtor main-

tained a legal interest. By making the payment, the debtor would be transferring that legal interest. The Section 574(b) requirement of a "transfer of *an interest of the debtor in property*," therefore, would be met. (Emphasis added).

In any event, the debtor dissipated the assets it held at the time of confirmation and extinguished any interest in those assets long before it made the payment to M & D. The debtor's sales of its existing inventory between May 1989 and October 1989 were insufficient to meet its operating costs incurred for the same period. By mid-September, the debtor was so strapped for cash that Liberty improperly advanced funds on the $1 million portion of the Liberty loan to meet TKA's request for additional monies for the debtor's benefit. By October 3, 1989, the Liberty loan was completely disbursed and the debtor was using the proceeds of the Nintendo loan for its operating costs.[115]

Clearly then, all assets the debtor held after October 3, 1989, were assets the debtor acquired after the confirmation of Toy King I. The debtor, therefore, could not have used assets or proceeds traceable to assets held by the debtor at confirmation to satisfy the M & D claim in December 1989. Instead, the debtor paid the M & D claim using monies it borrowed after confirmation or monies it generated from sales of its inventory acquired after confirmation.

ii. *Conversion vs. a new filing.*

More significantly, the line of cases relied upon by the defendants deals with a situation very different from the one this case presents. All of the cases cited by the defendants arise from the conversion of a pending Chapter 11 case to a case under Chapter 7 after the court has first confirmed the case under Chapter 11.

Unless the plan or order of confirmation provides otherwise, all of the property of the debtor is revested in the reorganized debtor when a case is confirmed under Chapter 11. 11 U.S.C. § 1141(b). The bankruptcy estate therefore ceases to exist. Were the court to subsequently convert the same case to a case under Chapter 7, there is nothing left in the bankruptcy estate for the Chapter 7 trustee to administer. Accordingly, courts have held that the trustee in a converted case cannot "reach back" and avoid transfers that occurred pursuant to a confirmed plan of reorganization before the conversion. Simply put, there is nothing into which to reach back.

In contrast, a subsequent new case, filed after the reorganized debtor has confirmed a Chapter 11 plan in an earlier case, creates an entirely new estate. "The estate created in one bankruptcy case is distinct from that created upon the commencement of a subsequent case." *In re Jamesway Corp.*, 202 B.R. 697, 701 (Bankr.S.D.N.Y. 1996).

It is clear, therefore, that the cases cited by the defendants have nothing whatsoever to do with the circumstances presented here where a second bankruptcy case and an entirely new bankruptcy estate are involved. In the second case, the trustee has all powers given the trustee by the Bankruptcy Code. The trustee is not denied some of those powers because there may have been an earlier bankruptcy case involving the same debtor. Although it is true that a Chapter 7 trustee in the *same* bankruptcy case in which a Chapter 11 plan was first confirmed may find no estate to administer—and as a practical matter may therefore be denied certain powers for that reason [116]—those cases dealing

---

**115.** *See* notes 49 and 56 *supra.*

**116.** If a bankruptcy estate has a preference claim, the trustee may exercise the trustee's power to pursue that claim and set aside the preference. If a bankruptcy estate does not have such a claim, the trustee has no ability

to pursue the preference. When a Chapter 11 plan is confirmed, all of the debtor's property revests in the debtor (unless the plan or order of confirmation provide otherwise). If the court converts the confirmed Chapter 11 case to a case under Chapter 7, the bankruptcy estate now administered by the Chapter 7

with the conversion situation are not controlling or persuasive in the subsequent case situation.

The estate in a subsequent case contains all of the assets that the reorganized debtor holds upon the filing of the petition in that second case. These assets are then administered for the purpose of paying claims of that estate in accordance with the priorities as set forth in Section 507. In the later case, "the entity's unpaid liabilities under the first case plan become general unsecured claims." *Official Committee of Unsecured Creditors of White Farm Equipment Co. v. United States (In re White Farm Equipment Co.)*, 943 F.2d 752, 757 (7th Cir.1991) (*quoting In re Jartran*, 76 B.R. 123, 125 (Bkrtcy.N.D.Ill. 1987)).

The clear import of this is that a claimant holding a claim that arises in the first case enjoys no special ownership interest in property of the estate of the subsequent case. *All* unsecured claims of the debtor, including unsecured claims arising from the prior confirmed case, are included within the same class in the subsequent case. 11 U.S.C. §§ 507, 1122. This is so even though "the rights and remedies of a creditor may be substantially altered or impacted upon in subsequently filed Chapter 11 proceedings." *Jamesway*, 202 B.R. at 702 (*quoting Shepherd Oil*, 118 B.R. at 747).

Unpaid claims arising from a confirmed plan in a prior case are to be treated pro rata with others in their class in a second case, except in specific and unique circumstances not present here.[117] Those creditors holding an unpaid unsecured claim from a prior confirmed bankruptcy case have no special property interest in the debtor's estate that supercedes other claimants in their class.

It follows by extension that, when the debtor makes a payment on a confirmed plan prior to the filing of a subsequent bankruptcy petition, the debtor does so using property of the debtor within the meaning of Section 547(b). The transfer is no different in its essentials than a transfer made pursuant to a contract or judgment. The paucity of case law on this issue itself corroborates this conclusion.

### iii. *National bankruptcy policy.*

Most importantly, this conclusion advances the principles that form the very foundation of bankruptcy law.

> The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy.... Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor....

*Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1355 (5th Cir.1986) (*citing H.R.Rep. No. 595*, 95th Cong., 1st Sess. 177–78, *reprinted in* 1978 U.S.C.C.A.N. 5787, 6138).

These principles are no less important, and may be more so, in a subsequent bankruptcy case than they are in the first. Having been through the process once al-

---

trustee has no assets. It therefore has no preference claim, and the Chapter 7 trustee has no ability to pursue a preference.

**117.** Priority tax and administrative claims conceivably could merit special treatment. *See, e.g., White Farm Equipment*, 943 F.2d at 757 [priority claim by IRS for trust fund taxes remains a priority claim in subsequent case]; *United States v. Conston, Inc. (In re Conston, Inc.)*, 181 B.R. 769, 780 (D.Del.1995) [priority income tax claims contained in a confirmed reorganization plan, if the claims retain tax characteristics, may be entitled to priority status in subsequent case]. *Contra, Jartran*, 886 F.2d at 870 [an administrative claim in the first case is not necessarily an administrative claim in the second case]. The claims at issue in this case, however, are simple unsecured claims, not administrative or priority claims, and therefore these cases are inapposite.

ready, the claimant holding a claim that arises from a confirmed plan has a better knowledge of the probable consequences that will flow from a second failure by the debtor. The claim arising from the first case is undoubtedly already reduced in amount, and the claimant has as much incentive to maximize its own return as does a creditor with a new post-confirmation claim. Such a claimant is more likely to "grab" the debtor's assets in payment of its claim before the second filing to enhance its position. Section 547, of course, is specifically designed to remedy such "grabs" and to ensure that all creditors of the same classes are paid equally on a pro rata basis.

Although concerned with different issues of law, *Shepherd Oil*, 118 B.R. at 750–752, illustrates clearly the dynamic that occurs in a subsequent case. In that case, the court held that it could not impose a constructive or express trust on the property of a subsequent bankruptcy estate for the benefit of an unpaid creditor of the first bankruptcy estate, even in the face of apparent fraud.

In *Shepherd Oil*, the debtor confirmed a plan whereby the United States Department of Energy ("DOE") was to receive a pro rata distribution from the net proceeds of the reorganized debtor along with other members of the class. Because the plan contemplated that DOE would not be paid immediately, DOE was also to receive a blanket lien on the debtor's assets to secure payment.

After confirmation and pending the disposition of the debtor's objection to the DOE claim, the debtor segregated in a certificate of deposit the monies to pay DOE but did not record the blanket lien. The debtor later used those monies to convert its facility to a corn/ethanol plant without DOE's knowledge. Although the debtor made partial distributions to other creditors in DOE's class, the debtor made no payments to DOE.

Several creditors then filed a new involuntary bankruptcy petition against the debtor based upon its defaults under the confirmed plan in the first case. The debtor's assets were ultimately liquidated, but the proceeds were insufficient to pay all claims in full, including DOE's claim for its unpaid dividend from the first case.

In an attempt to assert priority over the claims arising in the second case, DOE sought a declaration that the order of confirmation in the first case created a constructive or express trust in DOE's favor. The court disagreed, stating that, even if "the fraud perpetrated upon the D.O.E. created a constructive trust under some theory of law, this Court would be required to direct the turnover of any funds or assets for the benefit of all creditors in the [second case]." *Id.* at 748. The court went on to state that using the confirmed plan in the first case to create an express trust "would frustrate the fundamental purposes of the Bankruptcy Code of equality of distribution to creditors in the same class and the relative priorities of creditors." *Id.* at 752.

The bankruptcy system is built upon notions of fundamental fairness and equality of distribution within a particular class. The avoidance provisions contained in the Code allow the court to reach back before the filing of the bankruptcy petition to ensure that no one creditor will be advantaged to the detriment of others in its same class of priority. A creditor who receives a payment pursuant to a confirmed plan within the applicable preference period will be and should be subject to attack if the elements of a preference can be established. This will "ensure that the delicate balance of the priority and discharge scheme established by the Code is not skewed by the unanticipated development of serial Chapter 11 filings." *White Farm Equipment*, 943 F.2d at 757.

For all these reasons, the court is persuaded that payment of claims pursuant to a confirmed plan after confirmation and out of assets generated by the reorganized debtor are transfers of the debtor's prop-

erty within the meaning of Section 547(b). This conclusion does not leave a defendant who has received such a payment unprotected in the defendant's reliance of the payment. The defendant is vulnerable only within a specific and circumscribed time period, depending on its relation to the debtor. In any event, the plaintiff is obligated to establish all of the requisite elements of Section 547(b). The defendant also has the ability to defend the payment pursuant to Section 547(c).[118]

### c. Was the transfer to or for the benefit of a creditor?

First Union originally held the claims in question. It transferred its claims to M & D in the manner then required by the Federal Rules of Bankruptcy Procedure. M & D then became the holder of those claims. Section 101(10) of the Bankruptcy Code defines "creditor," among other things, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Section 101(5) defines "claim," among other things, as a "right to payment." M & D's right to payment, acquired from First Union, arose before the order for relief in the second bankruptcy case. M & D is therefore a creditor of the debtor for purposes of this claim. The fact that M & D acquired the unsecured claims from First Union instead of having the debtor incur the indebtedness directly does not alter this conclusion.

In addition, the debtor made and delivered to M & D a promissory note in the amount of the unpaid portion of the claims that M & D acquired from First Union. M & D therefore had a right to payment directly from the debtor under that note.

In either case, it is plain that the payment in question was to and for the benefit of M & D, a creditor, within the meaning of Section 547(b)(1).

### d. Was the transfer for or on account of an antecedent debt?

The debtor incurred the underlying indebtedness owed originally to First Union well before the filing of Toy King II. The debtor executed its note in favor of M & D for the unpaid portion of the First Union unsecured claims on September 11, 1989. Accordingly, the transfer made on December 29, 1989, in full satisfaction of that note was for or on account of an antecedent debt within the meaning of Section 547(b)(2).

### e. Was the debtor insolvent at the time of the transfer?

For the reasons stated in Section V.C.2.e. above, the court reaches the same conclusion with respect to this element as to payments made to TKA during the 90–day period immediately before the filing of this case. Accordingly, the debtor was insolvent at the time of the debtor's payment to M & D within the meaning of Section 547(b)(3).

### f. Did the transfer occur on or within 90 days of the filing of the petition?

The debtor made its payment to M & D on December 29, 1989. Because this date was after November 14, 1989, the first day of the 90–day preference period, the payment was made within the 90–day preference period as set forth in Section 547(b)(4)(A).

### g. Did M & D receive more than it would have received in a Chapter 7 liquidation?

The First Union claims were unsecured claims in Toy King I. The debtor executed

---

**118.** It is noteworthy that the plaintiffs have attacked only one dividend payment as preferential, a payment to an insider. Most of the dividend payments in this case occurred outside the applicable preference period. Even those that fall within the preference period, other than the one at issue here, would be unassailable because they were clearly arms-length transfers paid in the ordinary course of the debtor's and creditor's business and pursuant to the court's order of confirmation.

an unsecured promissory note on behalf of M & D for the portion of the First Union claims that was not paid within 90 days of the confirmation of Toy King I. As stated in Section V.C.2.g.ii. above, unsecured creditors in Toy King II were not likely to receive a 100 percent distribution on their claims and did not in fact receive any distribution on their claims. Accordingly, M & D, when it was paid in full on its note, received more than it would have received in a Chapter 7 liquidation had the payment not been made, all as required by Section 547(b)(5).

### h. Summary for transfer to M & D during the 90–day preference period.

Based upon the foregoing, the plaintiff has proven by a preponderance of the evidence that the payment by the debtor to M & D of principal and interest on the M & D note, in satisfaction of what initially began as the First Union unsecured claims, during the 90–day period immediately before the filing of this case satisfies each and all of the preference elements set forth in Section 547(b) of the Bankruptcy Code.

The defendants' affirmative defense to this preference claim pursuant to Section 547(c) of the Bankruptcy Code will be considered later after the determination of all of the preference claims.

### 5. Recording of UCC–1 financing statements by Liberty during the 90 days immediately before the filing of Toy King II.

### a. Introduction.

Liberty filed UCC–1 financing statements in Alabama, Florida, South Carolina, Virginia, and Wisconsin in June 1989. By these filings, Liberty perfected its security interest in the debtor's inventory in those states effective on the dates of the filings. None of these UCC–1 financing statements, however, contained "proceeds" in the collateral description.

Liberty re-filed its UCC–1 financing statements in the same states in January 1990. For the first time, these re-filed financing statements specifically included "proceeds" in the collateral description.

Liberty also filed UCC–1 financing statements in Maryland and Pennsylvania in January 1990. Liberty filed these UCC–1 financing statements more than 30 days after the debtor opened its new stores in Pennsylvania and Maryland.

The unsecured creditors committee seeks to set aside the perfection of the security interests accomplished as a consequence of these January 1990 filings.

The plaintiff, of course, has the burden to demonstrate that transfers, including the perfection of security interests, are preferences. *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991). As previously discussed, Section 547(b) sets forth the elements of a preference that the plaintiff is required to establish by a preponderance of the evidence.

The parties agree that questions about Liberty's perfection of its security interests are governed by Section 9–103 of the Uniform Commercial Code, as adopted by each state in which Toy King stores were located. Each of the states involved in this issue has adopted the Uniform Commercial Code, including the 1972 amendments to Article 9 of the Code.

### b. Does the re-filing of UCC–1 financing statements that specify proceeds for the first time constitute transfers?

Liberty re-filed UCC–1 financing statements in Alabama, Florida, South Carolina, Virginia, and Wisconsin in January 1990. These UCC–1 financing statements specifically included "proceeds" in the description of collateral. "Proceeds" were not included in the UCC–1 statements that Liberty filed in these same states in June 1989. A transfer of the debtor's property occurred if the re-filing

of the UCC–1 financing statements afforded Liberty greater rights with respect to the debtor's property that secured TKA's debt to Liberty than Liberty had before the re-filing occurred. *Provident Hospital & Training Association v. GMAC Mortgage Co. of Pennsylvania (In re Provident Hospital & Training Association)*, 79 B.R. 374, 378–79 (Bkrtcy.N.D.Ill.1987) ["For preference purposes, a transfer is deemed to occur at the time of re-perfection of a security interest where perfection has previously lapsed."].

Section 9–306 of the Uniform Commercial Code, as amended in 1972, provides that:

(1) "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. . . .

(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, *and also continues in any identifiable proceeds* including collections received by the debtor.

(Emphasis added).

Pursuant to these provisions of the UCC, a secured party automatically has a security interest in the "proceeds" of its collateral unless the parties agree otherwise. Thus, a UCC–1 financing statement that describes the collateral also covers the "proceeds" of that collateral even if "proceeds" are not included in the description of the collateral. To exclude the "proceeds" of the collateral, the UCC–1 financing statement would have to so state affirmatively.

The rule that existed prior to the 1972 amendments seemed to mandate an opposite conclusion. It provided that, unless financing statements specifically described "proceeds," secured creditors' rights in "proceeds" became unperfected after ten days from receipt by the debtor. The

"Official Reasons for the 1972 Change" explains the apparent shift in approach as follows:

This ambiguity has been clarified in favor of an *automatic right to proceeds,* on the theory that this is the intent of the parties, unless otherwise agreed. Further there has been eliminated the requirement of claiming proceeds in a financing statement, which has resulted in a checking of a box on each financing statement in order to claim proceeds. Instead, the filed claim to the original collateral is treated as constituting automatically the filing as to the proceeds. . . .

(Emphasis added).

*Uniform Laws Annotated, Master Edition,* Vol. 3, Section 9–306.

After the 1972 amendments, parties to a security agreement are therefore required to take affirmative action to exclude "proceeds" from the collateral that secures the underlying obligation. In the absence of such action, "proceeds" are automatically included within the pledged collateral.

The original UCC–1 financing statements filed by Liberty in June 1989, did not exclude "proceeds." Accordingly, Liberty had a perfected security interest in "proceeds" generated from the sale of the debtor's inventory at all times after these initial UCC–1 filings notwithstanding the failure of the original financing statements to include "proceeds" affirmatively in the description of the collateral. The January 1990, re-filings in Alabama, Florida, South Carolina, Virginia, and Wisconsin, therefore, gave Liberty no new or greater rights in the collateral than those that Liberty already had.

As a consequence, the plaintiff has failed to establish the element of transfer as required by Section 547(b) as to these re-filings. Because the plaintiff must establish all of the required elements of a preference, the failure to establish any one element defeats the plaintiff's claim. It is therefore unnecessary for the court to con-

sider any of the other preference elements as to the January 1990 UCC–1 financing statement re-filings in Alabama, Florida, South Carolina, Virginia and Wisconsin.

c. *Does the filing of UCC–1 financing statements more than 30 days after inventory has been moved constitute transfers?*

■ The debtor opened new stores in Pennsylvania and Maryland in mid-October 1989. The debtor transported inventory from its Florida warehouse to stock the new stores one week prior to the opening of each new location.[119] Liberty filed UCC–1 financing statements in Pennsylvania and Maryland in January 1990, to perfect its security interest in the debtor's inventory and proceeds in those states.[120] Liberty filed these UCC–1 financing statements more than 30 days, but less than four months, after the date the debtor first shipped inventory to those states.

As the court described earlier in Section IV.E.5. above, Liberty perfected its security interest in the debtor's inventory located in Florida, and its proceeds, by filing a UCC–1 financing statement in Florida in June 1989. The issue the plaintiff presents, therefore, is whether Liberty retained its security interest in the inventory shipped to Pennsylvania and Maryland upon its removal from Florida and, if so, for how long? If Liberty's security interest in the inventory shipped to Pennsylvania and Maryland became unperfected at any point after it left Florida, Liberty would not be able to enforce its security interest in all of that inventory. In that event, the filing of a UCC–1 financing statement to re-perfect a security interest in inventory and proceeds would operate to expand Liberty's rights and would constitute a transfer of an interest of the debtor's property. *Provident Hospital & Training Association,* 79 B.R. at 379.

Section 9–103(1)(d) of the Uniform Commercial Code states that:

When collateral is brought into and kept in this state while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected, but if action is required by Part 3 of this Article to perfect the security interest,

(i) if the action is not taken before the expiration of the period of perfection in the other jurisdiction or the end of four months after the collateral is brought into this state, whichever period first expires, the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal;

(ii) if the action is taken before the expiration of the period specified in subparagraph (i), the security interest continues perfected thereafter;

Pursuant to this section, to continue its perfection in all of the debtor's inventory, Liberty was required to file UCC–1 financing statements in Pennsylvania and Maryland no later than four months after the date the inventory was first shipped into each state.[121] In the case of Pennsylvania,

---

**119.** The debtor opened its new stores in Maryland and Pennsylvania as follows:

| Store | Location | Opened | Store Inventory Shipped |
|---|---|---|---|
| Franklin Mills | PA | 10/15/89 | 10/8/89 |
| Bowie | MD | 10/21/89 | 10/11/89 |
| Landover | MD | 11/11/89 | 11/04/89 |

**120.** Liberty filed UCC–1 financing statements on January 2, 1990, and January 3, 1990, in Pennsylvania and Maryland, respectively.

**121.** If Liberty did not file UCC–1 financing statements in Pennsylvania and Maryland within this four-month period, its perfection as to inventory in those states would lapse effective on the date the inventory was first shipped to the new state. If Liberty then filed its UCC–1 financing statements outside the four month period, the filing would continue Liberty's perfection in all inventory shipped within four months of that later date but would re-perfect Liberty's security interest in

that deadline was February 8, 1990. In the case of Maryland, that deadline was February 11, 1990. Liberty in fact filed UCC–1 financing statements in those states in early January 1990, well before the expiration of the four months period. Liberty's security interest in the debtor's Pennsylvania and Maryland inventory and proceeds, therefore, was continuously perfected at all times.

■ The plaintiff's argument to the contrary based upon Section 9–103(1)(c) of the Uniform Commercial Code is unpersuasive because that provision is inapplicable to these facts. It deals only with the obligations of a creditor with a purchase money security interest. It provides that:

> If the parties to a transaction creating a *purchase money security interest* in goods in one jurisdiction understand at the time that the security interest attaches that the goods will be kept in another jurisdiction, then the law of the other jurisdiction governs the perfection and the effect of perfection or non-perfection of the security interest from the time it attaches until thirty days after the debtor receives possession of the goods and thereafter if the goods are taken to the other jurisdiction before the end of the thirty-day period.

(Emphasis added).

Contrary to the plaintiff's arguments, Liberty did not have a purchase money security interest in the collateral at issue— the debtor's inventory—that secured the Liberty and the Nintendo loans. Section 9–107 of the Uniform Commercial Code defines a purchase money security interest as follows:

> A security interest is a "purchase money interest" to the extent that it is
>
> (a) taken or retained by the seller of the collateral to secure all or part of its price; or

> (b) taken by a person who by making advances or incurring an obligation gives value to enable *the debtor* to acquire rights in or the use of collateral if such value is in fact so used.

(Emphasis added).

Liberty did not sell inventory. It was merely a bank in the business of loaning money. Liberty loaned money to TKA. It therefore is TKA—and not Toy King— that is "the debtor" implicated in Section 9–107(b). Except for the $1 million letter of credit required to be used to pay Toy King I dividends, TKA had an unfettered right to use the money it received from the Liberty and Nintendo loans. TKA used the loan proceeds, except for the $1 million letter of credit, to make loans to Toy King for its general corporate purposes, including the purchase of Nintendo inventory. TKA, as "the debtor" on the Liberty obligations, did not use the loan proceeds to "acquire rights in or the use of collateral." In any event, Liberty did not hold a purchase money security interest in Toy King's inventory. Section 9–103(1)(c), therefore, is inapplicable to these facts.

Because Liberty retained a continuously perfected security interest in the debtor's inventory located in Pennsylvania and Maryland, the plaintiff has failed to establish that a transfer of the debtor's property occurred with respect to the filing of UCC–1 statements in Pennsylvania and Maryland in January 1990. The plaintiff's failure to establish this required element defeats its preference claim as to these filings.

> d. *Summary for recording of UCC–1 financing statements by Liberty during the 90–day preference period.*

As the foregoing describes, the plaintiff has failed to prove by a preponderance of

---

inventory shipped more than four months before the filing date, assuming no intervening purchaser. *See Gennet v. Fason,* 178 B.R. 888, 892 (S.D.Fla.1995) [holding that a secured creditor has four months from the date of each shipment of goods to file UCC–1 financing statements in a new state]. Such reperfection, of course, would constitute a transfer of an interest in property within the meaning of Section 547(b).

the evidence that a transfer of the debtor's property occurred as a result of the filing or re-filing of UCC–1 financing statements in January 1990. Because the plaintiff cannot establish one of the essential elements as set forth in Section 547(b), the court finds that no preference has occurred, and the court need not consider the other elements of that section.

6. *Execution of amended security agreement by the debtor to Liberty between 90 days before the commencement of Toy King II and the date of confirmation of Toy King I.*

a. *Introduction.*

To secure the Liberty loan, the debtor executed a security agreement on June 9, 1989, that granted Liberty a security interest in its inventory and proceeds. That security agreement also contained a future indebtedness or future advances clause, commonly referred to as a "dragnet clause," that granted a security interest to secure "any and all obligations" of TKA to Liberty.

TKA entered into a subsequent agreement with Liberty to borrow $700,000, referred to as the Nintendo loan. Before Liberty approved the loan, TKA executed a note on September 12, 1989, that included a grant of a security interest in "[a]ll collateral cited in Promissory Note and revolving credit and security agreement dated June 9, 1989." Liberty approved the loan on September 27, 1989. Liberty disbursed the proceeds to TKA between September 13, 1989, and October 17, 1989. On October 24, 1989, well after all of the loan proceeds had been disbursed by Liberty, the debtor executed an amended security agreement that specifically incorporated the Nintendo loan.

The unsecured creditors committee seeks to avoid the security interest created by the execution of the October 24, 1989, security agreement by the debtor.

b. *Was Liberty an insider of the debtor?*

The debtor executed the amended security agreement in connection with the Nintendo loan on October 24, 1989. This is the date the debtor allegedly transferred to Liberty an interest in its property, that is, a security interest in the collateral described in the security agreement. Because this date is not within the 90–day presumed preference period, the plaintiff must demonstrate that Liberty is an insider of the debtor in order to use the reach back period provided by Section 547(b)(4)(B).

In circumstances where the debtor is a corporation, Section 101(31)(B) of the Bankruptcy Code defines "insider" as including a:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor;

Plainly, Liberty does not fit within any of these categories. The definition, however, uses the word "includes" and thus is not limiting in scope. *See* 11 U.S.C. § 102(3). Consequently, the six categories of corporate insider set forth at Section 101(31)(B) are not exhaustive.

To determine if Liberty is an insider of the debtor, the court must look to the relationship between the debtor and Liberty. As the legislative history tells us, "an insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *Torcise v. Cunigan (In re Torcise),* 146 B.R. 303, 305 (Bkrtcy.S.D.Fla. 1992) (*quoting H.R.Rep. No. 595,* 95th Cong., 1st Sess. 312 (1977); *S.Rep. No. 989,* 95th Cong., 2d Sess. 25 (1978), *re-*

*printed in* 1978 U.S.C.C.A.N. 1987, 5787). *See, e.g., Browning Interests v. Allison (In re Holloway),* 955 F.2d 1008, 1011 (5th Cir.1992); *Committee of Unsecured Creditors for Pittsburgh Cut Flower Co. v. Hoopes (In re Pittsburgh Cut Flower Co.),* 124 B.R. 451, 459–60 (Bankr.W.D.Pa.1991); *Grant v. Podes (In re O'Connell),* 119 B.R. 311, 316 (Bankr.M.D.Fla.1990).

In *Germain v. RFE Investment Partners IV, L.P. (In re Wescorp, Inc.),* 148 B.R. 161, 164 (Bankr.D.Conn.1992), the court found that a bank was not an insider even where the bank had approval rights over compensation of the principals and, in the event of default, the ability to exercise stock warrants of the debtor and to elect jointly a majority of the board of directors. The court concluded that the bank and the debtor negotiated the terms of the loan agreement at arms-length, including those of potential control of the debtor. Because the bank never sought to implement the control provisions, even in the face of default, the court found no insider relationship. *Id. See also, Lynn v. Continental Bank, N.A. (In re Murchison),* 154 B.R. 909, 913 (Bankr.N.D.Tex.1993) [bank was not an insider even though it was debtor's primary lender and able to put substantial financial pressure on debtor where debtor made its own decisions without interference by the bank]; *Huizar v. Bank of Robstown (In re Huizar),* 71 B.R. 826, 831 (Bankr.W.D.Tex.1987)["[A] bank's financial power over the debtor does not by itself render the bank [an] 'insider' for purposes of § 547."]; *Schick Oil & Gas, Inc. v. Federal Deposit Insurance Corp. (In re Schick Oil & Gas, Inc.),* 35 B.R. 282, 285–86 (Bankr.W.D.Okla.1983) [to show control, a plaintiff must demonstrate some means of restraint or authority greater than the financial power over the debtor that is a normal incident of the debtor-creditor relationship].

In this case, Liberty did not exercise any managerial control over the debtor, and it did not require that the debtor "obtain its advice or consent before exer-

cising managerial decisions." *Cavalier Homes of Georgia,* 102 B.R. at 883. The debtor "was not required to obtain prior approval [from Liberty] for decisions made in the ordinary course of business." *Id.* The evidence adduced at trial demonstrates that at all times Liberty maintained nothing more than an "arms-length creditor debtor relationship" with Toy King.

On these facts, the court concludes that Liberty is not an "insider" of the debtor for purposes of the insider "reach back" period of Section 547(b)(4)(B) of the Bankruptcy Code. Because Liberty is not an insider and because the transfer occurred more than 90 days before the filing of the petition in this case, the plaintiff has failed to establish this element required by Section 547(b)(4).

 c. *Summary for the execution of the amended security agreement during the insider preference period.*

As the foregoing describes, the plaintiff has failed to prove by a preponderance of the evidence that Liberty is an insider subject to the extended preference period. Because the plaintiff cannot establish one of the essential elements as set forth in Section 547(b), the plaintiff cannot prevail on this claim. The court need not, therefore, consider the other elements of that section.

 7. *Ordinary course of business affirmative defenses to preference claims.*

 a. *Introduction.*

As the court determined in Sections V.C.2. and V.C.3. above, the debtor made preferential payments to TKA on the Liberty loan, the Nintendo loan, and the C & S line of credit. These payments comprised both interest and principal. Similarly, the court determined that the debtor made preferential payments to TKA for guaranty fees on the C & S line of credit.

The court also determined in Section V.C.4. above that the debtor made a preferential payment to M & D.

Both TKA and M & D have asserted Section 547(c)(2) of the Bankruptcy Code as a defense to these preferential payments made by the debtor. This "ordinary course of business" exception protects preferential payments received by a creditor if three conditions exist. Those conditions are summarized as follows:

(A) The *debt* in controversy was incurred in the ordinary course of both the debtor's and creditor's business;

(B) The controverted *payment* was made in the ordinary course of business of both the debtor and the creditor; and

(C) The *payment* was made in accordance with ordinary business terms.

11 U.S.C. § 547(c)(2). *See generally,* 4 *Collier on Bankruptcy* ¶ 51.10 at 547–51 (15th ed.1990).

■■■■ "The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general bankruptcy section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *H.R.Rep. No. 595,* 95th Cong., 1st Sess. 373–74 (1977). The section was "designed to encourage creditors to continue to deal with troubled debtors on normal business terms by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment." *Barnhill v. Johnson,* 503 U.S. 393, 402, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). Stated another way, "[t]he purpose of the ordinary course exception is to ensure that normal commercial transactions are not caught in the net of the trustee's avoidance powers." *Courtney v. Octopi, Inc. (In re Colonial Discount Corp.),* 807 F.2d 594, 600 (7th Cir.1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987).

■■■■ The ordinary course exception is "directed primarily to ordinary trade credit transactions." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1567 (11th Cir.1986). Courts and commentators agree that the exception protects "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 4 *Collier on Bankruptcy* ¶ 547.10 at 547–52 (15th ed.1990). The ambit of a recurring, customary credit transaction is fairly broad. In *Union Bank v. Wolas,* 502 U.S. 151, 162, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991), for example, the Court held that the "ordinary course" exception is available for payments on both long and short-term financial obligations. *See also, Rieser v. Randolph County Bank (In re Masters),* 137 B.R. 254, 261 (Bankr.S.D.Ohio 1992); *Warren v. Society Corp. (In re Perks),* 134 B.R. 627, 631–32 (Bankr. S.D.Ohio 1991). The court in *Gosch v. Burns (In re Finn),* 909 F.2d 903, 908 (6th Cir.1990), held that even an isolated, single credit transaction can qualify as a debt incurred in the ordinary course for purposes of this exception.

■■■■ "[A] creditor asserting that a transfer falls within § 547(c)(2) bears the burden of proving each of the three elements. 11 U.S.C. § 547(g)." *Miller v. Florida Mining & Materials (In re A.W. & Associates, Inc.),* 136 F.3d 1439, 1441 (11th Cir.1998). Each element must be established by a preponderance of the evidence. *Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.),* 957 F.2d 239, 244 (6th Cir.1992); *Perks,* 134 B.R. at 630.

■■■■ "Because of the important policies served by preference law, courts have repeatedly held that the exceptions contained in Code § 547(c), including the ordinary course exception, 'should be narrowly construed.'" *Hassett v. Goetzmann (In re CIS Corp.),* 195 B.R. 251, 257 (Bankr. S.D.N.Y.1996) [citations omitted]. Ultimately, the "[d]etermination [of ordinary course of business] is peculiarly factual".

*Pittsburgh Cut Flower*, 124 B.R. at 460. The court must therefore consider the transfers to TKA and M & D as they relate to each element of the ordinary course defense.

 b. *Were the debts incurred in the ordinary course of both the debtor's and the creditor's businesses?*

 i. *Debts to TKA.*

 (1) *Introduction.*

 ■ To satisfy this Section 547(c)(2)(A) element, the defendant must demonstrate that the "original transaction creating the debt" is within the ordinary course of dealing between the parties. *Grove Peacock Plaza*, 142 B.R. at 518. The focus is on the "nature of the original transaction creating the debt." *Id.* "[C]ourts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or whether it was incurred as an insider arrangement with a closely-held entity." *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728, 735 (Bankr.W.D.Va.1995) [citations omitted]. The purpose of the inquiry is to ensure that "neither the debtor nor the creditor do anything abnormal to gain an advantage over other creditors." *Id.*

 ■ In this case, the relationship between the debtor and TKA was not an arms-length relationship because there was an identity of interests between the two entities. TKA was formed shortly before the filing of Toy King I specifically for the purpose of acquiring the stock of the debtor. Morrow and Angle were each 20 percent shareholders of TKA. Morrow and Angle were also officers and directors of the debtor. They made all of the financial decisions for both TKA and the debtor. Accordingly, the tension that commonly exists between debtor and creditor is absent in this case. None of the transactions between TKA and the debtor here at issue

would therefore appear to fall readily into the category of a typical, arms-length commercial transaction. A closer examination of the relationship between TKA and the debtor and the transactions that occurred is therefore necessary.

 TKA loaned money to the debtor throughout the pendency of the Toy King I bankruptcy. The terms and conditions of that lending and the parties' course of dealing in payment of that lending are not in evidence. In any event, the relationship between TKA and the debtor while it was in the midst of reorganization was shaped by the requirements and limitations of the bankruptcy process. Accordingly, the court will look to the post-confirmation course of dealing between TKA and the debtor to determine the "ordinariness" of the transactions.

 After Toy King I was confirmed, TKA loaned money to the debtor in a series of loans for its use in paying plan dividends and/or for its operations. TKA acquired the funds to make these loans through its borrowings from Liberty and C & S. To appreciate the lending dynamic that occurred between TKA and the debtor that resulted from the shared management and control of those two companies, it is necessary to also examine the underlying transactions as they occurred between TKA and the banks.

 (2) *The Liberty loan.*

 The Liberty loan was negotiated between TKA and Liberty in furtherance of the confirmation of Toy King I. Liberty approved the loan with specific guaranties. Liberty and TKA then executed a commitment letter that detailed the terms and conditions of the loan and incorporated those terms and conditions into the confirmed plan. The commitment letter contemplated that $1 million of the loan would be made available directly to the debtor through a letter of credit for the sole purpose of paying plan dividends to unsecured creditors. The commitment letter further contemplated that $500,000 would be available to TKA under a line of credit

for the sole purpose of making a capital contribution in the debtor for its operating costs. The commitment letter also had a net worth covenant that required $2 million in equity to be in the debtor after its reorganization and before closing the Liberty loan. Touche Ross was to corroborate this equity in an opinion letter.

The court concluded in Section IV.E.5. above that Liberty closed the loan on terms and conditions that were not approved by the senior loan committee and/or were not in accordance with the confirmed plan. Liberty closed the loan with limited guaranties that were reduced in amount from the guaranties that had been previously approved. Liberty also closed the loan and began to advance the proceeds without obtaining corroboration from Touche Ross that the debtor had a net worth of $2 million.

Liberty made the proceeds of the loan available to TKA and the debtor in the manner contemplated by the commitment letter. Liberty made $1 million available directly to the debtor in the form of a letter of credit for the limited purpose of paying dividends pursuant to the confirmed plan in Toy King I. Liberty also made a $500,000 line of credit available to TKA but made an immediate debit in the amount of $301,822.93 on that line to pay the C & S indebtedness owed by TKA. Liberty also made an immediate debit in the amount of $18,707.22 to pay the bank's loan fees and costs. These monies, totaling $320,530.15, were paid out by Liberty at closing and thus were never available to TKA for its use in making a capital contribution or loan to the debtor.

Although TKA did not disburse any of the $320,530.15 in payment of the debtor's obligations, it nevertheless considered that the monies were used for the debtor's benefit and booked the transaction as an obligation of the debtor. TKA did this by

substituting the Liberty loan for the C & S loan as the underlying obligation on the notes the debtor gave TKA prior to and just after the Toy King I confirmation. These notes required interest to be paid monthly at a rate that exceeded the interest rate on the Liberty loan by one percent.

TKA drew down the remainder of the $500,000 line of credit during the months immediately following confirmation and made the monies available to the debtor. In most cases, the debtor executed a demand promissory note in favor of TKA for those draws. In every case, the demand notes required interest to be paid monthly at a rate that exceeded the interest rate on the Liberty loan by one percent.

The debtor ultimately executed notes in an aggregate amount of $421,885.[122] The debtor did not execute notes for the remaining $78,115. TKA, however, treated the entirety of the $500,000 line of credit as loans to the debtor, regardless of whether the parties executed promissory notes in support of those loans. On its balance sheets, the debtor booked some or all of the disbursements from the $500,000 line of credit as liabilities.[123]

TKA did not make any of the $500,000 line of credit available to the debtor as a capital contribution as required by the commitment letter. Instead, TKA denominated the $1 million letter of credit as a capital contribution in the debtor. The debtor showed this on its internal balance sheets under assets as a stock subscription receivable and under shareholder's equity as preferred stock. As the debtor drew down the letter of credit, the debtor made adjustments to its internal balance sheet by debiting the amount of the payment from the stock subscription receivable and from the prepetition liabilities. The court concluded in Section IV.F.2. above that the debtor's booking on its balance sheets of

**122.** *See* note 49 *supra.*

**123.** Although it is clear that the debtor understated its liabilities on its balance sheets, the court cannot determine from the evidence which liabilities were understated. *See* note 46 and surrounding text *supra.*

the $1 million as a capital contribution was inaccurate and contrary to general accounting principles.

The debtor exhausted the letter of credit by October 3, 1989. In November 1989, the debtor modified the way it recorded the $1 million on its balance sheet. In its November 28, 1989, balance sheet the debtor posted the $1 million as a liability rather than as preferred stock.[124]

Notwithstanding the way in which the $1 million was initially recorded on the debtor's balance sheets, TKA at all times treated the transaction as a loan to the debtor. TKA billed the debtor monthly for interest charges that were calculated on the basis of the total amount paid out as of that date on the letter of credit. TKA charged interest at a rate that was at least one percent more than the interest that Liberty charged to TKA on the letter of credit. TKA and the debtor did not execute any documents to memorialize these loans.

Thus, TKA made the proceeds of the Liberty loan available to the debtor in a manner that was inconsistent with the requirements of the confirmed plan, the Touche Ross pro forma, and the way in which it was booked on the debtor's balance sheets. The defendants offered no credible explanation for the divergent treatment of the Liberty loan by the debtor and TKA. The divergence is especially notable given the identity of interests between the parties.

In addition, TKA loaned a substantial portion of the Liberty loan proceeds to the debtor without any supporting documentation of the loan. In *Lee's Place v. Hawbaker*, 1992 WL 164443 (C.D.Ill.1992), the court found that loans made by an insider to the debtor without any written documentation were not incurred in the ordinary course.

In those cases where documentation was executed, TKA loaned the money to the debtor through demand notes that allowed TKA to direct repayment at will. TKA also charged interest at a rate that exceeded the interest they were paying on the underlying transaction. In short, the loans represented by the Liberty loan proceeds were insider arrangements specifically designed to benefit TKA and its principals.

For all of the above reasons, the court is unable to conclude that the debts represented by the Liberty loan were incurred by the debtor in the ordinary course of its dealings with TKA.

### (3) The C & S line of credit.

TKA negotiated a line of credit with C & S during the pendency of Toy King I. The line of credit was capped at $400,000 and was unconditionally guarantied by Morrow, Angle, and Woodward. TKA borrowed money on the line of credit in the amount of approximately $300,000 during the course of Toy King I and immediately thereafter. TKA repaid the principal in June 1989 as a condition of the Liberty loan. Although that payment went directly to C & S from the Liberty $500,000 line of credit, TKA and the debtor executed notes that memorialized the debtor's obligation to repay those monies to TKA. Even where no notes were executed, TKA and the debtor treated the transaction as a loan to the debtor.[125]

The debtor had insufficient cash reserves to sustain its operations after confirmation of Toy King I, largely as a consequence of TKA's repayment of the C & S line of credit from the Liberty loan proceeds. After that repayment, TKA had less than $200,000 on the Liberty line of credit to make available to the debtor for its use in its operations. Accordingly, TKA sought additional credit for the bene-

---

**124.** This change occurred following the November 17, 1989, meeting between Morrow, Angle, and Horne, at which Morrow advised Horne that TKA would be unable to make any payment on the principal as had been verbally agreed between the parties when the Liberty loan was negotiated.

**125.** *See* note 49 *supra* and surrounding text.

fit of the debtor within weeks of its first draw on the Liberty line of credit.

Initially, TKA approached Liberty, but Liberty declined to extend further credit at that time. Liberty waived its prohibition against additional borrowing, however, and consented to TKA's further borrowing on the C & S line of credit. TKA thereupon drew upon the C & S line of credit and made the funds available to the debtor. TKA and the debtor executed demand notes with specific interest and payment terms for all of the draws on the C & S line of credit. These notes contained terms that were consistent with all of the Liberty loan notes previously executed and also with each other.

At the time TKA incurred its obligation to C & S and the debtor in turn incurred its obligation to TKA on the C & S proceeds, the debtor was not operating normally. The debtor was unable to obtain the level of trade credit from toy manufacturers that had been projected. Consequently, the debtor was forced to purchase a significant percentage of its inventory from toy distributors, rather than from manufacturers, at higher prices. The debtor delayed new store openings. There were scant cash reserves in the debtor's operating account for day-to-day expenses. In short, the inevitable slide into bankruptcy had begun.

For these reasons, the court concludes that the TKA obligation represented by the C & S line of credit was not part of a normal financial relation between TKA and the debtor. It was an "unusual action undertaken during the 'slide into bankruptcy'" and therefore not incurred in the ordinary course of dealing between the debtor and TKA. *Grove Peacock Plaza,* 142 B.R. at 518.

(4) *The Nintendo loan.*

By August, when TKA approached Liberty for additional funds, the debtor had reached a crisis point. As described in Section IV.G.5. above, the debtor had little likelihood of being able to sustain its operations up to and through the Christmas season without an influx of cash.

The situation was so acute that TKA attempted to overdraw its Liberty line of credit in an effort to make funds available to the debtor. Liberty recognized the urgency of the circumstances and made the funds available to TKA from the $1 million portion of the Liberty loan, even though those monies were dedicated to a specific purpose and were not to be used for general funds.

As described in some detail in Section IV.G.5. above, the transaction between Liberty and TKA was itself out of the ordinary. Liberty's senior loan committee approved the Nintendo loan with additional terms and collateral intended to minimize Liberty's risk. Liberty sought more expansive guaranties as well as additional collateral. In *Production Steel Inc. v. Sumitomo Corp. of America (In re Production Steel, Inc.),* 54 B.R. 417, 423 (Bankr.M.D.Tenn.1985), the court found a creditor's new requirement of a substantial down payment and letter of credit from the debtor as a condition of shipment not in the ordinary course. Liberty did not actually receive any of the enhancements it negotiated with TKA because the loan proceeds were disbursed before the supporting documentation for the loan was executed. The court concluded in Section IV.G.5. above that Liberty was imprudent in the manner in which it made the Nintendo loan.

Of course, the transaction represented by the Nintendo loan that occurred between Liberty and TKA is not the transaction at issue here. At issue here is the series of loans that TKA made to the debtor using the proceeds of the Nintendo loan. Because the manner in which Liberty and TKA executed the Nintendo loan was fueled by the exigencies of the debtor, however, the facts of that loan transaction demonstrate the rapidly worsening circumstances of the debtor that were present when TKA loaned the Nintendo loan proceeds to the debtor.

TKA made all of the proceeds of the Nintendo loan available to the debtor and executed demand notes to memorialize each loan. The demand notes provided for interest payments on the loans to be made monthly at a rate that exceeded the interest paid to Liberty by one percent. The terms and conditions of these notes were in accord with all of the other notes that had been executed between TKA and the debtor post-confirmation.

The court determined in Section IV.G.5. above, however, that less than one quarter of the money that TKA loaned to the debtor from the Nintendo loan was used to purchase Nintendo products. The remainder was used to support the debtor's operations during the months preceding the Christmas season. TKA's loans to the debtor represented by the Nintendo loan were clearly not financial transactions incurred in the normal course of the debtor's financial relations with TKA but instead were unusual actions "undertaken during the 'slide into bankruptcy.'" *Grove Peacock Plaza*, 142 B.R. at 518.

Accordingly, the court concludes that TKA has failed to establish that the loans represented by the Nintendo loan were incurred in the ordinary course of dealing between TKA and the debtor.

### (5) *The guaranty fees for the C & S line of credit.*

TKA borrowed money from C & S on its line of credit. The debtor was neither obligor nor guarantor on that obligation. Although TKA made the monies available to the debtor that it obtained on the C & S line of credit, those transactions were separate and independent of TKA's obligations to C & S. The debtor executed a demand note for each disbursement made by TKA of monies obtained from the C & S line of credit. TKA charged an interest rate that was higher than the interest rate it was paying for those monies.

At the same time, TKA charged the debtor guaranty fees. The defendants offered no explanation for why the debtor was charged these fees, despite having no legal obligation on the underlying note. TKA charged the debtor these guaranty fees in June and July even though the underlying C & S obligation was completely paid. As the debtor's financial condition worsened, TKA increased the guaranty fees. TKA maintained no formal record of the debtor's obligation to pay the guaranty fees or the subsequent increase in these fees. The fees themselves, at all times, were excessive and unreasonable in amount. The record is devoid of any justification for the debtor's payment of guaranty fees, other than as a means to divert proceeds of the debtor into the pockets of Morrow, Angle, and Woodward. Accordingly, the court finds that the debtor's incurring of the obligation to pay guaranty fees was not in the ordinary course.

### (6) *Summary for whether debts to TKA were incurred in the ordinary course of business.*

For the foregoing reasons, the court finds that TKA has failed to establish by a preponderance of the evidence that the obligations represented by the Liberty loan, the C & S line of credit, the Nintendo loan, and the C & S guaranty fees were incurred in the ordinary course of dealing between TKA and the debtor as required by Section 547(c)(2)(A).

### ii. *Debt to M & D.*

In deciding whether the debt owed to M & D was incurred in the ordinary course of both the debtor's and M & D's businesses, the court must start by examining the relationship between M & D and the debtor. As discussed in Section IV.D.2. above, Morrow and Angle—the debtor's principals—formed M & D for the purpose of acquiring and holding the First Union claims against the debtor. Morrow and Angle were majority shareholders, officers, and directors of M & D. Accordingly, an insider relationship existed between Morrow and Angle and M & D.

Morrow and Angle were also affiliates and therefore insiders of the debtor. Each owned 20 percent of the shares in

TKA, the entity that held the majority of the debtor's stock.[126] In addition, Morrow and Angle were officers and directors of the debtor and in control of its operations. Morrow and Angle were thus both affiliates of the debtor because each directly or indirectly owned, controlled, or held with the power to vote 20 percent or more of the outstanding voting securities of the debtor. 11 U.S.C. § 101(2)(A). Because an affiliate is included within the definition of insider, Morrow and Angle were each insiders of the debtor.[127] 11 U.S.C. § 101(31)(E). *See also Equibank v. Dan–Ver Enterprises, Inc. (In re Dan–Ver Enterprises, Inc.)*, 86 B.R. 443, 449 (Bankr. W.D.Pa.1988).

Because M & D was an insider of two affiliates of the debtor, Morrow and Angle, M & D was an insider of the debtor in its own right. *Butler v. David Shaw, Inc.*, 72 F.3d 437, 441 (4th Cir.1996). *See also* 11 U.S.C. § 101(31)(E) [insider is defined as "affiliate or insider of an affiliate as if such affiliate were the debtor"].

As was the case with TKA and the debtor, M & D and the debtor had an identity of ownership and management. The M & D note transaction would therefore not seem to fall within the ambit of arms-length commercial financial relations and a closer look at the transaction between M & D and the debtor is required.

No prior course of dealing exists between M & D and the reorganized debtor because M & D was formed specifically for the purpose of acquiring the First Union claims. Accordingly, the court will look to the transaction itself in the context of the facts and circumstances present at the time it was incurred to determine the "ordinariness" of the transaction.

As described in Section IV.D.2. above, the debtor negotiated a compromise with First Union in settlement of the bank's claims against it during the pendency of the Toy King I case. Under the terms of the compromise, the debtor was to return real estate and make a payment to First Union on its unsecured claims. The debtor's payment on the unsecured claims was to be in an amount substantially less than that provided for in the plan. First Union purportedly was willing to accept a lower dividend because it wanted to be paid in advance of confirmation.

Rather than structure the debtor's compromise with First Union in a way that would benefit the debtor and its creditors, the debtor's principals structured the compromise in a manner that would give them the benefit personally. Morrow and Angle, therefore, reached a private agreement with First Union to acquire its claims. They formed a corporation, M & D, for that purpose. Although counsel for the debtor sent a letter to counsel for the unsecured creditors committee advising the committee of the principals' plans to acquire the claims, the letter misstated or omitted material facts, including the timing of the transaction. The letter indicated that First Union required consummation of the transaction immediately and stated that the closing would occur on the following day. Counsel sent the letter during the Christmas holidays. It is clear that the letter was timed to preclude any action by the unsecured creditors committee.

The debtor did not file a motion seeking the court's approval of the arrangement reached between the debtor and First Union, despite the fact that part of the arrangement provided for the surrender of collateral and the pre-confirmation payment of First Union's secured claim.[128]

126. *See* notes 6 and 38 *supra*.

127. Morrow and Angle also qualify as insiders of the debtor because they were officers and directors of the debtor. *See* 11 U.S.C. § 101(31)(B)(i) and (ii).

128. The agreement between the debtor and First Union was a compromise of controversy that required court approval upon notice and hearing pursuant to F.R.B.P. 9019(a) and F.R.B.P.2002(a).

Instead, the debtor itself filed a motion to substitute M & D for First Union as claimant, with First Union's written stipulation to the substitution attached. First Union was the only creditor who received service of that motion. The motion did not contain many of the details of the transaction, nor did it disclose the relationship between the substituted claimant and the debtor. The court granted the motion on an ex parte basis.

Notwithstanding the representations in the letter to counsel for the unsecured creditors committee that "time was of the essence," M & D did not pay First Union for its unsecured claims until almost three months after the court entered the order granting the motion to substitute claimant and some four months after the time debtor's counsel said the transaction was to close. M & D did not make the payment to First Union until the court approved the debtor's disclosure statement and the outcome of the Toy King case was in little doubt.

In marked contrast, the debtor made its initial payment on the First Union claims to M & D in the very first distribution to creditors after confirmation of Toy King I. That payment contained some amount of "interest" and "profit" in derogation of the terms of the confirmation order which provided for interest to be paid only on claims that were unpaid for more than 90 days from the date of confirmation. The debtor executed a note for the remainder of the dividend due on the First Union claims on terms that were inconsistent with the confirmed plan.[129]

The M & D transaction was unusual and out of the ordinary. It was a special arrangement between the principals of the debtor, the debtor, and First Union, negotiated and consummated largely outside of the scrutiny of the unsecured creditors, the United States trustee, and the bankruptcy court. The debt itself was structured in a way that was inconsistent with the terms of the confirmed plan.

For all of these reasons, the court concludes that the M & D obligation was not incurred in the ordinary course of dealing between M & D and the debtor within the meaning of Section 547(c)(2)(A).

 c. *Were the payments made in the ordinary course of the businesses of both the debtor and the creditors?*

 i. *Introduction.*

▮▮▮▮▮ Whether the transfer at issue occurred in the ordinary course of business between the parties within the meaning of Section 547(c)(2)(B) is a subjective inquiry. *McLaughlin v. Hoole Machine & Engraving Corp. (In re Parkline Corp.)*, 185 B.R. 164, 169 (Bankr.D.N.J.1994). The court must focus on the ordinary payment pattern between both the debtor and the creditor. *Central Hardware Co. v. The Walker–Williams Lumber Co. (In re Spirit Holding Co.)*, 214 B.R. 891, 898 (E.D.Mo.1997), *aff'd*, 153 F.3d 902, 905 (8th Cir.1998) ["[I]t is necessary to look at not only the creditor's actions during the preference period, but also the debtor's actions."]; *Grove Peacock Plaza*, 142 B.R. at 518. The transfers should demonstrate "some consistency with other business transactions between the debtor and the creditor." *Spirit Holding*, 214 B.R. at 897.

 ii. *Payments to TKA.*

 (1) *Introduction.*

In this case, TKA and the debtor did not have an established history or course of dealing prior to the preferential payments at issue here. Although the parties did have a creditor/debtor relationship during the pendency of Toy King I, that relationship was shaped by the limitations and restrictions imposed by the bankruptcy

---

**129.** The note provided for interest to be paid at the rate of 14.5 percent rather than the nine percent provided for in the plan.

process. In any event, the defendants presented no evidence of the parties' course of dealing during Toy King I.

■ The absence of an historical pattern of course of dealing is not fatal, however, because the court can also consider the written contractual terms governing the relationship of the parties. *Fred Hawes Organization*, 957 F.2d at 245. *Cf. Parkline*, 185 B.R. at 169 [non-adherence to written terms of contract was within ordinary course where the parties had a stable history of course of dealing over a long period of time]. The court will therefore look to the written contracts to establish the initial course of dealing between TKA and the debtor. Although TKA and the debtor did not execute a promissory note for every transaction between them, it is undisputed that TKA billed the debtor for all its obligations consistent with the terms of the executed notes. Accordingly, the terms of the TKA notes represents a course of dealing with respect to all indebtedness that the debtor owed to TKA: the Liberty loan, the C & S line of credit, and the Nintendo loan.

#### (2) *Payments of interest.*

■ Each promissory note required the debtor to pay interest charges on the last day of every month in which the loan was outstanding. Every month, TKA sent the debtor a written statement that reflected the interest owed. Each statement also listed the due date as the last day of the month. The debtor paid the interest charges in full as they were billed. The evidence reflects that the debtor made these payments by check drawn on its operating account prior to the due date. The debtor made no late payments.

All of the debtor's payments of interest on its obligations to TKA were made in a consistent and ordinary manner. There was little or no deviation in the manner and timing of these payments from the

date of the confirmation of Toy King I through the filing of the involuntary petition initiating Toy King II. Accordingly, the defendant has established that all interest payments made by the debtor on the obligations represented by the Liberty loan, the C & S line of credit, and the Nintendo loan were made within the ordinary course of dealing between TKA and the debtor within the meaning of Section 547(c)(2)(B).

#### (3) *Payments of guaranty fees.*

■ The debtor paid to TKA guaranty fees on notes that were tied to TKA's borrowing on the C & S line of credit. The debtor did not execute any documentation of its agreement to pay these fees to TKA. TKA, however, sent a monthly statement to the debtor that detailed the total interest and guaranty fees owed and the debtor promptly paid the amounts requested in a consistent and timely manner. As the court stated in the foregoing section, the debtor did not deviate in its method or in the timing of payment of these statements during the period between the confirmation of Toy King I and the filing of the involuntary petition in Toy King II. Accordingly, the defendant has established that all guaranty fee payments made by the debtor on its obligations represented by the C & S line of credit were made within the ordinary course of dealing between TKA and the debtor within the meaning of Section 547(c)(2)(B).

#### (4) *Payments of principal.*

■ It is a closer question with respect to the debtor's principal payments to TKA on its obligations. Each of the promissory notes executed by the parties stated that the principal balance of each promissory note was due upon demand. The procedure that TKA used to make demand on the debtor for the repayment of the principal balance on its promissory notes was not made a matter of evidence in this case.[130] The defendant guarantors stipu-

---

**130.** Notably, no evidence was presented that would reflect that TKA made written demand on the debtor for payment of principal on any of the promissory notes.

lated, however, that principal payments on the debtor's obligations were timed to correspond to TKA's payments on the underlying obligation. Accordingly, the court will look to the payment terms of the underlying obligations.

TKA executed a promissory note on each of its obligations. The promissory note on the Liberty loan provided for a due date for payment of principal of June 30, 1990. The C & S promissory note contained a due date for payment of principal on December 30, 1989. Similarly, the Nintendo loan promissory note provided for a due date for payment of principal of December 30, 1989.

The debtor paid TKA the principal owing on the C & S line of credit on December 1, 1989. The debtor made two payments to TKA on the principal balance of the Nintendo loan, one on December 8, 1989, and one on December 18, 1989. Finally, the debtor made two principal payments to TKA on the Liberty loan on December 28, 1989, and on January 8, 1989. In every case, the debtor made the principal payments weeks before the due date of the underlying indebtedness. In the case of the Liberty loan, the payment of principal was in advance of the due date of the underlying indebtedness by a period of months.

On its face, there would appear to be nothing out of the ordinary in this payment history. Indeed, the paradigm example of a course of dealing that is out of the ordinary course is a variation in the timing or method of payments, most notably late payments. *See Craig Oil,* 785 F.2d at 1567. The variation in method or timing is indicia of credit relations that have moved out of the ordinary course and into the realm of preferential payments as the debtor or the creditor seek to improve their positions in the face of impending financial disaster.

In this case, there is no variation because the debtor and TKA had no established course of dealing with respect to principal payments. The debtor made all of the payments before the due dates of the underlying obligations by check drawn on the debtor's operating account. There is nothing in the payment history itself, therefore, to indicate that the payments were made out of the ordinary course.

 The court is required, however, to pay "particular regard to the circumstances surrounding" the payment at issue. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.,* 96 B.R. 474, 476 (D.N.J.1988), *aff'd,* 891 F.2d 66, 72 (3d Cir.1989). Most typically, the circumstances under consideration are the collection practices of the creditor. *See Grant v. Cosec International, Inc. (In re L. Bee Furniture Co.),* 206 B.R. 989, 992–93 (Bankr.M.D.Fla.1997). A variation in collection practices can be indicative of external pressure placed on the debtor for the purpose of preferring the creditor. Collection practices that are unusual and are designed to obtain a benefit for the creditor during financially troubled times have been held to be out of the ordinary course of dealing. *See, e.g., Craig Oil,* 785 F.2d at 1566–67 [late payments and payments made by cashier's checks not in the ordinary course]; *Spirit Holding,* 214 B.R. at 899 [payment by wire transfer not in the ordinary course]; *J.P. Fyfe,* 96 B.R. at 478 [deal that imposed new terms and constraints as a direct result of creditor's knowledge of debtor's deteriorating financial condition not in the ordinary course]; *Valley Steel,* 182 B.R. at 737 [late payments out of the ordinary course]; *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Millard Partners),* 145 B.R. 682, 688 (D.Colo.1992), *aff'd,* 12 F.3d 1549, 1554 (10th Cir.1993), *cert. denied,* 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994) [escrow or lock box arrangement not in the ordinary course].

In this case, the historical course of dealing in the retail toy industry permitted the debtor to delay payment on most of its trade debt until after the Christmas season. This delay alleviated much of the

financial pressure that would have otherwise been placed on the debtor. In addition, the creditor, TKA, and the debtor have an identity of interest. It was unnecessary, therefore, for TKA to apply pressure on the debtor for the purpose of collecting its debt. TKA, through its principals, essentially made all decisions as to how much the debtor would pay on its obligations and when it would do so. An examination of the collection practices of the creditor in this case, therefore, is not especially illuminating on this point.

■ The court, however, is not limited to inspecting the creditor's actions. It may also consider the circumstances surrounding the debtor's actions. In *DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 92 B.R. 297, 306 (Bankr.E.D.Tenn.1988), the court found that the debtor's actions in "slow walking" payments—deliberately slowing down the payment process—during financial crisis were not in the ordinary course. Similarly, the court held in *Ledford v. Sears, Roebuck & Co. (In re Williams)*, 5 B.R. 706, 707 (Bankr.S.D.Ohio 1980), that payments made by a debtor were outside the ordinary course where the debtor, on his own and without pressure, sharply increased his monthly payment on goods bought on credit in the face of an impending judgment. Recently, the court in *Securities & Exchange Commission v. First Jersey Securities, Inc. (In re First Jersey Securities, Inc.)*, 180 F.3d 504, 514 (3d Cir.1999), held that the debtor's payment of fees to its law firm was not in the ordinary course of the parties where the manner and timing of the payment was suspect. In that case, although the payments were timely, the law firm was aware of the debtor's precarious financial situation and accepted restricted stock in payment of its fees. *Id.* at 513.

The internal circumstances surrounding TKA and the debtor's decisions to make the payments of principal in advance of the due date on the underlying debt are more instructive in determining whether the preferential payments of principal were within the ordinary course of the parties. At the time the debtor made these payments, the demise of the debtor as an operating entity was in little doubt. On November 17, 1989, Morrow and Angle met with Liberty's loan officer, Horne, to advise him that the debtor would post a substantial loss for the year and would be unable to make any principal payment on the Liberty loan. Shortly thereafter, the debtor paid the principal owing on the C & S line of credit obligations and an initial payment of principal on the Nintendo loan obligations. Both payments were in advance of TKA's due dates on the underlying obligations.

On December 11, 1989, Morrow ran an advertisement in the *Wall Street Journal* putting the debtor up for sale or merger. One week later, Morrow wrote a letter to Horne advising him that the debtor was going to post a substantial loss for the year and of his efforts to sell or merge the debtor.

The debtor then made its final payment of principal to TKA on the Nintendo loan obligations. In contravention of the representations made at the November 17, 1989, meeting, the debtor also made two payments of principal to TKA on the Liberty loan obligations. All of these payments served to prefer the parent company and its shareholders, many of which had an identity of interest with the debtor, to the detriment of the other unsecured creditors, who did not.

Under these circumstances, the court concludes that the debtor's payments of principal to TKA, made in advance of any due date on the underlying indebtedness and in the face of impending financial disaster, were not made in the ordinary course within the meaning of Section 547(c)(2)(B).

iii. *Payment to M & D.*

■ The M & D debt was structured in two parts, with the first payment being made in the debtor's initial distribution of

dividends and the remainder paid pursuant to an executed promissory note. In addition, the M & D obligation was subject to a subordination agreement executed by the debtor. The agreement operated to subordinate the M & D note to all of TKA's obligations to Liberty. The subordination agreement prohibited the payment of principal and interest on the M & D note, other than as provided for in the note itself, without Liberty's written consent. The subordination agreement specifically stated that, "[i]n any event the Borrower shall not pay, and the creditor shall not receive, any prepayment of principal or interest payable with respect to the Subordinated Debt prior to the date on which such sums are due and payable in the ordinary course under the terms of such Subordinated Debt." The promissory note provided for principal payments to be made monthly beginning in March 1990.

The debtor made a payment to M & D on December 29, 1989, paying the entirety of the balance owing on the subordinated note, inclusive of interest and principal. This payment was in advance of the due date, was done without the written consent or knowledge of Liberty, and was in direct derogation of the terms of the note itself, as well as the subordination agreement. The defendants explain the payment as necessary to obtaining a final decree in Toy King I and as a prerequisite to the anticipated merger with VMI. Even were this true,[131] the payment still would have been made out of the ordinary course of business of both the debtor and M & D.

In *CIS*, 195 B.R. at 260, the court held that the payment of a bonus to and by the principal, in the face of the debtor's insolvency and on the eve of bankruptcy, was not in the ordinary course. The court stated that the principal "must be charged with the highest duty since he was the top ranking executive of CIS, with the highest level of responsibility and compensation from the company." *Id.* at 259. The court found the payment to be extraordinary because the principal "was the top executive of CIS with the sole power to cause and control the direction, timing and nature of the Payment at a time when he knew that CIS was insolvent and would be filing for bankruptcy." *Id.*

Similarly, in this case, Morrow was the top ranking officer of the debtor and the sole officer making financial decisions at the time of the payment. He too knew that the debtor was insolvent at the time the payment was made and that the demise of the debtor was imminent. Morrow owed the debtor the same allegiance owed by the principal in *CIS* and through his actions demonstrated the same disregard for the best interests of the company as did the principal in *CIS*.

Morrow caused the debtor to pay the M & D note in full at a time when he knew that the debtor was unable to pay its debts as they came due. At the time the debtor paid the M & D note, the debtor owed nearly $2 million to its trade creditors.

---

131. The defendants suggest that the entry of the final decree in the Toy King I case was a prerequisite to the planned merger with VMI and that the debtor had to pay all unpaid dividends to obtain the entry of the final decree. This argument is unpersuasive. At the time the debtor made the payment, there was an appeal pending in the district court of the bankruptcy court's order awarding attorney's fees. The bankruptcy court could not have entered a final decree until that appeal was determined. The defendants lacked any ability to effect the disposition of that appeal, as did the bankruptcy court itself.

In addition, there is no requirement that all dividends be paid before the court can enter a final decree. The court can enter a final decree as soon as the estate is "fully administered." F.R.B.P. 3022. In this district, that means "substantial consummation." *See* 11 U.S.C. § 1101(2) and L.B.R. 3022–1. Substantial consummation had long since occurred in Toy King I because the debtor had commenced performance under the plan. Thus, the only reason the court could not enter the final decree at the time was the pendency of the appeal. There was no requirement whatsoever that additional payments had to be made to M & D or anyone else.

The debtor's financial demise was in the end stages. In acknowledgment of this, Morrow had placed an advertisement in the *Wall Street Journal* seeking to sell or merge the company. In causing the debtor to pay the M & D note, Morrow sought to advantage himself to the detriment of the company and its creditors in the face of the impending liquidation of the debtor.

Accordingly, the court finds that the debtor's payment to M & D of principal and interest on the M & D note on December 29, 1989, was out of the ordinary course of dealing between the parties within the meaning of Section 547(c)(2)(B).

> d. *Were the payments made in accordance with ordinary business terms?*
>> i. *Introduction.*

 This Section 547(c)(2)(C) element is an objective component requiring "proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Roberts v. Service Transport, Inc. (In re Ideal Security Hardware Corp.),* 186 B.R. 237, 239 (Bankr.E.D.Tenn.1995). This objective component serves two functions.

> One is evidentiary. If the debtor and creditor dealt on terms that the creditor testifies were normal for them but that are wholly unknown in the industry, this casts some doubt on his (self-serving) testimony .... The second possible function of the subsection is to allay the concerns of creditors that one or more of their number may have worked out a special deal with the debtor, before the preference period, designed to put that creditor ahead of the others in the event of bankruptcy.

*Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1048 (4th Cir.1994) (*quoting In re Tolona Pizza Products. Corp.,* 3 F.3d 1029, 1032 (7th Cir.1993)).

 In examining this element, the court must focus on the business "practices of the creditor's competitors." *Spirit*

*Holding,* 214 B.R. at 899. The defendant is required to adduce evidence of "a prevailing practice among similarly situated members of the industry facing the same or similar problems." *Id.* "In other words, the benchmark for ordinariness is the norm in the creditor's industry." *Id.*

Our court of appeals has recently made clear that the defendant must make a showing of ordinariness in relation to industry standards to prevail on the "ordinary course" defense of Section 547(c)(2)(C). *A.W. & Associates,* 136 F.3d at 1442. The court went on to say that "[i]ndustry standards do not serve as a litmus test by which the legitimacy of a transfer is adjudged, but function as a general backdrop against which the specific transaction at issue is evaluated." *Id.* at 1443.

 Accordingly, the defendant must:

> ... prove that the debtor made its prepetition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms. That is, subsection C allows the creditor considerable latitude in defining what the relevant industry is, and even departures from that relevant industry's norms which are not so flagrant as to be "unusual" remain within subsection C's protection. In addition, when the parties have had an enduring steady relationship, one whose terms have not significantly changed during the pre-petition insolvency period, the creditor will be able to depart substantially from the range of terms established under the objective industry standard inquiry and still find a haven in subsection C.

*Advo–System,* 37 F.3d at 1050 (*quoting Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.),* 18 F.3d 217, 226 (3d Cir. 1994)). These decisions are cited with approval in *A.W. & Associates,* 136 F.3d at 1442.

ii. *Payments to TKA.*

In its proof, TKA failed to define the industry that is similarly situated to it, the creditor here. TKA did not present any evidence beyond the adumbrated testimony of Horne and Morrow, representing Liberty and TKA respectively, that would enable the court to compare the subjective course of dealing between TKA and the debtor with an objective, normative, creditor's industry standard. The testimony of Horne and Morrow was limited to the specific practices of Liberty, TKA, and the debtor rather than general practices in the retail toy industry or other relevant industry, whatever that might be.

The court finds the testimony of Horne and Morrow, to the limited extent that it could be interpreted as describing an industry standard, to be both self-serving and insufficient to establish an objective industry standard. Testimony of the defendants, even in the event that it does include evidence of industry practice, is "inherently suspect because it is to be expected that the testimony of an officer of the defendant would be favorable to the defendant's position." *Ideal Security Hardware,* 186 B.R. at 239. Moreover, the evidence's weight is so insubstantial as to fail to meet the preponderance of the evidence standard. *See Anderson v. Ganis Credit Corp. (In re Weilert R.V., Inc.),* 245 B.R. 377, 386 (Bankr.C.D.Cal.2000)["[H]owever broad an interpretation is applied, some proof of industry standard is warranted."].

In the absence of any evidence of an industry standard, the court is required to conclude that TKA failed to establish this element of the ordinary course defense. *See, e.g., Spirit Holding,* 214 B.R. at 901–02 [vague, generalized evidence of industry standard provided by an employee of defendant insufficient to establish industry norm]; *Ideal Security Hardware,* 186 B.R. at 239 [defendant did not establish element of proof of the ordinary business terms of the industry]; *Hovis v. Powers Construction Co. (In re Hoffman Associates, Inc.),* 194 B.R. 943, 955 (Bankr.D.S.C.1995) [defendant could not prevail on its affirmative defense because there was a lack of credible evidence of industry norm].

Accordingly, TKA has failed to establish that the preferential payments made by the debtor to it were in the ordinary course of dealing prevalent in the industry within the meaning of Section 547(c)(2)(C).

iii. *Payment to M & D.*

The record is devoid of any evidence of the relevant industry or the industry standard with respect to the debtor's payment to M & D. For the reasons stated in Section V.C.7.d.ii. above the court finds that M & D has failed to establish that the preferential payment made by the debtor on December 29, 1989, to M & D was in the ordinary course of dealing prevalent in the industry within the meaning of Section 547(c)(2)(C).

e. *Summary for the ordinary course of business affirmative defenses.*

As the foregoing describes, TKA and M & D have failed to establish by a preponderance of the evidence one or more of the essential elements of the defense as set forth in Section 547(c)(2). Accordingly, the court finds that all of the preferential transfers occurred outside the ordinary course of business of TKA and the debtor and are recoverable by the plaintiff.

D. *FRAUDULENT TRANSFER CLAIMS.*

1. *Transfers by the debtor to TKA and M & D made between the confirmation of Toy King I and the commencement of Toy King II.*

The unsecured creditors committee seeks to set aside as fraudulent transfers payments that the debtor made to TKA, M & D, Liberty, and the individual defendants pursuant to the provisions of Sections 548 and 550 of the Bankruptcy Code. The committee also seeks the same relief pursuant to Sections 726.105 and 726.106, Florida Statutes. Because the applicable

federal and state law is substantially the same, the court will deal with the federal and state claims together.

The committee attacks the debtor's payments of principal, interest upcharges, and guaranty fees to TKA on the C & S line of credit, as well as payments of principal, loan fees and costs, and interest upcharges on the Liberty and Nintendo loans. The committee also seeks to set aside the debtor's payment to M & D of interest and "profit" on the first distribution on the First Union claims to the extent that it exceeded interest paid on claims in the same class under the Toy King I confirmed plan. In addition, the committee seeks to set aside the debtor's December 29, 1989, payment to M & D of both principal and interest in derogation of the subordination agreement. The debtor made all of the payments under attack within one year of the commencement of the Toy King II case.

The debtor paid TKA $2,231.26 in interest upcharges, $250,000 in principal, and $20,283.22 in guaranty fees on account of the C & S line of credit between May 10, 1989, and December 28, 1989. During the same period, the debtor paid TKA $8,632.12 in interest upcharges and $600,000 in principal [132] on the Liberty loan and $2,479.22 in interest upcharges and $700,000 in principal on the Nintendo loan. The debtor also paid M & D $439,506.17 in principal, interest, and "profit" between the period of July 6, 1989, and December 29, 1989, representing the dividend on the First Union claims that M & D acquired in Toy King I.

### 2. *Actual fraud.*

#### a. *Badges of fraud.*

##### i. *Introduction.*

Section 548 of the Bankruptcy Code, Fraudulent transfers and obligations, permits the avoidance of:

(a)(1) ... any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

\* \* \* \*

■■ The underlying purpose of this fraudulent transfer statute is to "prevent valuable assets from being transferred away from debtors in exchange for less than fair value, leaving insufficient funds to compensate honest creditors." 4 *Collier on Bankruptcy*, ¶ 548.01 at 548–4–24 (15th ed.1993). "In fraudulent conveyance actions, it is the trustee's burden to prove all issues." *Vurchio*, 107 B.R. at 364; 4 *Collier on Bankruptcy*, ¶ 548.10 at 548–111–12 (15th ed.1993). The plaintiff must do so by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See Western Wire Works, Inc. v. Lawler (In re Lawler)*, 141 B.R. 425, 429 (9th Cir. BAP 1992) [applying *Grogan* to all bankruptcy proceedings grounded in fraud].

■ Actual fraud is seldom proved by direct evidence. Because "[p]ersons whose intention is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose, ... it must be gleamed [sic] from inferences drawn

---

**132.** It is impossible to determine if these payments of principal included the debtor's obligation to pay loan fees and costs to TKA. For the purposes of this section, the court will assume that it does. Given the court's ulti-

mate determination of the issues, however, it does not make any difference in result if the $600,000 payment is considered as principal and loan fees and costs or exclusively as principal.

from a course of conduct." *Freehling v. Nielson (In re F & C Services, Inc.)*, 44 B.R. 863, 872 (Bankr.S.D.Fla.1984). Thus, a "finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent." *Id.* (*quoting* 4 *Collier on Bankruptcy*, ¶ 548.02[5] at 548.33–34 (15th ed.1984)).

■ To determine whether the circumstantial evidence supports such an inference of intent, the court looks to the existence of certain "badges of fraud." In a recent Section 548 fraudulent transfer decision, our court of appeals adopted the badges of fraud contained in the Florida fraudulent transfer statute. *Levine v. Weissing (In re Levine)*, 134 F.3d 1046, 1053 (11th Cir.1998). These "badges of fraud" include whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* (*citing* § 726.105(2), Fla. Stat.)

■ Although "[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud...." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991). The evidence in this case clearly establishes that multiple badges of fraud are present in every transfer under attack as a fraudulent transfer.

### ii. *Transfers to insiders.*

■ The first badge of fraud present in this case, transfer to an insider, is also one of the most important. *See F & C Services*, 44 B.R. at 868 ["Fraud will be presumed when the transfer occurs between corporations controlled by the same officers and directors." (*citing J.I. Kelley Co. v. Pollock & Bernheimer*, 57 Fla. 459, 49 So. 934, 935 (1909))]. *See also, White v. Coon (In re Purco, Inc.)*, 76 B.R. 523, 529 (Bankr.W.D.Pa.1987) [The actions of "insiders or those who exert considerable influence over the affairs of a corporate debtor should receive rigorous scrutiny."]; *Lipman v. Norman Packing Co.*, 146 Va. 461, 131 S.E. 797, 798 (1926) ["As a general rule the burden of proof rests on him who charges fraud, and not on him whose conduct is charged to be fraudulent. But, where the transaction assailed is between [insiders], only slight evidence is required to shift the burden of showing its bona fides." (*citing Mankin v. Davis*, 82 W.Va. 757, 97 S.E. 296, 298 (1918))]. Indeed, our court of appeals recently held that the district court erred in not considering the close relationship between the parties, among other things, when it held that a transfer was not fraudulent. *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1500 (11th Cir.1997)

[remanding the case for further consideration].

This "badge of fraud" is so significant that in some cases an insolvent debtor's transfer to an insider has caused the court to make a finding of actual fraud in the absence of any other badges of fraud. *See, e.g., Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994); *Terrific Seafoods*, 197 B.R. at 732. *Cf. Food & Fibre Protection*, 168 B.R. at 418 [because the insider relationship "did not fit the traditional mold," the court found no actual fraud where the only other badge of fraud was insolvency].

Indeed, under Florida law, any transfer made in payment of an antecedent debt to an insider who knew or should have known that the debtor was insolvent at the time of payment is constructively fraudulent. § 726.106(2), Fla. Stat.

As the court concluded earlier in Sections V.C.3.b. and V.C.7.b.ii. above, TKA and M & D were both insiders of the debtor. All payments to them, therefore, carry with them this badge of fraud.

### iii. *Concealment of transfers.*

#### (1) *Collective action.*

■■■ The second badge of fraud implicated in this case is the debtor's concealment of material aspects of its transfers to TKA and M & D. Morrow, Angle, and King, all principals of the debtor, either individually or collectively, misrepresented the financial condition of the debtor, including material aspects of the transfers at issue here. Because the alleged fraud at issue in this case arises out of the collective actions of the principals perpetrated through the debtor, the collective group product doctrine is applicable. Under that doctrine, individual liability attaches to each member of a group that has contributed collectively to a fraud. *Atlantis Group, Inc. v. Rospatch Corp. (In re Rospatch Securities Litigation)*, 760 F.Supp. 1239, 1255 (W.D.Mich.1991). When alleging a collective fraud, therefore, "specific allegations about the role of each defendant are unnecessary." *Id.* (*quoting, In re Consumers Power Co. Securities Litigation*, 105 F.R.D. 583, 593 (E.D.Mich.1985)).

■■■ The fraudulent transfers that the plaintiffs allege in this case revolve around the collective actions of the principals. It was these collective actions, represented through the corporate entity, which resulted in the transfers at issue here. Accordingly, the court will not seek to attach specific responsibility for the debtor's actions to any individual defendant except where necessary for its decision in other parts of this opinion. It is sufficient to state that the debtor's principals all contributed to the debtor's concealment of the transfers at issue here.[133]

■■■ Because each is an insider of the debtor and in a position to control the disposition of its property, the acts of concealment and the accompanying inference of fraudulent intent of each individual may be imputed to the transferor, the debtor. *Roco*, 701 F.2d at 984. *See also, Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 691 (Bankr.D.N.D. 1988) ["In cases such as this one in which the Debtor is a corporation the intent of the controlling officers and directors is presumed to be the Debtor's intent."]. Morrow, Angle, and King were insiders because each was an officer and director of the debtor. *See* 11 U.S.C. § 101(31)(B)(i) and (ii). In addition, Morrow and Angle were responsible for the financial manage-

---

133. "[O]nly those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held as primary participants in the alleged deception." *Rospatch Securities Litigation*, 760 F.Supp. at 1247. The court went on to write that "[a] person undertaking to furnish information which contains a material misstatement or omission is a primary participant, so long as he or she is not so removed from the transmission of the misleading information that liability would necessarily become vicarious." *Id.* In this case, Morrow, Angle, and King were all directors and officers of an insolvent debtor and thus had a fiduciary duty to its creditors. *See* Section V.F.4. *infra.*

ment[134] of the debtor and therefore were also insiders by virtue of being in control of the debtor. *See* 11 U.S.C. 101(31)(B)(iii).

### (2) *During Toy King I.*

The principals took affirmative steps to conceal the nature and extent of the debtor's transfers to TKA and M & D and in so doing misrepresented the debtor's financial condition to its trade creditors. The concealment began when the debtor filed a false financial statement, signed by King under penalty of perjury, during Toy King I that omitted the debtor's borrowing from TKA.[135] The debtor also failed to seek court approval for that borrowing, even though Morrow knew that it was required. As a consequence of this concealment, the Toy King I unsecured creditors did not know that the debtor was suffering from inadequate cash to support its operations at the time that they cast their votes in favor of the debtor's plan.

Morrow and Angle also concealed their acquisition of the First Union claims. The debtor filed the motion for substitution on M & D's behalf. That motion did not contain any facts or information that linked Morrow and Angle with the substituted claimant, M & D, or disclose the insider relationship between M & D and the debtor.

Morrow and Angle similarly concealed from the debtor's general unsecured creditors the profit that would accrue to them upon the debtor's payment of the negotiated dividend on the First Union claims. The motion to substitute claimant did not contain any facts or information showing M & D's cost to acquire the First Union claims or its anticipated profit.

### (3) *Touche Ross pro forma.*

Morrow provided projections and assumptions to Touche Ross for its use in drafting the debtor's pro forma. Morrow planned to use the pro forma to solicit monies to fund the Toy King I plan and to maintain the debtor's operations post-confirmation. Morrow also planned to use the pro forma in making credit requests from toy manufacturers to acquire inventory to be sold by the debtor post-confirmation.

Morrow understood that the pro forma was intended to provide a projection of the debtor's financial condition immediately following confirmation. The pro forma was based upon the debtor's historical financial information at the end of the 1988 fiscal year that was then adjusted in accordance with Morrow's assumptions and projections. Morrow used assumptions, however, that were inaccurate, contingent, and/or that would occur over a period of time substantially before or after confirmation. For example, he directed Touche Ross to show $1 million as an asset and in shareholder's equity, even though he knew that the money would be disbursed incrementally over time and even though he was aware that TKA was going to treat the transaction as a liability of the debtor.

Morrow understated the plan payment liabilities by decreasing the scheduled total to an amount that he estimated would be owed after the completion of objection to claims litigation or adversary proceedings against specific claimants. Morrow knew that those matters would be concluded long after confirmation and that the results were uncertain. Morrow took a wholly inconsistent position with respect to lease rejection damages. He chose not to include lease rejection damages as a liabili-

---

**134.** Although King was not responsible for the financial management of the debtor, he co-signed most of the checks drawn against the debtor's operating account.

**135.** Although not relevant to this decision, it appears that the concealment may have be-

gun even earlier during the Toy King I case. In that case, the debtor paid to TKA a "surety fee" disguised as advertising costs as additional compensation for inventory ordered through TKA.

ty on the pro forma balance sheet because those damages were speculative.[136]

At the same time, Morrow substantially understated current liabilities by denominating January 29, 1989, as the "snapshot" date of the pro forma. By using that date, Morrow was able to incorporate the positive effects of the reorganization that would accrue at a much later point or points in time and set those positive effects against liabilities at a much earlier point of time. Essentially, by selecting the January 29, 1989, date Morrow was able to ignore the debtor's substantial losses incurred between January 29, 1989, and the actual Toy King I confirmation date.

The court concluded in Section IV.D.3. above that Morrow crafted the assumptions used in formulating the pro forma in a way designed to inflate artificially and inaccurately the stated net worth of the debtor. Accordingly, the court concludes that Morrow intended to conceal the debtor's true financial position from its creditors when he directed Touche Ross to incorporate these assumptions into the debtor's pro forma.

### (4) *Financial statements.*

This pattern of concealment continued after the confirmation of Toy King I and was evidenced most strongly in the debtor's balance sheets. Each of the debtor's balance sheets prepared between the date of the confirmation of Toy King I and the filing of Toy King II contained omissions and misrepresentations of the debtor's transfers to TKA and M & D. The most egregious of these was the posting of $1 million of the Liberty loan as equity in the debtor rather than the liability it actually was.

The debtor also concealed the totality of its obligations to TKA by understating its liability for the monies it received from TKA from the $500,000 Liberty line of credit, including the obligation to pay loan fees and costs to TKA. The debtor failed to post accrued interest charges on its prepetition obligations (plan payments to Toy King I creditors) that remained unpaid for more than 90 days.

The principals used these balance sheets to conceal from the trade creditors the actual extent of the debtor's obligations to the parent. In addition, the principals misrepresented the debtor's actual financial condition in their communications by letter and telephone with trade creditors. The principals indicated in these communications that the debtor was performing well and was at or close to its projected levels. At the time that the principals were making these communications, they were unable to buy from Nintendo on credit and were in active negotiations with Liberty for additional monies because the debtor did not have sufficient capital to maintain operations up to and through the Christmas season.

In *Sugarman*, 926 F.2d at 1250, a principal of the debtor prepared financial statements that misrepresented the debtor's loan obligations and understated the amount of interest being paid. Another principal used these financial statements to solicit purchasers of debentures issued by the debtor. The debtor used the proceeds from the sale of these debentures to fund its operations. The court found that the principals "acted in concert to depict [the debtor's] business operations in a false light in order to lure further financing through debenture sales." *Id.* at 1250–51.

Similarly, in this case, the principals' concealment of the nature and extent of the debtor's liabilities and actual net worth was intended to present the debtor in a false light to solicit additional trade credit. The trade creditors relied to their detriment on the Touche Ross pro forma, the

---

**136.** The Touche Ross pro forma did include a footnote that stated that lease rejection damages, in the potential amount of $414,000, were not listed in the debtor's liabilities because they were "contingent." That footnote added to the false impression that recipients of the pro forma received, however, because it implied that the numbers that *were* actually used in the pro forma were not "contingent."

debtor's financial statements, and on the written and oral communications of the debtor and its principals. The trade creditors made favorable credit decisions on the basis of the debtor's overstated net worth. *See, e.g., Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 214–15 (2d Cir.1978) ["When persons or institutions lend money to a corporation, or otherwise become its creditors, they do so in reliance upon the protection and security provided by the money invested by the corporation's stockholders the so-called equity cushion." The court went on to say that "[t]his (reliance) is not only theoretically true, but common experience teaches that it is practically true also." (*quoting Scott v. Abbott*, 160 F. 573, 582 (8th Cir. 1908))]. Had the trade creditors known the debtor's actual net worth, they would have lowered the debtor's credit lines or refused to extend credit altogether.

The debtor also manipulated the timing of its financial statements to conceal its transfers to TKA and M & D. For example, the debtor always prepared and disseminated its balance sheets and income statements each month after the date on which it made its payments to TKA. Because the debtor had already made the payments, they were not reflected on the financial statements. In this way, the debtor was able to conceal its payments of the one percent interest upcharge and guaranty fees to TKA. The debtor did not even prepare or disseminate a balance sheet for the month of December 1989.

### (5) *First Union claims.*

The principals likewise concealed the fact that the debtor's payment of $138,500 to M & D on July 6, 1989, included "profit" and interest not contemplated or allowed in the confirmed plan. The debtor's schedule of dividend payments that referenced the payment to M & D listed the claimant as First Union, showed the debt as disputed, and indicated that the $138,500 payment was a final payment on the First Union claims.

In actual fact, the claims were held by M & D and had been since January, 1989. The debtor, represented by Morrow and Angle, had no "dispute" with the First Union claims that Morrow and Angle held through M & D. Finally, the July 6, 1989, payment was never intended to be a full and final disposition of the First Union claims.

Only $121,000.62 of the July 6, 1989, payment to M & D represented principal on the First Union claims dividend. The remaining $17,499.38 represented "profit" and interest. Under the confirmed plan, M & D was not entitled to interest on its initial dividend because the debtor made the payment within the first 90 days from the effective date of the confirmed plan. The plan provided for the payment of interest only to those unsecured creditors who were paid more than 90 days from the effective date of confirmation. At the Toy King I confirmation hearing, Morrow himself testified without equivocation that no creditor was to receive treatment other than as described in the debtor's proposed plan. In its very first distribution, the debtor accorded more favorable treatment to M & D than other unsecured creditors in its class received.[137]

### (6) *December transfers.*

Morrow also caused the debtor to make principal payments on its obligations to TKA and M & D in December 1989 at a time when he knew that the debtor would not be able to pay all of its obligations as they came due. Morrow caused the debtor to pay TKA $250,000 on account of the C & S line of credit, $600,000 on account of the Liberty loan, and $700,000 on account

---

137. The court notes that all of Horne's handwritten notes prepared in furtherance of the Liberty loan list the debtor's initial payment to M & D on the First Union claims in the amount of $140,000. Although there is no evidence as to how that payment was to ap- plied to the First Union claims dividend, anyone with a calculator can plainly see that the projected payment included some component of interest at a point in time when the debtor expected to pay no interest to unsecured claimants under its plan.

of the Nintendo loan. As noted above, the principals were able to conceal these transfers by not preparing and disseminating a balance sheet for December 1989.

Morrow also caused the debtor to pay $301,006.17 to M & D on account of the M & D note. The debtor did not seek Liberty's consent to the premature payment of the subordinated note, and thus Liberty did not know that the M & D note was being paid in derogation of the Toy King I confirmed plan. The principals were similarly able to conceal this transfer by not preparing and disseminating a balance sheet for December 1989.

The debtor's concealment of these transfers is particularly noteworthy because the principals caused the debtor to make the payments before they were due and at a time when the principals knew the debtor's days as an independent operation were numbered.

### (7) Conclusion.

Accordingly, the court finds that this badge of fraud is present with respect to the debtor's transfers to TKA associated with the Liberty loan and the C & S guaranty fees as well as its transfers to M & D. This badge of fraud is also present to a significant but, in fairness, a lesser degree with respect to the debtor's transfers to TKA associated with the C & S line of credit and the Nintendo loan.

### iv. *Transfers for less than reasonably equivalent value.*

### (1) *Alternative approaches.*

The third badge of fraud present in this case is the lack of equivalent value for some or all of the transfers at issue. This badge is also one of the elements required to prove constructive fraud pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 726.106(1), Florida Statutes.

The Bankruptcy Code does not define "reasonably equivalent value." The courts, therefore, have had to fashion a meaningful test to determine this issue. Courts have used three different approaches in their attempts to determine whether a debtor has received a "reasonably equivalent value" for a transfer that is under attack as a fraudulent conveyance.

The first approach is an objective one that relies upon a mathematical formula to determine equivalence. Using this approach, a court will find a per se lack of equivalent value when the transfer is for less than 70 percent of the market value of the debtor's property. *See, e.g., Durrett v. Washington National Insurance Co.,* 621 F.2d 201, 203–04 (5th Cir.1980).[138] "However, most courts have rejected this rigid test as being overly mechanical." *Official Unsecured Creditors Committee of Long Development, Inc. v. Oak Park Village Limited Partnership (In re Long Development, Inc.),* 211 B.R. 874, 881 (Bankr. W.D.Mich.1995), *aff'd,* 117 F.3d 1420, 1997 WL 377055 (1997) (*citing Bundles v. Baker (In re Bundles),* 856 F.2d 815, 823–24 (7th Cir.1988)).[139]

The second approach is a "subjective test which focuses on the fairness aspect. Under this approach, the consideration is presumed 'fair' so long as it is not 'so far short of the real value of the property as to startle a correct mind or shock the moral sense.'" *Id.* (quoting *Mancuso v. Champion (In re Dondi Financial Corp.),* 119 B.R. 106, 109 (Bankr.N.D.Tex.1990)). One could characterize this approach as a "smell test."

The third approach is the "totality of the circumstances" test. *Id.* at 881–82. This test combines both objective and subjective elements. Using this approach, courts have "looked to the 'totality of the circumstances' surrounding the transaction to de-

---

**138.** This case was abrogated by *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 544–46, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). *See* note 140 *infra.*

**139.** This case was abrogated by *BFP,* 511 U.S. at 544–46, 114 S.Ct. 1757. *See* note 140 *infra.*

termine whether 'fair consideration' or 'reasonably equivalent value' is given in exchange for a transfer of property." *Id.* In applying this test, the court considers the transfer in the context of the surrounding circumstances and from the perspective of the creditor. *Mancuso v. T. Ishida USA, Inc. (In re Sullivan)*, 161 B.R. 776, 781 (Bankr.N.D.Tex.1993).

■■■ Our court of appeals adopted this third approach in *Grissom v. Johnson (In re Grissom)*, 955 F.2d 1440, 1445 (11th Cir.1992).[140] The court stated that the "only proper way to determine reasonable equivalency under Section 548 is to conduct a thorough inquiry of all relevant facts and circumstances." *Id.* at 1449.

In this case, the transfers that the plaintiff attacks fall into four different categories. The first category is the debtor's payments to TKA and M & D of principal. The second category is the debtor's payment to TKA of loan fees and expenses. The third category is the debtor's payments to TKA and M & D of interest. The fourth category is the debtor's payments to TKA of guaranty fees on the underlying C & S line of credit.

### (2) *Payments to TKA and M & D of principal.*

The debtor made five payments of principal to TKA and two to M & D during the time between the confirmation of Toy King I and the filing of Toy King II. The debtor repaid principal to TKA in an amount that was exactly equivalent to the amount of principal it received; the debtor received at least a dollar for dollar value for its payment of principal to TKA. There can be

no question, therefore, that all payments of principal made by the debtor to TKA were reasonably equivalent in value. *Dicello v. Jenkins (In re International Loan Network, Inc.)*, 160 B.R. 1, 12 (Bankr.D.D.C. 1993) [payments made up to amount of antecedent debt were reasonably equivalent because they were dollar for dollar exchanges].

The court can make a similar determination about the debtor's principal payments to M & D of $121,000.62 on July 6, 1989, and $294,382 on December 29, 1989, on the First Union claims.[141] The First Union claims were for monies loaned to the debtor. The debtor received all of the monies that gave rise the claims. After protracted arms-length discussions during the pendency of Toy King I, the debtor negotiated a dividend of 17.5 percent of the total claims.

The debtor discharged the original First Union claims when the court confirmed the plan in Toy King I. 11 U.S.C. § 1141(d)(1)(A). In *Conston*, 181 B.R. at 772–73, the court explained the effect that discharge has on a prepetition debt as follows:

> [D]ischarge impairs a creditor's post-confirmation ability to enforce its pre-confirmation claim. . . . [T]he creditor can enforce only those pre-confirmation claims found in the confirmed plan and . . . the creditor can enforce those claims only in the manner and amount specified in the confirmed plan. From a commercial vantage point, the old debt is 'extinguished,' and a new debt is put in its place.

**140.** *Grissom* dealt with a challenge to a foreclosure sale. In 1994, the Supreme Court held in *BFP*, 511 U.S. at 544–46, 114 S.Ct. 1757, that any foreclosure sale conducted pursuant to state law is presumptively for reasonably equivalent value. Because the issue before this court is not a foreclosure sale, the Supreme Court's decision is inapplicable. *Grissom, Bundles,* and *Durrett* continue to be good law in a case involving factual circumstances like this one.

**141.** First Union had claims against Toy King in Toy King I for monies it had loaned to the debtor. No party in interest objected to the claims, and they were deemed allowed. Thus, the holder of the claims was entitled to payment of the claims under the terms of the plan. The plan provided that all unsecured claims would be paid 17.5 percent of their total allowed amount. The debtor and the creditors negotiated that dividend at arms length over a period of time. The court confirmed the plan that included this provision.

*See also, In re Townsend,* 187 B.R. 230, 235 (Bankr.W.D.Tenn.1995) ["Under Chapter 11 proceedings, discharge occurs when the reorganization plan is confirmed and substantially consummated." The pre-bankruptcy contracts are then "no longer valid and the Debtor is responsible for payments to creditors as described in the plan."].

In this case, the debtor's prepetition debts were discharged on May 23, 1989, when the debtor confirmed its plan. Each prepetition creditor then held a contract claim under the confirmed plan for its pro rata dividend. When the debtor paid the principal on the dividend owed to M & D for the First Union claims, it satisfied an antecedent debt that was a dollar-for-dollar equivalent of the amount it paid. Indeed, this amount was in an amount substantially less than the debtor originally received when the claims were created. The debtor, therefore, received a reasonably equivalent value for its payment to M & D of the principal balance on the First Union claims. *International Loan Network,* 160 B.R. at 12.

### (3) *Payment to TKA of loan fees and expenses.*

The debtor also obligated itself to pay loan fees and costs to TKA in the same amount as those incurred by TKA in connection with the Liberty loan.[142] It is undisputed that the debtor ultimately received all of the proceeds of the Liberty loan through its independent borrowing from TKA. It therefore received the same benefit from its transaction with TKA as TKA received from its transaction with Liberty. The plaintiff did not present any evidence or testimony that the fees and costs incurred by TKA, and in turn by the debtor, were unreasonable or out of the ordinary in type or amount. Liberty's loan officer, Horne, testified that it was typical within the banking industry to assess loan fees and costs against the obligor. The court, therefore, determines that the debtor received a reasonably equivalent value for its payment to TKA of loan fees and costs.

### (4) *Payments to TKA and M & D of interest.*

■ The debtor made periodic interest payments on its obligations to TKA. The debtor also made two payments of interest on its dividend obligation to M & D; one on July 6, 1989, that included "profit," and one on December 29, 1989. The plaintiff does not dispute that the payment of interest is a necessary cost of borrowing money, but objects to the amount of interest paid by the debtor in relation to the value it received. The plaintiff argues that TKA's charge of an additional one percent interest to the debtor was nothing more than a disguised means of skimming the debtor's assets for the benefit of TKA. The court agrees.

In general terms, Liberty determined the rate of interest to be charged on its loans consistent with the market and the degree of risk inherent in the loan.[143] Horne testified that Liberty evaluated the Liberty loan as more risky than most of the loans it made at or around the same time.[144] When Liberty determined the inherent risk of the Liberty loan, it did so on the basis of the amount and strength of the collateral that secured the loan and with the knowledge that TKA would repay the loan using revenues derived from the debtor's operations. Liberty ultimately

---

**142.** Liberty deducted loan fees and costs from its initial disbursement of the Liberty loan and charged them against the principal balance owed by TKA. TKA, in turn, incorporated these fees and costs into obligations owed by the debtor even though Toy King never actually received an equivalent amount of money. Essentially, TKA passed the fees and costs it incurred on the Liberty loan onto the debtor by charging it a like amount.

**143.** The risk of non-payment is determined by both the quality and quantity of security that collateralizes the loan as well as the strength or weakness of the debtor's operations and finances.

**144.** Horne testified that Liberty classified the loan as a 2S. *See* note 17 *supra.*

charged TKA interest at a rate of two percent over prime.[145] The court concludes that Liberty charged interest on the Liberty loan at an appropriate rate given the degree of risk and the amount and type of collateral that it held. The court reaches the same conclusion with respect to the Nintendo loan.[146]

TKA, however, charged a higher interest rate to the debtor on all its obligations funded by monies obtained by TKA from Liberty. The interest rate charged by TKA exceeded by one percent TKA's cost of borrowing. In different circumstances, this additional interest might be explained by the fact that all of the debtor's obligations to TKA were unsecured. An unsecured loan by definition is more risky than a secured loan because the creditor lacks the ability to attach directly the debtor's collateral upon default of the loan. For this reason, unsecured loans typically carry higher interest charges than secured loans. A debtor might be willing to pay the higher interest rate if it lacked collateral, had already pledged its collateral, or was otherwise unable to obtain a secured loan. A debtor could receive an equivalent value for its payment of the additional interest by not having to pledge its assets to secure the loan.[147] The amount of additional interest and the surrounding circumstances of the transaction would determine whether the equivalent value was reasonable.

In this case, however, there are several factual distinctions that remove the TKA/Toy King relationship from the ambit of the prototypical lender/borrower relationship. The most important distinction is that TKA was superfluous to the Liberty loan transaction because Liberty was willing to lend directly to the debtor. The debtor was not therefore in a situation where it had to pay a higher cost of borrowing because it was unable to obtain other financing or because its assets were already encumbered. Indeed, the debtor pledged its most significant asset, its inventory, to Liberty as part of its guaranty of TKA's borrowing from Liberty.

The other important distinction between TKA's relationship with the debtor and a prototypical lender/borrower relationship was the insider relationship that existed between TKA and the debtor. *See Carmel v. River Bank America (In re FBN Food Services, Inc.)*, 175 B.R. 671, 688 (Bkrtcy. N.D.Ill.1994), *aff'd and remanded*, 82 F.3d 1387, 1396 (7th Cir.1996) ["The bargaining position of the parties and their relationship should be examined to determine that the value transferred is disproportionately small compared to the value actually received by the Debtor."]. Indeed, TKA owned virtually all of the stock of the debtor and controlled and dominated it. The debtor did whatever TKA directed. In addition, as the evidence in this case clearly demonstrates, TKA's exposure on its borrowings was equivalent to the debtor's. The monies it would use to repay the Liberty loan were derived from the debtor's operations. If the debtor's revenues were insufficient to pay its obligations to TKA, TKA had no alternate source of income to make its payments to Liberty.[148] TKA also did not have any collateral to satisfy its obligations to Liberty other than its stock in the debtor and receivables

---

**145.** Liberty charged a fixed interest rate on $700,000 of the Liberty loan because it held cash or cash equivalent collateral in that amount.

**146.** Liberty charged TKA the same rate of interest on the Nintendo loan that it charged on the Liberty loan, despite the debtor's worsening financial condition.

**147.** In many cases, when its assets are already encumbered, an unsecured loan is the only option for a debtor. In those circumstances, there is a value in the debtor's ability to obtain financing that it would not otherwise be able to obtain.

**148.** TKA had no independent assets other than its stock in the debtor and receivables owed to it by the debtor. TKA engaged in no active business other than operation of the debtor.

from the debtor. Although it might appear that TKA was in a riskier position vis a vis the debtor than Liberty was (because, in the event of the debtor's failure, it stood equally with other unsecured creditors in its claim to the debtor's unencumbered assets), TKA was actually in a position to ensure that the debtor could prefer its obligations to TKA and therefore control the risk of default. In fact, this is exactly what occurred.

This dynamic is even more markedly illustrated by the C & S line of credit transaction. TKA's obligation to C & S on its line of credit was unsecured. TKA charged the debtor an additional one percent interest rate on the monies it borrowed on the C & S line of credit and loaned to the debtor. Again it could be argued that TKA was at greater risk than C & S because it lacked the additional guaranties of payment that C & S enjoyed, but, as explained in the preceding paragraph, TKA was in actuality at no greater risk than C & S. Clearly, the debtor received the same benefit from its borrowing as TKA did for less consideration. In addition, the record is devoid of any credible evidence that would suggest that the debtor was unable to borrow directly from C & S after obtaining court approval.

This case is not like *Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 485 (4th Cir.1992). In that case, the court found that the debtor's payments to the bank in satisfaction of a line of credit in the name of the parent and guarantied by the principals were for reasonably equivalent value. The court noted that the debtor received all draws on the line of credit and made all payments directly to the bank. *Id.* at 481. Although the parent maintained a note showing the indebtedness of the debtor, the note was on exactly the same terms as the parent's obligation to the bank and was credited equivalent to each payment made by the debtor. *Id.* Accordingly, the court found that the creditors were no worse off and

the debtor therefore received an equivalent value for its payments to the bank. *Id.* at 485.

In this case, TKA did not loan money to the debtor on the same terms and conditions as those contained in its borrowings from Liberty and C & S. Instead, TKA charged the debtor a higher rate of interest than the banks charged TKA. In addition, TKA's loans from the banks had a fixed maturity, while TKA's loans to the debtor were payable on demand. Unlike the case in *Jeffrey Bigelow Design Group*, the debtor did not receive equivalent value and the debtor's creditors were plainly worse off because of this arrangement.

After considering the totality of the circumstances, the court determines that the debtor received no benefit from its payment of additional interest to TKA and that TKA had no legitimate basis to charge the debtor a greater rate of interest than it was itself obligated to pay. Looking at the payment from the perspective of the creditors, it is clear that the debtor's value was proportionately diminished by these payments. The court concludes, therefore, that the interest upcharge of one percent was for less than a reasonably equivalent value to the debtor. In so concluding, the court notes that the determination of whether a debtor has received less than a reasonably equivalent value is fact intensive and that the court's conclusion here is necessarily limited by the facts before it. There may very well be circumstances, different than those that took place here, that would justify a parent company's charge to its subsidiary of an additional interest component when it makes available to its subsidiary the proceeds of its borrowings from a third party.

■ The situation is slightly different with respect to the debtor's interest and "profit" payments to M & D. The interest rate to be paid on that obligation was determined in the confirmed plan. That plan evolved from protracted negotiations and was supported by the creditors and approved by the court. The confirmed

plan provided that all unsecured claims that were paid more than 90 days after the date of confirmation would be paid interest at the rate of nine percent. The debtor paid M & D $138,500 on July 6, 1989, including $17,499.38 in interest and "profit," even though the payment was made within 90 days of the date of confirmation. The defendants offered no explanation for the debtor's payment of interest and "profit" in derogation of the confirmed plan. The court concludes that this payment of interest and "profit" was part of the principals' general scheme to skim monies from the debtor for the benefit of the individual defendants. Accordingly, the court determines that the debtor received no benefit for its July 6, 1989, payment to M & D of interest and "profit."

The debtor made a second payment to M & D on December 29, 1989, in the amount of $301,006.17. That payment included $6,624.17 in interest. As the court stated in Section IV.H.2. above, the debtor included in this payment less interest than it was required to pay under either the confirmed plan or the M & D note.[149] Accordingly, the debtor did not receive less than a reasonably equivalent value for its December 29, 1989, payment of interest on the M & D note.

(5) *Payments to TKA of guaranty fees on the C & S line of credit.*

■ Finally, the debtor paid guaranty fees to TKA on its notes denominated as supporting TKA's obligation to C & S. TKA distributed the fees to the guarantors on the C & S line of credit: Morrow, Angle, and Woodward. The debtor itself had no liability to C & S for TKA's obligation, either as obligor or as guarantor. There was no legitimate reason, therefore, for the debtor to pay these fees. The debtor derived no benefit from the pay-

ments. In addition, the plaintiff's accounting expert, McCarthy, testified that the fees were excessive and unreasonable in amount. Although TKA was unable to offer any explanation for these fees, it is clear that TKA was simply used as a means to conceal the debtor's payment of guaranty fees to the individual guarantors. By washing these payments through the parent company, the principals were less likely to excite the attention of Liberty and the debtor's trade creditors that would have resulted from disclosing specific and individual payments to the principals in the debtor's financial statements.

Looking at the debtor's payments of interest upcharges and guaranty fees to TKA from the creditors' perspective, it is clear that these payments diminished the assets of the debtor. It is equally clear that the debtor did not receive an equivalent benefit to compensate it for the diminution of its assets. These payments did not enhance or promote the debtor's business operations. To the contrary, each payment incrementally and proportionately drained the lifeblood of the debtor by diverting monies that were urgently needed for the operation of the debtor. At the same time that TKA was charging the debtor premium interest rates and guaranty fees, the debtor was operating at a loss and was severely undercapitalized. The debtor was required to borrow repeatedly to support its operations. Its future was in considerable doubt and the only hope the debtor had was that the 1989 Christmas season sales would exceed by a substantial margin past sales records. It is clear that TKA charged these additional interest upcharges and guaranty fees to the debtor as a means to ensure that the shareholders of TKA obtained a return on

**149.** *See* note 113 *supra*. Although the December 29, 1989, payment to M & D clearly contained less interest than was owed on that date, regardless of whether it was calculated according to the confirmed plan or the subordinated note, the court declines to offset the December 29, 1989, underpayment against

the July 6, 1989, overpayment. In the court's view, such an offset would be inequitable and inappropriate in the circumstances of this case because the July 6, 1989, overpayment was made in direct violation of the confirmed plan, in bad faith, and to insiders in advance of most other plan dividends.

their investment, regardless of the ultimate success or failure of the debtor.

### (6) *Summary.*

In summary, the court determines that the debtor received a reasonably equivalent value for all payments to TKA and M & D of principal, for its payment to M & D of interest on December 29, 1989, and for its payment to TKA of loan fees and costs. The court determines that the debtor did not receive a reasonably equivalent value for its payments to TKA of the interest or guaranty fees and for its payment to M & D of interest and "profit" on July 9, 1989.

### v. *Insolvency at the time of the transfers.*

■ The final "badge of fraud" implicated in this case is the debtor's insolvency, either at the time of or as a result of the transfer. This badge of fraud is another element required to prove constructive fraud pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 726.106, Florida Statutes. Perhaps because of the devastating effect of insolvency when transfers are considered, courts have found it to be "one of the most important factors" in the determination of actual fraud. *Liebersohn v. Zisholtz (In re Martin's Aquarium, Inc.)*, 225 B.R. 868, 876 (Bankr.E.D.Pa.1998) ["The issues of adequacy of consideration and insolvency of the transferor ... are 'the most significant' of the badges," (*quoting In re Main, Inc.*, 213 B.R. 67, 79 (Bankr.E.D.Pa.1997), *aff'd in part and rev'd & remanded in part on other grounds*, 226 B.R. 140 (E.D.Pa.1998)) ].

The court previously determined in Sections V.C.2.e. and V.C.3.c. above that the debtor was insolvent at all times after the confirmation of Toy King I and through the filing of Toy King II. Accordingly, this important badge is present as to all transfers at issue here.

### vi. *Summary.*

Applying the "badges of fraud" enumerated in *Levine* to the facts of this case, each transfer implicates at least three badges. The debtor's payments of principal and loan fees to TKA and of principal to M & D were insider transfers that the debtor and its principals concealed. The debtor made these transfers while the debtor was insolvent. The debtor's payments of interest upcharges, guaranty fees, and "profit" to TKA and M & D were transfers to insiders that the debtor and its principals either concealed or made for less than reasonably equivalent value. The debtor also made these transfers while the debtor was insolvent.

### b. *Subjective evaluation of the debtor's motive.*

■ "Although the Court may make inferences from the objective facts surrounding the transfer[s], such as the traditional 'badges of fraud,' the Court cannot find intent without also making a 'subjective evaluation of the debtor's motive.'" *Sullivan*, 161 B.R. at 780 (*quoting Jeffrey Bigelow Design Group*, 956 F.2d at 484). The court can "examine both the intent of the bankrupt and the intent of the transferee. A fraudulent intent on either party enables the [plaintiff] to avoid the transfer." *Ward v. Southern Land Title Corp. (In re Southern Land Title Corp.)*, 474 F.2d 1033, 1038 (5th Cir.1973) (*citing* 4 *Collier on Bankruptcy*, ¶ 67.37 (15th ed.1967)). "Fraudulent intent does not require an intent to run the company aground; it requires merely an intent to hinder or defraud creditors." *Roco*, 701 F.2d at 984.

For example, in *Roco*, the court held that a buy out transaction that left the debtor insolvent was fraudulent. *Id.* In that case, the father transferred his share of the company to his son in exchange for periodic payments. The court found that the father intended to secure a steady retirement income at his prior salary level at the expense of the company's creditors. *Id.*

Similarly, in *Hoffman Associates*, 194 B.R. at 960–61, the court found that the actions of the principal were intended to

defraud creditors to the benefit of the debtor's parent company and the principal personally. In that case, upon the death of a partner of the debtor, the parent company took over the business to wind it up. The remaining principal of the debtor was also a principal of the parent company. The principal "executed a plan that would allow him to receive payment on his debt the moment the Debtor had any excess cash." *Id.* at 960. As a consequence of this plan, "[o]ther creditors, with the notable exception of those who would have had claims against [the principal] personally based on his guarantees of the Debtor's obligations, were left with no recourse." *Id.* at 960–61. The court found that the principal was operating the debtor's business "for the purpose of 'orchestrating the corporations so that his debt, both personally and as [the parent corporation], was satisfied first.'" *Id.* at 955.

■■■ The court reaches a similar conclusion in this case after considering all of the evidence and testimony and the totality of the circumstances. The facts of this case overwhelmingly support the conclusion that the principals of the debtor, Morrow, Angle, and King, orchestrated and conducted a scheme that favored their individual and personal interests and prejudiced the trade creditors.

Morrow and Angle were sophisticated businessmen and both were trained and had previously worked as certified public accountants. In addition, Morrow had been in the business of evaluating and acquiring distressed companies for almost ten years. Although not an accountant, King had many years of experience in the retail toy industry and was knowledgeable about the ups and downs involved in operating a retail toy business. Consequently, Morrow, Angle, and King were all fully able to appreciate both the potential and the risks involved in operating Toy King. Each was privy to information about the condition and status of Toy King, including its true worth, its true liabilities, and its actual operations.

The principals, individually or together, concealed the actual financial condition of the debtor from the trade creditors and represented the debtor as having a substantially greater net worth than was the case for the purpose of obtaining maximum trade credit. At the same time, Morrow and Angle, through TKA and M & D, charged the debtor bogus fees dressed up as interest, guaranty fees, and "profit" that were intended to ensure that, whatever the ultimate future of the debtor, TKA, M & D, and their shareholders would receive a return on their investment.

When it became clear that the debtor would not survive as an independent entity, Morrow and Angle caused the debtor to make principal payments on all obligations to TKA that were tied to notes that they had personally guarantied. In addition, Morrow caused the debtor to pay the outstanding M & D note in derogation of the subordination agreement. As a consequence of these payments, each one of which was made prior to its actual due date, there was insufficient money remaining in the debtor to pay trade creditors as those obligations became due. Through these actions, the principals imposed on the trade creditors the risk of loss traditionally reserved for the shareholders.

The defendants directly implicated in this fraudulent scheme, Morrow, Angle, and King, have justified their actions, to the extent that they have defended them at all, as simple business judgments made in response to the exigent circumstances of the debtor. These defendants have offered no evidence that would support such an innocuous explanation for their actions, and the court does not credit it.

Although the court conceivably could reach a different result if each transfer were considered individually and in a vacuum, the evidence clearly supports a conclusion that the principals' actions in effectuating all of the transfers at issue in this proceeding were part of a "general fraudulent plan which must be viewed in its

entirety." *Pepper v. Litton,* 308 U.S. 295, 312, 60 S.Ct. 238, 84 L.Ed. 281 (1939). *See also, MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Services Co.,* 910 F.Supp. 913, 934 (S.D.N.Y.1995)["[A]n allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." (*quoting Orr v. Kinderhill Corp.,* 991 F.2d 31, 35 (2d Cir. 1993)) ].

The evidence in this case clearly shows a consistent and sustained course of dealing between TKA or M & D and the debtor, perpetrated and condoned by the debtor's principals, which was intended to hinder, delay and defraud creditors and inure to the benefit of insiders. The facts of this case epitomize what fraudulent transfer law is designed to prohibit: "placing the assets of a financially ailing corporation where insiders can reach them, but creditors cannot." *Pirrone v. Toboroff (Vaniman International, Inc.),* 22 B.R. 166, 181 (Bankr.E.D.N.Y.1982). In the words of the *Sugarman* court, the debtor was a "moribund [toy retailer] whose inevitable financial demise was lucratively delayed ... by insiders who financed its life support system at the expense of unsuspecting [trade creditors] who were left holding the bag when the plug was pulled by the onset of these involuntary bankruptcy proceedings." *Sugarman,* 926 F.2d at 1249.

#### c. *Conclusion.*

Accordingly, the court determines that the plaintiff has established by a preponderance of the evidence that each transfer at issue here satisfies the elements of Section 548(a)(1)(A) of the Bankruptcy Code and Section 726.105, Florida Statutes, and was a fraudulent transfer actually intended to hinder, delay, or defraud creditors.

150. Section 726.106, Florida Statutes, provides as follows:
(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor

#### 3. *Constructive fraud.*

#### a. *Introduction.*

 The purpose of Section 548(a)(1)(B) is to provide a test of constructive, as opposed to actual fraud. Section 548 of the Bankruptcy Code, Fraudulent transfers and obligations, permits the avoidance of:

(a)(1) ... any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

* * * *

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

"If the required elements of this provision are established, a conclusive presumption of fraud arises." *Pittsburgh Cut Flower,* 124 B.R. at 456 (*citing 4 Collier on Bankruptcy* ¶ 548.03 at 548–550 (15th ed.1990)).

 Section 726.106, Florida Statutes, is the state law equivalent to Section 548(a)(1)(B) of the Bankruptcy Code.[150] It

whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably

is substantially the same as the federal law except that it may be used only to benefit a "creditor whose claim arose before the transfer was made." *Id.* Clearly, the debtor incurred trade debt as part of its ordinary operations throughout the pendency of Toy King I and immediately thereafter. This trade debt was posted as a liability on each of the debtor's balance sheets. There can be no question, therefore, that the plaintiff's claims arose before the transfers at issue in this case. Accordingly, the court will consider the federal and the state claims together.

■ In analyzing the claims of fraudulent transfer in relation to the elements of Section 548(a)(1)(B) of the Bankruptcy Code and Section 726.106, Florida Statutes, as to each transfer the court reaches the same conclusions on the elements described below for the same reasons as the court described in Section V.D.2.a.iv. and Section V.D.2.a.v. above:

● Section 548(a)(1)(B)(i): the debtor received a reasonably equivalent value for its payments to TKA of principal, its payment to TKA of loan fees and costs, and its payment to M & D of principal and its December 29, 1989, interest payment on the First Union dividend claims.

The debtor, however, received less than a reasonably equivalent value for its payment to TKA of interest at a rate that exceeded the rate paid by TKA, for its payment of guaranty fees, and for its payment to M & D on July 6, 1989, of interest and "profit" on the First Union claims.

● Section 548(a)(1)(B)(ii)(I): the debtor was insolvent when each transfer was made.

equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose

### b. *Unreasonably small capital.*

■ In addition, the court determines that the plaintiff has also satisfied the requirements of Section 548(a)(1)(B)(ii)(II) as to each transfer because the debtor had an unreasonably small capital for its operations from the date of the confirmation of Toy King I and through the filing of Toy King II. "It must be remembered that '[u]nreasonably' small capitalization need not be so extreme a condition of financial debility as to constitute equitable insolvency...." *Murphy v. Meritor Savings Bank (In re O'Day Corp.),* 126 B.R. 370, 407 (Bankr.D.Mass.1991) (*quoting Metro Communications,* 95 B.R. 921, 934 (Bankr. W.D.Pa.1989) *rev'd on other grounds,* 945 F.2d 635, 650 (3d Cir.1991)). " '[U]nreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually.' " *Id.*

As stated in Section IV.F.2. above, the court credited McCarthy's opinion that the debtor had an unreasonably small capital when Toy King I was confirmed and at all times thereafter. At the time Toy King I was confirmed, the debtor had no more than $10,000 in capital. All other capital listed on the debtor's balance sheets was either phantom equity or disguised liabilities. In either case, this other equity was unavailable to the debtor to subsidize its operations during the loss months. The debtor needed an equity base to carry it through the prolonged period that the debtor expected to operate at a loss. Because the debtor had inadequate capital, it was forced to borrow repeatedly to augment its revenues during the loss months.

For all these reasons, the court concludes that the debtor had an unreasonably small capitalization for its anticipated

before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

operations for each of the transfers in issue.

### c. *Summary.*

To prevail, the plaintiff is required to satisfy only one of the three elements of Section 548(a)(1)(B)(ii). As just shown, the plaintiff has satisfied the first two. There is no need, therefore, for the court to consider Section 548(a)(1)(B)(ii)(III).[151]

In the circumstances, the plaintiff has established by a preponderance of the evidence that all of the transfers at issue, with the exception of those noted below, were constructively fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code and Section 726.106, Florida Statutes. The transfers that are not constructively fraudulent are the payments to TKA of principal and loan fees and costs and the payments to M & D of principal and the payment to M & D on December 29, 1989, for interest on the First Union claim. These payments are not constructively fraudulent because these payments were for reasonably equivalent value within the meaning of Section 548(a)(1)(B)(i). Thus, the plaintiff has failed to establish this necessary element of constructive fraud for those transfers.

### 4. *Summary.*

As the foregoing describes, the plaintiff has proven by a preponderance of the evidence that each transfer at issue in this proceeding satisfies all of the elements of Section 548(a)(1)(A) of the Bankruptcy Code and Section 726.105, Florida Statutes, and is a fraudulent transfer. Although the plaintiff has failed to establish that some of the transfers are constructively fraudulent under Section 548(a)(1)(B) of the Bankruptcy Code and Section 726.106, Florida Statutes, the plaintiff did establish that these transfers were actually fraudulent.

Accordingly, the court determines that the debtor made fraudulent transfers when it made payments to TKA of principal, interest upcharges and guaranty fees and when it made the July 6, 1989, payment of "profit" and the December 29, 1989, payment of principal and interest to M & D.

### E. *LIABILITY OF TRANSFEREES OF AVOIDED TRANSFERS.*

### 1. Introduction.

The court determined in Sections V.C. and V.D. above that many of the transfers at issue in this proceeding are avoidable under Sections 547 or 548 of the Bankruptcy Code. The court must now determine which defendants are liable for these avoided transfers. Section 550 of the Bankruptcy Code governs the question of liability for transfers avoided under Sections 547 and 548 of the Bankruptcy Code.

Section 550(a) provides, in pertinent part, that:

> [T]he trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

"[S]ection 550 prescribes the liability of a transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee." *Huffman v. Commerce Security Corp. (In re Harbour)*, 845 F.2d 1254, 1255–56 (4th Cir.1988) (*quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess. 375 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787–5876, 6331).

"The structure of the statute separates initial transferees and beneficiaries, on the one hand, from 'immediate or mediate transferee[s]', on the other." *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir.1988).

---

**151.** The plaintiff did not argue this element at trial.

Under Section 550, liability of the initial transferee and beneficiaries is strict; the statute provides no "good faith" defense to these recipients. The initial transferee and beneficiaries, therefore, may not defend from liability by claiming "good faith." *Id.* Immediate or mediate transferees, however, are afforded a "good faith" defense. *Id.*

### 2. Who are the initial transferees?

#### a. The conduit theory.

The debtor made all payments at issue in this case to TKA or M & D. There is no dispute that M & D is the initial transferee of the debtor's payments on the First Union dividend and the M & D subordinated note. With regard to the debtor's payments to TKA, however, all defendants argue that TKA is not an initial transferee but merely a conduit to Liberty and C & S. As such, TKA seeks to insulate itself from liability for all preferential and fraudulent transfers made to it. In addition, if TKA were a conduit, Liberty would be strictly liable as an initial transferee and would be unable to defend from liability using the "good faith" defense.[152]

"The conduit theory has been developed by the courts in an effort to avoid unfairness that might result from the literal application of 550(a)." *Billings v. Key Bank of Utah (In re Granada, Inc.)*, 156 B.R. 303, 306 (D.Utah 1990). Chief Judge Cardozo long ago explained the rationale for this limited exception in *Carson v. Federal Reserve Bank of New York*, 254 N.Y. 218, 172 N.E. 475, 482 (1930):

> The person to be charged with liability, if he has parted before the bankruptcy with title and possession, must have been more than a mere custodian, an intermediary or conduit between the bankrupt and the creditor. Directly or indirectly he must have had a beneficial

interest in the preference to be avoided, the thing to be reclaimed.

The conduit exception is "supported by basic fairness as well as public policy considerations: regardless of the lack of qualifying language in § 550(a), the broadest application of the concept of 'transferee' under it would inappropriately subject mere stakeholders, bailees, and intermediaries to liability, where they had never stood to gain personally from the funds momentarily in their possession." *Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.)*, 228 B.R. 225, 233 (Bankr.D.Minn.1998). "Generally, 'mere conduits' hold transferred funds via escrow, trust, or deposit, and do so only in the status of commercial or professional intermediaries for the parties that actually hold or receive a legal right, title, or interest." *Id.* The conduit has no legal entitlement to the funds. *Food & Fibre Protection*, 168 B.R. at 420.

For example, the court in *Metsch v. First Alabama Bank of Mobile, N.A. (In re Colombian Coffee Co.)*, 59 B.R. 643, 646 (Bankr.S.D.Fla.1986), determined that the defendant bank was a mere conduit for the avoided transfer. The court wrote:

> [The bank] no longer holds the debtor's property. It merely served as a commercial conduit employed by the transferor in moving its property to another corporation. Its role in this transfer was indistinguishable from that of a messenger, the postal service, a common carrier, a warehouse, or a broker. It derived no benefit from the transfer, other than its customary fee for its banking services. It was granted no discretion with respect to the disposition of the property entrusted to it. It could not have refused to follow the debtor's instructions.

*Id.* at 645.

Typically, a conduit is a commercial enterprise that has handled the debt-

---

**152.** C & S would also be an initial transferee if the court were to determine that TKA is a conduit. C & S is not a party to the proceed-

ing, however, and the plaintiff seeks no recovery from C & S.

or's transfer to a third party consistent with its normal handling of other commercial transactions. *Harbour,* 845 F.2d at 1257. Commercial banks are the most prevalent example of conduits, although steamship agents, real estate escrow and title companies, securities or investment brokers, and attorneys have also been found to be conduits. *See, e.g., Malloy v. Citizens Bank of Sapulpa (In re First Security Mortgage Co.),* 33 F.3d 42, 44 (10th Cir.1994) [bank acted only as a financial intermediary]; *Kaiser Steel Resources, Inc. v. Jacobs (In re Kaiser Steel Corp.),* 110 B.R. 514, 520–21 (D.Colo.1990) [bank was financial intermediary that facilitated conversion of the debtor's stock and therefore was not the initial transferee]; *Colombian Coffee Co.,* 59 B.R. at 646 [bank that received transfers to be deposited into customer's account was a "commercial conduit"]; *Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.),* 59 B.R. 873, 875 (Bankr.S.D.N.Y.1986) [steamship agent that received monies from a freight forwarder to be paid over to common carrier was a conduit]; *In re Moskowitz,* 85 B.R. 8, 11 (E.D.N.Y.1988) [title company was an "innocent conduit of funds in a commercial transaction"]; *Kupetz v. United States, Internal Revenue Service (In re Williams),* 104 B.R. 296, 299 (Bankr.C.D.Cal.1989) ["Escrow company is merely a conduit through which funds flow from a purchaser to a seller. . . ."]; *Keller v. Blinder (In re Blinder, Robinson & Co.),* 162 B.R. 555, 562 (D.Colo.1994) [securities broker "merely follows the instructions of shareholders in transferring funds held in the accounts it services" and thus is not an initial transferee]; *Poonja v. Charles Schwab & Co. (In re Dominion Corp.),* 199 B.R. 410, 415 (9th Cir. BAP 1996) [stock brokerage firm was an intermediary or conduit]; *Gropper v. Unitrac. S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334, 337 (Bankr.S.D.N.Y.1983) [law firm "acted as a mere conduit of funds" from the debtor to the creditor]; *Security First National Bank v. Brunson (In re Coutee),* 984 F.2d 138, 141 (5th Cir.1993) [law firm held

proceeds of personal injury lawsuit "merely in a fiduciary capacity" for the debtors].

■ At bottom, all of these cases involve an innocent and uninvolved link in the chain between the debtor and the ultimate recipient of the avoided transfer. The conduit exception protects the innocent and uninvolved link from strict liability for the avoided transfer and places that liability on the next link in the chain. Under the conduit exception, therefore, "a conduit does not constitute an initial transferee under § 550(a). Instead, a creditor who received a preference payment from a conduit is liable as an initial transferee" and cannot therefore utilize the defenses provided in Section 550(b) for subsequent transferees. *Granada,* 156 B.R. at 306.

A simplistic example of a conduit might be Western Union. Suppose A transfers cash to Western Union to wire to B. Western Union acts merely as the carrier of the funds. Assuming the transfer of the funds is an avoidable transfer, Western Union is a mere conduit who should not be liable for the avoidable transfer. The conduit exception, therefore, ignores Western Union and makes B, the ultimate recipient, the initial transferee for liability purposes.

b. *Who is a conduit?*

■ Our court of appeals has adopted the dominion and control test first advanced in *Bonded Financial Services,* 838 F.2d at 893–96, to determine whether a transferee is a conduit. *See Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1202 (11th Cir.1988) [holding that a bank that received funds from a debtor was a mere conduit of the funds between the debtor and the bank's customer and had no control over the funds]. To establish that the transferee has dominion and control of the avoided transfer under this test, the transferee must have an unfettered right to use the funds for its own purposes. *Circuit Alliance,* 228 B.R. at 232.

■ Some courts, including our court of appeals, have also found the absence or presence of a creditor-debtor relationship to be a significant factor in determining whether a transferee is a conduit. *See, e.g., Chase & Sanborn,* 848 F.2d at 1201 [court noted that, although the defendant had technically become the debtor's creditor, "no real debtor-creditor relationship" existed]; *Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.),* 892 F.2d 26, 28 (4th Cir.1989) ["When a creditor receives money from its debtor to pay a debt, the creditor is not a mere conduit."]; *Bonded Financial Services,* 838 F.2d at 893 [I]n determining that the defendant was not a conduit, the court pointed out that the defendant "received nothing from [the debtor] that it could call its own; the [defendant] was not [the debtor's] [creditor. . . ."].

These cases establish the importance of the transferee's retention of the avoided transfer when considering the availability of the judicially created conduit exception to transferee liability. When the transferee is a creditor, or has a business relationship with the debtor, and it receives a transfer that is applied to its own debt, the transferee cannot be a conduit. This is true because, in its essentials, the avoided transaction is a two party transfer—where A pays B to satisfy A's debt to B—and not a three party transfer—like the Western Union example where A pays Western Union who then pays B. The liability for the avoided transfer, therefore, is with the second party—B, not Western Union.

This point is made in *Bonded Financial Services* when the court distinguished its case with a hypothetical case. In *Bonded Financial Services,* the debtor sent a transfer to the bank with specific instructions to deposit it into its principal's personal account. The principal then made a payment from his account to the bank in satisfaction of his personal obligation to the bank. The court contrasted this situation, where it found that the bank was a simple conduit between the debtor and the principal, with a hypothetical case in which the debtor sends a transfer to the bank with instructions to apply it directly to the principal's obligation to the bank. *Id.* at 893. The *Bonded Financial Services* court noted that the latter case would result in the attachment of liability to the bank as the initial transferee.

■ This case parallels the hypothetical scenario used by the *Bonded Financial Services* court. TKA had a close business relationship with the debtor and was a creditor. Each payment that the debtor made to TKA was on account of its own debts to TKA. TKA had complete dominion and control over those monies when TKA received them. Although TKA elected to use the monies it received from the debtor to make payments on its own obligations to Liberty and C & S, it did so on different terms and on different dates than those involved in the debtor's payments to TKA. In some months, for example, there was a two week delay between TKA's receipt of the debtor's payment and its own payment to Liberty or C & S. TKA also received more interest from the debtor than it paid to Liberty or C & S. Thus, TKA had dominion and control over each transfer it received from the debtor. The debtor's payments to TKA were, therefore, two party transfers and not three party transfers as is the case when the conduit exception is implicated. *See also, Richardson v. Federal Deposit Insurance Corp. (In re M. Blackburn Mitchell, Inc.),* 164 B.R. 117, 125–26 (Bankr.N.D.Cal.1994).

Two reported decisions are squarely on point with the facts in this case. In *Granada,* 156 B.R. at 308, the court refused to apply the conduit exception as a means to fix strict liability on the defendant bank for avoidable transfers made to it by partnerships involving the debtor. In that case, the debtor was the general partner of the defendant partnerships and, as part of its operations, upstreamed or downstreamed monies in and out of the partnerships, as needed. Before its bankruptcy filing, the

debtor sent monies to the defendant partnerships that the partnerships in turn used to pay down bank debts of the partnerships. The principal of the debtor was a guarantor of these paid debts. When the court found the transfers to be avoidable, the trustee sought to hold the bank liable for the avoided transfers as an initial transferee. The trustee argued that the partnerships were simply conduits between the debtor and the bank because the debtor determined when and how much money to upstream or downstream between the debtor and the partnerships. The court rejected the trustee's position, however, because the partnerships had dominion and control over the monies they received from the debtor. *Id.* Similarly, in this case, TKA had dominion and control over the monies it received from the debtor.

In *Erie Marine Enterprises, Inc. v. Nationsbank, N.A. (In re Erie Marine Enterprises, Inc.)*, 216 B.R. 529, 536 (Bankr. W.D.Pa.1998), the debtor subsidiary sought to invoke the conduit exception by claiming that the non-debtor parent company was a conduit for payments made to the bank by the debtor. The parent company maintained a line of credit with the bank that it used, in part, to support the subsidiary's operations. The subsidiary was a guarantor on the bank's loan and pledged its accounts receivable as security for the loan. *Id.* at 531–33. Both the subsidiary and parent company had common management. The parent made informal bookkeeping entries to track the monies it made available to the debtor for its operations. In turn, the parent company made equivalent debits for monies it received from the debtor or the debtor's customers resulting from the debtor's operations. The parent company used the monies received from the debtor to pay down its own indebtedness to the bank. *Id.*

On these facts, the court found the parent company was the initial transferee of the debtor's transfers and not a mere con-

duit. *Id.* at 536. The court concluded that the debtor meant to pay down its own indebtedness to the parent when it made the transfers at issue. The court noted that the parent did not segregate or "earmark" the monies it received from the debtor for payment to the bank. *Id.* The parent had "complete dominion and control over the monies and the Debtor retained no interest or control." *Id.* The court also noted that, although the parent elected to use the debtor's monies to honor its obligations to the bank, it was free to use the monies in any way it chose. There was no business relationship between the debtor and the bank, and the debtor was not a party to the parent's obligation to the bank. *Id.* All of these facts caused the court to conclude that the parent company was "a creditor of the Debtor and not merely an agent or conduit who held funds for an undisclosed principal." *Id.*

All of the facts upon which the court's decision in *Erie Marine Enterprises* turned are present in this case. TKA had unfettered and unrestricted dominion and control over all of the monies it received from the debtor. It was not constrained by law or contract in its ability to use those monies in any way it deemed appropriate. TKA had a close business relationship with the debtor and was a significant creditor. TKA applied the payments it received from the debtor to the debtor's obligations to it. The debtor was not a party to TKA's transactions with Liberty and C & S. Clearly, therefore TKA was not a conduit.

### c. *Equitable considerations.*

 Finally, the court notes that the conduit exception is based upon equitable principles, as the cases make clear. It is intended to protect innocent transferees from liability for avoided transfers that the transferee received and processed in good faith. It is implicit, therefore, that the "defendant must not [itself] have acted inequitably, i.e., in bad faith." *Harbour,* 845 F.2d at 1257. The facts of this case

amply demonstrate, as the court concluded in Section V.D. above, that the adjectives "innocent" and "good faith" cannot be used in connection with TKA's relations with the debtor. Accordingly, TKA is precluded on equitable grounds from obtaining the protection of the conduit exception.

### d. *Conclusion.*

In summary, the court concludes that TKA was not an innocent transferee of the debtor's payments. More importantly, all of the foregoing clearly demonstrates that TKA was the initial transferee of the debtor's payments to it rather than a conduit.

The court concludes, therefore, that the plaintiff has established that TKA and M & D are initial transferees of the avoided transfers within the meaning of Section 550(a)(1). Because an initial transferee may not use Section 550(b) of the Bankruptcy Code to defend from liability for an avoided transfer, TKA and M & D are strictly liable for all avoided transfers found by the court in Sections V.C. and V.D., respectively.

### 3. *Who are the beneficiaries or immediate transferees of the transfers?*

The court determined in the preceding section that TKA and M & D are the initial transferees of the avoided transfers. The court must now determine whether the remaining defendants are also liable under Section 550 for the avoided transfers. Section 550(a)(2) allows the plaintiff to pursue the subsequent transferees, as the immediate or mediate transferees, for avoided transfers so long as the chain of possession can be established. *See M.*

*Blackburn Mitchell,* 164 B.R. at 126 [the "focus when analyzing who is a transferee, is on the flow of funds"].[153]

In this case, TKA paid to Liberty principal, interest, and loan fees on the Liberty and Nintendo loan obligations with monies that it received from the debtor. TKA paid to Morrow, Angle, and Woodward guaranty fees with monies that it received from the debtor. M & D paid to Morrow, Angle, and Woodward principal, interest, and "profit" payments with monies that it received from the debtor on July 6, 1989. M & D paid to Morrow and Woodward principal and interest payments with monies that it received from the debtor on December 29, 1989. The position of these defendants as immediate transferees within the meaning of Section 550(a)(2) is therefore apparent.

The record contains no evidence that the remaining defendants, King, Hunsaker II, Hunsaker III, and Ranney, received either money or benefit flowing from the avoided transfers made by the debtor to TKA and M & D. The court, therefore, concludes that the plaintiff has failed to establish that these defendants are transferees within the meaning of Section 550(a)(1) or (2) of the Bankruptcy Code.

### 4. *Liberty's "good faith" defense to transferee liability.*

### a. *Introduction.*

In the preceding section, the court determined the liability of all defendants for the transfers avoided as preferences and as fraudulent in Sections V.C. and V.D. above. Liberty, however, has asserted the defense of "good faith" as to its liability for

---

**153.** Alternatively, Section 550(a)(1) allows the plaintiff to pursue the person or entity that receives the benefit of the avoided transfer.

In this case, Liberty, Morrow, Angle, and Woodward received money from TKA or M & D. None of these defendants, therefore, can be beneficiaries under Section 550(a)(1). *See Bonded Financial Services,* 838 F.2d at 896 ["Someone who receives the money later on is not an 'entity for whose benefit such trans-

fer was made'; only a person who receives a benefit from the initial transfer is within this language."].

A guarantor is the paradigm example of a beneficiary. *Id.* at 895. In this case, the debtor was the sole obligor on its obligations to TKA and M & D; no person or entity guarantied the debtor's obligations to TKA or M & D.

these transfers.[154] As shown in Section V.E.3. above, these are the debtor's payments to TKA on account of the Liberty and Nintendo loans.

 Section 550(b)(1) allows a subsequent transferee to avoid liability for avoided transfers made to it if received in "good faith." Section 550(b) prohibits the plaintiff from recovering under Section 550(a)(2) from:

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

As the proponent of the defense, Liberty has the burden of proving each of the elements. *Leonard v. Mountainwest Financial Corp. (In re Whaley)*, 229 B.R. 767, 776 (Bankr.D.Minn.1999).

b. *Was Liberty a transferee who took for value, in good faith, and without knowledge of the voidability of the transfers?*

i. *Introduction.*

"A [plaintiff] may not recover from a subsequent transferee who 'takes for value, including satisfaction ... of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided.'" *Bonded Financial*

*Services*, 838 F.2d at 896. Section 550(b) "leaves with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent. The initial transferee is the best monitor; subsequent transferees usually do not know where the assets came from and would be ineffectual monitors if they did." *Id.* at 892–93. The defendant must establish all three elements of the "good faith" defense in order to avoid liability for the avoided transfer.

ii. *For value.*

 The first element that Liberty must establish is that it provided value for the avoided transfer. As the *Bonded Financial Services* court pointed out, "[t]he statute does not say 'value to the debtor'; it says 'value.' A natural reading looks to what the transferee gave up rather than what the debtor received." *Id.* at 897. In this case, Liberty provided value because it made all of the monies from the Liberty and Nintendo loans available to TKA. Each of the payments that Liberty received from TKA was in payment of those antecedent obligations, whether for interest or principal, as discussed earlier in Sections IV.F.1 and IV.G.5. Accordingly, Liberty gave value and therefore satisfies this first element of the defense.

iii. *Good faith.*

 The second element that Liberty must establish is that it received the transfers in good faith. "The phrase

---

**154.** Liberty does not refer specifically to Section 550(b)(1) as a defense in the pretrial stipulation (Document No. 43). Liberty explained this omission in one of its briefs as follows:

4. *Toy King Acquisitions, Inc. served as a "conduit" between Liberty and Toy King Distributors, Inc.* Liberty has argued from the outset that although Toy King received the benefit of all of the monies loaned (and in turn Toy King repaid to Liberty all the amounts received on Liberty's loans), this was accomplished primarily through the "conduit" of T.K. Acquisitions, Inc. Although Liberty originally gave some thought to raising defenses under § 550(b) [on the theory that Toy King paid monies to T.K. Acquisitions as "initial transferee" and

further on the theory that Liberty was therefore a transferee of T.K. Acquisitions and not Toy King], this argument was abandoned once Liberty's counsel realized that it was inconsistent with the argument that Toy King was the true principal in the loan transactions.

[Document No. 70 at 10–11]. As shown in Sections V.B.2. and V.E.2. above, however, the court has rejected this conduit theory. Nevertheless, as shown by a complete reading of the pretrial stipulation and Liberty's briefs, Liberty has consistently defended on the basis that all of its actions were taken in "good faith" and were completely "above board." This "good faith" defense, therefore, is plainly sufficient to invoke the principles of Section 550(b)(1). *See* note 1 *supra*.

'good faith' in [Section 550(b)] is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a transfer from him, that is, 'washing' the transaction through an innocent third party. In order for the transferee to be excepted from liability ... he himself must be a good faith transferee." *Id.* at 896 (*quoting H.R.Rep. No. 95–595,* 95th Cong.2d Sess. 376 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5876–77, 6332). Stated another way, "an absence of fraudulent intent does not mean that the transaction was necessarily entered into in good faith. The lack of good faith imports a failure to deal honestly, fairly and openly." *Greenbrook Carpet,* 22 B.R. at 90.

 The question of whether Liberty showed good faith in its dealings with TKA and the debtor is a close one, especially when considered in the context of the affirmative bad faith evidenced by the actions of Morrow, Angle, and King, perpetrated through TKA, M & D, and the debtor. Liberty entered into the Liberty and Nintendo loan transactions with TKA and the debtor as part of its normal commercial operations. *See Harbour,* 845 F.2d at 1257 [The "likelihood of bad faith on the defendant's part is lessened where the defendant is a commercial enterprise handling transactions in a routine fashion."]. Liberty negotiated the terms and conditions of those loans at arms-length from TKA and the debtor. Liberty performed its obligation to give monies to TKA, and all of those monies were used for the debtor's direct benefit. Liberty neither sought nor received a profit or reward from those transactions that was in excess of what any bank in the industry would expect in the same circumstances.

Liberty held a security interest in the debtor's inventory and thus was in a superior position to the debtor's other creditors in the event TKA defaulted on its obligations. The debtor's internal balance sheets at all times between the closing of the Liberty loan and the filing of Toy King II showed the debtor's inventory as having a value far in excess of Liberty's potential claims. Liberty had a reasonable expectation, therefore, that its claims could be satisfied by the debtor's inventory. Liberty did not appear to be "jumping the queue" or seeking an unfair advantage when it received TKA's payments on the Liberty and Nintendo loans in advance of the Toy King II filing. Looking at these facts, one could easily conclude that Liberty acted in good faith in its relations with TKA and the debtor.

There is a missing element in the above recitation, however, that fundamentally infects Liberty's apparent good intentions. That element is Liberty's failure to act prudently or in compliance with its own requirements as contained in the commitment letter when it closed the Liberty loan without verifying that the debtor had a net worth of $2 million. Liberty similarly failed to act prudently when it closed the Nintendo loan before the parties executed the note and on terms that were inconsistent and worse than the terms and conditions that the senior loan committee had approved. "Venerable authority has it that the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate." *Bonded Financial Services,* 838 at 897–98.

Liberty had more than enough knowledge of the events surrounding the debtor's transfers to TKA to induce a reasonable person to investigate. For example, Liberty knew or should have known that the debtor did not have $2 million in equity after Toy King I was confirmed and before the Liberty loan closed, in violation of the requirements of the commitment letter.[155] Liberty also knew that the $1 million capi-

---

**155.** For a more comprehensive discussion of this point, see Section IV.E.4. and accompa-
nying notes *supra.*

tal contribution that the debtor posted as a stock subscription receivable in its assets and as paid-in capital in its shareholders' equity was to come from proceeds of the Liberty loan. Liberty knew or should have known that TKA could not make that capital contribution in the way and in the amount represented. Liberty knew or should have known before it closed the Liberty loan that TKA could not make a capital contribution in the debtor of more than $200,000 from the proceeds of that loan.

Most importantly, Liberty had a contractual obligation to investigate the debtor's financial condition, at least to the extent of obtaining an accountant's opinion letter verifying the debtor's net worth. Had Liberty insisted on the Touche Ross opinion letter, Touche Ross would have identified and addressed the other anomalies and inconsistencies in the debtor's pro forma described in Section IV.D.3. above. As the court concluded in Section IV.D.4 above, Touche Ross would have been unable to opine that the debtor had $2 million in equity.

Accordingly, Liberty knew or should have known immediately after the Toy King confirmation that the debtor was inadequately capitalized for its operations and that TKA would not and could not provide additional capital to the debtor in any significant amount.

Certainly, by the time Liberty closed the Nintendo loan, it was apparent that the debtor was in serious difficulties. All of the surrounding circumstances of that loan transaction evidence Liberty's recognition that the debtor was in critical need of operating funds. Thus, Liberty had even more reason to investigate the debtor's financial condition before making the Nintendo loan. Had Liberty investigated, it would have easily discerned that the debtor was severely undercapitalized at that point.

At the same time, Liberty knew that the Touche Ross pro forma, the Liberty commitment letter incorporated into the debtor's confirmed plan, and the debtor's internal balance sheets all created the illusion that the debtor was solid, if not secure. Liberty knew that these papers would be disseminated and used by trade creditors in making credit decisions in favor of the debtor. Liberty further understood that the inventory the debtor acquired with its trade credit would secure TKA's obligation to Liberty. In short, Liberty knew that trade creditors would ship inventory into its lien and subordinate their own claims to Liberty in reliance on the Touche Ross pro forma, the commitment letter, and the debtor's balance sheets.

That is exactly what occurred. The debtor's trade creditors did not have access to the critical information available to Liberty of TKA's inability to make a capital contribution in the debtor from the proceeds of the Liberty loan, the debtor's chronic cash flow problems, and the debtor's difficulty in obtaining adequate Nintendo inventory. Because the trade creditors relied upon the Touche Ross pro forma, the commitment letter, and the debtor's internal balance sheets, they believed that the debtor had sufficient substance and net worth to operate through the Christmas season with a reasonable expectation of paying its trade debt soon after.

The trade creditors made their credit decisions in reliance on these documents. The trade creditors relied upon the documents in part because they understood that the form and substance of those documents had been verified and validated as a condition of the Liberty loan. The trade creditors shipped inventory into Liberty's lien because they believed that Liberty had adequately performed its due diligence in making the Liberty loan. In fact, Liberty had not.

By the time Liberty received its principal payments from TKA on the Liberty and Nintendo loans, Liberty knew that the debtor was unable to pay all its debts and could no longer support its operations. Al-

though Liberty was in a superior position to the debtor's trade creditors because of its secured position, Liberty's security arose, in part, as a consequence of its own failure to adequately investigate the debtor's financial condition at any point from the early negotiations on the Liberty loan through the filing of Toy King II.[156] On these facts, Liberty cannot be said to have been acting "fairly or openly" in its relations with TKA and the debtor.

For all of these reasons, the court concludes that Liberty has failed to carry its burden of persuasion on this element; Liberty has not shown that it was acting in good faith when it received TKA's payments of interest and principal on the Liberty and Nintendo loans that were paid with the debtor's monies.

iv. *Without knowledge of voidability.*

The third and final element that Liberty must establish is that it did not have knowledge of the voidability of the transfers made to it. "No one supposes that 'knowledge of voidability' means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do." *Id.* at 898. "'Knowledge' is a stronger term than 'notice.'" *Id.* The without knowledge requirement is not satisfied "if the transferee knew facts that would lead a reasonable person to believe that the property [transferred] was recoverable." *Grove Peacock Plaza,* 142 B.R. at 520. In *Grove Peacock Plaza,* the court found that the defendant bank was "fully aware of the debtor's financial condition and the potential for a bankruptcy petition." *Id.* Similarly, in *Greenbrook Carpet,* 22 B.R. at 91, the court held that a credi-

tor's knowledge of insolvency created an inference of bad faith.

In both of the foregoing cases, the creditor had reason to know that the debtor was then or soon to be insolvent. In the *Greenbrook Carpet* case, for example, the creditor had received a balance sheet that demonstrated that the debtor was insolvent. *Id.* at 91. Similarly, in the *Grove Peacock Plaza* case, the debtor was in default on its debt and was actively negotiating with the bank that was its largest creditor. *Grove Peacock Plaza,* 142 B.R. at 520. Because the creditors in these cases received payments originating from the debtors at a time when they had knowledge of the debtors' insolvency or imminent insolvency, they were charged with knowledge of the voidability of the transfers.

Insolvency is, of course, only one of the elements necessary to establish the voidability of a transfer under Sections 547 or 548 of the Bankruptcy Code. It is, however, the element most susceptible to ready discovery by a creditor.[157] Thus, if the creditor has knowledge of the debtor's insolvency when it receives a voidable transfer from the initial transferee, the creditor is charged with knowledge of the voidability of that payment.

In this case, Liberty must be charged with knowledge of the debtor's insolvency dating from November 26, 1989. Morrow and Angle met with Horne on November 17, 1989, and informed him at that time that the debtor would post a loss for the year and would therefore be unable to make any payment on the Liberty loan principal. The debtor's November 26, 1989, balance sheet clearly demonstrated

---

**156.** Nor can Liberty excuse its failures by relying upon its secured status. Liberty willingly acceded to TKA's request that TKA be denominated as the obligor on the Liberty loan. Although it may not have appreciated the consequences of its actions when it made the loan to TKA rather than to the debtor directly, Liberty knew or should have known that interposing TKA between itself and the debtor would put it in an entirely different

posture in the event the debtor became insolvent.

**157.** Section 550(b) is, of course, an affirmative defense as to which a defendant bears the burden only after the plaintiff has established all of the elements necessary to find a transfer avoidable as a preference or a fraudulent transfer.

the debtor was insolvent excluding the paid-in capital originating from the "quasi-reorganization" accounting convention.[158] The November 26, 1989, balance sheet posted an accrued loss of $1,235,647.81 and liabilities of $6,033,357.78, totaling $7,269,005.59, with assets of only $6,724,594.97, leaving a shortfall to be absorbed by shareholder's equity of $544,410.62. Whatever the propriety of using the "quasi-reorganization" accounting convention at the time of the Toy King I confirmation, by November 26, 1989, Liberty could not have had any reasonable belief that the paid-in capital originating from that accounting convention represented realizable equity in the debtor. Stated another way, Liberty was conversant enough with the debtor's financial affairs to know that there was no "capital" in the debtor to offset its chronic and protracted losses, notwithstanding the paid-in capital shown on the debtor's balance sheet. Accordingly, Liberty must be charged with knowledge of the debtor's insolvency.

For these reasons, the court concludes that Liberty has failed to carry its burden of persuasion on this element. Liberty has not established that it was without knowledge of the voidability of the transfers when it received TKA's payments of principal and interest on the Liberty and Nintendo loans on or after November 26, 1989.

158. *See* debtor's November 26, 1989, balance sheet in note 84.

159. The court determines TKA's liability as follows:

Preferences more than 90 days before the filing of Toy King II:

| Liberty Loan Interest | Nintendo Loan Interest | C & S Loan Interest | C & S Guaranty Fees |
|---|---|---|---|
| $44,678.27 | $7,162.50 | $6,900.00 | $15,283.22 |

Preferences within 90 days of the filing of Toy King II:

| Liberty Loan Interest | Nintendo Loan Interest | C & S Loan Interest | C & S Guaranty Fees |
|---|---|---|---|
| $40,492.62 | $12,157.00 | $2,906.26 | $5,000.00 |

## c. *Conclusion.*

As the foregoing describes, Liberty has failed to prove by a preponderance of the evidence each of the elements required to except Liberty from liability as a good faith transferee. Accordingly, the court finds that Liberty is liable for the preferential and fraudulent transfers made by the debtor to TKA and ultimately to Liberty on account of the Liberty and Nintendo loans.

## 5. *Summary.*

For the foregoing reasons, the court finds that the plaintiff has established by a preponderance of the evidence that TKA is the initial transferee, within the meaning of Section 550(a)(1) of the Bankruptcy Code, of the debtor's transfers of principal, interest, and guaranty fees made in payment of TKA's obligations on the Liberty loan, the Nintendo loan, and the C & S line of credit and avoided as both preferential and fraudulent in Sections V.C. and V.D. above.[159] The court also finds that the plaintiff has established by a preponderance of the evidence that M & D is the initial transferee, within the meaning of Section 550(a)(1) of the Bankruptcy Code, of the debtor's transfers of principal, interest, and "profit" made in payment of the First Union dividends and the subordinated note to the extent that they were avoided as both preferential and fraudulent in Sections V.C. and V.D. above.[160]

| Liberty Loan Principal | Nintendo Loan Principal | C & S Loan Principal |
|---|---|---|
| $600,000.00 | $700,000.00 | $250,000.00 |

Fraudulent transfers within one year of the filing of Toy King II:

| Liberty Loan Interest | Nintendo Loan Interest | C & S Loan Interest | C & S Guaranty Fees |
|---|---|---|---|
| $8,632.12 | $2,479.22 | $2,231.26 | $20,283.22 |

| Liberty Loan Principal | Nintendo Loan Principal | C & S Loan Principal |
|---|---|---|
| $600,000.00 | $700,000.00 | $250,000.00 |

160. The court determines M & D's liability as follows:

The court further determines that the plaintiff has established by a preponderance of the evidence that Liberty was an immediate transferee, within the meaning of Section 550(a)(2), of the debtor's transfers of principal and interest on the Liberty and Nintendo loans to the extent they were avoided as preferences and fraudulent transfers in Sections V.C. and V.D. above.[161]

The court also determines that the plaintiff has established by a preponderance of the evidence that Morrow, Angle, and Woodward are immediate transferees, within the meaning of Section 550(a)(2), of the debtor's transfers of principal, interest, guaranty fees, and "profit" to the extent they were avoided as preferential or fraudulent transfers in Sections V.C. and V.D. above, as follows: [162] Morrow, Angle, and Woodward are the immediate transferees of the debtor's payments of guaranty fees to TKA; Morrow, Angle, and Woodward are the immediate transferees of the debtor's payments of principal, interest and "profit" to M & D on July 6, 1989; Morrow and Woodward are the immediate transferees of the debtor's payments of principal and interest to M & D on December 29, 1989.

Finally, the court determines that the plaintiff has failed to establish by a preponderance of the evidence that King, Hunsaker II, Hunsaker III, and Ranney are initial or immediate transferees within the meaning of Section 550(a)(1) or (2) of any of the debtor's transfers found to be preferential or fraudulent in this proceeding.

### 6. *Liability under Florida law.*

The court determined in Section V.D. above that many of the transfers at issue here were fraudulent transfers under Sections 726.105 and 726.106, Florida Stat-

**161.** The court determines Liberty's liability as follows:

Preferences more than 90 days before the filing of Toy King II:

| Liberty Loan Interest | Nintendo Loan Interest |
|---|---|
| $38,812.44 | $6,631.94 |

Preferences within 90 days of the filing of Toy King II:

| Liberty Loan Interest | Nintendo Loan Interest | Liberty Loan Principal | Nintendo Loan Principal |
|---|---|---|---|
| $37,726.33 | $10,208.34 | $600,000.00 | $700,000.00 |

Fraudulent transfers within one year of the filing of Toy King II:

| Liberty Loan Principal | Nintendo Loan Principal |
|---|---|
| $600,000.00 | $700,000.00 |

**162.** The court determines Morrow, Angle, and Woodward's liability as follows:

Preferences within 90 days of the filing of Toy King II:

| M & D Note principal December 29, 1989 | M & D Note Interest December 29, 1989 |
|---|---|
| $294,382.00 | $6,624.17 |

Fraudulent transfers within one year of the filing of Toy King II:

| M & D interest & "profit" July 6, 1989 | M & D Note Principal December 29, 1989 |
|---|---|
| $17,499.38 | $294,382.00 |

Preferences more than 90 days before the filing of Toy King II:

| | Guaranty Fees |
|---|---|
| Morrow | $5,094.41 |
| Angle | 5,094.41 |
| Woodward | 5,094.41 |

Preferences within 90 days of the filing of Toy King II:

| | Guaranty fees | M & D Note December 29, 1989 |
|---|---|---|
| Morrow | $1,666.67 | $280,000.00 |
| Angle | 1,666.67 | |
| Woodward | 1,666.67 | 10,000.00 |

Fraudulent transfers within one year of the filing of Toy King II:

| | Guaranty fees | M & D principal interest, & "profit" |
|---|---|---|
| Morrow | $6,761.08 | $288,303.46 * |
| Angle | 6,761.08 | 8,303.46 ** |
| Woodward | 6,761.08 | 10,892.46 *** |

* This amount represents M & D's payment to Morrow of interest and "profit" on July 6, 1989, $8,303.46, plus its payment of $280,000 on or after December 29, 1989.

** This amount represents M & D's payment to Angle of interest and "profit" on July 6, 1989.

*** This amount represents M & D's payment to Woodward of interest and "profit" on July 6, 1989, $892.46, plus its payment of $10,000 on or after December 29, 1989.

utes.[163] The court must now determine which defendants are liable for these avoided transfers. Sections 726.108 and 726.109, Florida Statutes, govern the question of liability for transfers avoided under state law.

Section 726.108, Florida Statutes, provides, in pertinent part, that:

(1) In an action for relief against a transfer or obligation under ss. 726.101–726.112, a creditor, subject to the limitations in § 726.109 may obtain:

(a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

In addition, Section 726.109, Florida Statutes, provides, in pertinent part, that:

(2) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under § 726.108(1)(a), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (3), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(a) The first transferee of the asset or the person for whose benefit the transfer was made; or

(b) Any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

In analyzing the defendants' liability under these statutes, the court adopts its reasoning and conclusions with respect to the defendants' liability under Section 550(a)(1) and (2) of the Bankruptcy Code as set forth in the previous portions of this Section V.E. above. Accordingly, the court concludes that the plaintiff has established the defendants' liability under Florida law as follows:

• TKA and M & D are the first transferees of the transfers avoided under Sections 726.105 and 726.106, Florida Statutes.

• Liberty, Morrow, Angle, and Woodward, are subsequent transferees other than good faith transferees who took for value of the transfers avoided under Sections 726.105 and 726.106, Florida Statutes.

• King, Hunsaker II, Hunsaker III, and Ranney are not first or subsequent transferees within the meaning of Section 726.109(2)(a) or (b), Florida Statutes.

Under Section 726.109(2), Florida Statutes, a complaining creditor is limited in its recovery to the extent of its claim or the value of the avoided transfer, whichever is less. Here, the plaintiff asserts claims under Florida law for the benefit of all unsecured creditors of the debtor, with aggregate claims that exceed in dollar amount the avoided transfers. The plaintiff is therefore entitled to recover from the defendants only in the amount of the value of the transfers avoided as fraudulent under Sections 726.105 and 726.106, Florida Statutes. Accordingly, the court determines that the plaintiff may recover the value of the transfers avoided in Section V.E.5. above, from TKA [164] and M & D [165] as initial transferees, and

163. There is no equivalent to Section 547 of the Bankruptcy Code in Florida Statutes (although transfers avoided pursuant to Section 726.106(2) are occasionally referred to as preferences in the case law). The plaintiff neither asserted nor prosecuted any claim for relief under state law on a theory that the transfers at issue were preferential.

164. The court determines TKA's liability as follows:

Fraudulent transfers within one year of the filing of Toy King II:

| Liberty Loan Interest | Nintendo Loan Interest | C & S Loan Interest | C & S Guaranty Fees |
|---|---|---|---|
| $8,632.12 | $2,479.22 | $2,231.26 | $20,283.22 |

| Liberty Loan Principal | Nintendo Loan Principal | C & S Loan Principal | |
|---|---|---|---|
| $600,000.00 | $700,000.00 | $250,000.00 | |

165. The court determines M & D's liability as follows:

Fraudulent transfers within one year of the filing of Toy King II:

Liberty,[166] Morrow,[167] Angle, and Woodward as subsequent transferees.

### F. *OTHER STATE LAW CLAIMS.*

#### 1. *Introduction: Section 544.*

The unsecured creditors committee seeks relief on a number of state law theories pursuant to Section 544(b) of the Bankruptcy Code. Section 544(b) provides that the trustee, or the committee in this case, "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title."

The unsecured creditors committee seeks money damages or equitable relief on a variety of state law claims.[168] The committee asserts that Liberty, TKA, and M & D breached the confirmed plan. The committee asserts that the individual defendants caused the debtor to make dividend distributions to the debtor's shareholders at a time when it was insolvent. The committee asserts that the individual defendants breached their fiduciary duties to the debtor. The committee asserts that Liberty aided and abetted the individual defendants in their breach of fiduciary duties to the debtor. The committee seeks to discharge the debtor's contingent liability as guarantor on the Liberty loan on the ground that the Nintendo loan increased the debtor's risk on that loan. The committee also urges claims of contribution and subrogation against the individual guarantors and Liberty on the basis of the debtor's payments on the Liberty and Nintendo loans. Finally, the committee seeks to recover damages for the debtor's payments of rent and salary expenses prior to the filing of Toy King II that were for the benefit of non-debtor companies or in excess of the value received.

#### 2. *Breach of the Toy King I confirmed plan.*

##### a. *Introduction.*

The unsecured creditors committee seeks to recover money damages from Liberty, TKA, and M & D for various alleged breaches of the confirmed plan. General principles of contract law apply to these claims regardless of whether the claims arise under Florida state law or federal common law. Accordingly, to recover on a claim for breach of contract, the plaintiff must prove by a preponderance of the evidence the existence of the contract, a breach of that contract, and damages flowing from the breach. *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).

A confirmed plan is a contract, approved by the court, that involves

| | M & D interest & "profit" | M & D Principal |
| --- | --- | --- |
| | July 6, 1989 | December 29, 1989 |
| | $17,499.38 | $294,382.00 |

**166.** The court determines Liberty's liability as follows:

Fraudulent transfers within one year of the filing of Toy King II:

| Liberty Loan Principal | Nintendo Loan Principal |
| --- | --- |
| $600,000.00 | $700,000.00 |

**167.** The court determines Morrow, Angle, and Woodward's liability as follows:

Fraudulent transfers within one year of the filing of Toy King II:

| | Guaranty fees | M & D principal interest, & "profit" |
| --- | --- | --- |
| Morrow | $6,761.08 | $288,303.46 * |
| Angle | 6,761.08 | 8,303.46 ** |
| Woodward | 6,761.08 | 10,892.46 *** |

\* This amount represents M & D's payment to Morrow of interest and "profit" on July 6, 1989, $8,303.46, plus its payment of $280,000 on or after December 29, 1989.

\*\* This amount represents M & D's payment to Angle of interest and "profit" on July 6, 1989.

\*\*\* This amount represents M & D's payment to Woodward of interest and "profit" on July 6, 1989, $892.46, plus its payment of $10,000 on or after December 29, 1989.

**168.** The unsecured creditors committee's claims of fraudulent transfers and associated liability under Florida law have been determined in Sections V.D. and V.E. *supra.*

matters of offer, acceptance, performance, and other contract principles. *In re RBS Industries, Inc.*, 115 B.R. 419, 421 (Bankr. D.Conn.1990); *In re L & V. Realty Corp.*, 76 B.R. 35, 37 (Bankr.E.D.N.Y.1987). *See also Townsend*, 187 B.R. at 235 ["Confirmation of a chapter 11 plan discharges the debts provided for in the plan and creates new contractual rights between the Debtor and the creditors based on the provisions of the confirmed plan."]. As the court wrote in Section V.B.1. above, a breach of the confirmed plan is actionable if the responsibility for the breach can be laid at the door of one or more of the defendants in this proceeding because each is a party to the confirmed plan. The confirmed plan is binding on all parties even if it is contrary to bankruptcy law, unless confirmation is successfully appealed, revoked, or otherwise set aside. *In re Sullivan*, 153 B.R. 746, 751 (Bankr.N.D.Tex.1993). No party sought to modify, revoke, or set aside the confirmed plan. It therefore became a final and binding contract. Accordingly, the court determines that the plaintiff has established the first element of its breach of contract claims.

The committee seeks damages for a myriad of breaches of the Toy King I confirmed plan by Liberty, TKA, and M & D. In this regard, it is helpful to remember that the court has authorized the committee to bring the debtor's claims against others on the debtor's behalf. Thus, it is the debtor's breach of contract claims that the committee asserts rather than the committee's or creditors' own claims. In certain circumstances, the debtor's claims—as a trustee under the Bankruptcy Code—are derived from creditors, and thus the claims of the debtor and the creditors are sometimes identical. In the circumstance of common law claims, such as breach of contract, however, the debtor's claims arise only from its position as an entity and not derivatively from creditors. Although the committee is bringing the debtor's breach of contract claims, the claims it asserts are defined by the debtor itself rather than by creditors generally.

### b. *Did Liberty breach the confirmed plan?*

#### i. *Introduction.*

The plaintiff asserts that Liberty breached the confirmed plan in two ways. First, the plaintiff says that Liberty breached the confirmed plan when it made the Liberty loan despite the debtor's lack of $2 million in equity and the bank's lack of an opinion letter by Touche Ross attesting to the debtor's net worth. Second, the plaintiff asserts that Liberty breached the confirmed plan when it made the Nintendo loan.

#### ii. *Making the Liberty loan.*

As determined in Section V.B.1. above, the confirmed plan included the terms of the commitment letter. Liberty was bound, therefore, to abide by all material provisions of the commitment letter regardless of whether those provisions were ultimately incorporated into the final loan documents when Liberty made the loan. The commitment letter required that TKA obtain an opinion letter from Touche Ross that verified the debtor's equity immediately following the Toy King I confirmation. The Touche Ross opinion letter was a precondition to the Liberty loan.

It is without dispute that Liberty made the Liberty loan without requiring that TKA obtain an opinion letter from Touche Ross. This was clearly a breach of the confirmed plan. Although the plaintiff has not fully articulated its theory of damages for this breach, the plaintiff generally asserts that Liberty's breach of the confirmed plan caused the debtor to incur trade debt that it could not pay. Thus, the plaintiff appears to be making the following argument: Liberty had a contractual obligation to ensure that the debtor was adequately capitalized to the extent of $2 million before it funded the Liberty loan. Had Liberty performed that obligation, it would have ascertained that the debtor was inadequately capitalized and would have rightfully refused to make the loan. *See End of the Road Trust on behalf of*

*Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168 [violation of net worth covenant constitutes a material default]. *See also Johnson v. American National Insurance Co.*, 126 Ariz. 219, 613 P.2d 1275, 1278 (1980)["Courts have generally treated the terms and conditions of a loan commitment as conditions precedent to the lender's obligation to perform."]. Without the Liberty loan funds, the debtor would have been unable to make its plan payments under the confirmed plan and would have liquidated rather than continue in operation. As a consequence, the debtor would not have incurred additional trade debt. The plaintiff thus seeks damages in the amount of the debtor's unpaid trade debt at the time Toy King II was filed.

▮▮▮ "The judicial remedies available against one who has committed a breach of contract are damages, restitution and specific performance." *Beefy Trail, Inc. v. Beefy King International, Inc.*, 267 So.2d 853, 856 (Fla. 4th DCA 1972). The plaintiff in this case does not seek restitution or specific performance. Instead, the plaintiff seeks damages.

▮▮▮ "The purpose of damages is to put the injured party in as good a position as he would have occupied had the contract been fully performed." *Id.* at 857. In *Beefy Trail*, the court explained the alternatives by which a non-breaching party can be made whole as follows:

If a party seeks the remedy of damages two alternative methods for determining recovery are available: (1) he may prove the gains he would have made had the defendant performed in full as the contract required subtracting therefrom the costs of the operations necessary to realize those gains, i.e., the injured party may seek lost profits and in such case the interest he seeks to protect is his "expectation interest"; (2) he may omit an attempt to show lost profits and prove instead his actual expenditures made before the repudiation or nonperformance by the defendant insofar as those expenditures were reasonably to have been foreseen, i.e., expenditures made in preparation for performance or in part performance and in such case the interest the plaintiff seeks to protect is his "reliance interest".

*Id.* at 856.

The plaintiff's theory fits most readily into the category of reliance damages.[169] The plaintiff suggests that the debtor incurred trade debt in reliance on Liberty's performance of all of its obligations under the commitment letter, including verification of the debtor's net worth.[170] This position is patently untenable for several reasons.

First, the debtor had direct knowledge of its financial condition that was indepen-

---

169. The debtor did not have a profit expectancy with respect to its receipt of the Liberty loan proceeds. The debtor expected to pay its obligations under the TKI confirmed plan and to maintain its operations with an anticipated loss for the 1989 fiscal year. Even if the debtor did have a profit expectancy, it could not show that Liberty thwarted that expectancy when Liberty failed to verify the debtor's net worth. The debtor's profit expectancy, if any, was premised on Liberty's funding of the Liberty loan and thus enabling the debtor to continue in operation rather than from the presence or absence of an opinion letter. Stated another way, the debtor's profit expectancy depended on its actual worth, including monies coming from the Liberty loan, rather than on an opinion of its worth.

170. The net worth covenant contained in the commitment letter was not intended to benefit the debtor. Rather, it was there for Liberty's protection to ensure that the ultimate beneficiary of the loan proceeds was a financially viable and creditworthy operation. The net worth covenant was also there for the debtor's trade creditors' benefit. Because the commitment letter was incorporated into the debtor's confirmed plan, the debtor's trade creditors were justified in their reliance on Liberty's adherence to all of the terms of the commitment letter, including the net worth covenant.

dent of any Touche Ross opinion letter. Indeed, the information that Touche Ross would have used in drafting an opinion letter was information that would of necessity come from the debtor. The debtor knew better than anyone, therefore, that it was inadequately capitalized and in a precarious financial position. The debtor did not rely upon Liberty for verification of its financial condition.

Second, even if the debtor relied upon Liberty to fully perform all its obligations set forth in the commitment letter and operated its business under that premise, the debtor knew on June 18, 1989, that Liberty would not in fact require the opinion letter. The debtor, therefore, could not have continued to reasonably rely on Liberty's performance after the loan was closed and the proceeds were distributed. Stated another way, the debtor's trade debt incurred after the Liberty loan closed would not qualify as "actual expenditures made before the repudiation or nonperformance" by Liberty. *Id.*

Third, even if the debtor were entitled to recover its unpaid trade debt as reliance damages for Liberty's breach of contract, the debtor would be limited in its recovery because the debtor failed in its obligation to mitigate its damages. *See, e.g., Graphic Associates, Inc. v. Riviana Restaurant Corp.*, 461 So.2d 1011, 1014 (Fla. 4th DCA 1984)[The "duty to mitigate damages, prevents a party from recovering those damages inflicted by a wrongdoer which the injured party 'could have avoided without undue risk, burden, or humiliation.' " (*quoting Restatement (Second) of Contracts* § 305(1) (1979) ]). If the debtor relied upon Liberty to confirm that it had an adequate degree of equity to permit it to incur debt without concern for default, then it could have and should have refused to incur such debt when it became apparent that Liberty would not confirm the debtor's equity.

Finally, the court notes that Liberty performed all of its other obligations on its loan commitment. Most importantly, Liberty provided to TKA and ultimately the debtor the monies that were to be loaned under the Liberty loan commitment. All parties agree that the debtor used these monies to pay its Toy King I plan dividends and to fund its ongoing business operations. The debtor, having enjoyed the fruits of the bargain with Liberty, now complains that the deal should not have been consummated at all. The difficulty in successfully advancing this position is evidenced by the absence of a single published case the parties have cited or the court could find in which a plaintiff complains that a bank made a loan to it and should not have.[171]

For all these reasons, therefore, the court concludes that the plaintiff has failed to prove that Liberty damaged the debtor when it breached the confirmed plan by closing the Liberty loan without requiring or obtaining an opinion letter from Touche Ross. Although Liberty should have obtained an opinion letter, its failure to do so did not damage the debtor.[172]

The court concludes, therefore, that the plaintiff's claim for damages for Liberty's

---

171. In contrast, one can find a multitude of published cases in which an aggrieved plaintiff seeks damages as a consequence of a bank's failure to make a promised loan. *See, e.g., United of Omaha Life Insurance Co. v. Nob Hill Associates*, 450 So.2d 536, 539 (Fla. 3d DCA 1984); *Capital National Bank (Peoples Downtown National Bank v. Southern Pine Isle Corp.)*, 353 So.2d 600, 602 (Fla. 3d DCA 1977); *Financial Federal Savings and Loan Association of Dade County v. Continental Enterprises, Inc.*, 338 So.2d 907, 908 (Fla. 3d DCA 1976).

172. As the court wrote in Section V.D.2. *supra,* the trade creditors relied upon Liberty's due diligence and were adversely affected by Liberty's negligence in making the Liberty loan. The plaintiff has successfully pursued claims on behalf of the trade creditors through its preference and fraudulent transfer claims in which Liberty has been held to account for its failures. *See* Section V.E.4. *supra.* Those claims, of course, sound in tort rather than contract and different legal principles apply.

breach in not requiring an opinion letter fails.

### iii. *Making the Nintendo loan.*

 The second breach of which the plaintiff complains is Liberty's making of the Nintendo loan. The plaintiff asserts that Liberty made the Nintendo loan without court approval and in violation of the confirmed plan. Liberty does not dispute that it did not seek court approval of the Nintendo loan but argues that no such approval was required.

 A reorganized debtor is not subject to the control of the court after confirmation unless the confirmed plan specifically provides for such control. *John G. Berg Associates, Inc. v. Township of Pennsauken (In re John G. Berg Associates, Inc.)*, 138 B.R. 782, 786 (Bankr.E.D.Pa. 1992) ["A bankruptcy is not 'forever;' after confirmation, a debtor must normally 'go about its business without further supervision or approval' from the bankruptcy court." (*quoting Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir.1991)) ].

In this case, the debtor's plan in Toy King I provided for the debtor's payment of its prepetition claims through dividend payments to each unsecured creditor in an amount that represented 17.5 percent of each creditor's total allowed claim. The plan itself made no specific provision for or restriction of the debtor's operation of its ongoing business. The plan reserved the court's jurisdiction only for the purpose of enforcing the terms of the plan. Nothing in the plan purported to limit Liberty's post-confirmation lending. The commitment letter, incorporated into the confirmed plan, prohibited the debtor and

TKA from borrowing from a source *other than* Liberty without Liberty's written consent.[173]

More importantly, Liberty did not make a loan to the debtor, it made a loan to TKA. Because nothing in the confirmed plan prohibited Liberty from lending additional amounts to TKA, Liberty did not breach the confirmed plan when it made the Nintendo loan.[174]

### iv. *Conclusion.*

For these reasons, the court concludes that the plaintiff has failed to establish any contract claim as against Liberty.

### c. *Did TKA breach the confirmed plan?*

#### i. *Introduction.*

The plaintiff asserts that TKA breached the confirmed plan in three ways. First, the plaintiff says that TKA breached the confirmed plan when it failed to contribute $1 million of the Liberty loan as a capital infusion in the debtor. Second, the plaintiff asserts that TKA breached the confirmed plan when it required the debtor to pay loan fees and costs on the Liberty loan. Third, the plaintiff argues that TKA breached the confirmed plan by taking distributions or bonuses from the debtor, disguised as additional interest and guaranty fees, that the commitment letter prohibited.

#### ii. *Failing to make a $1 million capital contribution.*

 The committee says that TKA first breached the confirmed plan when it failed to use $1 million of the Liberty loan proceeds to make a capital infusion into

---

**173.** For example, subsequent to the Toy King I confirmation, TKA obtained Liberty's written consent to borrow against the C & S line of credit.

Although not raised in this proceeding, the terms of the commitment letter prohibited the debtor from borrowing from TKA absent Liberty's consent.

**174.** The court notes that, even had Liberty breached the confirmed plan in making the

Nintendo loan, the committee has failed to provide any evidence of quantifiable damage to the debtor flowing from Liberty's making of the Nintendo loan. The debtor was not the obligor on the Nintendo loan. The debtor was simply a guarantor and, because TKA paid the Nintendo loan in full prior to the filing of Toy King II, the debtor was never called upon by Liberty to perform its obligations under the guaranty.

the debtor. TKA argues in defense that the confirmed plan did not require any such capital infusion. To be sure, the Toy King I plan of reorganization itself contained no provision for capitalizing the debtor, other than the $10,000 stock subscription. As stated previously in Section V.B.1. above, however, the provisions of the commitment letter constituted terms of the confirmed plan. The commitment letter required TKA to use $500,000 of the Liberty loan proceeds for the sole purpose of making a capital contribution into the debtor.[175] Clearly, therefore, the confirmed plan required that TKA make a capital contribution to the debtor in at least that amount.

The plaintiff argues that TKA was bound by the confirmed plan to contribute at least $1 million. In making this claim, the committee points to the Touche Ross pro forma, the debtor's balance sheets, and the debtor's dealings with its creditors. It is certainly true that the Touche Ross pro forma and the debtor's balance sheets reflected that $1 million of the Liberty loan was provided as capital to the debtor. It is also undoubtedly true, as discussed in Section V.D.2. above, that creditors of the debtor relied upon the debtor's representations of its net worth, including that of a $1 million capital contribution, in their financial dealings with the debtor. While these facts may be relevant to a claim based upon fraud as the court discussed in Section V.D.2. above, they are irrelevant to an action for breach of contract where the terms of the contract must define the parties' obligations. Of necessity, the terms of the contract involved in this breach of

contract claim are limited to the terms of the confirmed plan; that plan required TKA to contribute only $500,000 of the Liberty proceeds to the debtor as equity.[176] Accordingly, the court concludes that TKA breached the confirmed plan only to the extent that it failed to make a capital contribution to the debtor of $500,000 of the Liberty loan proceeds.

TKA's failure to make this $500,000 capital contribution adversely affected the debtor's ability to operate. Because TKA loaned the money to the debtor, rather than make it available as equity, the debtor was required to make monthly interest payments to TKA and ultimately to repay the principal. The debtor was thus burdened with loan repayments at an unnecessarily high interest rate that continued to drain its already stretched resources and exacerbated its liquidity problems. In addition, the debtor committed its inadequate monies to repay a debt that should have been subordinate to the claims of the unsecured creditors.

Accordingly, the court concludes that the plaintiff has established by a preponderance of the evidence that TKA breached the confirmed plan when it failed to make $500,000 of the Liberty loan available to the debtor as equity. The court further concludes that the plaintiff has established by a preponderance of the evidence that TKA damaged the debtor by this breach of the confirmed plan in the amount of $531,509.47, representing the $500,000 TKA loaned to the debtor and that the debtor repaid and $31,509.17 representing the interest that TKA collected from the debtor on the $500,000.[177]

---

**175.** The commitment letter also provided that, in the event the initial $1 million letter of credit was repaid and additional monies were loaned under that line, any extensions on the line were to be made available to the debtor as a capital contribution.

**176.** The commitment letter contemplated that Liberty would advance $1 million of the Liberty loan proceeds through a letter of credit to the debtor for the *sole purpose* of paying creditors' claims pursuant to the confirmed plan.

The plan itself contemplated that these payments—or dividends—would be paid by borrowings of the debtor, either from TKA or another source. Although the debtor's balance sheet did show some of this money as equity in the debtor, it was not required by the plan.

**177.** The court calculated this amount by adding together all of the interest that the debtor paid to TKA on Notes 1, 2, 3, 4, 8, and 15

### iii. *Charging fees and costs on the Liberty loan.*

 The committee asserts as TKA's second breach of the confirmed plan its charge to the debtor of the Liberty loan fees and costs. The commitment letter clearly states that TKA, and not the debtor, is responsible for all fees and costs associated with the Liberty loan. If the debtor paid these fees to Liberty on TKA's behalf, then that perhaps would be a breach of the confirmed plan. That is not, however, what occurred. Liberty deducted the loan fees and costs from the principal in its first disbursement to the debtor. TKA remained obligated to Liberty, however, for the full amount of the Liberty loan, including these loan fees and costs. TKA, in turn, included an amount denominated as loan fees and costs in the principal due from the debtor on its obligations to TKA. The debtor paid loan fees and costs to TKA on its own obligations, therefore, rather than to Liberty on the Liberty loan. Accordingly, the court concludes that TKA did not breach the confirmed plan when it collected loan fees and costs from the debtor.

### iv. *Charging interest upcharges and guaranty fees.*

 As its third claim of breach of contract, the committee asserts that TKA breached the confirmed plan when it collected interest upcharges and guaranty fees from the debtor. The committee also asserts that TKA breached the confirmed plan when it paid over to Morrow, Angle, and Woodward the guaranty fees it collected from the debtor. The committee argues that these charges and payments are in fact disguised dividends or bonuses and thus prohibited by the confirmed plan. As the court wrote in Section IV.D.4. above, the commitment letter prohibited TKA and the debtor from making dividend or bonus distributions without Liberty's consent

other than for the purpose of making payments on the Liberty loan.

The disbursements about which the plaintiff complains are these prohibited distributions. Yet the plaintiff is bringing the debtor's breach of contract claims in this adversary proceeding, not its own claims.[178] With regard to this breach of contract claim, the debtor is in essence the plaintiff and therefore complains about its own actions. Perhaps this might make intellectual sense if the plaintiff committee had asserted that the debtor and TKA were a single enterprise on an alter ego basis or if the committee had sought to pierce TKA's corporate veil to hold TKA liable for these acts of the debtor. None of the parties to this proceeding, however, tried the case on such a basis. Indeed, the court, based upon the positions urged by the parties, has carefully distinguished between the debtor and TKA, has analyzed their positions separately, and has not treated them as a single entity. In this proceeding, therefore, the plaintiff—bringing the debtor's claims against others— cannot be heard to assert claims against the debtor itself. For these reasons, the plaintiff's claim of breach on account of the debtor's payment of monies contrary to the terms of the confirmed plan must fail. Accordingly, the court need not decide whether the debtor's payments of interest upcharges and guaranty fees were made in violation of the confirmed plan.

 TKA did, however, itself make pro rata payments to Morrow, Angle, and Woodward of the guaranty fees that it collected from the debtor. Because it is undisputed that Liberty did not consent to TKA making any distributions other than to pay the Liberty loan, TKA breached the confirmed plan if these payments were dividends or bonuses. Morrow, Angle, and Woodward defend TKA's payment of the guaranty fees as a cost of borrowing money from C & S. They claim that they

---

between the dates of May 30, 1989, and December 28, 1989. *See* note 57 *supra.*

**178.** The court specifically authorized the plaintiff committee to do this.

guarantied the C & S obligation and in turn TKA paid them a fee for their assumption of risk on that debt.

 "A 'dividend' has been defined as a payment to the stockholders as a return upon their investment." *Alliegro v. Pan American Bank of Miami,* 136 So.2d 656, 660 (Fla. 3d DCA 1962). Whether a payment constitutes a dividend is a "question of fact to be determined by the Court and no one factor is determinative." *Dunn v. United States,* 259 F.Supp. 828, 835 (W.D.Okla.1966)(*citing Goldstein v. Commissioner of Internal Revenue,* 298 F.2d 562, 566 (9th Cir.1962)).

██ In this case, TKA did not identify its payments to Morrow, Angle, and Woodward as dividends. It instead called them guaranty fee payments. However, "[i]t has been universally recognized that the mere fact that the distributions are not called 'dividends' by the board of directors of the corporation does not detract from such distributions being dividends within the meaning of the law." *Alliegro,* 136 So.2d at 660.

██ TKA did not pay guaranty fees to all of its shareholders, nor were the payments proportionate to the recipients' pro rata share in the corporation. A disproportionate payment does not, however, preclude the payment from being identified as a dividend payment.[179] *Id.* at 660–61 (*citing Lincoln National Bank v. Burnet,* 63 F.2d 131, 133 (D.C.Cir.1933)).

After considering the totality of the circumstances, the court concludes that TKA's payments of guaranty fees to Morrow, Angle, and Woodward were indeed disguised dividends or bonuses prohibited by the confirmed plan. Two facts are especially telling in the court's view. First, the debtor and TKA made guaranty fee payments during times when the underlying debt was paid in full and the individual guarantors were not at risk. Second, in September 1989, TKA increased the amount of the guaranty fees it paid to Morrow, Angle, and Woodward even though there was no change in the underlying debt.[180] Taken in the context of the self-dealing by the individual defendants and TKA and the overall financial situations of the debtor and TKA described at length in this decision, these two facts weigh heavily in favor of a conclusion that, when TKA made its guaranty fee payments to Morrow, Angle, and Woodward, it was distributing its "profits" rather than remunerating specific shareholders for their participation as guarantors.

██ The court concludes, therefore, that TKA breached the confirmed plan when it made payments of guaranty fees to Morrow, Angle, and Woodward without Liberty's consent. The plaintiff must next demonstrate that this breach of contract damaged the debtor. Although TKA's wrongful payment of dividends to its insiders resulted in a direct diminution of monies in TKA, the debtor did not make these payments and the debtor was not diminished in any way by these payments. As a matter of law, therefore, the debtor suffered no damage as a proximate cause of these payments by TKA. This failure to establish the element of damage defeats the plaintiff's claim of breach for the payment of these disguised dividends. The court concludes, therefore, that the plaintiffs cannot prevail on this claim.

v. *Conclusion.*

In summary, the court concludes that TKA breached the confirmed plan by failing to make the $500,000 capital contribution in the debtor and by charging

---

**179.** Although not germane to the issues in this case, the court notes that, when a corporation distributes a dividend to its shareholders that is disproportionate to their equity interests, it may be an illegal dividend. *See generally, Alliegro,* 136 So.2d at 659–61.

**180.** TKA increased the guaranty fees as a response to the worsening condition of the debtor which, although not formally or legally obligated on the C & S note, was the source of the monies used to make the payments to C & S.

$31,509.17 in interest on the $500,000 loan. The plaintiff is therefore entitled to recover this $531,509.17. The plaintiff's other attacks on TKA for alleged plan breaches are meritless.

### d. Did M & D breach the confirmed plan?

The plaintiff asserts that M & D breached the confirmed plan when it required the debtor to pay interest and "profit" to M & D in the amount of $17,499.38 on July 6, 1989. In addition, the plaintiff asserts that M & D breached the confirmed plan when it received the final payment in the amount of $301,006.17 from the debtor in satisfaction of the M & D subordinated note made in derogation of the confirmed plan.

The plaintiff's breach of contract claims as to this defendant must fail for the same reason as the court stated in Section V.F.2.c.iv. above. It was the debtor, rather than M & D, who made the payments in contention here. The plaintiff does not seek in this proceeding to invoke the alter ego doctrine to pierce the corporate veil between M & D and the debtor. The court, therefore, cannot hold M & D liable for the debtor's actions on a breach of contract theory. As a consequence, the court need not address the issue of whether the debtor's payments of interest and "profit" on July 6, 1989, or payment of the subordinated note on December 29, 1989, were in violation of the confirmed plan.

### e. Summary.

Based upon the foregoing, the plaintiff has proven by a preponderance of the evidence that TKA breached the confirmed plan when it failed to make available $500,000 of the Liberty loan as a capital contribution to the debtor. The plaintiff has also established by a preponderance of the evidence that TKA damaged the debtor in the amount of $531,509.17 through this breach of the confirmed plan.

The plaintiff has failed to prove by a preponderance of the evidence, however, that TKA breached the confirmed plan when it charged the debtor for loan fees and costs in connection with its obligations to TKA. The plaintiff has also failed to prove by a preponderance of the evidence that TKA damaged the debtor when it made dividend distributions to Morrow, Angle, and Woodward denominated as guaranty fees.

Similarly, the plaintiff has failed to prove by a preponderance of the evidence that Liberty breached the confirmed plan and/or damaged the debtor when it made the Liberty and Nintendo loans to TKA.

The plaintiff has also failed to prove by a preponderance of the evidence that M & D breached the confirmed plan when the debtor paid it interest and "profit" in excess of the amount allowed in the confirmed plan. Finally, the plaintiff has failed to prove by a preponderance of the evidence that M & D breached the confirmed plan when the debtor satisfied the M & D note in derogation of the confirmed plan.

### 3. Payment of dividends by an insolvent corporation.

■ The unsecured creditors committee seeks to recover damages from Morrow, Angle, and King on a theory that, in violation of Section 607.06401, Florida Statutes, the debtor made impermissible dividend distributions disguised as guaranty fees and interest upcharges to its shareholders at a time when the debtor was insolvent. Section 607.06401(3), Florida Statutes, provides that:

No distribution may be made if, after giving it effect:

(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential

rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

The first issue that the court must decide is whether the debtor's payments to TKA of guaranty fees and interest upcharges were in fact disguised dividends. The court determined in Section V.F.2.c.iv. above that TKA paid to its shareholders dividends disguised as guaranty fees. For the reasons stated in that section, the court determines that the debtor's payment of these guaranty fees to TKA were also disguised dividends.

The court found in Section V.D.2.a.iv.(4) and V.D.3.a. above that the debtor did not receive an equivalent value for its payment to TKA of interest upcharges. The court determined that the interest upcharges served no legitimate business purpose and were instead a means for the debtor to distribute monies to its shareholder, TKA. Accordingly, the court concludes that the debtor's payments of interest upcharges to its shareholder, TKA, were disguised dividends.

The court must next determine whether the debtor's payments of dividends disguised as guaranty fees and interest upcharges were impermissible dividend payments. In Sections V.C.2.e. and V.C.3.c. above, the court found that the debtor was insolvent at all times between the confirmation of Toy King I and the filing of Toy King II. Accordingly, the plaintiff has satisfied its burden of persuasion by a preponderance of the evidence that each and all of the debtor's payments to TKA of guaranty fees and interest upcharges were impermissible dividends within the meaning of Section 607.06401, Florida Statutes.

Section 807.0831, Florida Statutes, provides the statutory framework by which

recovery may be sought from a corporation's directors for the wrongful payment of dividends. That statute, along with Section 809.0830, Florida Statutes, forms the basis for a director's fiduciary duty to the corporation. The plaintiff's claims of breach of fiduciary duties are dealt with in the next section. Accordingly, the court will determine Morrow, Angle, and King's liability for the debtor's impermissible payments of dividends there.

### 4. Breach of fiduciary duties.

#### a. Introduction.

The unsecured creditors committee seeks to recover money damages from all individual defendants on the theory that they breached their fiduciary duties as set forth in Section 607.0830, Florida Statutes. Section 607.0830 sets general standards for directors of corporations.[181] The court will therefore measure the conduct of the debtor's officers and directors by these standards.

#### b. Woodward, Hunsaker II, Hunsaker III, and Ranney.

Woodward, Hunsaker II, Hunsaker III, and Ranney were neither officers nor directors of Toy King. They are not accountable, therefore, as fiduciaries of the debtor under Section 607.0830, Florida Statutes. Accordingly, the plaintiff cannot prevail on its claims for breach of fiduciary duties as to Woodward, Hunsaker II, Hunsaker III, and Ranney.

#### c. Morrow, Angle, and King.
##### i. Introduction.

Morrow, Angle, and King were officers and directors of the debtor. Morrow was

---

**181.** Although the statute is not specifically directed to corporate officers, the case law makes clear that both officers and directors of a corporation owe fiduciary duties to the corporation. *See, e.g., Sea Pines,* 692 F.2d at 977; *Tinwood v. Sun Banks, Inc.,* 570 So.2d 955, 959 (Fla. 5th DCA 1990); *Snyder Electric,* 305 N.W.2d at 869. *Cf. Steinberg v. Ken-*

*dig (In re Ben Franklin Retail Stores, Inc.),* 2000 WL 28266 (N.D.Ill.) ["Although Delaware courts have found that officers owe fiduciary duties to the corporation, this Court has found that the only instances where such a duty is found are where the circumstances involved self-dealing."].

both an officer and director of the debtor for a period that preceded the filing of Toy King I and ran through the confirmation of Toy King II. Morrow, therefore, was a fiduciary at all relevant times.

 Angle was also an officer and director of the debtor during the pendency of Toy King I. Angle resigned his positions with the debtor and sold his interest in TKA to Morrow, however, on December 23, 1989. Absence or resignation does not necessarily sever a fiduciary's duty to the corporation. *Federal Deposit Insurance Corp. v. Barton,* 1998 WL 169696 at *5 (E.D.La.). Once the director or officer has sold and transferred his stock, however, the director or officer no longer owes a continuing fiduciary duty to his corporation. 18A Am.Jur.2d *Corporations* § 769 (1985). Accordingly, Angle's fiduciary duties to the debtor ceased on December 23, 1989, when he sold his interest in TKA to Morrow and resigned as an officer and director of the debtor.

King was an officer and director of the debtor during the pendency of Toy King I and through the filing of Toy King II. He was also, therefore, a fiduciary of the debtor at all relevant times.

ii. *The duties of care and loyalty.*

Morrow, Angle, and King each owed fiduciary duties to the debtor and are subject to the mandates of Section 607.0830, Florida Statutes. This statute provides that:

(1) A director shall discharge his or her duties as a director ...

(a) In good faith;

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(c) In a manner he or she reasonably believes to be in the best interests of the corporation.

These fiduciary duties are generally described as the duties of care and the duty of loyalty, and they are similar in their basic essentials under the law of most states. "Each of these duties is of equal and independent significance." *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 367 (Del.1993).

In *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989), the court explained the importance of an officer or director's fiduciary duties of care and loyalty as follows:

It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders ....

The fiduciary nature of a corporate office is immutable ....

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its shareholders .... This rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Id.* (*quoting Guth v. Loft,* 5 A.2d 503, 510 (Del.1939)).

 Generally, an officer or director owes fiduciary duties exclusively to the corporation's shareholders. When a corporation becomes insolvent, however, the officer or director's fiduciary duties shift to the creditors of the corporation. *Guaranty Trust & Savings Bank v. United States Trust Co.,* 89 Fla. 324, 103 So. 620, 622 (1925) ["The directors ... of an insolvent corporation occupy toward the creditors of the corporation a fiduciary relation ...."]. *See also Federal Deposit*

*Insurance Corp. v. Sea Pines Co.*, 692 F.2d 973, 976–77 (4th Cir.1982) [when a corporation becomes insolvent, "the fiduciary duty of the directors shifts from the stockholders to creditors"]; *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 824 (W.D.Pa. 1997) [upon insolvency fiduciary duty of insider extended to creditors]; *Brandt v. Hicks, Muse & Co. (In re Healthco International, Inc.)*, 208 B.R. 288, 300 (Bankr. D.Mass.1997) ["When a transaction renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors become paramount."]; *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787–88 (Del.Ch.1992) ["[T]he fact of insolvency . . . causes the duty to creditors [to] arise"]. The shift in fiduciary duties from the shareholders to the creditors that occurs upon the insolvency of the corporation is sometimes referred to as the "insolvency exception."

In *Steinberg v. Kendig (In re Ben Franklin Retail Stores, Inc.)*, 225 B.R. 646, 653 (Bankr.N.D.Ill.1998), *aff'd in part and rev'd in part*, 2000 WL 28266, the court explained the "insolvency exception" as follows:

> The economic rationale for the "insolvency exception" is that the value of creditors' contract claims against an insolvent corporation may be affected by the business decisions of managers. At the same time, the claims of the shareholders are (at least temporarily) worthless. As a result it is the creditors who "now occupy the position of residual owners."

*Id.* (*quoting* Christopher W. Frost, "The Theory, Reality and Pragmatism of Corporate Governance in Bankruptcy Reorganizations", 72 *The Am.Bankr.L.J.*, 103, 108 (1998)).

■ In *Ben Franklin Retail Stores*, the court noted that "[t]he possibility of insolvency can do curious things to incentives, exposing creditors to risks of opportunistic behavior, and creating complexi-

ties for directors." *Id.* at 654 (*quoting Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 WL 277613 (Del.Ch. Dec.30, 1991) at *34 fn. 55). At a minimum, an officer or director of an insolvent corporation is precluded from preferring himself to the detriment of creditors in his dealings with the corporation. *Whitley v. Carolina Clinic, Inc.*, 118 N.C.App. 523, 455 S.E.2d 896, 899 (1995).

■ In this case, the debtor was insolvent at all times between the confirmation of Toy King I and the filing of Toy King II. Morrow, Angle, and King, therefore, owed fiduciary duties to the debtor's creditors during this period. The committee asserts that Morrow, Angle, and King breached their fiduciary duties of both care and loyalty.

■ The debtor-in-possession, as a trustee, has standing to bring these claims against the debtor's fiduciaries. *See Healthco International*, 208 B.R. at 300, where the court stated that:

> The Trustee can bring any suit Healthco could have brought, including suits against directors and controlling shareholders for breach of fiduciary duty. In complaining that directors authorized a transaction which unduly weakened Healthco, the Trustee is not asserting the claims of creditors. He alleges Healthco was the victim of poor management causing damage to the corporation which necessarily resulted in damage to its creditors by diminishing the value of its assets and increasing its liabilities.

*See also Mims v. Kennedy Capital Management Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 110 (Bankr. N.D.Tex.1999) ["Officers and directors owe a duty of loyalty to their corporation to act only in the corporation's and its shareholders' best interest."]; *New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 110 N.E.2d 397, 400 (1953); *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813 (Del.1944). In this case, the court has

specifically authorized the committee to bring these claims on the debtor's behalf.

■■■■ An officer or director may be held "strictly accountable and liable if the corporate funds or property are wasted or mismanaged due to their inattention to the duties of their trust." *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980). "Where two or more directors jointly participate in a breach of fiduciary duty, the liability is joint and several." *Id. See also Performance Nutrition*, 239 B.R. at 112.

■■■■ "The duty of the directors of a company to act on an informed basis ... forms the duty of care...." *Cede*, 634 A.2d at 367. The director must "inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties." *Id.*

### iii. *The business judgment rule.*

■■■■ Officers and directors are protected in the performance of their fiduciary duties of care by the "business judgment rule." The "business judgment rule" is a judicially created presumption that an officer or director has exercised due care in the furtherance of his duties. *Mills Acquisition*, 559 A.2d at 1279. "[I]n order to come within the ambit of the rule, directors must be diligent and careful in performing the duties they have undertaken; they must not act fraudulently, illegally, or oppressively, or in bad faith." *Federal Deposit Insurance Corp. v. Stahl*, 89 F.3d 1510, 1516 (11th Cir.1996).

■■■■ The *Stahl* court explained the history of the "business judgment rule" as follows:

> The [business judgment rule] is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges. In this light, the [business judgment rule] may be viewed as a method of preventing a factfinder,

in hindsight, from second-guessing the decisions of directors.

*Id.* at 1517 (Citations omitted). "The rule posits a powerful presumption in favor of actions taken by directors in that a decision made by a loyal and informed board will not be overturned by the courts ...." *Cede*, 634 A.2d at 361.

■■■■ The party "challenging a board decision has the burden at the outset to rebut the rule's presumption." *Id.* "To rebut the rule, [the] ... plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty—good faith, loyalty or due care." *Id.*

■■■■ In Florida, the business judgment rule has been defined by statute. Section 607.0831, Florida Statutes, "will not permit liability for violation of the duties under the standard of care, unless the breach constitutes among other things, a violation of criminal law, a transaction which amounts to self-dealing, or recklessness, conscious disregard for the best interests of the corporation, or willful misconduct." *Federal Deposit Insurance Corp. v. Gonzalez–Gorrondona*, 833 F.Supp. 1545, 1556 (S.D.Fla.1993). Thus, in order to overcome the presumption of the business judgment rule under Florida law, the plaintiff must establish by a preponderance of the evidence that the officer or director has been more than grossly negligent in the exercise of his duty. *Id.*

### iv. *Did they breach their duties of care?*

#### (1) *Introduction.*

In this case, the debtor asserts that Morrow, Angle, and King breached their duties of care in two ways. First, the plaintiff argues that they breached their duties of care by the way they structured the debtor's financial transactions with TKA. Second, the plaintiff argues that they breached their duties of care when they failed to invest the Liberty loan pro-

ceeds in the debtor as a capital contribution. The plaintiff asserts that these breaches of the fiduciary duty of care harmed the debtor and its creditors because they diminished the monies available to the debtor to maintain its operations and pay its rightful debts.

(2) *Causing Toy King to make impermissible dividend distributions or fraudulent financial transactions.*

■■■ The first breach of the fiduciary duties of care about which the plaintiff complains is the way that Morrow, Angle, and King engineered the debtor's financial transactions with TKA. In the pretrial stipulation, the plaintiff framed this claim in the context of the debtor's borrowing through Liberty. The court determined in Section V.B.2. above, however, that the debtor did not borrow money directly from Liberty. Rather, the debtor borrowed from its parent, TKA. Accordingly, it is the financial transactions between the debtor and TKA that must be considered by the court. These transactions include all monies that TKA loaned to the debtor, originating from both Liberty and C & S. They also include the guaranty fees that TKA charged to the debtor on account of the C & S line of credit.

The court determined in Section V.F.3. above that the debtor's payments to TKA of interest upcharges and guaranty fees, in the total amount of $33,625.82, were impermissible dividends within the meaning of Section 607.06401, Florida Statutes.

The court also determined in Sections V.D.2. and V.D.3. above that Morrow, Angle, and King had the actual and constructive intent to hinder, delay, and defraud creditors when they caused the debtor to borrow money from TKA at an inflated interest rate and on inferior terms instead of from another source, such as Liberty, on more favorable terms. The court also determined in those sections that Morrow, Angle, and King had the actual and constructive intent to hinder, delay, and de-

fraud creditors when they caused the debtor to pay guaranty fees to TKA that were not legitimate, reasonable, or necessary costs of the debtor's borrowing.

Through these financial transactions, Morrow, Angle, and King added an additional layer of debt to a corporation that was already suffocated by its liabilities. Their actions constituted willful misconduct, and they were taken in blatant disregard for the best interests of the corporation and its creditors.

As a result of these financial transactions, the debtor was forced to pay to TKA $13,342.60 more in interest and $20,283.22 more in guaranty fees than it would have paid had it borrowed directly from Liberty and C & S.[182] The debtor's unsecured creditors, other than TKA, were damaged by this breach of the fiduciary duty of care because that money was unavailable to the debtor to pay its rightful debts.

In these circumstances, therefore, the plaintiff has met its burden to overcome the presumption of the "business judgment rule" as to these transactions. Morrow, Angle, and King were more than grossly negligent in their actions in authorizing impermissible dividend payments or engineering financial transactions that siphoned monies from the debtor. Accordingly, the court concludes that the plaintiff has established by a preponderance of the evidence that Morrow, Angle, and King breached their fiduciary duties of care by causing the debtor to make these financial transactions. The court further concludes that Morrow, Angle, and King are jointly and severally liable to the plaintiff in the amount of $33,625.82 for these breaches.

(3) *Failing to make the $500,000 capital contribution.*

■■■ The second breach by Morrow, Angle, and King of the fiduciary duties of care that the plaintiff alleges is their failure to invest $500,000 of the Liberty loan in the debtor as a capital contribution. The act that is the subject of complaint here—

**182.** *See* notes 53, 54, 57, and 75 *supra.*

the failure to invest a portion of the Liberty loan in the debtor—is an act that was controlled by the parent, TKA, rather than the debtor. The plaintiff has not sought in this proceeding to invoke the alter ego doctrine to pierce the corporate veil between TKA and the debtor. As described in Section V.F.2.c.iv. above, the actions and decisions of Morrow and Angle, therefore, made while acting in their capacities as officers or directors of TKA, are not relevant to this claim of breach of fiduciary duties to the debtor.[183]

The court therefore concludes that the plaintiff has failed to establish by a preponderance of the evidence that Morrow, Angle, and King breached their fiduciary duties of care by failing to invest $500,000 of the Liberty loan proceeds in the debtor as capital.

### v. *Did they breach their duties of loyalty?*

#### (1) *Introduction.*

An officer or director owes a fiduciary duty of loyalty to the corporation. The duty of loyalty obligates officers and directors to "devote themselves to the affairs of the corporation with a view towards promoting the interests of the corporation." *Bernstein v. Donaldson (In re Insulfoams, Inc.)*, 184 B.R. 694, 707 (Bankr.W.D.Pa.1995). In *Pepper*, 308 U.S. at 311, 60 S.Ct. 238, the Supreme Court described the fiduciary duty of loyalty owed by an officer or director as follows:

> He who is in ... a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot

utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandisement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis.

*Id.*

"Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Cede*, 634 A.2d at 362. "[T]he question of when director self-interest translates into board disloyalty is a fact-dominated question, the answer to which will necessarily vary from case to case." *Id.* at 364.

The committee claims that Morrow and Angle breached their fiduciary duties of loyalty when they acquired the First Union claims during Toy King I for an amount less than the anticipated dividend. The committee asserts that this breach of fiduciary duty harmed the debtor and its creditors because Morrow and Angle usurped a corporate benefit for their own enrichment, denying the debtor the financial benefits of the corporate opportunity.

The committee also asserts that Morrow, Angle, and King violated their fiduciary duties of loyalty when they made transfers to shareholders or to or for the shareholders' benefit at a time when they knew that the debtor was insolvent and could not pay its debts to third parties. Specifically, the plaintiff complains that

---

**183.** Morrow and Angle were officers and directors of both TKA and the debtor. King, however, was an officer and director of the debtor only.

Morrow, Angle, and King breached their fiduciary duties of loyalty in making all payments to TKA and M & D found in this proceeding to be preferential or fraudulent transfers. The committee asserts that these breaches directly or indirectly benefited the officers or directors.

(2) *Acquiring the First Union claims.*

The committee asserts that Morrow and Angle breached their fiduciary duties of loyalty to the debtor and its creditors when they acquired the First Union claims during the pendency of Toy King I for an amount less than the anticipated dividend payment on those claims. The court has described this transaction in Section IV. D.2 above.

▇▇▇▇ In the previous portions of this decision, the court has not made a specific finding of the debtor's insolvency as of April 11, 1989, the date that Morrow and Angle acquired the First Union claims. This date, of course, occurred during the pendency of the Toy King I case. Nevertheless, the law is well settled that during a bankruptcy case the debtor-in-possession owes a fiduciary duty to the "entire community of interests in the corporation—creditors as well as stockholders." *Pepper*, 308 U.S. at 307, 60 S.Ct. 238. "Specifically, a debtor in possession has the duty to protect and conserve the property in his possession for the benefit of creditors." *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982). When the debtor-in-possession is a corporation, it is the officers and directors who are entrusted with that duty. *Slater v. Smith (In re Albion Disposal, Inc.)*, 152 B.R. 794, 798 (Bankr.W.D.N.Y.1993). Thus, Morrow and Angle owed a fiduciary duty of loyalty to the debtor itself and to its creditors on the date they acquired the First Union claims through M & D.[184]

▇▇▇ The duty of loyalty to creditors precludes self-dealing or self-preferment by the officers and directors to the detriment of the creditors. *Whitley*, 455

S.E.2d at 899. In *Independent Optical Co. of Winter Haven v. Elmore*, 289 So.2d 24, 25 (Fla. 2d DCA 1974), the court emphasized that "[i]t is a cardinal principle that an officer or director of a corporation will not be permitted to make profit out of his official position .... [B]ecause of their fiduciary character, officers and directors will not be permitted to acquire for their own advantage interests adverse or antagonistic to the corporation." *See also Insulfoams*, 184 B.R. at 707 [officers and "directors may not seize for their own personal gain a business opportunity which lies within the scope of the corporation's activities"].

▇▇▇ The usurpation of a corporate opportunity is included within the ambit of prohibited conduct. *Cohen v. Hattaway*, 595 So.2d 105, 108–09 (Fla. 5th DCA 1992). The opportunity to purchase claims at a discount pursuant to a bankruptcy case constitutes a corporate opportunity. *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1004 (3d Cir.1973).

In a case that is closely analogous to this proceeding on its facts, *Committee of Creditors Holding Unsecured Claims v. Citicorp Venture Capital, Ltd. (In re Papercraft Corp.)*, 187 B.R. 486, 500 (Bankr. W.D.Pa.1995), the court held that an insider's acquisition of claims against the debtor, while the debtor was in bankruptcy, was a breach of the insider's fiduciary duty of loyalty. The insider acquired claims against the debtor that had a potential profit of $5.4 million. The bankruptcy court concluded that the insider's usurpation of this corporate opportunity was a breach of its fiduciary duty because the insider "was active in its own interests in derogation of its fiduciary responsibility toward Debtor and its estate." *Id.* at 501.

The bankruptcy court held that there was a *per se* prohibition against the acquisition of claims by an insider in a bankruptcy case. *Id.* On appeal, the district court rejected the bankruptcy court's im-

---

**184.** Most of the Toy King I creditors also became creditors in Toy King II.

position of a *per se* rule but upheld its finding that the insider had breached its fiduciary duty and adopted the bankruptcy court's reasoning on that point. *Papercraft*, 211 B.R. at 823.

The bankruptcy court identified three adverse effects that flowed from the insider's breach of fiduciary duty on the facts of that case. First, the court noted that the sellers of the claims "were deprived of the ability to make a fully informed decision concerning the sale of their claims." *Papercraft*, 187 B.R. at 499. In that case, the noteholders who sold their claims to the insider had no knowledge of and did not participate in the prebankruptcy negotiations to restructure the corporation's debt. The insider, therefore, had "inside" information that was not readily available to the noteholders.

That is not the situation in this proceeding. First Union was the largest unsecured creditor in the Toy King I bankruptcy case. Although not serving on the unsecured creditors committee, First Union participated actively in negotiating a settlement of its claims with the debtor. First Union knew the potential value of its claims when it agreed to sell at a discount. The plaintiff has not presented any evidence to the contrary.

The second adverse effect identified by the *Papercraft* court was the insider's "attempt to wrest from the prepetition creditors the valuable assets of the Debtor" by diluting the voting rights of the prepetition creditors. *Id.* The insider acquired a controlling vote in its class through its acquisition of the claims and used that position to put forward a competing plan. It later abandoned its own plan but objected to the debtor's plan of reorganization. Ultimately, the insider was able to obtain a seat on the board of the reorganized debtor and favorable changes in the proposed distribution through settlement of that objection.

Morrow and Angle, acting through M & D, similarly acquired the controlling vote in the unsecured creditor class in Toy King I through the acquisition of the First Union unsecured claims. The plaintiff presented no evidence, however, that M & D attempted to use its power as the largest claimant to dominate the class. The debtor proposed the plan it had negotiated with the unsecured creditors committee before M & D acquired the First Union claims. All classes voted overwhelmingly to accept the plan, including M & D. No class of creditors objected to the plan and, but for the minimal intervention of the court, the debtor's plan would have been confirmed as proposed without dissension or modification.

The third adverse effect identified by the *Papercraft* court was that the insider "put itself in a position of having a conflict of interest by jeopardizing its ability to make future decisions on claims as a director free of [its] own personal interests as owner of claims." *Id.* (citing *Cumberland Farms, Inc. v. Haseotes (In re Cumberland Farms)*, 181 B.R. 678, 680 (Bankr. D.Mass.1995), *aff'd in part, modified in part, & rev'd in part*, 216 B.R. 690 (D.Mass.1997)).

This, of course, is exactly what occurred in the Toy King II case. From the moment the court confirmed Toy King I, Morrow and Angle designed their actions to advance their own personal interests in preference to the debtor's and the other creditors'. This pattern of unabashed and unadorned self-dealing culminated in the final payment to M & D of the First Union claims at a time when it was clear that the debtor was going to fail. When the debtor paid M & D, the debtor was in critical need of cash. Depleting the debtor's cash by directing substantial payments to themselves through M & D severely damaged the debtor's ongoing financial viability. Thus, Morrow and Angle damaged the debtor through their acquisition of First Union's claims by creating a conflict of interest that permeated and tainted their actions

from the date of the Toy King I confirmation.

Morrow and Angle also damaged the debtor in quantifiable terms when they acquired the First Union claims through M & D. Through their actions, Morrow and Angle prevented the debtor itself from taking advantage of the reduction in the claims offered by First Union. Had the debtor satisfied the First Union claims for $125,000, it would have reduced its indebtedness on these prepetition unsecured claims by nearly one third and would have had the money thus "saved" available to pay its rightful debts to its other creditors post-confirmation. Alternatively, the debtor could also have used the benefit of the reduced payment to First Union to increase the plan's percentage dividends to the unsecured creditor class.

Although a Chapter 11 debtor is usually not permitted to pay a creditor its prepetition claim prior to confirmation, the court may authorize such a payment as part of a compromise and settlement when it is in the best interest of all creditors and the estate to do so. In this case, the debtor's preconfirmation payment of First Union's claims at the substantial discount First Union offered could have been approved by the court after notice and hearing.

 Morrow and Angle defend their acquisition of the First Union claims by suggesting that the debtor itself did not have the financial resources to acquire the First Union claims. They have not, however, offered any evidence to support this suggestion. It is unnecessary, at this juncture, to examine possible scenarios in which the debtor could have satisfied the First Union claims prior to confirmation.[185] "Even where the corporation does not immediately have the financial resources to take advantage of the opportunity, the officer or director has a good faith obligation

of fair dealing and full disclosure of facts, so that the corporation can attempt to find some viable method of exercising the opportunity...." *Ault v. Soutter*, 167 A.D.2d 38, 43, 570 N.Y.S.2d 280 (1991).

Indeed, the *Papercraft* court made clear that an officer or director who seeks to acquire the claims of a debtor corporation has an affirmative obligation to disclose fully and formally its identity and status as an insider. *Papercraft*, 187 B.R. at 497. Informal knowledge by the unsecured creditors committee or the court does not excuse the insider from this obligation. *Id.* ["... the committee's knowledge is not controlling."]. *See also Performance Nutrition*, 239 B.R. at 110 ["The duty of loyalty holds officers and directors to an 'extreme measure of candor, unselfishness, and good faith,' particularly where there is an interested transaction." (*quoting International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex.1963))]; *Mills Acquisition*, 559 A.2d at 1283 ["[T]he duty of candor is one of the elementary principles of fair dealing...."].

Morrow and Angle did not formally notify the court or the debtor's creditors of M & D's insider status and acquisition of the First Union claims in the Toy King I case. To the contrary, Morrow and Angle timed their informal communication with the unsecured creditors committee in such a way as to minimize scrutiny and foreclose any meaningful competition for the First Union claims.[186]

(3) *Inapplicability of the business judgment rule.*

 The business judgment rule likewise provides no protection to an officer or director who has engaged in self-dealing. Section 607.0831, Florida Statutes, which defines the "business judgment rule" in Florida, does not protect an officer or director who has breached his fiduciary

---

**185.** One possibility that comes immediately to mind, however, is that the debtor could have filed a motion for post-petition financing to borrow the necessary funds from TKA that were available on the C & S line of credit.

**186.** See note 12 *supra* and accompanying text for a description of the factual circumstances surrounding this "notice."

duty of loyalty. Accordingly, officers and "directors are required to demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess a financial, business or other personal interest...." *Mills Acquisition,* 559 A.2d at 1280. *See also Healthco International,* 208 B.R. at 306 [Protection of the "business judgment rule" can only be claimed by disinterested directors who "neither appear on both sides of a transaction nor expect to derive any personal benefit from it in the sense of self-dealing...."].

■ Factors that the court should consider in determining the fairness and good faith of an interested transaction include the "adequacy of consideration, the degree to which the officer represented the corporation, the disclosure to and knowledge of the full board of directors or shareholders, and the necessity of the transaction to the corporation." *Performance Nutrition,* 239 B.R. at 113 (*quoting General Dynamics v. Torres,* 915 S.W.2d 45, 49 (Tex.App.1995)). Morrow and Angle have presented no evidence that supports a conclusion that they were acting in good faith and fairness when they acquired the First Union claims. Indeed, the evidence overwhelmingly supports a contrary conclusion.

■ Morrow and Angle paid a fraction of the worth of the claims and did so at a time when the risk of nonpayment of those claims was minimal. Morrow and Angle made no attempt to disclose formally the transaction and their insider connection to either the unsecured creditors committee or the court. Instead, the debtor's attorney sent a fax to counsel for the unsecured creditors committee with a cursory and misleading description of the transaction. The debtor's attorney sent the fax late in the day in the midst of the Christmas holiday with a closing date that purported to be the following day at noon. The fax claimed urgency in closing the transaction. Yet Morrow and Angle made the actual payment to First Union for the claims much later—only two months in advance of the debtor's first payment of dividends. The debtor itself received no benefit from the transaction, it merely replaced one creditor with another. In fact, the debtor was plainly worse off because Morrow and Angle had immediate and unfettered access to the debtor's assets to satisfy their claims. Morrow and Angle plainly were not acting in good faith and fairness when they acquired the First Union claims through M & D.

### (4) *The Toy King I confirmation order does not insulate the First Union transaction.*

■ Morrow and Angle argue that their acquisition and entitlement to the First Union claims was determined in Toy King I and incorporated into the confirmed plan. They further argue that the confirmed plan has res judicata effect and therefore bars the committee's attack on them.

■ "It is beyond cavil that an order confirming a plan of reorganization constitutes a final judgment on the merits in the bankruptcy case and may have res judicata effect." *Insulfoams,* 184 B.R. at 705. "Res judicata, or claim preclusion, requires: (1) a final judgment on the merits; (2) involving the same parties; and (3) a subsequent suit based on the same cause of action." *Id.* "It gives dispositive effect to a prior judgment if a particular issue, although not actually litigated, could have been litigated in a prior proceeding." *Id.*

■ Under the facts of this case, however, the plaintiff could not have litigated claims of breach of the fiduciary duties of loyalty against Morrow and Angle for their acquisition of the First Union claims prior to the time that the debtor confirmed its plan. The claims for breach of the fiduciary duties of loyalty were not yet ripe at the time the debtor confirmed its plan. Under Florida law, "[a]ctions for breach of fiduciary duty ... do not accrue under Florida's last element rule until the plaintiff

suffers some type of damage." *Stahl,* 89 F.3d at 1522 fn. 16. In this case, although the breach of the fiduciary duty took place prior to the confirmation of Toy King I, the court determined in Section V.F.4.c.v. (2) above that the damage from the breach did not occur until after confirmation. After the court confirmed Toy King I, the reorganized debtor suffered generally from the conflict of interest between Morrow and Angle and the debtor and also suffered specifically when the debtor made its distributions to M & D in an amount that exceeded M & D's cost of acquiring the claims.

Furthermore, at issue here are Morrow and Angle's breaches of their fiduciary duties to the debtor's post-confirmation creditors. Although many of these creditors were also creditors of the debtor during Toy King I, the creditor body represented in this proceeding is not identical to the parties represented during Toy King I. The parties are not the same, therefore, for res judicata purposes.

Finally, the plaintiff could not have litigated its claim of breach of fiduciary duty against Morrow and Angle prior to the confirmation of Toy King I because Morrow and Angle concealed their insider connections with M & D in all of the documents filed with the court. *See generally Dionne v. Keating (In re XYZ Options, Inc.),* 154 F.3d 1262, 1269–71 (11th Cir. 1998) [trustee is not bound by judgment against the debtor where the judgment was part of a collusive scheme to hinder, delay, and defraud creditors]. *Cf. Florida Department of Insurance v. Blackburn (In re Blackburn),* 209 B.R. 4, 11–12 (Bankr.

M.D.Fla.1997) [for purposes of determining when director's wrongdoing was discoverable so that corporation could seek redress, director's knowledge of wrongdoing is not imputed to corporation when director's interests are adverse to the corporation].

Thus, Morrow and Angle breached their fiduciary duties of loyalty when they acquired the First Union claims through M & D for an amount that was less than the anticipated dividend on those claims. "The measure of damages for breach of fiduciary duty is the profits lost by the corporation as a consequence of the breach."[187] *Insulfoams,* 184 B.R. at 708.

In this case, the debtor would have realized a "profit" or benefit of $314,506.17 had it acquired the First Union claims for $125,000.[188] The court concludes, therefore, that Morrow and Angle are jointly and severally liable to the debtor for their breaches of their fiduciary duties of loyalty resulting from their acquisition of the First Union claims in the amount of $314,506.17. This was the profit they diverted to M & D on account of the First Union claims. Because this was the debtor's opportunity, the court's judgment will return these profits to the debtor.

### (5) *Other transfers to Morrow, Angle, and King.*

The unsecured creditors committee also asserts that Morrow, Angle, and King breached their fiduciary duties of loyalty after Toy King I was confirmed when they made transfers for their own benefit. These transfers include the debtor's pay-

---

**187.** "The usual remedy for the improper purchase of claims at a discount by a fiduciary is to subordinate or disallow the fiduciary's claim to the extent its face amount exceeds the amount paid." *Papercraft,* 187 B.R. at 501. This alternative remedy is inapplicable on these facts because M & D has no pending claim against the estate.

**188.** The court calculates this amount as follows: $439,506.17 representing the amount that the debtor paid on the First Union

claims, minus $125,000.00 representing the amount that Morrow and Angle paid to acquire the First Union claims, equals $314,-506.17. *See* notes 59 and 89 *supra* and surrounding text. The court notes that, in this case, the debtor would not have realized a "profit" if it had acquired the First Union claims but instead would have realized a commensurate reduction in its liabilities. This distinction, however, is unimportant for the purposes of this damage calculation.

ments to TKA in payment of the Liberty and Nintendo loans and the C & S line of credit, as well as the debtor's payment to M & D in payment of the First Union claims dividend. In Sections V.C. and V.D. above, the court has held that these payments were voidable preferences and/or fraudulent transfers.

In *Snyder Electric Co. v. Fleming,* 305 N.W.2d 863, 869 (Minn.1981), the court held that impermissible preferences that advantage directors to the detriment of other creditors, even when made for adequate consideration and in good faith, are a breach of the directors' fiduciary duties when the debtor is insolvent. The *Snyder Electric* court concluded that "[d]irectors and officers may make loans to their corporations and they may use the same methods as other creditors to collect bona fide corporate debts owed to them, but only so long as the corporation is solvent." *Id. See also Whitley,* 455 S.E.2d at 899 (*quoting Hill v. Pioneer Lumber Co.,* 113 N.C. 173, 18 S.E. 107, 108 (1893))["[D]irectors of an insolvent corporation cannot as creditors of such corporation secure to themselves a preference. They must share ratably in the distribution of the company's assets."]; *Ben Franklin Retail Stores,* 225 B.R. at 655 ["[C]reditors have a right to expect that directors will not divert, dissipate or unduly risk assets necessary to satisfy their claims."].

"Similarly, it is an impermissible preference for an insolvent corporation's officers or directors to seek exoneration of corporate debts on which they are secondarily liable to the prejudice of other creditors." *Snyder Electric,* 305 N.W.2d at 869. Moreover, as the court concluded in Section V.F.4.c.iii. and V.F.4.c.v. (3) above, the "business judgment rule" does not protect a director who engages in self-dealing.

The focus of this claim of breach of the fiduciary duty of loyalty is not the harm that accrues to the debtor from the breach, as was the case with the earlier claims of breaches of the fiduciary duties of care and loyalty, but the benefit that inures to the officer or director. Essentially, the test for liability is whether the officer or director has been unjustly enriched by the preferential or fraudulent payment. *Insulfoams,* 184 B.R. at 708.

Likewise, the issue as to this claim is whether the *debtor's* preferential or fraudulent payments to TKA and M & D conferred a direct or indirect financial benefit on the fiduciaries. It is not whether *TKA's* payments to Liberty and C & S conferred a benefit on the fiduciary. For these reasons, the court is not here concerned with the release of liability that Morrow and Angle enjoyed upon *TKA's* payment of the Liberty and C & S debts. The court is only concerned with the direct or indirect benefit that Morrow, Angle, and King received by the debtor's payments to TKA and M & D.

In this case, the debtor paid TKA in the total amount of $1,684,579.87, representing principal, interest, and guaranty fees paid while the debtor was insolvent.[189] The debtor also paid M & D in the amount of $439,506.17, representing principal, interest, and "profit" on the First Union claims while the debtor was insolvent.[190] The test for liability and the measure of damages of the breach of their fiduciary duties, however, is whether and to what extent the officers or directors were unjustly enriched by these payments by the debtor to TKA and M & D. *Id.*

TKA paid most of these monies to Liberty and C & S. TKA paid Morrow and Angle directly only $13,522.16, representing guaranty fees. M & D also paid directly to Morrow and Angle $16,606.92,

**189.** *See* note 159 *supra.* This amount represents all preferential transfers made by the debtor to TKA as determined by the court in Sections V.C.2. and V.C.3. *supra.* Included in this amount is the lesser amount of

$1,583,625.82 that the court determined in Section V.D. represents fraudulent transfers by the debtor to TKA.

**190.** *See* notes 59 and 89 *supra.*

representing interest and "profit" on the First Union claims. Finally, M & D paid $280,000 to Morrow directly, representing principal and interest on the M & D subordinated note. The court has found that each of these payments was a preferential and/or fraudulent transfer in Sections V.C.2., V.C.3., V.C.4., V.D.2., and V.D.3. above. It is plain, therefore, that Morrow and Angle were benefited by the debtor's payments to TKA and M & D that those entities paid over to them, the debtor's fiduciaries.

Morrow and Angle clearly breached their fiduciary duties of loyalty within the meaning of Florida Statute, 607.0830 when they paid themselves, through TKA and M & D, guaranty fees on the C & S line of credit and interest and "profit" on the First Union claims. They advantaged themselves personally by these payments when they were fiduciaries for the benefit of the debtor and its creditors. As fiduciaries, it was their duty to put the debtor's and its creditors' interests before their personal interests.

The plaintiff has therefore established by a preponderance of the evidence that Morrow and Angle breached their fiduciary duties of loyalty when they received $30,129.08 from TKA and M & D. Accordingly, the court concludes that Morrow and Angle are jointly and severally liable to the debtor for this amount.

The plaintiff has similarly established by a preponderance of the evidence that Morrow breached his fiduciary duty when he received $280,000 from M & D. Because Angle had sold his shares in TKA and resigned his position as an officer and director of the debtor on the date that this payment was made, the court concludes that Angle has no legal responsibility for this payment.[191] Morrow, therefore, shall be individually liable to the plaintiff for this payment.

The record contains no evidence that TKA or M & D paid King any monies from payments received from the debtor.

The plaintiff has therefore failed to establish by a preponderance of the evidence that King has breached his fiduciary duty of loyalty to the debtor when he caused the debtor to make payments on its obligations to TKA and M & D.

d. *Summary.*

In summary, the court concludes that the plaintiff has established by a preponderance of the evidence that Morrow, Angle, and King breached their fiduciary duties of care when they caused the debtor to borrow money from TKA at an excessive rate of interest and to incur bogus guaranty fees in the total amount of $33,-625.82. The court also concludes that the plaintiff has established by a preponderance of the evidence that Morrow and Angle breached their fiduciary duties of loyalty when they acquired the First Union claims through M & D and caused the debtor to lose the opportunity to increase its profits or decrease its liabilities in the amount of $314,506.17. In addition, the court concludes that the plaintiff has established that Morrow and Angle breached their fiduciary duties of loyalty when they caused the debtor to make preferential and/or fraudulent transfers to TKA and M & D that were then paid over to themselves in the aggregate amount of $30,-129.08. Finally, the court concludes that the plaintiff has established by a preponderance of the evidence that Morrow breached his fiduciary duty of loyalty when he caused the debtor to make a preferential and fraudulent payment to M & D that was then paid over to him in the amount of $280,000.

The court concludes, however, that the plaintiff has failed to establish by a preponderance of the evidence that Woodward, Hunsaker II, Hunsaker, III, or Ranney owed the debtor fiduciary duties of

---

191. The court concluded, however, in Section V.F.4.c.v.(4) above, that Angle is legally re-

sponsible for this payment under an alternative theory.

178

care or loyalty. The court further concludes that the plaintiff has also failed to establish by a preponderance of the evidence that Morrow, Angle, and King breached their fiduciary duties of care when TKA failed to contribute $500,000 of the Liberty loan to the debtor as equity. Finally, the court concludes that the plaintiff failed to establish by a preponderance of the evidence that King breached his fiduciary duty of loyalty when he caused the debtor to make preferential and/or fraudulent transfers to TKA and M & D at a time when the debtor was insolvent.

### 5. Aiding and abetting the breaches of fiduciary duties.

 The unsecured creditors committee asserts that Liberty aided and abetted Morrow, Angle, and King in the breach of their fiduciary duties. To prevail on this claim, the committee must establish by a preponderance of the evidence three elements: "(1) existence of a fiduciary relationship, (2) breach of the fiduciary's duty, and (3) knowing participation in that breach by the nonfiduciary defendants." *Healthco International,* 208 B.R. at 309.

The court determined in Section V.F.4. above that Morrow, Angle, and King owed fiduciary duties to the debtor and that they breached those duties in several respects. The court, concludes, therefore, that the plaintiff has satisfied the first two elements of this claim by a preponderance of the evidence.

 The third element requires "knowing participation" on the part of Liberty, the non-fiduciary. *Id.* "A court can infer a non-fiduciary's knowing participation only if a fiduciary breaches its duty in an inherently wrongful manner, and the plaintiff alleges specific facts from which that court could reasonably infer knowledge of the breach." *Nebenzahl v. Miller,* 1996 WL 494913, *7 (Del.Ch.1996). For example, the court in *Healthco International,* 208 B.R. at 309, found that the party that purchased the debtor's stock in a leveraged buyout was a knowing partici-

pant in the director's breach of fiduciary duty because it "knew all the essential details of the proposed transaction ... [and] urged the board on at every step."

Similarly, in *Performance Nutrition,* 239 B.R. at 112–113, the court found that a third party competitor knowingly aided and abetted a fiduciary in his breach of fiduciary duty. In *Performance Nutrition,* the competitor negotiated a sale of the debtor's assets with the director prior to the filing of a bankruptcy case and included in its negotiations a generous employment contract for the director. After the bankruptcy filing, the defendant then assisted and encouraged the director in his concealment of the specifics of the sale from the unsecured creditors and the court, including an artificially low valuation of the assets. *Id.* at 112.

 In this case, the plaintiff has provided evidence that Liberty acted recklessly, imprudently, and even negligently in its dealings with TKA and the debtor. The plaintiff must show more, however, to establish that Liberty aided and abetted Morrow, Angle, and King in breaching their fiduciary duties. The plaintiff must demonstrate that Liberty knowingly participated in the breaches of fiduciary duty. In other words, the plaintiff must show that Liberty demonstrated some degree of complicity and/or culpability through its actions or inactions that resulted in a knowing ratification or assistance of Morrow, Angle, and King's breaches of their fiduciary duties.

The court has found that Morrow, Angle, and King breached their fiduciary duties of care and loyalty in the way they handled the debtor's loan transactions with TKA. Although Liberty was clearly aware that the debtor had financial dealings with TKA, there is no evidence in this case that suggests that Liberty knew the particulars of those dealings, including TKA's collection of an interest upcharge and guaranty fees or that Liberty participated in any way in those transactions. Accordingly,

the court concludes that the plaintiff has failed to establish this element by a preponderance of the evidence as to the debtor's transactions with TKA.

The court also found that Morrow and Angle violated their fiduciary duties when they acquired the First Union claims through M & D and when they caused the debtor to pay those claims to M & D. The evidence clearly shows that Liberty knew that Morrow and Angle acquired the First Union claims at a discount. Horne's handwritten notes document Morrow and Angle's acquisition cost of the claims. The subordination of M & D's "profit" was an integral and material aspect of the Liberty loan transaction.

Liberty did not enter into its negotiations with TKA and the debtor, however, until April 1989, a date some months after the court's entry of the order substituting M & D for First Union. By the time Liberty began its negotiations with TKA and the debtor, M & D's acquisition of the First Union claims was an historical fact rather than a pending event. Accordingly, the plaintiff has failed to show by a preponderance of the evidence that Liberty knowingly participated in Morrow and Angle's breach of fiduciary duties in the acquisition of the M & D claim.

There is also no evidence that Liberty knew beforehand that the debtor was to make the December 29, 1989, payment on M & D's subordinated note. There is no evidence that the debtor informed Liberty of its intention to pay the M & D note, and there is no evidence that Liberty consented to that payment. Accordingly, the plaintiff has failed to show by a preponderance of the evidence that Liberty knowingly participated in Morrow's breach of his fiduciary duties when he caused the debtor to pay the M & D subordinated note in derogation of the confirmed plan.

For all these reasons, the court determines that the plaintiff has not satisfied the third element required to establish its claim that Liberty aided and abetted Morrow, Angle, and King in their breaches of their fiduciary duties. Accordingly, the court concludes that the plaintiff has failed to establish by a preponderance of the evidence that Liberty aided and abetted Morrow, Angle, and King in their breaches of their fiduciary duties.

### 6. *Discharge of Toy King's guaranty of TKA's Liberty loan.*

The unsecured creditors committee seeks to discharge the debtor's obligations to Liberty as guarantor on the Liberty loan on the theory that Liberty's approval and execution of the Nintendo loan to TKA increased the debtor's risk or exposed the debtor to greater liability under its original guaranty of TKA's loan from Liberty. In making this claim, the committee relies on Georgia Statute 10–7–22, which provides that:

> Any act of the creditor, either before or after judgment against the principal, which injures the surety or increases his risk or exposes him to greater liability shall discharge him; a mere failure by the creditor to sue as soon as the law allows or neglect to prosecute with vigor his legal remedies, unless for a consideration, shall not release the surety.

This statute derives from the common law and is grounded in principles of fairness. It seeks to ensure that a surety or guarantor who makes a promise to pay a debt does not, at the moment of default and through the actions of others, face loss of or injury to collateral, increased risk, or greater liability. The statute protects against later changes in the contract between creditor and principal that the guarantor has guarantied. *Upshaw v. First State Bank*, 244 Ga. 433, 260 S.E.2d 483, 484 (1979). Under this statute, a guarantor is discharged "only if the change is material and causes some injury, loss, or prejudice to it." *Brock Construction Co. v. Houston General Insurance Co.*, 144 Ga.App. 860, 243 S.E.2d 83, 86

**180**

(1978), *aff'd*, 241 Ga. 460, 246 S.E.2d 316, 319 (1978).

For example, in *West Cash & Carry Building Materials of Savannah, Inc. v. Liberty Mortgage Corp.*, 160 Ga.App. 323, 324, 287 S.E.2d 320 (1981), the court held that a bank's extension of credit beyond the limit agreed to in the credit application increased the surety's risk and thus discharged the entire debt. Similarly, in *Cantrell v. First Tennessee National Bank Association*, 207 Ga.App. 458, 428 S.E.2d 368, 369–70 (1993), the court held that a bank's delay in pursuing its remedies upon the default of the obligor increased the risk of the guarantor and therefore discharged his liability on the note. In both of these cases, however, the surety or guarantor had no knowledge of, and did not consent to, the increase in risk.

▆▆▆▆▆▆ "[I]t is the *unconsented* change in potential risk or liability [and] not the imposition of greater liability that causes the discharge." *Bank of Terrell v. Webb*, 177 Ga.App. 715, 341 S.E.2d 258, 260 (1986) (Emphasis added). A guarantor "is not discharged by any act of the creditor or obligee to which he consents. Consent may be given in advance" or at the time the new obligation is entered into. *Id.* at 258–59 (*quoting Bonner v. Wachovia Mortgage Co.*, 142 Ga.App. 748, 236 S.E.2d 877, 879 (1977)).

For example, in *Dunlap v. Citizens & Southern DeKalb Bank*, 134 Ga.App. 893, 216 S.E.2d 651, 654 (1975), the court refused to discharge the plaintiff's liability as guarantor because he "consented in advance to the retention [as] a primary obligor on any Bank agreement through which his daughter became indebted." Similarly, in *Underwood v. Nationsbanc Real Estate Service, Inc.*, 221 Ga.App. 351, 471 S.E.2d 291, 293 (1996), the court found that the plaintiff had consented in advance to additional risk and therefore could not obtain a discharge of his guaranty. In that case, the plaintiff signed a guaranty that "specifically contemplated [an] increase in the company's debt and the creation of new

obligations, and ... included waivers of any 'legal or equitable discharge' and of any defense based upon an increase in risk." *Id. See also Ramirez v. Golden*, 223 Ga.App. 610, 478 S.E.2d 430, 431 (1996) [guarantor foreclosed from asserting that he was discharged under Section 10–7–22 because he assented in advance to waiver of all legal and equitable defenses]; *Lothridge v. First National Bank of Gainesville*, 217 Ga.App. 711, 458 S.E.2d 887, 890 (1995) [The plaintiff "consented in advance to the bank releasing any other guarantors [and collateral and this consent operated] as a waiver of his right to assert that the release resulted in his discharge."].

▆▆▆▆▆▆ These cases are squarely controlling here. The debtor signed an unconditional guaranty on June 6, 1989, that included a provision that waived any defense to payment based upon "the failure of Lender to give notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any person whomsoever, in connection with any obligation hereby guaranteed...." as well as "... any other legal or equitable defenses whatsoever to which Guarantor might otherwise be entitled." The guaranty applied to "... all obligations to Lender made on behalf of [TKA] by any officer, partner, or agent of [TKA]." This guaranty clearly covered the Nintendo loan that Liberty later made to TKA. Even were this not true, the debtor signed an amended guaranty on October 24, 1989, that specifically included the Nintendo loan. The court therefore concludes that the debtor consented to the Nintendo loan and cannot now discharge the Liberty loan obligation.

▆▆▆▆▆▆ Alternatively, the court concludes that the debtor did not suffer an increase in risk or any material loss, injury, or prejudice as a consequence of Liberty's grant of the Nintendo loan to TKA. As the cases previously cited illustrate, the paradigm injury that the statute seeks to redress occurs when the guarantor or

surety is faced with payment upon the default of the obligor, having no knowledge of and never having consented to the subsequent circumstances that now place it in an adverse posture.

In this case, the debtor, through its principals, had full knowledge that TKA was seeking additional monies from Liberty. Indeed, it is uncontroverted that the debtor was the ultimate recipient of the monies that TKA borrowed from Liberty through the Nintendo loan. More importantly, it is clear from the evidence and testimony that the debtor was substantially advantaged by its ability to borrow the Nintendo proceeds from TKA.[192]

At the time the Nintendo loan was being negotiated and closed, the debtor was perilously short of working capital. Without the monies that TKA made available to the debtor from the Nintendo loan, it is doubtful whether the debtor would have been able to continue in business through the Christmas season. Had the debtor ceased operations prior to the Christmas season, the debtor would have been forced to liquidate its inventory during a time of year when toy retailers historically operate at a loss because sales are slow and the gross margin on sales is less. The Nintendo loan proceeds enabled the debtor to maintain its operations during the Christmas season, historically the peak sales period for toy retailers.[193] The Nintendo loan proceeds that TKA made available to the debtor thus enabled the debtor to maximize its return on its inventory. This in turn ensured that the debtor would have sufficient value in its inventory and proceeds so that, if called to account on the

Liberty loan, it would be able to fulfill its obligation. Thus, the Nintendo loan did not increase the debtor's risk or cause the debtor any material loss, injury or prejudice.

For all these reasons, the court concludes that the plaintiff has failed to meet its burden on this claim.

### 7. Toy King's right of contribution from its co-guarantors.

The unsecured creditors committee seeks to recover from the individual guarantors all payments that TKA or the debtor made to Liberty in payment on, or in satisfaction of, the Liberty or Nintendo obligations. In making this claim, the committee relies upon Georgia Statute Section 10-7-50, which provides:

Where several are sureties for the same principal for the same sum of money, either by one or by distinct instruments, and one pays more than an equal share of the sum, he may compel contribution from his cosureties. If one of the cosureties is insolvent, the deficiency in his share must be borne equally by the solvent sureties.

 This section was amended in 1981, as set forth above, to abolish the distinction between surety and guaranty. *Floyd Davis Sales, Inc. v. Central Mortgage Corp. of Michigan*, 197 Ga.App. 532, 398 S.E.2d 820, 821 (1990). The right of contribution "arises from the payment of the debt." *Sherling v. Long*, 122 Ga. 797, 50 S.E. 935, 935 (1905). The guarantor has no right of action "[u]ntil [he] has parted with his money in discharging the joint liability." *Id.* A guarantor who has

**192.** Although the court has held in Section V.F.4.c.iv.(2) *supra* that Morrow, Angle, and King breached their fiduciary duties of care in connection with engineering borrowings from TKA, it was the terms of the borrowings—and not the fact of borrowing *per se*—that underlies the court's decision.

**193.** The debtor more than doubled its inventory between the time that TKA approached Liberty for an additional loan and the time that TKA made available to the debtor all of

the proceeds from that loan. All inventory shipped into the debtor during this period secured the Liberty loan through the after-acquired collateral clause. As shown in notes 46, 82, 83, 84, and 98 and surrounding text *supra*, the debtor's inventory, whether valued at the debtor's stated amounts or the court's adjusted amounts, at all times exceeded TKA's outstanding balance on both the Liberty and Nintendo loans.

paid the debt on behalf of the obligor need not first attempt to collect from the obligor but may proceed directly against his fellow guarantors. *A & T Motors, Inc. v. Roemelmeyer*, 158 So.2d 567, 570 (Fla. 3d DCA 1963) ["... presentation of the note by the maker when due, request to pay, and notice to the guarantor of dishonor need not be alleged; nor is the guarantee at law under any legal obligation to first resort to the maker of the note guaranteed."].

■ The debtor was a joint and several guarantor of TKA's Liberty and Nintendo loans along with Morrow, Angle, Woodward, Hunsaker II, Hunsaker III, and Ranney. The debtor paid no monies directly to Liberty prior to the filing of Toy King II. The debtor paid only TKA. The plaintiff therefore has no claim of contribution for payments the debtor made during that period.[194]

■ During the pendency of Toy King II, however, the debtor paid $1,059,470.83 directly to Liberty in payment of the Liberty loan. These payments represented $900,000 in principal and $159,470.83 in interest. The plaintiff therefore has a claim of contribution against its co-guarantors for these payments.

■ To determine the liability of each guarantor, the court is required to examine "how the liability of each co-guarantor is defined in the guaranty agreement, e.g., whether it is several, limited, shared jointly with less than all co-obligors, or simply joint with all other obligors." *In re Wetzler*, 192 B.R. 109, 116 (Bankr.D.Md.1996). Under the terms of the guaranties in this case, each guarantor is jointly and severally liable to Liberty for the Liberty loan debt. Woodward, Hunsaker II, Hunsaker III, and Ranney, however, capped their guaranties at specific dollar amounts: $350,000, $175,000, $87,500 and $87,500, respectively. A guarantor "who has paid the joint obligation is entitled to judgment against each of his co-obligors only for the proportion for which each is liable—judgment should not be entered against any one of them or against all of them jointly for the aggregate amount due from them." *Todd v. Windsor*, 118 Ga.App. 805, 165 S.E.2d 438, 440 (1968).

Applying these principles, therefore, the court concludes that the plaintiff has established by a preponderance of the evidence that the debtor has a right to contribution as provided by Georgia Statute 10–7–50 from its co-sureties as follows: Morrow, Angle, and Woodward in the amount of $177,367.71 each, Hunsaker II in the amount of $175,000.00, and Hunsaker III and Ranney in the amount of $87,500 each. The calculation of these amounts is in the notes.[195]

194. The debtor was the obligor on its borrowing from TKA. Thus, the debtor paid $1.3 million in principal directly to TKA in the period between the confirmation of Toy King I and the filing of Toy King II in repayment of its debt to TKA. TKA in turn paid to Liberty $600,000 on the Liberty loan and $700,000 in satisfaction of the Nintendo loan from the monies it received from the debtor.

195. The court calculates the liability of each guarantor as follows: by dividing the total that the debtor paid directly to Liberty in the amount of $1,059,470.83 by seven guarantors (the debtor, Angle, Morrow, Woodward, Hunsaker II, Hunsaker III, and Ranney), each guarantor would be responsible for a pro rata contribution in the amount of $151,352.9757. Hunsaker III and Ranney, however, are limited guarantors with a cap of $87,500. Subtracting this limited amount, in the total amount of $175,000, from $1,059,470.83 equals $884,470.83. By dividing this amount by the remaining five guarantors (the debtor, Morrow, Angle, Woodward, and Hunsaker II), each of the remaining guarantors would be liable for $176,894.166. Hunsaker II, however, also limited his liability on the guaranty to a total of $175,000. Subtracting $350,000 from $1,059,470.83 ($87,500 each for Ranney and Hunsaker III and $175,000 for Hunsaker II) leaves $709,470.83 to be divided pro rata among the remaining four guarantors (the debtor, Morrow, Angle, and Woodward), or $177,367.7075 each. (Woodward is also a limited guarantor. Because her liability is capped at $350,000, however, the limitation on her liability is irrelevant to

### 8. Toy King's right of subrogation against Liberty.

The unsecured creditors committee asserts the right of subrogation against Liberty and the collateral Liberty is holding to secure the obligations of the individual guarantors under their guaranties. By this subrogation claim, the plaintiff seeks to stand in the shoes of Liberty to the extent Liberty holds collateral of the co-guarantors.[196] Thus, the plaintiff seeks the collateral to satisfy wholly or in part its judgment against the co-guarantors on the contribution claims determined in the plaintiff's favor in Section V.F.7. above.

In making this subrogation claim, the plaintiff relies on Georgia Statute Sections 10–7–56 and 10–7–57. The first statute states that "[a] surety who has paid the debt of his principal shall be subrogated, both at law and at equity, to all the rights of the creditor and, in a controversy with other creditors, shall rank in dignity the same as the creditor whose claim he paid." Section 10–7–57 further provides that "[a] surety who has paid the debt of his principal shall also be entitled to be substituted in place of the creditor as to all securities held by him for the payment of the debt."

"There are few doctrines better established than that a surety who pays the debt of another is entitled to all rights of the person he paid to enforce his right to be reimbursed." *Wetzler*, 192 B.R. at 114 (*quoting Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 136–37, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962)). *See also Anderson v. Armistead*, 18 Ga.App. 387, 89 S.E. 525, 525 (1916) ["[I]t seems to be well settled in Georgia, that a surety who has paid the debt of his principal is subrogated at law and in equity to all the rights of the creditor, and that he stands in loco of the creditor."].

To prevail on a claim for subrogation, the debt must be paid in full. *Fender v. Fender*, 30 Ga.App. 319, 117 S.E. 676, 677 (1923). In *Todd*, the court explained that a surety, after payment of the principal's debt, is subrogated to the rights and remedies of the creditor and is entitled to found his action for contribution directly on the original evidence of indebt-

this calculation.) The court, therefore, determines each guarantor's contribution on the Liberty loan as follows:

| Guarantor | Contribution | | |
|---|---|---|---|
| The debtor | $ 177,367.71, | rounded up from | $177,367.7075 |
| Morrow | 177,367.71, | rounded up from | 177,367.7075 |
| Angle | 177,367.71, | rounded up from | 177,367.7075 |
| Woodward | 177,367.71, | rounded up from | 177,367.7075 |
| Hunsaker II | 175,000.00 | | |
| Hunsaker III | 87,500.00 | | |
| Ranney | 87,500.00 | | |
| | $1,059,470.84 | | |

Of these amounts, 84.948 percent represents principal and 15.052 percent represents interest as follows:

| Guarantor | Contribution | |
|---|---|---|
| | Principal | Interest |
| The debtor | $150,670.32 | $ 26,697.39 |
| Morrow | 150,670.32 | 26,697.39 |
| Angle | 150,670.32 | 26,697.39 |
| Woodard | 150,670.32 | 26,697.39 |
| Hunsaker II | 148,659.00 | 26,341.00 |
| Hunsaker III | 74,329.50 | 13,170.50 |
| Ranney | 74,329.50 | 13,170.50 |
| | $899,999.28 | $159,471.56 |

196. This collateral includes real estate, shares of stock, and repurchase agreements and is more particularly described in note 20 *supra* and accompanying text.

edness. *Todd*, 165 S.E.2d at 440–41. The surety is not entitled, however, to enforce these obligations against his co-sureties in exactly the same manner and in the same amounts as could the creditor because the surety is bound by the substantive rules of contribution. *Id.* Although the creditor can execute on any and all collateral it holds as security for its debt without regard to whose collateral it is, a party seeking to enforce its subrogation rights against that same collateral is limited by the amount of contribution owed by the party who has pledged the collateral.

■ In this proceeding, the plaintiff has proven by a preponderance of the evidence that the debtor paid Liberty on the Liberty loan in full through its payments made during the pendency of the Toy King II case. The court therefore concludes that the plaintiff has established a claim for subrogation within the meaning of Georgia Statute Sections 10–7–56 and 10–7–57 and may enforce its claims for contribution (as decided in Section V.F.7. above) against the collateral that the obligor or the individual guarantors pledged to Liberty to secure the Liberty loan. To the extent that any individual party has pledged collateral as security for the Liberty loan in an amount that exceeds the debtor's contribution claim against that individual, the debtor may enforce its subrogation rights against that collateral only up to the value of the collateral necessary to satisfy that individual's contribution obligation to the debtor.

### 9. *Claims for Toy King's payment of rent and prepetition salary.*

■ The unsecured creditors committee seeks to recover from TKA, Morrow, and Angle the monies that the debtor paid to lease the building that housed the headquarters of Toy King, TKA, AMI, and M & D that were for the benefit of non-debtor companies. The committee also seeks to recover from Morrow the monies the debtor paid to Morrow in salary before the filing of the Toy King II case that were in excess of the fair market value of the services he performed.

The plaintiff has failed to tie these claims to any cognizable legal theory. More importantly, the plaintiff has not offered any evidence to support these claims under theories of fraudulent transfer, breach of the confirmed plan, or breach of fiduciary duties. For example, the record lacks any evidence that the debtor paid lease expenses on behalf of other companies and if so, in what amount. The record is similarly devoid of any evidence that would allow the court to compare Morrow's salary with others in like circumstances. Nor does the record contain any evidence that the debtor paid Morrow for services he did not perform or for services performed for other companies rather than the debtor.

### 10. *Summary.*

As the foregoing describes, the plaintiff has established by a preponderance of the evidence that TKA breached the confirmed plan when it failed to make available $500,000 of the Liberty loan as a capital contribution to the debtor. The plaintiff failed to establish by a preponderance of the evidence that Liberty, TKA, or M & D breached the confirmed plan in any other way.

The plaintiff has also established by a preponderance of the evidence that Morrow, Angle, and King breached their fiduciary duties of care when they caused the debtor to borrow monies from TKA at an unnecessarily high interest rate and required the payment of interest upcharges and guaranty fees to TKA as impermissible dividends in violation of Section 607.06401, Florida Statutes.

The plaintiff has also established that Morrow and Angle breached their fiduciary duties of loyalty when they acquired the First Union claims through M & D.

The plaintiff has also established that Morrow and Angle breached their fiduciary duties of loyalty when they caused the

debtor to make preferential and/or fraudulent transfers to TKA and M & D that resulted in their own personal enrichment.

In addition, the plaintiff has established by a preponderance of the evidence that Morrow breached his fiduciary duty of loyalty when he caused the debtor to make a preferential and fraudulent transfer to M & D that resulted in his personal enrichment.

The plaintiff failed to establish by a preponderance of the evidence that King breached his fiduciary duty of loyalty in any respect.

The plaintiff also failed to establish by a preponderance of the evidence that Woodward, Hunsaker II, Hunsaker III, or Ranney were fiduciaries of the debtor; the plaintiff's claims for breach of the fiduciary duties of care or loyalty by those defendants therefore fails.

The plaintiff has failed to establish by a preponderance of the evidence that Liberty aided and abetted Morrow, Angle, and King in their breaches of their fiduciary duties.

The plaintiff has also failed to establish by a preponderance of the evidence that Liberty exposed the debtor to greater liability, increased its risk, or otherwise injured the debtor within the meaning of Georgia Statute Section 10–7–22 when it made the Nintendo loan to TKA. Thus, the debtor may not discharge its obligation on the Liberty loan.

The plaintiff has, however, established by a preponderance of the evidence its right to contribution from the individual guarantors within the meaning of Georgia Statute Section 10–7–50 for its payments to Liberty during the pendency of Toy King II of principal and interest.

Similarly, the plaintiff has established by a preponderance of the evidence its entitlement to subrogation as set forth in Georgia Statute Sections 10–7–56 and 10–7–57

to Liberty's rights in the individual guarantors' collateral that secures the Liberty loan obligation.

Finally, the plaintiff has failed to establish by a preponderance of the evidence under any theory that the debtor paid lease payments on behalf of non-debtor entities or excessive salary to Morrow prepetition.

### G. POST–PETITION CLAIM FOR EXCESS SALARY.

#### 1. Introduction.

The unsecured creditors committee asserts that Morrow failed to comply with the court order requiring him to repay to the debtor salary he received during the pendency of Toy King II that was in excess of the salary approved in that order (Main Case Document No. 192). Accordingly, the plaintiff seeks recovery of those monies pursuant to Section 549 of the Bankruptcy Code. Section 549 allows the trustee, or in this case the unsecured creditors committee,[197] to "avoid a transfer of property of the estate—(1) that occurs after the commencement of the case ... [and] that is not authorized [by the Bankruptcy Code] or by the court."

#### 2. Toy King's payment of salary to Morrow during Toy King II in excess of approved amounts.

 The court determined in Section IV.H.3. above that Morrow was entitled to a salary in the amount of $6,333.33 in payment of services he performed for the debtor during the pendency of Toy King II. The court further determined that Morrow received compensation from the debtor in the amount of $20,769.24 between the dates of April 10, 1990, and June 30, 1990. Morrow therefore received $14,434.91 from the debtor in excess of the salary approved by the court. Morrow subsequently re-

---

**197.** The confirmed plan in Toy King II (Main Case Document No. 310) allowed the unsecured creditors committee to prosecute any and all claims that a trustee or debtor-in-possession could prosecute.

paid $12,014.62 of that excess compensation.

The court concludes, therefore, that the plaintiff has established by a preponderance of the evidence that Morrow failed to repay $2,421.62 to the debtor in excess compensation. Accordingly, the court determines that Morrow is liable to the debtor in that amount.

H. *THE SECURED STATUS OF LIBERTY'S CLAIM AND THE AMOUNTS TO WHICH LIBERTY IS ENTITLED TO BE PAID ON ITS SECURED CLAIM.*

1. *Introduction.*

Liberty was a secured creditor of the debtor in the Toy King II case. When the court confirmed the Toy King II plan, the debtor paid Liberty its claim in full. The committee filed an objection to Liberty's claim on the grounds that the claim was only partially—not fully—secured (Main Case Document No. 338). In other words, the committee contends that the value of Liberty's security was less than the amount of the debtor's debt to Liberty and that Liberty is entitled to payment of its secured claim only in the amount of the value of Liberty's collateral. In this adversary proceeding, the committee seeks to recover from Liberty the excess the debtor paid. Before trial, the court consolidated the contested matter initiated by the filing of the objection to claim with the adversary proceeding that seeks the recovery of the excess (Document No. 59). The court treats these related and consolidated matters in this section of the decision.

As the court discussed in Section IV.D.4. above, Liberty was a secured creditor of the debtor. The debtor pledged inventory

and proceeds as security for both the Liberty and Nintendo loans. The individual guarantors also pledged cash or cash equivalents, stock, and real estate as security for these loans.

During the pendency of Toy King II, the debtor sold substantially all of its assets to VMI, including the collateral pledged to Liberty. VMI paid $1,000,050 to the debtor for its inventory, fixed assets, three leaseholds, and contract rights. Of this amount, $750,000 represented the debtor's inventory.[198]

The debtor paid $1,049,008.33 to Liberty on August 2, 1991, as required by its confirmed plan. That payment represented payment in full on Liberty's claim against the debtor's estate and was comprised of $900,000 in principal and $149,008.33 in interest.[199] Accordingly, the debtor paid $1,049,008.33 in principal and interest to Liberty on its claim after the filing of Toy King II.

The plaintiff asserts that Liberty's claim against the debtor's estate was not fully secured and therefore seeks to recover the debtor's payment of principal to Liberty to the extent that it exceeds the amount of Liberty's allowed secured claim. In addition, the plaintiff seeks to recover the debtor's payment of interest to Liberty on the basis that Section 506(b) of the Bankruptcy Code does not permit post-petition interest on Liberty's claim because the claim was not oversecured.

Because the debtor paid Liberty on its claim during the pendency of Toy King II, the committee relies upon Section 549 of the Bankruptcy Code to recover both amounts. Section 549 allows the trustee, or in this case the unsecured creditors committee,[200] to "avoid a transfer of prop-

198. The remaining $250,050 that VMI paid to the debtor represented the fixed assets, leasehold interests, and contract rights.

199. The debtor had previously made an interest payment in the amount of $10,762.50 to Liberty on March 31, 1990. *See* note 57 and surrounding text *supra.* The unsecured credi-

tors committee seeks to recover this payment in its contribution claim only.

200. The confirmed plan in Toy King II (Main Case Document No. 310) allowed the unsecured creditors committee to prosecute any and all claims that a trustee or debtor-in-possession could prosecute.

erty of the estate—(1) that occurs after the commencement of the case . . . [and] that is not authorized [by the Bankruptcy Code] or by the court."

## 2. Determining the secured status of Liberty's claim.

To decide these issues, the court must first determine the secured status of Liberty's claim pursuant to Section 506(a) of the Bankruptcy Code. Liberty "bears the ultimate burden to prove by a preponderance of evidence . . . that its claim was oversecured, to what extent, and for what period of time." *Financial Security Assurance, Inc. v. T–H New Orleans Limited Partnership (In re T–H New Orleans Limited Partnership)*, 116 F.3d 790, 798 (5th Cir.1997).[201]

Section 506(a) of the Bankruptcy Code provides in pertinent part that:

An allowed claim of a creditor secured by a lien on property *in which the estate has an interest* . . . is a secured claim *to the extent of the value of such creditor's interest in the estate's interest in such property* . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property. . . .

(Emphasis added).

Although the collateral subject to Liberty's loan includes the property of the individual guarantors and property of the debtor, only the debtor's property is relevant to the court's determination of the secured status of Liberty's claim against the debtor under Section 506.[202] The debtor's property given as collateral to Liberty is comprised of the debtor's inventory and the proceeds of that inventory.

## 3. Does Liberty have a perfected security interest in all of Toy King's inventory?

### a. Inventory in Pennsylvania and Maryland.

The plaintiff asserts that Liberty does not have a security interest in some of the debtor's inventory because Liberty failed to file timely UCC–1 financing statements in Pennsylvania and Maryland and failed to file a UCC–1 financing statement altogether in Mississippi. The court determined in Section V.C.5. above that Liberty timely filed its UCC–1 financing statements to continue its perfected security interest in the debtor's inventory located in Pennsylvania and Maryland. The plaintiff, therefore, cannot prevail on its claim as to the inventory located in those states.

### b. Inventory in Mississippi.

### i. Effect of the bankruptcy filing when a financing statement was not filed in Mississippi.

It is true, however, that Liberty never filed a UCC–1 financing statement in Mississippi. As the court discussed in Section V.C.5.c. above, under Section 9–103(1)(d) of the Uniform Commercial

---

201. A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). The party who objects has the burden of going forward with facts that overcome the presumption of validity that attaches to all properly filed claims. *Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.)*, 121 B.R. 983, 992 (Bankr.N.D.Ill.1990). Once the plaintiff has overcome this presumption, the burden is on the claimant to establish the validity and amount of its claim by a preponderance of the evidence. *T–H New Orleans Limited Partnership*, 116 F.3d at 798.

202. The debtor has no legal or beneficial entitlement to the cash, cash equivalents, or real estate collateral pledged by the individual guarantors to secure the Liberty loan.

In Section V.F.8. above, the court determined that the debtor—through the committee—is subrogated to the rights of Liberty to the collateral given Liberty by the individual guarantors. This development does not affect the court's determination of the secured status of Liberty's claim because the court makes the secured status determination as of a much earlier time. *See* Section V.H.4. *infra*.

Code, Liberty had four months from the date that the debtor shipped inventory into Mississippi to file a UCC–1 financing statement in that state to continue its perfected security interest in inventory located there.

The debtor shipped inventory into Mississippi one week before it opened its new store on November 11, 1989. Liberty therefore needed to file a UCC–1 financing statement in Mississippi on or before March 3, 1990, to continue to perfect its security interest in the debtor's inventory located in that state. The debtor did not do so. The trade creditors filed an involuntary petition initiating the Toy King II case, however, before the re-perfection window closed on March 3, 1990.

Courts have split on the question of whether an insolvency proceeding tolls the four month deadline by which a secured creditor is required to file a UCC–1 financing statement in a new state to continue its perfected security interest. Section 9–103(1)(d) of the Uniform Commercial Code, the controlling provision, is silent with respect to this specific issue. Courts have therefore determined the issue on the basis of statutory construction, adopting either a liberal or literal interpretation of the Uniform Commercial Code, depending on the court's view of the objectives and purposes of the applicable law.

In *General Electric Co. v. Halmar Distributors, Inc. (In re Halmar Distributors, Inc.)*, 968 F.2d 121, 128 (1st Cir.1992), for example, the court held that the filing of a bankruptcy petition tolled the period by which the secured creditor is required to file a financing statement in a new state. The court based its decision on Section 9–403(2) of the Uniform Commercial Code. Section 9–403(2) provides that, when a previously filed financing statement is due to expire during the course of bankruptcy proceedings, a creditor need not file a continuation statement until after the bankruptcy is closed. *Id.* at 126.

The court extended the reach of Section 9–403(2) to Section 9–103(1)(d), reasoning

that both sections shared a common purpose. The court noted that each section is primarily concerned with providing notice of the secured creditor's security interest to subsequent putative creditors, rather than with protecting the original secured creditor itself. *Id.* at 125. The court concluded that the filing of a bankruptcy petition accomplished the primary purpose of Section 9–103(1)(d) because the trustee takes open and notorious possession of property of the debtor's estate and the court thereafter retains jurisdiction of its disposition. *Id.* at 126 (*citing United States, Small Business Administration v. Freeland (In re Chaseley's Foods, Inc.)*, 30 B.R. 452, 456–57 (N.D.Ind.1983), *aff'd & remanded*, 726 F.2d 303, 306 (7th Cir. 1983)).

In contrast, in *Borg–Warner Acceptance Corp. v. Twelves (In re Utah Agricorp., Inc.)*, 12 B.R. 573, 578 (Bankr.D.Utah 1981), the court adopted a more literal reading of the Uniform Commercial Code when it refused to extend Section 9–403(2) to Section 9–103(1)(d). The court reasoned that the expected duration of the relief afforded by each section is very different in scope. The court emphasized that Section 9–103(1)(d) is intended to provide a temporary grace period, while Section 9–403(2) can operate to toll indefinitely the filing of a continuation statement. *Id.* at 577. The court also found the absence of any mention of an extension of the Section 9–103(1)(d) grace period, such as that contained in Section 9–403(2), to be "indicative of the Code's intent not to extend such periods in insolvency proceedings." *Id.*

Under the *Halmar Distributors* approach, of course, the substantive distinction relied on by the *Utah Agricorp* court is irrelevant because the insolvency proceeding itself is a substitute for the filing of a UCC–1 financing statement called for by Section 9–103(1)(d). Provided that the insolvency proceeding is initiated within the four month period, Section 9–103(1)(d)

is deemed satisfied, at least throughout the pendency of the insolvency proceeding.

The *Halmar Distributors* approach has been adopted in at least one other circuit and is favored by commentators. *See Reedy River Ventures Limited Partnership v. Synoptics Communications, Inc.*, 38 F.3d 1213, 1994 WL 560570 *2 (4th Cir.1994); James J. White & Robert S. Summers, *Uniform Commercial Code* § 22–21 at 1056 (3d ed. 1988) ["[D]ebtor's bankruptcy within the four month period will have the same effect as though the [creditor] had perfected its security interest by filing in the new state."] Section 1–102 of the Uniform Commercial Code makes clear that the Act is to be "liberally construed and applied to promote [its] underlying purposes and policies."

The court adopts the *Halmar Distributors* decision as the better reasoned view and concludes that the filing of a bankruptcy petition tolls the deadline by which a secured creditor must file a UCC–1 financing statement in a new state. Liberty, therefore, had a continuously perfected security interest in the debtor's inventory and its proceeds located in Mississippi at all times after the inventory was shipped to that state.

ii. *Who has priority if the perfection lapses? The debtor or the secured party, Liberty?*

■ In any event, even if Liberty's perfected security interest in the debtor's inventory located in Mississippi lapsed due to Liberty's failure to file a UCC–1 financing statement in Mississippi, Liberty would still hold a priority position in relation to the plaintiff. When a secured creditor fails to file a UCC–1 financing statement within the four month period, under Section 9–103(1)(d)(i) the creditor's "security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a *purchaser*

after removal." (Emphasis added). Section 9–103(1)(d)(i) specifically excludes a lienholder from its ambit and, thus, does not allow a lienholder to prime a secured creditor who fails to perfect timely its security interest in a new state. *See Final Report of the Article 9 Review Committee of the Permanent Editorial Board for the Uniform Commercial Code*, April 25, 1971 ["The Committee proposes in ... 9–103(1)(d)(i) ... to make clear that after the lapse purchasers—i.e., buyers and secured parties—have priority over the lapsed security interest. The negative inference is that judgment lienors remain subordinate."]. *See also*, James J. White & Robert S. Summers, *Uniform Commercial Code* § 22–21 at 1056 (3d ed. 1988)["[A] trustee in a bankruptcy occurring within [the four month period] should lose because the out-of-state security interest does *not* become unperfected beyond the four-months as against one not a 'purchaser'."].

Section 544(a) of the Bankruptcy Code, of course, gives the trustee, or in this case the unsecured creditors committee standing in the shoes of the debtor, the rights of a hypothetical judgment lienholder rather than a bona fide purchaser.[203] *See City National Bank of Miami v. General Coffee Corp. (In re General Coffee Corp.)*, 828 F.2d 699, 704 (11th Cir.1987). To obtain priority over Liberty, however, the trustee (or the debtor) would be required to have the rights of a bona fide purchaser. Because the plaintiff has rights only as a hypothetical judgment lienholder, it cannot assume a position superior to Liberty on the facts of this case even if the filing of a bankruptcy petition did not toll Liberty's obligation to file a UCC–1 financing statement in Mississippi.

iii. *Conclusion.*

The plaintiff concedes that Liberty has a perfected security interest in the debt-

---

**203.** Under Section 544(a)(3) of the Bankruptcy Code, the trustee has the rights of a bona

fide purchaser only as to real property.

or's inventory and proceeds in all states but Pennsylvania, Maryland, and Mississippi. For all of the foregoing reasons, the court concludes that Liberty has a perfected security interest in all of the debtor's inventory and proceeds, including inventory located in Pennsylvania, Maryland, and Mississippi, superior to that of the plaintiff.

### 4. What is the value of Liberty's collateral?

■■■ Having determined that Liberty has a fully perfected security interest in all of the debtor's inventory and proceeds, the court must now determine the value of that collateral. Courts are required to determine the secured status of a creditor's claim "on a case-by-case basis in light of the purpose of the valuation and the proposed disposition or use of the subject property." In re Landing Associates, Ltd., 122 B.R. 288, 292 (Bankr.W.D.Tex. 1990) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5854).

■■■ Some courts have held that a creditor's secured claim is always determined on a specific date. See, e.g., Community Bank of Homestead v. Torcise (In re Torcise), 187 B.R. 18, 23 (S.D.Fla.1995) ["The amount by which a claim is oversecured must be determined as of the petition date."], rev'd on other grounds, 162 F.3d 1084, 1087 (11th Cir.1998); NCNB Texas National Bank v. Hulen Park Place, Ltd. (In re Hulen Park Place, Ltd.), 130 B.R. 39, 43 (N.D.Tex.1991) [issue of whether creditor is oversecured is determined as of the petition date]; Landing

Associates, 122 B.R. at 293 [measurement date is confirmation date].

The majority of courts, however, adopt a flexible approach to the determination of the secured status of a claim that is based upon the circumstances of the case and the purpose of the valuation. See, e.g., T–H New Orleans Limited Partnership, 116 F.3d at 798; In re Hemisphere International Center, Inc., 59 B.R. 289, 294 (Bankr.S.D.Fla.1986). This court adopts the flexible approach as the better reasoned position. The court must therefore decide the appropriate date and method to value Liberty's collateral based upon the facts of this case.

■■■ In this case, TKA paid down the entire balance of the Nintendo loan and paid $600,000 in principal on account of the Liberty loan prior to the filing of Toy King II. Consequently, TKA owed Liberty $900,000 on the Liberty loan on the Toy King II petition date. The debtor as guarantor had a contingent liability for this amount. There is no dispute, therefore, that Liberty has an allowed claim in the amount of $900,000 that is secured by property of the estate. The collateral, the debtor's inventory, had a value of $1,111,610.03 on the Toy King II petition date.[204] The evidence, therefore, demonstrates that Liberty's claim was oversecured when the Toy King II case was filed.

Later, on May 17, 1990, the debtor sold substantially all of its assets for the total amount of $1,000,050. In Section IV.I.3. above, the court determined that $750,000 of this amount represented the debtor's inventory in which Liberty had a security

---

**204.** The court calculates this amount as follows: By subtracting the value of the debtor's inventory on May 17, 1990, in the amount of $750,000 from the value of the debtor's inventory on January 28, 1990, as determined by the court in note 98 supra of $1,169,313.76, the court determines that the value of the debtor's inventory diminished in the amount of $419,313.76 over a period of 109 days, or by $3,846.9152 per day. By multiplying $3,846.9152 by the number of days between January 28, 1990, and the date Toy King II was filed, February 12, 1990, or 15 days, the court determines that the debtor's inventory diminished by $57,703.80 by the Toy King II filing date. By subtracting this amount, $57,703.80, from the value of the debtor's inventory on January 28, 1990, $1,169,313.76, the court concludes that the debtor's inventory had a value of $1,111,610.03 on February 12, 1990.

interest.[205] By May 17, 1990, therefore, the debtor's inventory had a value that was less than the amount of Liberty's claim against the debtor's estate. The court is satisfied that at some point in time between the filing of Toy King II and the debtor's sale of its assets, Liberty's claim became undersecured.

In circumstances where the collateral has been sold, courts generally determine the secured status of the claim on the date of sale for the purpose of allowing the secured claim and determining the creditor's entitlement to interest and attorney's fees, provided that the sale price is fair and the result of arms-length negotiation. See, e.g., Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 870 (4th Cir.1994) ["[C]ourts should use the sale price, not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest under § 506(b)."]; Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.), 151 B.R. 931, 935–36 (9th Cir. BAP 1993) ["[T]he value of the collateral at the time of sale, subject to credit for the costs of improvements made by [the debtor], is the appropriate benchmark for determining [the creditor's] secured status."]; In re Mitchell, 81 B.R. 171, 173 (Bankr.D.C. 1988) ["[T]he maximum amount allowable to [the secured creditor] under Sections 502(b)(2) and 506(b) is the net sales price . . . ."]; In re Kids Stop of America, Inc., 64 B.R. 397, 401 (Bankr.M.D.Fla.1986) ["If there is to be a disposition of the property, then the valuation of the collateral should be based on the funds received from the disposition so long as the disposition is commercially reasonable."]. See also 5 Collier on Bankruptcy, ¶ 506.01 at 506.03[6][b] (15th ed. 1999) ["[R]egardless of the purpose of the valuation, if an actual sale (or equivalent disposition) is to occur, the value of the collateral should be based on the consideration to be received by the estate in connection with the sale, provided that the terms of the sale are fair and were arrived at on an arm's-length basis."].

The debtor completed the sale of its assets to VMI during the pendency of the bankruptcy case and under the supervision of the court. The sale was noticed to all creditors, and each was given an opportunity to object. The sale brought the highest and best price; there were no higher offers. The court conducted a hearing on the motion to sell and determined that the sale was in the best interest of the estate. The court then entered an order approving the debtor's motion to sell its assets to VMI that set forth a deadline by which the sale was to be closed.

When the parties failed to close the sale by that date, the court conducted a second hearing on the debtor's motion to sell. At that hearing, the parties reached an agreement to go forward with the sale at a reduced purchase price. VMI reduced its offer because the debtor could not fulfill all of the terms of the sale and because the value of the debtor's inventory had diminished. There were no higher offers. The court approved the motion to sell on the renegotiated terms. The sale closed shortly thereafter.

The court concludes that the debtor sold its assets, including the inventory subject to Liberty's lien, to VMI for a fair price that was achieved by arms-length negotiation. On the facts of this case, therefore, the court is required to determine the secured status of Liberty's claim as of the time of the May 17, 1990, sale. The court determined in Section IV.I.3. above and in this section that the debtor's inventory had a value of $750,000 on that date. Accordingly, the court concludes that Liberty has an allowed secured claim against the debtor in that amount and an allowed unse-

205. Liberty stipulated that it did not have a security interest in the debtor's fixed assets and leasehold interests.

cured claim for the remaining $150,000.[206] Thus, Liberty received $150,000 more than it was entitled to receive on the principal of its claim when the debtor paid to Liberty $900,000 in principal on August 2, 1991.

### 5. Is Liberty entitled to interest as an oversecured creditor?

The debtor also paid Liberty $149,008.33 in interest on August 2, 1991. The plaintiff seeks to recover this amount on the basis that Liberty is not entitled to interest under Section 506(b) of the Bankruptcy Code.

That section provides that:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The court has determined in Section V.H.4. above that Liberty has an allowed claim totaling $900,000, comprised of an allowed secured claim in the amount of $750,000 and an allowed unsecured claim in the amount of $150,000. Because the debtor's inventory had a value at the time of sale that was less than Liberty's total claim, Liberty is undersecured and therefore not entitled to interest pursuant to Section 506(b).

The same result obtains under the principles set forth in Dobbins, 35 F.3d at 870. In that case, the court found that the creditor was not entitled to post-petition interest, even though it was oversecured at the time the case was filed, because its collateral was ultimately sold for less than was owed. Id. The court was unimpressed that the creditor had been oversecured before the sale, and expressed concern

that allowance of post-petition interest in the circumstances of that case would be unfair to unsecured creditors because the monies used to pay the post-petition interest would of necessity come from the estate's "unencumbered assets ... that would otherwise be available for distribution to unsecured creditors." Id. at 871.

In this case, the debtor paid post-petition interest to Liberty out of the proceeds it realized from the sale to VMI of its unencumbered property. This payment reduced the monies available for distribution to its unsecured creditors, the very result that the Dobbins court feared.

For the reasons stated above, the court concludes that, because Liberty's claim was undersecured at the time the debtor sold its collateral, it is not entitled to post-petition interest on its claim. Liberty received more than the amount to which it was entitled on its claim, therefore, when the debtor paid to Liberty $149,008.33 in interest on August 2, 1991. The plaintiff is also entitled to repayment by Liberty of this amount.

### 6. Is Liberty entitled to attorney's fees as an oversecured creditor?

As the court has explained, Liberty's secured position eroded during the pendency of the case. When the debtor liquidated the inventory that secured its claim, the debtor received less than was owed to Liberty on the debtor's guaranty. The court has determined that Liberty has an allowed secured claim in the amount of $750,000, an amount that is less than its total claim. Because Liberty is undersecured, it is not entitled to attorney's fees and costs pursuant to Section 506(b). In re Broomall Printing Corp., 131 B.R. 32, 35 (Bankr.D.Md.1991) [when the debtor liquidates collateral that is security for the creditor's claim against it for an amount

---

**206.** The court calculates this amount as follows: By subtracting Liberty's allowed secured claim in the amount of $750,000 from the amount it sought in its proof of claim, $900,000, the court determines that Liberty's claim is unsecured in the amount of $150,-000.

that is less than the amount of the creditor's secured claim, the creditor is not entitled to attorney's fees]. Liberty is therefore not entitled to attorney's fees on its claim against the debtor in this case.[207]

### 7. May the debtor surcharge Liberty?

■ The plaintiff also seeks to surcharge Liberty by recovering the monies paid by the debtor to administer and sell its encumbered assets for the ultimate benefit of Liberty pursuant to Section 506(c) of the Bankruptcy Code. As a general rule, the costs of administering the debtor's estate are not charged against a secured creditor's collateral. *Precision Steel Shearing, Inc. v. Fremont Financial Corp. (In re Visual Industries, Inc.)*, 57 F.3d 321, 324 (3d Cir.1995). Section 506(c) of the Bankruptcy Code, however, allows the trustee, or in this case the unsecured creditors committee standing in the debtor's shoes, to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."[208]

■ Courts have limited recovery under this section to "expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with a maximum return on the debt and also apportions those costs to the secured creditor who, realistically, is assuming the asset." *United Jersey Bank v. Miller (In re C.S. Associates)*, 29 F.3d 903, 907 (3d Cir.1994). In other words, the Section 506(c) surcharge

applies when the estate incurs expenses to liquidate collateral for the sole or primary benefit of a secured creditor rather than the estate.

■ The party seeking to charge the costs of administering and disposing of the debtor's assets to a specific creditor has the "burden of proving that his costs and expenses may be surcharged against a creditor's collateral." *American Savings & Loan Association v. Gill (In re North County Place, Ltd.)*, 92 B.R. 437, 443 (Bankr.C.D.Cal.1988). The plaintiff must show that the costs incurred in preserving or administering the debtor's assets resulted in a quantifiable benefit to the creditor. *Id.* at 445. The question of "whether a benefit has been conferred on a creditor is one of fact." *New York National Bank v. First Fidelity Bank*, 1991 WL 208813 *3 (D.N.J.).

■ If the plaintiff successfully argues that the secured creditor received a quantifiable benefit from the sale or disposition of its collateral, then the fees and costs of the sale that inured to the secured creditor's benefit may be surcharged from the value of its collateral. The costs and expenses, however, must be reasonable in type and amount. *In re Wyckoff*, 52 B.R. 164, 167 (Bankr.W.D.Mich.1985). In *Wyckoff*, the court noted that:

> The reasonableness of the costs and expenses sought to be charged under section 506(c) is often measured against the benchmark of the amount of the costs and expenses which would necessarily have been incurred by the holder of the secured claim in foreclosing the property on its own behalf, particularly when such holder has not consented to

---

**207.** The court notes that, although Liberty included attorney's fees in an unspecified amount in its claim, the debtor did not pay attorney's fees when it paid the claim. Instead, Liberty has sought payment of its attorney's fees from the debtor's co-guarantors and/or their pledged collateral, as provided for in the Liberty loan documents.

**208.** In *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120

S.Ct. 1942, 1948, 147 L.Ed.2d 1 (2000), the Court held that only a trustee or debtor-in-possession can seek recovery under Section 506(c) of the Bankruptcy Code. The Court left open the question of whether a bankruptcy court can authorize a creditor or creditor's committee to bring a claim under Section 506(c). *Id.* at 1951 n. 5.

the disposition by the debtor, debtor in possession or trustee.

*Id.* (*quoting* 3 *Collier on Bankruptcy* ¶ 506.06 (15th ed.1985)).

In *New York National Bank,* 1991 WL 208813 at *4, the court used this approach. The district court remanded the case to the bankruptcy court to compare the "costs that the creditor would have incurred if forced to foreclose, with the costs incurred by the trustee in maintaining and disposing of the property" and to determine whether and to what extent the creditor received a quantifiable benefit. *Id.*

■■■■ In this case, the court concludes that the plaintiff has failed to carry its burden of proof on this claim because it has not presented any evidence of specific costs and expenses that the debtor incurred in administering and disposing of the inventory in which Liberty held a security interest. Similarly, the plaintiff has made no attempt to show a quantifiable benefit to Liberty or to present evidence of what costs and expenses Liberty would have incurred had it foreclosed its security interest in state court. Without this essential evidence, the court cannot reach the issues of benefit or reasonableness.

### 8. *Summary.*

For the foregoing reasons, the court concludes that Liberty had a perfected security interest in the debtor's inventory and inventory proceeds on February 12, 1990. Liberty therefore had an allowed secured claim against the debtor's inventory and inventory proceeds. The court further finds that, when the debtor sold its inventory to VMI on May 17, 1990, the value of that inventory was $750,000. Accordingly, Liberty has established by a preponderance of the evidence that it has an allowed secured claim in the amount of $750,000 and an allowed unsecured claim in the amount of $150,000 for the purpose of payment under the debtor's confirmed plan.

The court further finds that Liberty is not entitled to interest or attorney's fees within the meaning of Section 506(b) of the Bankruptcy Code.

Accordingly, the court finds that the plaintiff has established by a preponderance of the evidence that the debtor paid Liberty $150,000 in principal and $149,008.33 in interest in excess of its allowed claim. The plaintiff is entitled to recover these overpayments.

Finally, the court finds that the plaintiff has abandoned, or has failed to establish by a preponderance of the evidence, a claim for the debtor's costs and expenses of administering and disposing of the debtor's assets to be surcharged against the collateral that secures Liberty's claim.

### I. *EQUITABLE SUBORDINATION.*

#### 1. *Introduction.*

■■■■ The unsecured creditors committee seeks to equitably subordinate all of the defendants' claims against the debtor pursuant to Section 510(c) of the Bankruptcy Code. A "chapter 11 debtor-in-possession has standing to bring an equitable subordination action." *Audre Recognition Systems, Inc. v. Casey (In re Audre, Inc.),* 210 B.R. 360, 363 (Bankr.S.D.Cal. 1997). Because the court has authorized the unsecured creditors committee to pursue the debtor's claims against the defendants, the committee has standing to bring this claim.

Liberty and King are the only defendants in this proceeding who have filed claims against the debtor. Liberty filed a secured proof of claim for monies owed on the Liberty loan in the amount of $900,000. King filed a proof of claim for monies owed on his employment contract in the amount of $77,591.89, $2,000 of which he claimed as priority and $75,591.89 of which he claimed as unsecured. None of the other defendants filed proofs of claims in this case. In the event the plaintiff is successful in recovering property or money from any defendant under Sections 544, 547, 548, or

550 of the Bankruptcy Code, however, that defendant might be able to file a proof of claim pursuant to Section 502(h) of the Bankruptcy Code. The plaintiff seeks to subordinate any such claim if filed in addition to Liberty and King's claims.

The plaintiff does not clearly articulate the extent and degree of the subordination sought for these claims and putative claims. It appears, however, that the plaintiff seeks to subordinate these claims in their entirety to the general unsecured claims filed by non-defendants in the Toy King II case.

Given the economics of the debtor's estate, the practical import of equitably subordinating a claim to the general unsecured claims in this case is the disallowance of that claim because there will be insufficient monies in the estate to provide payment in full to unsubordinated general unsecured claims.[209] *Lifschultz Fast Freight*, 132 F.3d 339, 341 (7th Cir.1997) ["Equitable subordination of a claim moves the creditor down in the order of payment out of the assets in the bankruptcy estate, generally reducing (or eliminating) the amount the creditor can recover."].

### 2. *Equitable subordination theory: a higher standard to subordinate non-insiders and non-fiduciaries.*

Section 510(c) provides that:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or a part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

■■■ "Equitable subordination relies on courts' peering behind the veil of formally unimpeachable legal arrangements to detect the economic reality beneath." *Lifschultz Fast Freight*, 132 F.3d at 349. "This task by nature 'require[s] the court to make extremely subjective judgments as to whether a party has acted opportunistically.'" *Id.* (*quoting* David A. Skeel, Jr., "Markets, Courts, and the Brave New World of Bankruptcy Theory," 1993 Wis. L.Rev. 465, 506).

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–705 (5th Cir. 1977), a pre-Code case, is the seminal decision on equitable subordination. In *Mobile Steel*, the court set forth three elements that must be shown by the plaintiff to justify the equitable subordination of the defendant's claim. *Id.* at 700. These elements are: (1) "The claimant must have engaged in some type of inequitable conduct." (2) "The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." (3) "Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Id.*

■■■ The plaintiff's burden of proof as to the first element depends on whether the claimant is a fiduciary or insider. When the plaintiff seeks to equitably subordinate the claim of a non-fiduciary, non-insider of the debtor, the plaintiff is held to a greater proof standard than is the case with a fiduciary or insider. *Boyd v. Sachs (In re Auto Specialties Manufacturing Co.)*, 153 B.R. 457, 478 (Bankr. W.D.Mich.1993). Because equitable subordination is an extraordinary remedy

---

**209.** Without considering administrative claims that must be paid before priority and general unsecured claims, the pending allowed priority and unsecured claims in this case are $3,163,881.91. *See* Section IV.I.3. above. This amount exceeds any possible recovery in this adversary proceeding. Because the only assets remaining in this case are the claims in this adversary proceeding, it is not possible that unsubordinated general unsecured claimants can be paid in full in this case.

"[the] claim of a non-fiduciary creditor generally will not be equitably subordinated unless egregious conduct on behalf of the creditor can be proven with particularity." *Id.* (*citing Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.),* 29 B.R. 139, 168 (Bankr.E.D.N.Y.1983)). The plaintiff must prove that "the claimant is guilty of gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.'" *Teltronics Services,* 29 B.R. at 169 (*quoting W.T. Grant Co.,* 4 B.R. 53, 75 (Bankr.S.D.N.Y.1980)). *See also Boyajian v. DeFusco (In re Giorgio),* 862 F.2d 933, 939 (1st Cir.1988) ["Where a bankruptcy court has subordinated the debt of a creditor who was not an insider, it has done so on the ground that that conduct was egregious and severely unfair in relation to other creditors."].

For example, in *Slefco v. First National Bank of Stuttgart (In re Slefco),* 107 B.R. 628, 644–45 (Bankr.E.D.Ark.1989), the court found that the defendant bank acted fraudulently to promote its own interests at the expense of the unsecured creditors and equitably subordinated the bank's claim. In that case, the bank misrepresented its intentions to lend further monies to the debtor to induce the debtor to correct deficiencies in its loan portfolio and to pledge additional collateral to the bank. *Id.* The bank continued its misrepresentations through harvest in an effort to ensure that the debtor maximized the recovery on its collateral. At the same time, the bank encouraged the debtor to delay payment on its obligations to unsecured creditors. *Id. See also Bergquist v. First National Bank of St. Paul (In re American Lumber Co.),* 5 B.R. 470, 478 (D.Minn. 1980) [court equitably subordinated creditor's claim where creditor, with knowledge of the debtor's insolvency, demanded and received a security interest in the debtor's inventory and proceeded to liquidate the debtor in a way that favored its own interests to the detriment of unsecured creditors].

In contrast, in *Unsecured Creditors' Committee v. Banque Paribas (In re Heartland Chemicals, Inc.),* 136 B.R. 503, 517–19 (Bankr.C.D.Ill.1992), the court found that the bank did not exercise control over the debtor's affairs and did not engage in egregious conduct where it merely made innumerable suggestions to the debtor and threatened to close its line of credit if the debtor failed to make changes in its operations. The court reasoned that "a non-fiduciary claimant can act strategically to protect its interest to the potential detriment of similarly situated claimants." *Id.* at 516 (*quoting Badger Freightways, Inc. v. Continental Illinois National Bank & Trust Co. of Chicago (In re Badger Freightways, Inc.),* 106 B.R. 971, 976 (Bankr.N.D.Ill.1989)).

Similarly, in *Auto Specialties Manufacturing,* 153 B.R. at 494, the court found that the plaintiff failed to establish that the debtor's bank had committed acts of fraud, overreaching, or spoliation sufficient to justify the equitable subordination of its debt. In that case, the bank had a long history with the debtor and was its principal lender. When the debtor experienced a downturn in its business the bank required, as a condition of further lending, the replacement of the existing management with a new management team. The debtor ultimately selected new management based upon a strong recommendation by the bank. The bank also negotiated additional credit with the debtor to permit it to pay a bonus to the debtor's new management. *Id.* at 491–94.

The court refused to equitably subordinate the bank's claim on these facts, finding that the bank's actions were "nothing more than a creditor trying its level best to get out of a bad loan cleanly without either sacrificing its collateral or exposing itself to liability." *Id.* at 495. *See also Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),* 212 B.R. 898, 928 (Bankr.N.D.Ill.1997) ["Firms that have negotiated contracts are entitled to enforce them to the letter, even to the

great discomfort of their trading partners, without being mulcted for lack of good faith," (*quoting Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990)) ].

### 3. *The claim against Liberty.*

In Section V.C.6.b. above, the court determined that Liberty is neither a fiduciary nor an insider of the debtor. The non-fiduciary, non-insider standard, therefore, is the appropriate standard by which the court must judge Liberty's actions.

■ There is no doubt that Liberty can be charged with some inequitable conduct. Liberty's actions in making the Liberty and Nintendo loans, however, fall somewhere between the egregious acts of the *Slefco* case and the innocuous acts of the *Heartland Chemicals* case. The question before the court, therefore, is whether Liberty's actions rise to the level of magnitude that would justify the equitable subordination of Liberty's claim. The answer lies in Liberty's motivations and rewards in making the Liberty and Nintendo loans.

■ Although Liberty failed to exercise due diligence and reasonable care in making the Liberty and Nintendo loans, there is no evidence that it did so with intent to harm. To the contrary, the evidence suggests that Liberty put the needs of the debtor and TKA above its own sound business judgment in an attempt to facilitate the debtor's reorganization and to promote the debtor's ability to operate. To that end, Liberty made a risky loan in hurried circumstances without adequate attention to the credit worthiness of TKA and the debtor. Liberty was a small community savings bank, just beginning to expand its loan operations into commercial lending, and it placed undue reliance on its business relationships with its borrowers' principals. Although the court does not condone the manner in which Liberty made the Liberty and Nintendo loans, it cannot conclude that Liberty did so with malice or intent to hinder, delay, or defraud.

In marked contrast to the benefits that TKA, M & D, Morrow, Angle, and Woodward achieved, Liberty did not garner a benefit from the Liberty and Nintendo loans that was in any way exceptional or out of the ordinary in the commercial lending industry. Although Liberty sought to protect its position and ensure payment on its loan, it did not coerce or exert undue pressure on TKA and the debtor to do so. For example, Liberty elected to fund the Nintendo loan without the additional collateral and guaranties that would have improved its secured position because the debtor needed the money quickly. As was the case in *Auto Specialties Manufacturing,* Liberty's actions in making the Liberty and Nintendo loans were intended to protect the bank's interest in its collateral and to preserve the debtor's ability to satisfy its indebtedness to TKA and Liberty. Liberty's actions, although lacking in sound business judgment and harmful to the debtor's trade creditors, were not taken in an affirmative attempt to secure itself a benefit it would not otherwise obtain through the ordinary course of its dealings with TKA and the debtor.[210]

For these reasons, the court concludes that Liberty's actions in making the Liberty and Nintendo loans do not demonstrate "gross misconduct" and were not "egregious and severely unfair to other creditors." The court also notes that if the plaintiff were to prevail on its claim for equitable subordination, Liberty would receive no recovery from the estate while, at the same time, bearing responsibility for the avoided transfers it received from TKA. This would essentially shift all responsibility for the debtor's failure to Lib-

---

**210.** Liberty clearly operated under the premise that the Liberty loan was a private transaction between the parties and thus did not appreciate the legal ramifications of making the loan as part of a confirmed plan in a bankruptcy reorganization.

erty, a result that would be manifestly unjust.[211]

The court determines, therefore, that the plaintiff has failed to establish by a preponderance of the evidence the first element required for equitable subordination of Liberty's claim. Accordingly, the court need not consider the remaining elements. The plaintiff's request to equitably subordinate Liberty's claim fails.

### 4. *The claims against TKA and M & D.*

#### a. *Introduction.*

■■■■The committee seeks to equitably subordinate any Section 502(h) claims that TKA or M & D may assert against the estate. TKA and M & D were both creditors of the debtor. They may assert claims in the amounts of any repayments that they make of preferences or fraudulent transfers as previously determined by the court. In Section V.C.3.b. and V.C.7.b.ii. above, the court determined that TKA and M & D are insiders of the debtor. The court must therefore apply the fiduciary, insider standard in determining the plaintiff's equitable subordination claims against them. Thus, the plaintiff merely must prove inequitable conduct rather than egregious conduct.

In circumstances where the plaintiff seeks to equitably subordinate the claim of a fiduciary or insider of the debtor who is also a creditor, the line between the defendant creditor and the debtor is often blurred. The insider creditor is typically in a position to exert control over the debtor. The creditor may also share common management and/or ownership with the debtor. In its efforts to collect its debt, therefore, the creditor may act directly or cause the debtor to act. Consequently, it becomes more difficult to establish with particularity that the creditor defendant has engaged in inequitable conduct. *See Lifschultz Fast Freight,* 132

F.3d at 349 ["easy, clear rules to find underhanded behavior are hard to come by, because the clever soon figure out ways around them."].

■■■■ Recognizing the analytical difficulties inherent in determining whether a fiduciary or insider has engaged in inequitable conduct, courts have uniformly shifted the evidentiary burden from the plaintiff to the defendant after the plaintiff shows some form of inequitable conduct. *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators),* 926 F.2d 1458, 1467–70 (5th Cir.1991) [creditor acted inequitably where insider relationship between the creditor and the debtor enabled the creditor to gain preferential treatment]; *Wilson v. Huffman (Missionary Baptist Foundation of America),* 818 F.2d 1135, 1146 (5th Cir.1987) [partner's inequitable conduct could be imputed to defendant who was "intimately connected" with the transactions sought to be subordinated]; *Goode v. Hagerty (In re Systems Impact, Inc.),* 229 B.R. 363, 373 (Bankr. E.D.Va.1998) [defendants engaged in inequitable conduct "when as directors of the debtor they *allowed* payments to be made to them in contravention of two corporate resolutions." (Emphasis added)]. Once the plaintiff shows an inequity, "the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated." *Estes v. N & D Properties, Inc. (N & D Properties, Inc.),* 799 F.2d 726, 731 (11th Cir.1986).

#### b. *Inequitable conduct.*

■■■■ The first element that the plaintiff must establish under the *Mobile Steel* test is whether the defendant has engaged in inequitable conduct. *Mobile Steel,* 563 F.2d at 700. "In the context of equitable subordination, the type of conduct that has been considered 'inequitable' generally falls within the following categories: '(1) fraud, illegality, breach of fiduciary duties;

---

**211.** The evidence shows that TKA and M & D are shell corporations with few, if any, assets.

Hence, it is unlikely that the plaintiff will realize a tangible recovery from those entities.

(2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego.'" *Lifschultz Fast Freight*, 132 F.3d at 344–45 (*quoting Missionary Baptist Foundation*, 712 F.2d 206, 212 (5th Cir.1983), *remanded*, 818 F.2d at 1144). These categories describe the kind of conduct required to satisfy the *Mobile Steel* elements rather than the degree of culpability required. *See, e.g., In re Beverages International Ltd.*, 50 B.R. 273, 281 (Bankr.D.Mass.1985) ["Proof of outright fraud is unnecessary."]; *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 133 (5th Cir.1993) ["It is well established that actual fraud need not be shown for equitable subordination."] (*quoting Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709, 720 (5th Cir.1980)).

Essentially, "[t]he court must closely examine the claimant's relationship to the debtor to determine whether the claimant has used an opportunity to adjust its position in such a way that other creditors are prejudiced." *Beverages International*, 50 B.R. at 281. In *Beverages International*, the court noted that:

> Inequitable conduct is conduct which may be lawful, yet shocks one's good conscience ... a secret or open fraud ... an unjust enrichment, not ... by astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.

*Id.* (*quoting In re Harvest Milling Co.*, 221 F.Supp. 836, 838 (D.Or.1963)). "The inquiry is on a case-by-case basis focusing on fairness to other creditors." *Kids Creek Partners*, 212 B.R. at 928.

For example, in *N & D Properties*, 799 F.2d at 732, the court found that the defendant acted inequitably when she misrepresented to potential customers the debtor's ability to transact business while taking steps to promote her own interests. The defendant owned a minority interest in the debtor, a retail furniture business, and took control of the debtor upon learning that it was defaulting on its obligations. While in control of the debtor, the defendant offered substantial discounts to cash paying customers, knowing that the debtor would be unable fill those orders. At the same time, the defendant took a security interest in the debtor's inventory and receivables. The court concluded that the defendant "was acting solely for her own benefit, to minimize her risk of loss without any consideration for other creditors." *Id.*

Similarly, in *Systems Impact*, 229 B.R. at 372, the court found that the defendant directors treated the plaintiff unfairly when the debtor made note payments to the defendant directors in contravention of a subordination agreement and despite repeated assurances to the plaintiff that the plaintiff's obligations would receive priority treatment. The court emphasized that, because the defendants were insiders of the debtor, the plaintiff did not need to prove that the defendants "committed 'wrongful acts' or engaged in fraudulent conduct" but merely that they acted inequitably. *Id.* at 373.

*Herby's Foods*, 2 F.3d at 133, is another case containing an example of conduct that the court found to be inequitable. In that case, the defendant and debtor shared commonality of ownership and management. The court found that the defendant's actions in advancing funds to the debtor through loans rather than equity and then later taking a security interest in the debtor's assets when the debtor was insolvent was "more than adequate evidence of inequitable conduct." *Id.*

Likewise, in *In re McFarlin's, Inc.*, 49 B.R. 550, 553 (Bankr.W.D.N.Y.1985), the court found that the plaintiff had satisfied its burden of persuasion on a claim for equitable subordination where the plaintiff established facts of "exorbitant interest rates, bad faith, and unfair dealings on the part" of the defendant. *Id.*

On the other hand, in *Lifschultz Fast Freight*, 132 F.3d at 353, the court refused to equitably subordinate the insider's claim against the debtor where the insider acted at arms-length in making a loan to the debtor. The court noted that "the insiders provided funds to the company on a footing comparable to that an outsider afforded." *Id.*

TKA's actions in this case parallel those found to be inequitable in the *N & D Properties*, *Systems Impact*, *Herby's Foods*, and *McFarlin's* cases, rather than those cited with approval in the *Lifschultz Fast Freight* case. TKA acted unfairly when it put its own interests before the other creditors in its dealings with the debtor. For example, TKA ignored Liberty's requirement that it invest $500,000 of the Liberty loan proceeds into the debtor and instead loaned the monies to the debtor. TKA charged interest on all of its lending to the debtor at excessive and unreasonable rates. TKA also charged to the debtor guaranty fees that were wholly unreasonable and excessive in amount.

At the same time, TKA was able to obtain an unfair advantage through Morrow and Angle, who were principals of both TKA and the debtor. For example, the debtor misrepresented on its balance sheets the obligations it owed to TKA and in its representations to trade creditors, thereby enticing trade creditors to advance credit to the debtor. The debtor funded its payments to TKA through the liquidation of inventory that it purchased with this credit. At all times, the debtor treated its obligations to TKA on a priority basis, making its payments no matter what was happening with the debtor. The debtor elected to reduce its purchases of Nintendo products (a lead product), to purchase goods that were of inferior quality or outdated, and to use more costly suppliers in preference to foregoing or reducing its payments to TKA. When it became clear that the debtor would not be able to continue to operate as a going concern on its own, the debtor made substantial payments on its TKA obligations in preference to its trade debt. Although the debtor made these payments without any apparent coercion by TKA, the evidence is clear that Morrow and Angle were acting in the best interests of TKA rather than the debtor when they caused the debtor to pay down its debts to TKA.

The court concludes that the plaintiff has established that TKA acted inequitably in its dealings with the debtor. Accordingly, the burden of proof shifts to TKA to show that its actions were fair. TKA proffered some testimony at trial by its principals that its relations with the debtor were for a valid business purpose and reasonable in degree. The court did not credit this testimony, and TKA did not offer any other evidence in support of its position. TKA therefore cannot carry its burden of proof; the plaintiff has satisfied the first element of the *Mobile Steel* case with respect to TKA.

M & D's actions in this case were also inequitable. As was the case with TKA, the common management between M & D and the debtor allowed M & D to control the actions of the debtor to the extent necessary to further the interests of M & D whenever they were at odds with the debtor's interests. M & D was able to secure for itself the First Union claims with minimal investment. M & D obtained a better interest rate on those claims than the interest rate provided for claims of that class in the Toy King I confirmed plan. The debtor paid M & D a portion of its dividend, with interest and "profit" included, before any other dividend claim was paid. When it became clear that the debtor was failing, the debtor paid the M & D subordinated note in contravention to the terms of the confirmed plan and in advance of its trade creditors. The debtor made no attempt to obtain Liberty's consent to this payment.[212] Although the

212. One can only imagine what Liberty's re- action would have been had it been told of

debtor made the payment without any apparent coercion by M & D, the evidence is clear that Morrow was furthering M & D's interests rather than the debtor's when he caused this payment to be made.

Accordingly, the court concludes that the plaintiff has established that M & D acted inequitably in its dealings with the debtor. The burden of proof therefore shifts to M & D to show that its actions were fair. M & D has provided no evidence in this case that would support such a conclusion. In fact, its conduct in acquiring the First Union claims and continuing through the payment on those claims provides a classic case of self-dealing by insiders and fiduciaries. The court therefore concludes that the plaintiff has also established the first element of the *Mobile Steel* test with respect to M & D.

### c. *Resulting harm or unfair advantage.*

 The second element of the *Mobile Steel* test that the plaintiff must establish is whether the defendant's actions resulted in harm to other creditors or created an unfair advantage for the defendant. *Mobile Steel*, 563 F.2d at 700. In *Capitol Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604 Columbus Avenue Realty Trust)*, 968 F.2d 1332, 1363 (1st Cir.1992), the court described the appropriate analysis for this element as follows:

> In examining the effect of the conduct on creditors, the court should consider the effect on the then-known creditors, as well as future creditors. In this analysis, the question to be answered is whether or not the offending conduct had an impact on the bankruptcy results, that is, the bottom line, in the proceeding before the court .... This would encompass all the effects of fraud and inequitable conduct that would have an impact upon [other creditors' legal or equitable rights in the bankruptcy re-

this payment after having just been told by Morrow and Angle that the debtor was unable

sults] .... In demonstrating the harm, the objecting party usually need not identify specifically each particular creditor who was harmed and quantify the injury suffered by each. If the misconduct results in harm to the entire creditor body, the objecting party need demonstrate only that the misconduct harmed the creditor body in some general, albeit concrete, manner.

(*quoting*, A. DeNatale and P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law, 417, 426 (1985)).

 For example, harm may consist of a creditor's "reliance on the management's mischaracterizations of financial condition, or the continued buildup of unsecured debt caused by the manipulation of the debtor by the claimant to his own advantage." *Beverages International*, 50 B.R. at 283 (citations omitted). This element can be satisfied, therefore, if the plaintiff can show that the "general creditors are less likely to collect their debts." *80 Nassau Associates v. Crossland Federal Savings Bank (In re 80 Nassau Associates)*, 169 B.R. 832, 840 (Bankr.S.D.N.Y. 1994).

 Alternatively, the second element is satisfied if the plaintiff can demonstrate that the defendant received more than it would have but for its inequitable conduct. *See, e.g.*, *McFarlin's*, 49 B.R. at 555 ["The decision by the officers to make ... substantial payments on behalf of the debtor" to the corporation that they owned while making no payments to other creditors "conferred an unfair advantage on the officers to the detriment of other creditors."].

 The facts that the plaintiff has adduced in this case with respect to both TKA and M & D are more than sufficient to establish both types of harm. The debtor's creditors were harmed by TKA's failure to capitalize the debtor and by M &

to make anticipated principal payments on the Liberty loan.

D's usurpation of the debtor's opportunity to acquire the First Union claims at a discount. TKA and M & D siphoned needed cash from the debtor by these acts and exacerbated the debtor's liquidity problems. At the same time, the debtor's liabilities to its trade creditors climbed from roughly $538,167 at the time Toy King I was confirmed [213] to roughly $1,967,706 at the time Toy King was filed.[214] The debtor was unable to make any distribution on these liabilities in this case.

TKA and M & D, on the other hand, who stood in parity with the debtor's trade creditors, received substantially more from the debtor than they would have if their claims had been paid with the general unsecured claims during the pendency of this case. TKA received regular periodic payments of interest and guaranty fees. TKA also received principal payments, including monies that were to be infused in the debtor as equity. M & D received its principal on its subordinated note in addition to interest and "profit".

For these reasons, the court concludes that the plaintiff has established this element with respect to both TKA and M & D.

### d. Consistency with the provisions of the Bankruptcy Code.

The third element under *Mobile Steel* that the plaintiff must satisfy is whether equitable subordination of the defendant's claim is consistent with the Bankruptcy Code. *Mobile Steel*, 563 F.2d at 700. "This requirement has been read as a 'reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable.'" *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims (In Papercraft Corp.)*, 160 F.3d 982, 990 (3d

Cir.1998) (*quoting United States v. Noland*, 517 U.S. 535, 539, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996)).

In *80 Nassau Associates*, the court made the following observation with respect to this element:

> The requirement that subordination must be consistent with bankruptcy law comes into play only after the court has concluded that the first two prongs [under *Mobile Steel*] have been satisfied. Conversely, if a court determines that the party advocating equitable subordination has satisfied the first two prongs of the *Mobile Steel* test, it is difficult to imagine a situation in which equitable subordination would not be warranted by bankruptcy law. And since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot.

*80 Nassau Associates*, 169 B.R. at 841.

Indeed, an exhaustive examination of cases decided after 1980 fails to yield one case in which the court refused to equitably subordinate a claim because the plaintiff could not satisfy the third element under *Mobile Steel*.

Courts that have considered this element concluded that, where the plaintiff has satisfied the first two elements of the *Mobile Steel* test, the third element is satisfied. *See, e.g., Papercraft*, 160 F.3d at 990 [availability of alternate remedies under the Code did not make equitable subordination incompatible with the Code]; *McFarlin's*, 49 B.R. at 555–56 [equitable subordination consistent with the Bankruptcy Code].

In *McFarlin's*, the court pointed out that:

> One of the functions of bankruptcy is fair and orderly distribution of the debtor's assets among creditors.

---

**213.** The debtor owed this amount as of May 28, 1990. *See* note 46 *supra*.

**214.** The debtor owed this amount as of January 28, 1990. *See* note 98 *supra*.

Where insiders have injured the debtor, preferred themselves over the other creditors, and created an unfair bargain, the principles of fairness would be violated if the insiders' claim was allowed to share equally with the other creditors.

*Id.*

 For these reasons set forth in *McFarlin's*, the court determines that the plaintiff has established this element with respect to TKA and M & D.

### e. *Conclusion.*

For the reasons set forth above, the court concludes that the plaintiff has established by a preponderance of the evidence each of the three elements required to equitably subordinate the claims of TKA and M & D within the meaning of Section 510(c) of the Bankruptcy Code.

### 5. *The claims against the individual defendants.*

#### a. *King.*

 The committee seeks to subordinate King's claim in the amount of $77,591.89. King's claim is for monies owed on an employment contract with the debtor and thus not directly connected with any of the transactions at issue in this proceeding. In *Mobile Steel*, the court made clear, however, that "inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim." *Mobile Steel*, 563 F.2d at 700.

#### i. *Inequitable conduct.*

The court determined in Section V.F.4.c.i. above that King is a fiduciary of the debtor. King is also an insider because he is an officer and director of the debtor corporation. 11 U.S.C. § 101(31)(B)(i) and (ii). The fiduciary, insider standard thus applies, and the plaintiff must demonstrate that King's conduct

was inequitable to satisfy the first prong of the *Mobile Steel* test.

The court concluded in Section V.D.2.a.iii.(2) above that King actively participated in a general scheme to hinder, delay, and defraud creditors when he affirmatively misrepresented the debtor's financial condition to its trade creditors as a means of securing credit. The court also concluded in Section V.F.4.c.iv.(2) above that King breached his fiduciary duty of care when he, along with Morrow and Angle, caused the debtor to borrow monies from TKA at an excessive interest rate and to pay unearned guaranty fees. The plaintiff "need prove only that [the insider] breached a fiduciary duty or engaged in conduct that is somehow unfair." *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1282 fn. 13 (8th Cir.1988). The plaintiff has thus demonstrated that King acted inequitably.

The burden of proof therefore shifts to King to demonstrate that his actions were fair. King has not offered an alternative explanation of his actions and has not provided any evidence that would rebut or controvert the court's conclusion that his actions were inequitable. Accordingly, the court determines that the plaintiff has established by a preponderance of the evidence the first element of the *Mobile Steel* test.

#### ii. *Resulting harm or unfair advantage.*

King harmed the debtor's creditors by his misrepresentations of the debtor's financial condition because he induced the debtor's trade creditors to extend credit to an entity that was insolvent and incapable of paying all of its debts. King similarly harmed the debtor and its creditors through his breach of his fiduciary duty of care because he passively or actively participated in the debtor's wasting of its precious cash on payments of bogus and inflated charges to TKA making it more difficult to maintain its operations and pay its rightful debts.

**204**

The plaintiff has adduced no evidence that King was unfairly benefited by his inequitable actions. The plaintiff is not required to establish both types of harm, however, and need only show that the defendant's actions harmed the creditors. *Mobile Steel,* 563 F.2d at 700.

Accordingly, the court determines that the plaintiff has established by a preponderance of the evidence the second element of the *Mobile Steel* test.

iii. *Consistency with the provisions of the Bankruptcy Code.*

In analyzing the third element of the *Mobile Steel* test, the court concludes that the plaintiff has established this element by a preponderance of the evidence for the reasons stated in Section V.I.4.d. above.

iv. *Conclusion.*

For the reasons set forth above, the court concludes that the plaintiff has established by a preponderance of the evidence each of the three elements required to equitably subordinate King's claim within the meaning of Section 510(c) of the Bankruptcy Code.

b. *Morrow, Angle, Woodward, Hunsaker II, Hunsaker III, and Ranney.*

The plaintiff seeks to subordinate equitably pursuant to Section 510(c)(1) of the Bankruptcy Code any claim that the remaining defendants, Morrow, Angle, Woodward, Hunsaker II, Hunsaker III, and Ranney, may assert against the debtor. Although these defendants have not to date filed any claims against the debtor, they may file claims in the future based upon their repayments of avoided transfers.

 "When a trustee recovers property under 11 U.S.C. § 550, the subsequent transferee is authorized under § 502(h) to pursue a claim against the bankruptcy estate the same as if such claim had arisen before the date of the filing of the petition." *See Southmark Corp. v. Schulte, Roth & Zabel, L.L.P. (In re Southmark Corp.),* 242 B.R. 330, 341 (N.D.Tex.1999). To pursue such a claim against the debtor, however, the subsequent transferee must be a creditor of the debtor or be able to assert a claim against the debtor under principles of common law. *Id.* The first issue to be decided by the court, therefore, is whether the remaining defendants will be able to assert a claim against the debtor.

In *Southmark,* the court found that a law firm that was the subsequent transferee of monies paid by the debtor in settlement of pending litigation could not assert a claim against the debtor's estate. *Id.* at 342. The facts of that case were as follows. The debtor was engaged in litigation in connection with a proxy bid. In settlement of that litigation, the debtor agreed to pay a sum of money to the opposing party, including an amount for its legal fees and costs. The debtor made the payment, and the opposing party thereupon settled its legal fees with the defendant. The debtor later filed bankruptcy and sought to avoid the settlement and recover the payment from both the opposing party, as initial transferee, and the defendant law firm, as subsequent transferee. *Id.* at 340–42.

The district court held that the defendant law firm was a subsequent transferee of an avoidable preference who had knowledge of the voidability of the payment of its legal fees and costs. *Id.* at 340. The district court also held that the defendant law firm could not assert a claim against the debtor for the avoidable preference because it was a creditor of the initial transferee, and not of the debtor. *Id.* at 341.

In addition, the court found that the defendant law firm could not assert any common law claim against the debtor. *Id.* at 342. The court reasoned that the defendant was not a third party beneficiary of the debtor's settlement with the initial transferee because the language of the contract did not clearly evidence the intent

of the parties to permit third party enforcement of the contract. *Id.* Indeed, at the time the debtor entered into the settlement, it did not know that the opposing party had not yet paid its legal fees and costs to the defendant law firm. Finally, the court also rejected the defendant's argument that it could assert a claim against the debtor under the common law doctrine of equitable subrogation, reasoning that the defendant's claim of subrogation was against the initial transferee rather than the debtor. *Id.*

 Morrow, Angle, and Woodward are subsequent transferees of avoidable preferences flowing from TKA's borrowing from the C & S and the M & D transactions. The facts and the ultimate conclusion of the *Southmark* case are directly applicable to Morrow, Angle, and Woodward's ability to assert a claim against the debtor. Morrow, Angle, and Woodward were never creditors of the debtor with respect to the TKA and M & D obligations. They are instead creditors of the initial transferees of the avoided transfers, TKA and M & D. Because Morrow, Angle, and Woodward are not creditors of the debtor, they may not assert a claim on that basis.

Nor can they assert a claim against the debtor on any common law theory. Morrow, Angle, and Woodward are not third party beneficiaries of TKA's or M & D's transactions with the debtor. The notes in each transaction are silent with respect to any possible third party enforcement.

In addition, Morrow, Angle, and Woodward would not have an equitable subrogation claim against the debtor for monies that they repay on the TKA and M & D transactions. Instead, they would have an equitable subrogation claim against TKA or M & D for payments made to the debtor in remittance of the avoided transfers.

The court concludes, therefore, that Morrow, Angle, and Woodward cannot assert a claim against the debtor under any

theory of law. Because each would have no claim under Section 502(h), the court need not reach the issue of whether the plaintiff may equitably subordinate the non-existent claims.

The plaintiff has not obtained a recovery under any theory other than contribution from Hunsaker II, Hunsaker III, and Ranney. In Section V.F.7. above, the court concluded that Hunsaker II, Hunsaker III, and Ranney are liable for their pro rata share of the principal and interest owed to Liberty by TKA and paid by the debtor. Accordingly, these defendants have no basis to assert a claim against the debtor who merely paid Liberty on their behalf. The court, therefore, is not required to make a determination on the issue of equitable subordination of the non-existent claims of these defendants.

### 6. *Summary.*

For these reasons, the court concludes that the plaintiff has established by a preponderance of the evidence all of the elements necessary under Section 510(c) of the Bankruptcy Code to justify the equitable subordination of any claim or potential claim that TKA, M & D, and King has filed or may file against the debtor's estate.

The court further concludes that the plaintiff has failed to establish by a preponderance of the evidence all of the elements required by Section 510(c) of the Bankruptcy Code to justify the equitable subordination of Liberty's claim against the debtor's estate.

Finally, the court concludes that the plaintiff has established that Morrow, Angle, Woodward, Hunsaker II, Hunsaker III, and Ranney cannot file a claim against the debtor's estate and therefore equitable subordination is not at issue with respect to those defendants.

### 7. *The appropriate remedy.*

Having concluded that equitable subordination is warranted with respect to any claims that TKA, M & D, and King have or

may file against the debtor, the court must now determine the extent of the subordination that is appropriate in the circumstances of this case.

■ "The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *McFarlin's*, 49 B.R. at 554. The doctrine of equitable subordination is "remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *Fabricators*, 926 F.2d at 1464. *See, e.g., Herby's Foods*, 2 F.3d at 134 [creditor's secured claims were subordinated to the unsecured creditors claims because the harm that resulted from the defendant's inequitable conduct was "pervasive"]; *Fabricators*, 926 F.2d at 1470 [secured creditor's claim was subordinated to the level of general unsecured creditors]; *N & D Properties*, 799 F.2d at 733 [defendant's claim was subordinated only to the claims of consumer creditors]; *Papercraft*, 160 F.3d at 990 [defendant's claims acquired during bankruptcy subordinated to unsecured creditors only to extent that claim exceeded the purchase price]. Thus, the *court must* "attempt to identify the nature and extent of the harm it intends to compensate in a manner that will permit a judgment to be made regarding the proportionality of the remedy to the injury that has been suffered by those who will benefit from the subordination." *Id.* at 991.

■ In this case, TKA specifically harmed the debtor by providing $500,000 as a loan rather than as the required equity contribution. TKA also harmed the debtor by charging $13,342.60 in interest upcharges and $20,283.22 in guaranty fees. In addition, TKA harmed the debtor generally by its failure to contribute equity to the debtor because the debtor's creditors relied upon that equity in their credit decisions about the debtor. "If the insiders were allowed to retain their ranking as unsecured creditors, they would have gained an advantage in the priority scheme by encouraging outside creditors to increase their credit exposure to [the debtor]." *Herby's Foods*, 2 F.3d at 134. Accordingly, the court concludes that TKA's inequitable conduct was "pervasive" and thus the entirety of any claim that TKA might file in this case should be subordinated to the claims of other unsecured creditors.

M & D specifically harmed the debtor by collecting $314,506.17 more than it paid for the First Union claims. Because M & D's benefit is substantially the same as its liability to the plaintiff as determined in this proceeding, the court determines that any future claim that M & D might file in this case will be subordinated to the claims of general unsecured creditors.[215]

King's actions generally harmed the debtor's trade creditors by inducing them to provide credit to the insolvent debtor. The harm that resulted was "pervasive."

---

215. M & D's benefit from its acquisition of the First Union claims was slightly less than its liability for preferential and fraudulent transfers in this proceeding. M & D is liable for $318,505.55 in preferential and fraudulent transfers but was benefited by only $314,506.17 of that amount. (The court calculates M & D's benefit by subtracting M & D's cost of acquiring the First Union claims, $125,000, from the debtor's payments post-confirmation payments on those claims of $439,506.17.)

Although M & D could theoretically make a claim against the debtor for $3,999.38 more than the benefit it received ($318,505.55 minus $314,506.17), the court views this as a remote possibility because the evidence shows that M & D is a shell corporation. There appears, therefore, to be no reasonable likelihood that M & D will satisfy its liabilities in full.

It is the court's intent to subordinate M & D's claim only to the extent that it received an unjust benefit. In the unlikely event that M & D satisfies its liabilities in full, the court is available to adjust this equitable subordination determination to allow M & D an appropriate unsubordinated claim.

King himself reaped no particular financial benefit from his actions other than a continuation of his employment and the payment of his salary. The claim the plaintiff seeks to subordinate, however, is a claim on his employment contract. Accordingly, it is appropriate to subordinate the entirety of that claim to the claims of general unsecured creditors.

### J. *THE PLAINTIFF'S RECOVERIES.*

#### 1. *Introduction.*

▆▆ In prior sections of this decision, the court has determined the claims brought by the unsecured creditors committee. Because the plaintiff asserted alternative theories of recovery as to the same transactions, the disposition of these claims has resulted in a determination of recoveries that is to some extent duplicative. The plaintiff is entitled, however, to only one recovery of the property or value under multiple theories. *See Diversified Graphics, Ltd. v. Groves,* 868 F.2d 293, 295 (8th Cir.1989); *Florida Temps, Inc. v. Shannon Properties, Inc.,* 645 So.2d 102, 104 (Fla. 2d DCA 1994). Similarly, Section 550(d) provides that the plaintiff "is entitled to only a single satisfaction under subsection (a) of [Section 550]."

In this section, the court will summarize and categorize the defendants' liability on all claims that the plaintiff has prosecuted successfully. Looking at these claims from this perspective, it is clear that the plaintiff has proven recoveries flowing from five separate, broad categories of transactions: the Liberty loan, the Nintendo loan, the C & S line of credit, the M & D transaction, and the payment of compensation to Morrow during the Toy King II case. Each transaction includes separate and distinct components, or subparts, as well. Accordingly, the plaintiff is entitled to a single recovery of the property or value as a result of each transaction and component.

The chart that follows is the Summary of Plaintiff's Recoveries organized by transaction and component part. The chart also shows for each transaction and component the successful legal theories that result in recovery. In many cases, different legal theories result in recoveries in different amounts for the same transaction. In those cases, the plaintiff is entitled to recover the highest amount supported by any theory.

#### 2. *Summary of plaintiff's recoveries.*

SUMMARY OF PLAINTIFF'S RECOVERIES

| TRANSACTION | | LEGAL THEORIES | LIBERTY | TKA | M&D | MORROW | ANGLE | KING | WOODWARD | HUNSAKER I | HUNSAKER II | HUNSAKER III | RANNEY | MAX RECOVERY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LIBERTY LOAN | INT > 90 | Pref | 38,812.44 | 44,678.27 | | | | | | | | | | |
| | | F/T | | | | a 5,865.83 | a 5,865.83 | a 5,865.83 | | | | | | |
| | | Br. F/D C | | | | | | | | | | | | 44,678.27 |
| | | Br. K | | 24,654.05 | | | | | | | | | | |
| | INT < 90 | Pref | 37,726.33 | 40,492.62 | | | | | | | | | | |
| | | F/T | | 2,766.29 | | a 2,766.29 | a 2,766.29 | a 2,766.29 | | | | | | |
| | | Br. F/D C | | 6,855.12 | | | | | | | | | | 40,492.62 |
| | | Br. K | | | | | | | | | | | | |
| | INT Post | Obl. CL | | | | | | | | | | | | |
| | | Contrib | 149,008.33 | | | b 26,697.39 | b 26,697.39 | b 26,697.39 | b 26,697.39 | b 26,341.00 | b 13,170.50 | b 13,170.50 | b 13,170.50 | 149,008.33 |
| | PRIN > 90 | Pref. F/T | 660,000.00 | 600,000.00 | | | | | | | | | | |
| | | Br. K | | 500,000.00 | | | | | | | | | | 600,000.00 |
| | PRIN Post | Obl. CL | 150,000.00 | 150,000.00 | | | | | | | | | | |
| | | Contrib | | | | b 150,670.32 | b 150,670.32 | | b 150,670.32 | b 148,559.00 | b 74,329.50 | b 74,329.50 | b 74,329.50 | 749,328.96 1,583,508.18 |
| NINTENDO LOAN | INT > 90 | Pref | 6,631.94 | 7,162.50 | | | | | | | | | | |
| | | F/T | | 530.56 | | a 530.56 | a 530.56 | 530.56 | | | | | | 7,162.50 |
| | | Br. F/D C | | | | | | | | | | | | |
| | INT < 90 | Pref | 10,208.34 | 12,157.00 | | | | | | | | | | |
| | | F/T | | 1,948.66 | | a 1,948.66 | a 1,948.66 | a 1,948.66 | | | | | | 12,157.00 |
| | | Br. F/D C | | | | | | | | | | | | |
| | PRIN < 90 | Pref. F/T | 700,000.00 | 700,000.00 | | | | | | | | | | 700,000.00 719,319.50 |
| C&S LINE OF CREDIT | INT > 90 | Pref | | 6,900.00 | | | | | | | | | | 6,900.00 |
| | | Br. F/D C | | 1,825.00 | | a 1,825.00 | a 1,825.00 | a 1,825.00 | | | | | | |
| | INT < 90 | Pref | | 2,906.26 | | | | | | | | | | 2,906.26 |
| | | F/T | | 406.26 | | a 406.26 | a 406.26 | a 406.26 | | | | | | |
| | | Br. F/D C | | | | | | | | | | | | |
| | GUAR > 90 | Pref. F/T | | | | a 5,094.41 | a 5,094.41 | | 5,094.41 | | | | | |
| | | Br. F/D C | | | | a 15,283.22 | a 15,283.22 | | | | | | | |
| | | Br. F/D L2 | | | | a 10,188.82 | a 10,188.82 | | | | | | | |
| | GUAR < 90 | Pref. F/T | | 15,283.22 | | a 15,283.22 | a 15,283.22 | a 15,283.22 | | | | | | 15,283.22 |
| | | Br. F/D C | | | | a 1,666.67 | a 1,666.67 | | 1,666.67 | | | | | |
| | | Br. F/D L2 | | | | a 3,333.34 | a 3,333.34 | | | | | | | |
| | PRIN < 90 | Pref | | 5,000.00 | | a 5,000.00 | a 5,000.00 | a 5,000.00 | | | | | | 5,000.00 |
| | | F/T | | | | | | | | | | | | |
| | | Br. F/D C | | | | | | | | | | | | |
| | PRIN < 90 | Pref. F/T | | 250,000.00 | | | | | | | | | | 250,000.00 260,089.48 |
| | | Br. F/D C | | | | | | | | | | | | |
| FIRST UNION CLAIMS (M&D) | INT > 90 | F/T | | | | a 8,303.46 | a 8,303.46 | | | | | | | |
| | | Br. F/D L1 | | | 17,499.38 | a 17,499.38 | a 17,499.38 | | 892.46 | | | | | 17,499.38 |
| | | Br. F/D L2 | | | | a 16,606.92 | a 16,606.92 | | | | | | | |
| | INT < 90 | Pref. F/T | | | | a 17,499.38 | a 17,499.38 | | 220.00 | | | | | 17,499.38 |
| | | Br. F/D L1 | | | 6,624.17 | a 6,160.00 | a 6,624.17 | | | | | | | |
| | | Br. F/D L2 | | | | a 6,160.00 | | | | | | | | |
| | PRIN < 90 | Pref. F/T | | | | a 6,624.17 | a 6,624.17 | | 9,760.00 | | | | | 6,624.17 |
| | | Br. F/D L1 | | | 294,382.00 | 273,840.00 | | | | | | | | |
| | | Br. F/D L2 | | | | a 290,382.62 | a 290,382.62 | | | | | | | 294,382.00 318,505.55 |
| MORROW SALARY | | | | | | 2,421.29 | 2,421.29 | | | | | | | 2,421.29 |
| TOTALS | | | 1,692,387.33 | 1,684,579.87 | 318,505.55 | 527,920.99 | 525,499.70 | 33,625.82 | 195,021.25 | 175,000.00 | 87,500.00 | 87,500.00 | 87,500.00 | 2,903,844.00 |

L1 = Breach of fiduciary duty of loyalty for usurpation of corporate opportunity to acquire First Union claims
L2 = Breach of fiduciary duty of loyalty in making preferential or fraudulent transfers that benefited the fiduciary

a = Joint and several liability
b = The debtor has subrogation rights in the individual defendants' collateral held by Liberty and may execute on any individual's collateral up to the amount of the judgment against that defendant

### 3. *Summary of judgment provisions.*

Translating the chart, Summary of Plaintiff's Recoveries, into words, the plaintiff is entitled to the entry of a judgment that includes:

1. A money judgment against the defendants as follows:

a. On account of the payment of interest on the Liberty loan during the period more than 90 days before the filing of the petition: the sum of $38,812.44 against Liberty; the sum of $44,678.27 against

TKA; and the sum of $5,865.83 against Morrow, Angle, and King, jointly and severally. The maximum amount recoverable under this subparagraph is $44,678.27.

b. On account of the payment of interest on the Liberty loan during the period 90 days and less before the filing of the petition: the sum of $37,726.33 against Liberty; the sum of $40,492.62 against TKA; and the sum of $2,766.29 against Morrow, Angle, and King, jointly and severally. The maximum amount recoverable under this subparagraph is $40,492.62.

c. On account of the payment of interest on the Liberty loan during the period after the filing of the petition: the sum of $149,008.33 against Liberty; the sum of $26,697.39 against Morrow; the sum of $26,697.39 against Angle; the sum of $26,697.39 against Woodward; the sum of $26,341.00 against Hunsaker II; the sum of $13,170.50 against Hunsaker III; and the sum of $13,170.50 against Ranney. The maximum amount recoverable under this subparagraph is $149,008.33.

d. On account of the payment of principal on the Liberty loan during the period 90 days and less before the filing of the petition: the sum of $600,000.00 against Liberty; and the sum of $600,000.00 against TKA. The maximum amount recoverable under this subparagraph is $600,-000.00.

e. On account of the payment of principal on the Liberty loan during the period after the filing of the petition: the sum of $150,000.00 against Liberty; the sum of $150,670.32 against Morrow; the sum of $150,670.32 against Angle; the sum of $150,670.32 against Woodward; the sum of $148,659.00 against Hunsaker II; the sum of $74,329.50 against Hunsaker III; and the sum of $74,329.50 against Ranney. The maximum amount recoverable under this subparagraph is $749,328.96.

f. On account of the payment of interest on the Nintendo loan during the period more than 90 days before the filing of the petition: the sum of $6,631.94 against Lib-

erty; the sum of $7,162.50 against TKA; and the sum of $530.56 against Morrow, Angle, and King, jointly and severally. The maximum amount recoverable under this subparagraph is $7,162.50.

g. On account of the payment of interest on the Nintendo loan during the period 90 days and less before the filing of the petition: the sum of $10,208.34 against Liberty; the sum of $12,157.00 against TKA; and the sum of $1,948.66 against Morrow, Angle, and King, jointly and severally. The maximum amount recoverable under this subparagraph is $12,157.00.

h. On account of the payment of principal on the Nintendo loan during the period 90 days and less before the filing of the petition: the sum of $700,000.00 against Liberty; and the sum of $700,000.00 against TKA. The maximum amount recoverable under this subparagraph is $700,-000.00.

i. On account of the payment of interest on the C & S loan during the period more than 90 days before the filing of the petition: the sum of $6,900.00 against TKA; and the sum of $1,825.00 against Morrow, Angle, and King, jointly and severally. The maximum amount recoverable under this subparagraph is $6,900.00.

j. On account of the payment of interest on the C & S loan during the period 90 days and less before the filing of the petition: the sum of $2,906.26 against TKA; and the sum of $406.26 against Morrow, Angle, and King, jointly and severally. The maximum amount recoverable under this subparagraph is $2,906.26.

k. On account of the payment of guaranty fees on the C & S loan during the period more than 90 days before the filing of the petition: the sum of $15,283.22 against TKA; the sum of $15,283.22 against, Morrow, Angle, and King, jointly and severally; and the sum of $5,094.41 against Woodward. The maximum amount recoverable under this subparagraph is $15,283.22.

l. On account of the payment of guaranty fees on the C & S loan during the period 90 days and less before the filing of the petition: the sum of $5,000.00 against TKA; the sum of $5,000.00 against Morrow, Angle, and King, jointly and severally; and the sum of $1,666.67 against Woodward. The maximum amount recoverable under this subparagraph is $5,000.00.

m. On account of the payment of principal on the C & S loan during the period 90 days and less before the filing of the petition: the sum of $250,000.00 against TKA.

n. On account of the payment of interest on the First Union claims during the period more than 90 days before the filing of the petition: the sum of $17,499.38 against M & D; the sum of $17,499.38 against Morrow and Angle, jointly and severally; and the sum of $892.46 against Woodward. The maximum amount recoverable under this subparagraph is $17,499.38.

o. On account of the payment of interest on the First Union claims during the period 90 days and less before the filing of the petition: the sum of $6,624.17 against M & D; the sum of $6,624.17 against Morrow and Angle, jointly and severally; and the sum of $220.00 against Woodward. The maximum amount recoverable under this subparagraph is $6,624.17.

p. On account of the payment of principal on the First Union claims during the period 90 days and less before the filing of the petition: the sum of $294,382.00 against M & D; the sum of $290,382.62 against Morrow and Angle, jointly and severally; and the sum of $9,780.00 against Woodward. The maximum amount recoverable under this subparagraph is $294,382.00.

q. On account of the receipt of excessive compensation after the filing of the petition: the sum of $2,421.29 against Morrow.

2. The money judgment should provide that the amounts recoverable under each of the subparagraphs a. through q. of paragraph 1 above are cumulative.

3. The judgment should also provide that the plaintiff is subrogated to the rights of Liberty with respect to any collateral of Morrow, Angle, King, Woodward, Hunsaker II, Hunsaker III, and Ranney held by Liberty to secure such defendant's obligation to Liberty. Accordingly, the plaintiff may execute on the collateral of any individual judgment defendant held by Liberty to satisfy the judgment debt against that defendant as established in subparagraphs c. and e. of paragraph 1 above.

4. The judgment should also provide that the claims of TKA, M & D, and King, if any, against the bankruptcy estate of Toy King Distributors, Inc., are subordinated in their entirety to the claims of general, unsecured creditors.

5. Except to the extent contained in paragraphs 1 through 4 above, the judgment should provide that the claims of the plaintiff against the defendants are dismissed on the merits.

In summary, the total judgment amount in favor of the plaintiff, excluding impermissible multiple recoveries, is $2,903,844.00. The maximum recoveries from each defendant are: $1,692,387.38 against Liberty; $1,684,579.87 against TKA; $318,505.55 against M & D; $527,920.99 against Morrow; $525,499.70 against Angle; $33,625.82 against King; $195,021.25 against Woodward; $175,000.00 against Hunsaker II; $87,500.00 against Hunsaker III; and $87,500.00 against Ranney.

Were one to add the maximum recoveries from each defendant, the resulting sum would include multiple recoveries that the plaintiff may not receive. Nevertheless, these individual amounts represent the maximum exposure of each defendant.

4. *Allowance of costs to the plaintiff as prevailing party.*

F.R.B.P. 7054(b) provides that, except in circumstances not applicable

here, "[t]he court may allow costs to the prevailing party...." F.R.B.P. 7054(b) is an adaptation of F.R.Civ.P. 54(d)(1). Under that rule, "prevailing party" has been held to mean "simply that the prevailing party is the party in whose favor judgment was entered, even if that judgment does not fully vindicate the litigant's position in the case." 10 J. Moore, *Moore's Federal Practice* § 54.101[3] at 54–157 (3d ed.2000). In this case, therefore, the plaintiff clearly is the prevailing party.

 Under F.R.Civ.P. 54(d)(1), costs "shall be allowed as of course to the prevailing party unless the court otherwise directs." Thus, costs are allowed unless the district court exercises its discretion to deny costs. Under F.R.B.P. 7054(b), however, the allowance of costs to the prevailing party requires an affirmative exercise of the court's discretion.

 As this decision demonstrates in great detail, the creditors of the debtor, represented by the plaintiff here, have suffered enormous financial damages as a consequence of the defendants' actions. Having already suffered so much at the hands of the defendants, it would be inequitable not to allow the plaintiff statutory costs to help defray a small portion of the expenses of this litigation. Likewise, the court can discern no sound reason to deny an allowance of costs. In these circumstances, therefore, the court will allow costs to the plaintiff as prevailing party.

## VI. *CONCLUSION.*

For the foregoing reasons, the court will enter a separate judgment in favor of the plaintiff and against the defendants in the form described in Sections V.J.3. and V.J.4. above, all pursuant to the provisions of F.R.B.P. 9021.